LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ., NV# 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ., NV# 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: 702-382-1170
Fax: 702-382-1169

Proposed Attorneys for Debtors and
Debtors in Possession

SAUL EWING ARNSTEIN & LEHR LLP
MICHAEL L. GESAS, ESQ., IB#6186924
E-mail: michael.gesas@saul.com
Tel: 312-876-7125
DAVID A. GOLIN, ESQ., IB# 6180517
E-mail: david.golin@saul.com
Tel: 312-876-7805
*Pro Hac Vice Pending*
161 North Clark St., Suite 4200
Chicago, Illinois 60601

Proposed Attorneys for Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re METAL PARTNERS REBAR, LLC,<br>☒ Affects this Debtor. | BK-20-12878-mkn<br>Chapter 11 (Lead Case)<br>(Joint Administration Requested) |
| In re BGD LV HOLDING, LLC,<br>☒ Affects this Debtor. | BK-20-12876-abl<br>Chapter 11 |
| In re BRG HOLDING, LLC,<br>☒ Affects this Debtor. | BK-20-12879-abl<br>Chapter 11 |
| In re BCG OWNCO, LLC,<br>☒ Affects this Debtor. | BK-20-12880-mkn<br>Chapter 11<br><br>Date:  OST Pending<br>Time:  OST Pending |

### OMNIBUS DECLARATION OF JOSEPH TEDESCO IN SUPPORT OF
### DEBTORS' INITIAL EMERGENCY MOTIONS AND RELATED RELIEF

I, Joseph Tedesco, hereby declare under penalty of perjury that the following (this "Declaration") is true to the best of my knowledge, information and belief:

1.    I am the Chief Financial Officer and a designated Responsible Person of Metal Partners Rebar, LLC ("MPR"), an Illinois limited liability company, BGD LV Holding, LLC ("BGD"), a Nevada limited liability company, BRG Holding, LLC ("BRG"), a West Virginia limited liability company, and BCG Ownco, LLC, an Illinois limited liability company ("BCG"), debtors and debtors in possession (collectively, the "Debtors").

1

2.      I am over the age of eighteen (18) and am authorized by the Debtors to submit this Declaration.  I received a bachelor of science degree in accounting in 1981 and became a certified public accountant in 1986.  I have over 15 years of experience as a chief financial officer for several businesses and over ten years of experience as a workout consultant. In early 2017, I began to work as a consultant for Intermetal Rebar, LLC ("Intermetal Rebar") and have been the chief financial officer of Intermetal Rebar for the past one and half years.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team or the Debtors' advisors, my review of the relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

4.      I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, as well as the Debtors' restructuring efforts. I became the chief financial officer of MPR in mid-January 2020 when Jose D. Carrero ("Carrero") acquired the majority ownership of MPR and became the manager of MPR.  Carrero is also one of the owners of Intermetal Rebar.  My firsthand knowledge of the Debtors' operations and business affairs began when I became MPR's chief financial officer in mid-January 2020.

5.      I submit this Declaration: (a) to assist the Court and all parties in interest in understanding, among other things, the Debtors' operations, their corporate structures, and the circumstances that led to the commencement of these chapter 11 cases, (b) in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") filed on June 16, 2020 ("Petition Date"); and (c) in support of the relief that the Debtors request from the Court pursuant to the "First Day Motions" described in this Declaration, namely, the motion for joint administration of the Debtors' chapter 11 cases, the motion for use of cash collateral and to obtain debtor in possession financing, the motion to continue using the existing cash management system, the motion to authorize payment of prepetition employee compensation, the motion to determine and provide adequate assurance of payment to utilities,

and the motion to pay prepetition taxes and fees.

## I.    DESCRIPTION OF THE DEBTORS' HISTORY, STRUCTURE AND BUSINESS OPERATIONS

6.     The Debtors are one of the largest independently owned fabricators of reinforcing bars and other steel products in the United States.  Founded in 2008, the Debtors supply steel and epoxy coated rebar, wire mesh and dowel bars with custom fabrication and value-added services to a diverse customer base that includes large national construction firms as well as regional firms such as construction suppliers, pre-casters, contactors and other fabricators.

7.     MPR is an Illinois limited liability company that was organized in 2008.  MPR does business as Metal Partners International.  Carrero owns 80% of the membership interest of MPR and Frank Bergren ("Bergren") owns 20% of the membership interest of MPR.  Carrero is the manager of MPR.  Prior to January 15, 2020, Bergren was the majority owner and manager of MPR.

8.     BGD is a Nevada limited liability company and that was organized in March 2018. BGD also does business as Metal Partners International.  Carrero owns 65% of the membership interest of BGD.  The remaining membership interests of BGD are owned by David Day (25%) and Jake Holmes (10%).  Carrero is the manager of BGD.  Prior to April 6, 2020, Bergren was the majority owner and manager of BGD.

9.     BRG is a West Virginia limited liability company that was organized in December 2017.  BRG purchased the assets of Trinity Rebar, a former customer of MPR. After the acquisition, BRG fabricated rebar doing business as Trinity Rebar.  On or about December 31, 2019,  BRG sold the inventory and equipment of the fabrication business and ceased doing business as Trinity Rebar.  All net proceeds of the sale were paid to Chase (defined below).  The accounts receivable, however, were not sold.  In June 2019, BRG began doing non-union installation work doing business as Reinforcing Steel Installer.  All expenses of BRG are paid by MPR.  All receivables attributable to the business operations of BRG are paid directly into a bank account in the name of MPR.  Carrero is the sole member and the manager of BRG.  Prior

to January 15, 2020, Bergren was the majority owner of BRG. On January 15, 2020, Carrero acquired a 50% ownership of BRG, with Bergren retaining the remaining 50%.  On April 8, 2020, Carrero acquired Bergren's 50% interest and became the manager of BRG

10.     MPR leases a warehouse and a fabrication facility in New Castle, Delaware, and subleases a warehouse and fabrication facility in Hammond, Indiana, and conducts operations at these facilities.  MPR also conducts operations at a warehouse and fabrication facility in North Las Vegas, Nevada.  BGD, however, is the named tenant of the North Las Vegas facility and MPR is a guarantor of the lease.  MPR also leases an office in Tampa, Florida.  BRG leases a yard and office in Holt, Missouri.

11.     BCG Ownco, LLC is an Illinois limited liability company.  Carrero and Bergren each own 50% of the membership interest of BCG.  Carrero is the sole manager of BCG.  BCG owns real estate in Bakersfield, California that is improved with a facility (the "<u>Bakersfield Property</u>") that was formerly used by MPR for fabrication.   The property is currently unoccupied.

12.     For freight and delivery, MPR uses trucks owned by F&M Transportation, LLC ("<u>F&M</u>"), a Florida limited liability company.  F&M has consented to MPR's use of the trucks on a month to month basis.  MPR makes a monthly use, mileage, and service payment directly to the lessor of each truck.  F&M is owned and managed by Bergren.

13.     On April 2, 2020, Traxys North America LLC ("<u>Traxys</u>") filed a 12 count complaint in the United States District Court for the Southern District of New York seeking various injunctive relief and monetary damages against numerous defendants, MPR, BGD, Intermetal, Carrero, JP Morgan Chase Bank, N.A. ("<u>Chase</u>") and ADR. Traxys' claims propagate from a joint venture agreement between Traxys, MPR, and BGD (the "<u>JV Agreement</u>").  Pursuant to this JV Agreement, those parties had agreed to the purchase of raw rebar materials, the fabrication of rebar products, and the subsequent sale of those products to certain customers of the joint venture.  Traxys alleges that monies collected from the sale of products under the JV Agreement was not properly accounted for and distributed as per the JV Agreement.  Traxys also alleges that MPR, BGD, Intermetal, and Carrero breached a settlement

agreement that Traxys contends resolved the alleged breaches of the JV Agreement.  Based on these allegations, Traxys alleges claims against MPR, BGD, Intermetal and Carrero for breach of contract, conversion, breach of bailment, unjust enrichment, for an accounting, for a constructive trust, and for injunctive relief.  Traxys also alleges claims for conversion and unjust enrichment against Chase, breach of contract and bailment against MPR for use of raw rebar materials and breach of a–loan agreement for equipment against BGD.  Finally, Traxys alleges a breach of a separate assignment of accounts receivable agreement by defendant ADR based on its alleged failure to turn over funds collected on certain assigned receivables.  In addition to its Complaint, Traxys filed a petition seeking an Order to Show Cause against the defendants seeking immediate temporary injunctive relief relating to the use of physical inventory maintained by MPR at various locations and monies collected (and to be collected) by MPR and deposited (and to be deposited) with Chase.  The parties resolved the issues presented by Traxys' Order to Show Cause which was subsequently documented in a written settlement agreement.  On May 12, 2020, Traxys by letter to the court moved to withdraw its Order to Show Cause based on the parties' settlement agreement.  On May 13, 2020, the District Court granted this motion and Traxys' Order to Show Cause was withdrawn from the docket.  As part of the parties' settlement, Chase agreed to make loans or deposit MPR's cash collateral into a segregated blocked deposit account in MPR's name at Chase in amounts equal to the disputed collections received on or after April 13, 2020, to the extent the same are identified in writing by MPR.  Funds deposited in this blocked account can only be withdrawn by agreement of the parties or pursuant to a final order of a court of competent jurisdiction or final arbitration award.  The parties are currently engaged in discussions to set deadlines for responsive pleadings to Traxys' current Amended Complaint and to address scheduling for anticipated discovery.

14.     On April 8, 2020, Traxys also filed a two (2) count complaint in the District Court for the State of Nevada, County of Clark, against MPR and BGD alleging counts for "Claim and Delivery" as to certain inventory of rebar materials located at the defendants' facilities in Las Vegas, Nevada and as to certain equipment owned and operated by BGD and

alleged to be subject to a promissory note and secured by a perfected purchase money security interest. Traxys seeks injunctive relief preventing MPR and BGD from selling, transferring, moving, altering, concealing, encumbering, or otherwise disposing of the inventory and equipment and seeks writs of possession for the immediate turnover of the inventory and equipment to Traxys. On April 24, 2020, Traxys filed an *ex parte* application for order to show cause why a writ of possession should not issue seeking to gain immediate possession of the aforementioned inventory. However, based on the settlement agreement entered into in the New York proceedings discussed above, on May 19, 2020, Traxys withdrew its *ex parte* application for order to show cause.

15.    On April 9, 2020, Traxys filed a single count complaint in the Superior Court of the State of Delaware against MPR and BGD seeking a writ of replevin for certain steel reinforcement materials including metal rebar located in New Castle, Delaware. Based on the settlement agreement entered into in the New York proceedings discussed above, Traxys has refrained from filing a motion to schedule a hearing on its complaint for replevin of the subject inventory.

16.    The foregoing summary (paragraphs 14 – 16) is without prejudice to, and shall not constitute a waiver of, any parties' respective rights and/or obligations under any applicable agreements and/or in the various proceedings.

17.    On or about January 1, 2020, International Rebar, L.L.C. ("International Rebar") began providing MPR and its affiliates with certain management, sourcing and transaction services in exchange for a bi-weekly fee of $25,000. International Rebar is owned by Carrero and his wife. International Rebar also sells rebar to MPR.

## II.    THE DEBTORS' CAPITAL STRUCTURE AND CREDIT FACILITY

18.    As of December 31, 2019, MPR's unaudited internal balance sheet listed total assets of approximately $73,863,368 on a net book basis. The majority of MPR's assets included accounts receivable of $43,649,716 (prior to an allowance for doubtful and uncollectable accounts), inventories of $12,757,692, property and equipment of $5,519,581, related party receivables of $9,106,795 (again, prior to an allowance for doubtful or

uncollectible accounts), and cash of $1,902,692, among other items. Approximately $20,000,000 of the receivables constitute intercompany receivables for receivables which are grossly past due.

19. MPR's same balance sheet as of December 31, 2019 listed total current liabilities of $77.5 million, which included approximately $34.3 million due on its secured term loan lending facility and approximately $41.6 million in accounts payable to trade vendors and service provides, and $1.5 million accrued expenses. MPR also reported long-term liabilities for that period of approximately $2.5 million, including additional lending facilities for capital expenditures, real estate, and other notes payable for equipment and other capital lease obligations.

20. BGD's assets consists of: (a) its interest in the JV Agreement described above; and (b) any interest in the $40,000 security deposit held by the landlord of the North Las Vegas facility.

21. JPMorgan Chase, N.A. ("Chase"), as lender, and MPR, BRG, and BCG, as borrowers (collectively, the "Prepetition Borrowers"), entered into a Credit Agreement, dated as of August 3, 2018 (the "Prepetition Credit Agreement"), which provided for: (a) a $60 million revolving credit facility ("RLOC Facility," and such loans thereunder, "Revolving Loans"), which included a $30 million subfacility for the issuance of letters of credit ("Letters of Credit"), and (b) a facility for three term loans: (i) an M&E Term Loan for $1,594,000; (ii) an RE Term Loan for $1,568,000; and (iii) CapEx Terms loans not to exceed $3,000,000 (collectively, the "Term Loans"). A true and correct copy of the Prepetition Credit Agreement is attached hereto as **Exhibit 1**. Under the Prepetition Credit Agreement, MPR is the Borrower Representative. Under the Prepetition Credit Agreement, the Prepetition Borrowers granted a security interest on all of their personal property to secure their obligations to Chase. To perfect its security interest, Chase filed UCC financing statements with the Secretary of State of Illinois and the Secretary of State of West Virginia, true and correct copies of which are attached hereto collectively as **Exhibit 2**. Additionally, BCG granted to Chase a Deed of Trust on the Bakersfield Property which was recorded with the Kern County Official Records on August 6,

2018, a true and correct copy of which is attached hereto as **Exhibit 3**.  Under the Prepetition Credit Agreement, all collections of the Prepetition Borrowers are deposited into a Collection Account held with Chase.

22.    On September 19, 2018, Chase and the Prepetition Borrowers entered into a First Amendment to the Prepetition Credit Agreement which, *inter alia,* revised the Borrowing Base. On October 2, 2018, Chase and the Prepetition Borrowers entered into a Second Amendment to the Prepetition Credit Agreement which, *inter alia*, increased the Revolving Commitment to $70 million and revised the Borrowing Base.  On March 15, 2019, Chase and the Prepetition Borrowers entered into a Third Amendment to the Prepetition Credit Agreement which, *inter alia*, further revised the Borrowing Base.  True and correct copies of the First Amendment, Second Amendment, and Third Amendment to the Prepetition Credit Agreement are attached hereto as **Exhibits 4**, **5 and 6** respectively.

23.    On December 26, 2019, Chase issued a Notice of Default identifying several Events of Default under the Credit Agreement, including exposure exceeding the borrowing base. The existing indebtedness exceeded the Borrowing Base by over $10 million. In the Notice of Default, Chase reserved the right to refuse to make future advances.

24.    On January 28, 2020, Chase and the Prepetition Borrowers entered into a Forbearance Agreement and Fourth Amendment to the Prepetition Credit Agreement which, *inter alia*: reduced the Revolving Commitment to $60 million and the Letter of Credit Exposure Amount to $5 million, revised the Borrowing Base, and required the Prepetition Borrowers to: provide Chase with short term, four week, and long term budgets, and work towards a strategic transaction.  A true and correct copy of the Forbearance Agreement and Fourth Amendment to the Prepetition Credit Agreement is attached hereto as **Exhibit 7**.

25.    As of the Petition Date, the Prepetition Borrowers owe approximately $35,000,000 of principal amount for loans outstanding under the Prepetition Credit Facility, comprised of approximately $33,000,000 of  Revolving Loans, a $100,000 Letter of Credit, and $1,873,000 of Term Loans.

### III. CIRCUMSTANCES LEADING TO BANKRUPTCY

26.    On March 8, 2018, the United States placed a 25% tariff on imports of steel, under section 232 of the Trade Expansion Act.  Metal Partners' performance was affected due to these tariffs and the resulting increase in raw material costs.

27.    Additionally, increased competition in the rebar distribution market has contributed to compressed margins.

28.    The Debtors have suffered from operating losses over the past four years.

29.    As noted above, on December 26, 2019, Chase issued a Notice of Default identifying several Events of Default under the Prepetition Credit Agreement, including exposure exceeding the borrowing base. The existing indebtedness exceeded the borrowing base by over $10 million.  In the Notice of Default, Chase reserved the right to refuse to make future advances.

30.    As noted above, on January 28, 2020, Chase and the Prepetition Borrowers entered into a Forbearance Agreement.  The Forbearance period ended on February 28, 2020.

### IV. SALE OF THE DEBTORS' ASSETS

31.    Although beyond the scope of this Declaration, it is the Debtors' intention to seek approval of a sale process and procure a purchaser for the sale of all or substantially all assets of the Debtors pursuant to an *Asset Purchase Agreement* (the "APA").  Prior to filing the chapter 11 cases, the Debtors engaged in discussions with an entity controlled by Carrero and executed an APA as a stalking horse bid.  It is intended that I shall become the chief financial officer of the stalking horse bidder if it becomes the successful purchaser.  As part of the Debtors' agreement to obtain post-petition financing (as described below), the Debtors are required to meet certain milestones in connection with a Court approved sale auction and sale process.

### V. OVERVIEW OF FIRST DAY RELIEF

32.    The Debtors have filed or expect to file several "First Day Motions" seeking orders granting various forms of relief intended to preserve value as the Debtors pursue a sale, stabilize the Debtors' business, facilitate the efficient administration of these chapter 11 cases,

and  lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations.  I believe that this Court's approval of the relief requested in the "First Day Motions" is essential to avoid immediate and irreparable harm to the Debtors and their estates, to provide the Debtors with an opportunity to continue to meet their obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of these chapter 11 cases.  A description of the relief requested and the facts supporting the "First Day Motions" is briefly set forth below.

## VI.    EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

### A.    Motion for Joint Administration

33.    The Debtors have filed a motion to jointly administer the Debtors' bankruptcy cases (the "Joint Administration Motion").  As noted above, each of the Debtors has the same manager – Jose D. Carrero.  As in many large chapter 11 cases that are jointly administered, the Debtors' operations are integrated by nature.  Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

### B.    Motion for Use of Cash Collateral and Debtor in Possession Financing

34.    The Debtors have filed a motion (the "Cash Collateral/DIP Financing Motion"), in which the Debtors seek approval of, among other things: (a) MPR's use of the cash collateral of Chase (the "Cash Collateral"); and (b) postpetition financing by Chase (the "DIP Financing"), as set forth in that certain *Debtor in Possession Credit Agreement* (the "Postpetition Credit Agreement").  A true and correct copy of the Postpetition Credit Agreement is attached hereto as **Exhibit 8**. Under the Postpetition Credit Agreement, MPR will be the sole borrower and BRG, BGD and BCG will be guarantors.  Under the Postpetition Credit Agreement, MPR will have access to $35,000,000 in the aggregate maximum principal amount, consisting of $15,000,000 on an interim basis and the balance on a final basis; and (b) the consensual use of Cash Collateral. The relief requested in the Cash Collateral/DIP Financing Motion is critical to

---

[1]  Capitalized terms used but not defined herein have the same meanings as in the applicable First Day Motion.

ensuring the certainty that the Debtors will have sufficient liquidity throughout the duration of the Chapter 11 Cases, subject to certain milestones as more set forth in the DIP Agreement.

35.    The Cash Collateral shall be used to pay down the Prepetition Debt.  The DIP Financing shall be used for the following purposes: (a) to pay for the costs of the preservation of the Debtors' assets and the operation of its businesses, (b) to pay for the costs of administration of the Debtors' chapter 11 case, including the Debtors' attorneys' fees, the Debtors' consultant's fees, and all U.S. Trustee fees, and (c) upon entry of a Final Order, to repay any outstanding amounts of Prepetition Debt.

36.    Management of the Debtors and the Debtors' financial consultants reviewed and analyzed the anticipated cash needs and prepared a projection outlining the Debtors' postpetition cash needs in the initial seven (7) weeks of the Chapter 11 Cases (the "Budget").  The Debtors believe that the Budget is an accurate reflection of its funding requirements over the identified period, will allow the Debtors to meet their obligations - including the administrative expenses of the Chapter 11 Cases - and is reasonable and appropriate under the circumstances.

37.    Based on this forecast, the Debtors have determined that they will require  the DIP Financing to provide sufficient liquidity to efficiently administer the Debtors' estates during the Chapter 11 Cases.  Among other things, the Debtors need such liquidity to satisfy payroll and make other payments that are essential or appropriate for the efficient administration of the Debtors' estates.  The Debtors' ability to continue making such payments during the Chapter 11 Cases is essential to the preservation of their assets during the pendency of these cases.

38.    Additionally, approval of the DIP Financing provides certainty concerning the Debtors' potential sale of all or substantially all of their assets.  The backdrop of the DIP Financing provides comfort to all parties, including any potential bidders, that the Debtors will have sufficient liquidity to bridge from the Petition Date through the consummation of a sale.  Thus, the Debtors believes that failure to obtain interim approval of the DIP Financing could hinder their ability to obtain the highest or otherwise best offer in an asset sale.

39.    Accordingly, without the immediate relief requested in the Cash Collateral/DIP Financing Motion, I believe that the Debtors will face a material risk of substantial, irreparable,

and ongoing harm.  The use of Cash Collateral and the DIP Financing will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer the Chapter 11 Cases.

40.     The Debtors do not have alternative sources of financing readily available. All of the Debtors' assets are encumbered under the Prepetition Chase Loans, which, along with the Debtors' uncertain financial condition, restricts the availability of, and options for, postpetition financing.  Chase has also made it clear that it would not consent to "priming" DIP financing provided by a third party.  As a result, the Debtors do not believe third-party DIP financing would be reasonably obtainable.

41.     Nevertheless, the Debtors retained SSG Advisors, LLC ("SSG") to, inter alia, solicit proposals for alternative DIP financing.  J. Scott Victor ("Victor"), a managing director of SSG, has advised me that SSG reached out to several potential sources of financing outside of Chase to gauge their interest in providing DIP financing to the Debtors.  However, no party provided a proposal for independent DIP financing.  Accordingly, the Debtors were unable to develop an alternative source of financing with terms better than those of the DIP Financing. A separate declaration of Victor is being filed to describe the efforts of SSG to obtain DIP financing.  For all of the foregoing reasons, I believe that the DIP Financing is reasonable, appropriate, and provides the best terms presently available to the Debtors.

42.     The Debtors have agreed, subject to Bankruptcy Court approval, to pay a commitment fee of 0.25% per annum on any unused portion of the post-petition loans to Chase pursuant to the Postpetition Credit Agreement.  I believe that it is understood and agreed by all parties, including the Debtors, that this fee is an integral component of the overall terms of the DIP Financing, and is required by Chase as consideration for the extension of the postpetition financings.

43.     The Debtors and Chase negotiated the proposed terms of the Debtors' use of Cash Collateral and the DIP Financing in good faith and at arm's length.

44.     For the foregoing reasons, I believe that the relief requested in the Cash Collateral/DIP Financing Motion is in the Debtors' best interests and will enable the Debtors to

preserve and maximize the value of their estates.

###### C.    Motion for Continued Use of Cash Management System

45.    The Debtors have filed a motion for authority to continue using their existing cash management system and for other relief (the "Cash Management Motion"), in which the Debtors seek authority (i) to continue the use of their cash management system, including existing bank accounts and business forms; (ii) for banks to honor certain transfers and charge certain fees; and (iii) to waive certain requirements of the U.S. Department of Justice, Office of the United States Trustee.

46.    In the ordinary course of business prior to the Petition Date, the Debtors used the Cash Management System, which is similar to those utilized by other large companies, to collect, transfer, and distribute funds generated by the Debtors' business operations efficiently. In the ordinary course of business, the Debtors accurately recorded such collections, transfers, and disbursements as they were made.  Currently, MPR has three bank accounts, all with Chase, that it uses for business operations, consisting of: (a) a Cash Collateral Account - used to receive all cash payments from customers and to pay down the Debtors' line of credit with Chase, (b) an Operating Account – used to draw on the line of credit, to pay EFTs and wires, and to make transfers into the Payables Account, and (c) a Payables Account - used to receive transfers from the Operating Account and to clear checks (collectively, the "Business Operations Bank Accounts").  The Cash Collateral Account is swept each day in an amount equal to the prior days' deposits.

47.    The Debtors' Cash Management System constitutes ordinary course, essential business practices providing significant benefits to the Debtors including, *inter alia*, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Any disruption of the Cash Management System could have a severe and adverse impact upon Debtors' value.

48.    The Debtors will maintain their books and records relating to the Cash Management System to the same extent the books and records were maintained before the

Petition Date.  In this way, all transfers and transactions will be properly documented, and accurate balances will be maintained.  As a result, the Debtors will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.  Based on the foregoing, I believe that maintenance of the existing Cash Management System is in the best interests of the Debtors' estates, and all creditors and parties in interest.  Therefore, in the Cash Management Motion the Debtors seek authority to maintain and use their Cash Management System during the  Chapter 11 Cases.

49.    As noted above, MPR also has a bank account at Chase relating to the Traxys settlement (the "Blocked Deposit Account").  The Operation Bank Account and the Blocked Deposit Account are referred to herein collectively as the "Bank Accounts".

50.    In connection with its use of the Cash Management System, the Debtors incur service charges for the Bank Accounts (the "Service Charges"), which are payable in arrears of the end of each month and may also incur other fees, claims, costs, expenses or charges associated with the Bank Accounts, including, without limitation, service charges or fees; (i) checks deposited with the Banks which have been dishonored or returned for insufficient funds; and (ii) any reimbursement or other payment obligations, such as overdrafts, arising under the Bank Account Agreements (collectively, together with the Service Charges, the "Bank Account Claims").  Under the terms of the Bank Account Agreements, Chase may apply, deduct or offset any funds deposited in the Bank Accounts to pay or reimburse Chase for any of the Bank Account Claims.  Payment of any prepetition Bank Account Claims is in the best interests of the Debtors, their estates and all parties in interest as it will prevent any disruption to the Cash Management System.  In the Cash Management Motion, the Debtors request that Chase be authorized to apply, deduct or offset any funds deposited in the Bank Accounts, to the extent necessary, to pay or reimburse Chase for any prepetition Bank Accounts.

51.    Funds are routinely deposited and withdrawn from the Business Operations Bank Accounts by checks, wire transfers, and automated clearinghouse transfers.  Rigid adherence to the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession and Trustees" (the "Guidelines") would require, as of the Petition Date, the closure

of the prepetition Bank Accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtor in Possession" designation on them.  I believe however, that the Debtors' transition to chapter 11 will be smoother, less costly, and more orderly, and disruption and harm to its Cash Management System will be minimized, if the Bank Accounts are continued following the commencement of its case with the same account numbers; *provided, however*, that checks issued or dated prior to the Petition Date will not be honored absent a prior order of the Court.

52.    In the Cash Management Motion, the Debtors request that Chase be authorized to accept and honor all representations from Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date.

53.    By preserving business continuity and avoiding disruption and delay to Debtors' disbursement obligations, including payroll, that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best-served.  The confusion that would otherwise result, absent the relief requested herein, would ill-serve Debtors' rehabilitative efforts.

54.    In the Cash Management Motion, the Debtors request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System to manage cash in a manner consistent with prepetition practices, and to pay any ordinary course bank fees that may be incurred in connection with the Bank Accounts or any other new bank account that may be opened pursuant to an order of this Court following the Petition Date.

55.    In addition, to minimize expenses, in the Cash Management Motion the Debtors request that they be authorized to continue to use their correspondence and business forms, including, but not limited to, purchase orders, checks, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as debtor in possession.  The Debtors request that MPR be allowed to continue to use its existing check stock; *provided, however*, that MPR shall commence marking "Debtor in Possession" and the chapter 11 case number on such check stock

and wire transfer instructions instead of having new stock printed with such marking.

56.     If the Debtors are not permitted to maintain and utilize their current Bank Accounts and their existing Business Forms, including check stock, the resultant prejudice will include significant (i) disruption to the Debtors' ordinary financial affairs and business operations, (ii) delay in the administration of Debtors' estates, and (iii) cost to the estates to set up new systems, open new accounts, print new business forms, and print new checks.

57.     MPR is a party to Merchant Services Processing Agreement (the "Merchant Agreement") with Paymentech, LLC and Chase (collectively, the "Merchant Processors").  In the Cash Management Motion, the Debtors request that MPR be authorized to continue to obtain merchant processing services and operate under the Merchant Agreement and to pay or reimburse the Merchant Processors for any obligations incurred prepetition for the merchant processing services under the Merchant Agreement.

58.     As of the Petition Date, the amount of funds in the Traxys Settlement Account was approximately $750,000, which amount exceeds the amount insured by the Federal Deposit Insurance Corporation (the "FDIC").  Moreover, it is likely that at certain times the Business Operations Bank Accounts may contain funds in excess of the amounts insured by the FDIC.  To the extent funds in the Bank Accounts at Chase exceed the amounts insured by the FDIC, the Debtors believe that such amounts will be secure.  Chase has been approved by the U.S. Trustee as authorized bank depository in this District. Chase is a highly rated and secure federally chartered bank subject to supervision by federal banking regulators.  Additionally, this requested relief will avoid the Debtors having to open additional accounts at Chase or other banks merely to be under the appropriate deposit insurance limits, thus avoiding increasing accounting burdens.

59.     Based on the above, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' transition through chapter 11.

**D.      Motion to Authorize Employee Compensation**

60.     The Debtors have filed a motion for the entry of an order (a) authorizing MPR to

(i) pay prepetition wages, salaries, benefits, and other compensation, and (ii) continue employee compensation and employee benefit programs, and (b) granting related relief (the "Employee Compensation Motion").

61.    MPR conducts operations from: (a) a warehouse and fabrication facility in New Castle, Delaware, (b) a warehouse and fabrication facility in Hammond, Indiana, (c) a warehouse and fabrication facility in North Las Vegas, Nevada, and (d) an office in Tampa, Florida.  BGD is the named tenant of the North Las Vegas facility, but has no employees.  BRG operates out of a facility in Holt, Missouri.  BRG, however, has no employees. All persons performing work for BRG are employees of MPR.

62.    MPR currently has two hundred forty-five (245) employees (the "Employees"). Eighty-seven (87) of the Employees, although paid by MPR, provide services for BRG.  All of the Employees and their continued service are essential to the Debtors' ongoing operations and reorganization efforts.

63.    To process the payroll for all of the Employees, MPR uses Zenefits as its payroll processor (the "Payroll Processor").  The funds for the gross payroll are transferred by MPR to the Payroll Processor two days prior to the payroll date.

a.    The Employees providing services directly for MPR are paid bi-weekly. They are paid on a Friday for the two-week period ended the prior Saturday.  On June 5, 2020, prior to the filing of the Petitions, the Payroll Processor issued a payroll for these employees for the period May 17, 2020 through May 30, 2020.  The gross amount of this payroll was approximately $351,400.  On June 19, 2020, a payroll is scheduled for these employees for the period May 31, 2020 through June 13, 2020.  The gross amount of this payroll is anticipated to be approximately $370,000.

b.    The Employees providing services for BRG are paid weekly. They are paid on a Friday for the one-week period ended the prior Saturday.  On June 12, 2020, prior to the filing of the Petitions, the Payroll Processor issued a payroll for these employees for the period May 31, 2020 through June 6, 2020.  The gross amount of this payroll was approximately $106,500.  On June 19, 2020, a payroll is scheduled for these

17

employees for the period of June 7, 2020 through June 13, 2020.  The gross amount of this payroll is anticipated to be approximately $108,000.

c.      The majority of the Employees normally receive payment of their wages or salary by direct deposit.  The other Employees receive payment by check.  For the Employees providing services directly for MPR (who are paid bi-weekly), one hundred forty-eight  (148) are normally paid by direct deposit and eight (8) are paid by check.  For the Employees providing services for BRG (who are paid weekly), thirty-one (31) are normally paid by direct deposit and fifty-six (56) are paid by check.  For the payroll to be made on June 19, 2020, MPR may decide to pay all Employees by check.  For those Employees who receive payment by check, the checks for the payrolls made on June 5, 2020 and June 12, 2020 may not have cleared as of the filing of the Petitions (the "Prepetition Uncleared Payroll Checks"). The total amount of the Prepetition Uncleared Payroll Checks is unknown.

d.      For the period May 31, 2020 through the day before the Petition Date, the Employees have accrued wages and salaries in the amount of approximately $337,000 (the "Accrued and Unpaid Prepetition Wages and Salaries").

e.      In the Employee Compensation Motion, the Debtors are seeking an order authorizing the Prepetition Uncleared Payroll Checks to be cleared and authorizing MPR to pay the Accrued and Unpaid Prepetition Wages and Salaries on the next scheduled payroll date for such Employees.

f.      The Payroll Processor charges a monthly fee of $4,001.06. This fee is paid by an automatic withdrawal from an MPR bank account at JPMorgan Chase Bank, N.A. The next fee will be due for the period June 24 – July 23, 2020.

64.      In the ordinary course of processing payroll for the Employees, MPR may also withhold certain amounts for various garnishments (collectively, the "Garnishments"), which have not yet been forwarded to the appropriate third party recipients. In the Employee Compensation Motion, to the extent such Garnishments exist, MPR is requesting authorization to remit such funds.

65.     In the ordinary course of business, MPR is required by law to withhold amounts from the Employees' wages and salaries related to federal, state, and local income taxes, social security and medicare taxes, for remittance to the appropriate taxing authorities (collectively, the "Employee Payroll Taxes").  In the ordinary course of business, MPR is also required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes, and together with the Employee Payroll Taxes, the "Payroll Taxes").  For the bi-weekly payroll made on June 5, 2020 (for the employees providing services directly for MPR), the Employee Payroll Taxes were approximately $72,400 and the Employer Payroll Taxes were approximately $26,700.  For the bi-weekly payroll to be made on June 19, 2020, the Employee Payroll Taxes and the Employer Payroll Taxes are estimated to be approximately $75,0000 and $30,000, respectively.  For the weekly payroll made on June 12, 2020 (for the employees providing services for BRG), the Employee Payroll Taxes were approximately $20,800 and the Employer Payroll Taxes were approximately $9,000.  For the weekly payroll to be made on June 19, 2020, the Employee Payroll Taxes and the Employer Payroll Taxes are estimated to be approximately $21,000 and $10,000 respectively.  In the Employee Compensation Motion, MPR is requesting authorization to continue to pay or turn over the Payroll Taxes to the applicable recipients in the ordinary course of business.

66.     In the ordinary course of business, MPR provides its Employees with certain forms of paid time off, such as vacation, sick, and personal days (collectively, "Employee Paid Time Off").  MPR estimates that the accrued Employee Paid Time Off for all Employees as of the Petition Date is approximately $126,000.   In the Employee Compensation Motion, MPR is requesting authority to honor its obligations for unpaid but accrued prepetition Employee Paid Time Off.

67.     In the ordinary course of their employment, certain of the Employees are paid a monthly car allowance  (collectively, the "Car Allowances"). The approximate amount of the Car Allowances each month is $5,170. Additionally, in the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or

expended their own personal funds on behalf of and for the benefit of the Debtors (the "Employee Reimbursable Business Expenses").  Employees rendered services and incurred Employee Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed.  MPR cannot provide a definitive amount of Employee Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, MPR estimates that amount does not exceed $10,000.    In the Employee Compensation Motion, MPR is seeking authorization to continue to pay the Car Allowances and any such Employee Reimbursable Business Expenses in the ordinary course of business.

68.    MPR offers its Employees the opportunity to participate in medical, dental and vision care plans (collectively, the "Health Care Plans"). Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the workforce during the Chapter 11 Cases. The monthly cost to MPR for its share of the premiums for the medical plans is approximately $44,600.  The costs for the dental and vision plans are paid entirely by the employees.

69.    In the Employee Compensation Motion, MPR is requesting authority to (a) continue the Health Care Plans in the ordinary course of business, (b) continue making the above-described contributions to the medical plans, and (c) pay any amounts related thereto, including premiums, claims amounts and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business.

70.    MPR provides certain of the Employees with life insurance, short-term disability insurance, and long-term disability insurance coverage (collectively, the "Life Insurance and Disability Benefits").  MPR pays the full amount of the premiums.  The monthly premiums are approximately $4,915, broken down as follows:  life insurance - $752; short-term disability insurance - $1,619; and long-term disability insurance - $2,544.  In the Employee compensation Motion, MPR is requesting authority to continue paying premiums for the Life Insurance and Disability Benefits in the ordinary course of business.

71.    MPR maintains an employee savings plan for the benefit of eligible Employees,

which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "401(k) Plan").  There are approximately twenty-five (25) participants in the 401(k) Plan, which is administered by Savant – Ideal 401(k) Plan Servicing Team (the "401(k) Plan Administrator").  MPR withholds certain amounts from participating Employees' paychecks and contributes such amounts to the 401(k) Plan (the "Employee 401(k) Contributions").  In the Employee Compensation Motion, MPR is requesting authority to continue the Employee 401(k) Contributions on a postpetition basis.

72.    MPR also has historically provided a 3% match to the Employees' contributions to the 401(k) Plan (the "401(k) Match").  This amount totals approximately $2,600 on a bi-weekly basis.  MPR requests authority to continue matching these contributions.  In the Employee Compensation Motion, MPR is requesting authority to pay any prepetition fees owed to the 401(k) Plan Administrator.

73.    In the ordinary course of business, MPR and BRG maintain workers' compensation insurance.  The policy for the period February 5, 2019 – February 5, 2020 was issued by Travelers Property Casualty Company of America ("Travelers").  The policy for the period February 5, 2020 – February 5, 2021 was issued by The Phoenix Insurance Company, on information and belief an affiliate of Travelers.  MPR and BRG are current on the monthly installment payments due on the current policy.  As of the Petition Date, MPR and BRG were also obligated to pay $181,754 to Travelers as a result of a recent payroll audit.  MPR and BRG request authority to pay this amount and to continue making the installment payments on the current policy in the ordinary course of business (collectively, the "Workers' Compensation Obligations").

74.    I believe that it is essential for the morale and maintenance of trust of the Employees that all necessary steps are taken to protect the employment compensation described above (collectively, the "Employee Compensation"). If the outstanding prepetition Employee Compensation is not immediately honored, the Debtors may experience immediate and irreparable harm, in the form of Employees that seek alternative employment or otherwise.

75.     MPR will have sufficient cash on hand, through use of cash collateral and debtor in possession financing, to honor all of the foregoing Employee Compensation obligations. In the Employee Compensation Motion, the Debtors are seeking authority for MPR to pay and/or honor the Employee Compensation described in the motion.  In the Employee Compensation Motion, the Debtors are also requesting that the Court enter an order authorizing and directing all applicable banks and other financial institutions to receive, process, honor and pay any and all checks related to the foregoing, whether presented prior to or after the Petition Date in accordance with the stated policies with regard thereto, provided sufficient funds exist to cover such payments.

76.     MPR's books and records indicate that in all instances the amount of prepetition compensation owing to any single Employee is less than $13,650.

**E.      Motion to Provide Adequate Assurance of Payment to Utilities**

77.     The Debtors have filed a motion for the entry of an order (i) approving the proposed adequate assurance of payment for continued utility service from each of the utility companies as described below; and (ii) prohibiting the utility companies from terminating, discontinuing, or otherwise interrupting utility services to the Debtors until further order of the Court (the "Utilities Motion").

78.     MPR leases a warehouse and a fabrication facility in New Castle, Delaware, and subleases a warehouse and fabrication facility in Hammond, Indiana, and conducts operations at these facilities. MPR also leases an office in Tampa, Florida.  MPR also conducts operations at  a warehouse and fabrication facility in North Las Vegas, Nevada.  BGD, however, is the named tenant of the North Las Vegas facility.  The accounts for garbage service at the North Las Vegas facility are in the name of BGD but are paid by MPR.

79.     In the ordinary course of business, MPR and BGD obtain utility services related to the day-to-day operation and/or maintenance of the Debtors businesses from ten utility providers (each a "Utility Company" and collectively, the "Utility Companies"), for electricity, gas, water, sewer, garbage, and internet services (the "Utility Services").  The Utility Companies are set forth on the list attached to the Utilities Motion as Exhibit 1, together with  the average

one month's billing for the Utility Services (the "Utility Companies List").

80.    Uninterrupted Utility Services are essential to the continued operations of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts, as well as the safety of employees.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance of payment to the Utility Companies without hindering the Debtors' ability to function as a going concern.

81.    The Utility Companies that provide electricity and gas to the fabrication facilities are holding substantial pre-petition security deposits. Delmarva Power & Light Company ("Delmarva Power"), the provider of electricity and gas to the New Castle, Delaware facility, is holding a pre-petition deposit of $6,734.  This amount exceeds the amount of the average monthly bill by approximately 25%.  Northern Indiana Public Service Company ("NIPSCO"), the provider of electricity and gas to the Hammond, Indiana facility, is holding a deposit in the amount of $13,885.  This amount exceeds the amount of the average one month's bill by approximately 50%.  (The electricity and gas for the North Las Vegas facility is paid by the landlord.)  The Debtors propose that Delmarva Power and NIPSCO retain their pre-petition security deposits as post-petition security deposits.

82.    As of the Petition Date, MPR was current on its payments to Delmarva Power and NIPSCO.

83.    The monthly payments to the other Utility Companies are substantially less than those for the providers of electricity and gas.  As set forth on Exhibit 1 to the Utilities Motion, the aggregate average amount of such payments is approximately $4,200.  MPR proposes to deposit $4,200 (the "Adequate Assurance Utility Deposit") into a segregated bank account (the "Adequate Assurance Utility Deposit Account") within 10 days of the Petition Date.  The Adequate Assurance Utility Deposit will be held in the Adequate Assurance Utility Deposit Account for the duration of the Debtors' chapter 11 cases.  If MPR fails to pay a Utility Company for any post-petition Utility Services when due, such Utility Company may demand

23

payment from the Adequate Assurance Utility Deposit up to the amount set forth in Exhibit 1 to the Utilities Motion as its average one month's bill.

84.    MPR intends to pay, and has the ability to pay, for all post-petition Utility Services on a timely basis.

85.    Accordingly, the Debtors propose the following as assurance to the Utility Companies of payment for continued utility services:

(a)    Delmarva Power and NIPSCO shall each retain the prepetition security deposit paid by MPR as a post-petition security deposit;

(b)    MPR shall deposit the sum of $4,200, as the Adequate Assurance Utility Deposit, into the Adequate Assurance Utility Deposit Account, for all Utility Companies other than Delmarva Power and NIPSCO.

86.    It is possible that, despite the Debtors' best efforts, certain utility companies have not yet been identified by the Debtors.  In the Utilities Motion, the Debtors request that they be allowed, without further order of the Court, to supplement the Utility Companies List if any utility company has been inadvertently omitted from the list (the "Additional Utility Company").  If the Debtors determine that the Utility Companies List should be supplemented, the Debtors will, as soon as reasonably practicable, file with the Court a supplement (the "Supplement") to Exhibit 1 to the Utilities Motion setting forth the name and address of any Additional Utility Company, and the amount of an average one month's bill.  MPR will also deposit into the Adequate Assurance Utility Deposit Account the amount of the average one month's bill.  The Debtors will then serve a copy of this Motion, the order entered on this Motion, and the Supplement, on such Additional Utility Company.  In the Utilities Motion, the Debtors request that any Additional Utility Company be subject to the terms of any order granting the Utilities Motion, as appropriate.

F.    **Motion to Pay Prepetition Taxes**

87.    The Debtors have filed a motion for an order authorizing the Debtors to pay certain pre-petition Taxes (as hereinafter defined) in the ordinary course of business, and authorizing financial institutions to receive, process, honor, and pay all checks presented for

payment and electronic payment requests related to the foregoing (the "Taxes Motion").

88.    In the ordinary course of their business, the Debtors collect and incur taxes, including sales and property taxes in connection with the operation of their business (collectively, the "Taxes").  The Taxes are payable periodically at various times to various taxing, licensing, and other governmental authorities (collectively, the "Authorities").  In particular, the Debtors, collectively, believe they may be filing state tax returns in approximately fourteen (14) states for TY 2019.  Certain Taxes are direct obligations of the Debtors, while other Taxes are collected by the Debtors from other parties and are held until remitted for the benefit of the Authorities.

89.    In the Taxes Motion, the Debtors seek an order authorizing, but not directing, the Debtors to pay the Taxes (including, but not limited to those described below) as and when they become due in the ordinary course of the Debtors' business.  To the extent that a check issued or an electronic funds transfer requested prior to the Petition Date for payment of Taxes has not cleared the Debtors' banks, including without limitation JPMorgan Chase Bank, N.A. (collectively, the "Banks") as of the Petition Date, the Debtors additionally request that the Court: (i) authorize the Banks to receive, process, honor, and pay such checks and/or fund transfer requests, and/or (ii) authorize the Debtors to issue replacement checks, submit replacement fund transfer requests, or provide other means of payment to the appropriate Authorities to the extent necessary to pay all outstanding pre-petition Taxes described in the Taxes Motion.

90.    The Debtors collect from customers or incur an assortment of state and local sales taxes (collectively, the "Sales Taxes"), and remit the Sales Taxes to the appropriate Authorities.  Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price invoiced to the customer.  If such taxes are not remitted to the Authorities on a timely basis, the Authorities often impose personal liability on officers or other responsible persons of a business entity.  The Debtors remit Sales Taxes on a monthly basis.  The Debtors estimate that as of the Petition Date, approximately $240,000 in Sales Taxes are accrued but unpaid for the month of May 2020.

91. BCG owns a piece of real property located at 1800 White Lane in Bakersfield, California for which it must pay real property taxes to Kern County, California, which property has an assessed value of $1,716,660.00. BCG presently owes Kern County a total of $24,697.65 in tax payments, with penalties, including a payment due May 7, 2020. The real property taxes have an automatic super-priority under California law. See, e.g., Cal. Rev. & T. Code §§ 2187 and 2192.1.

92. Various state and local laws may require the Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local, state, and federal regulatory agencies. The amount owed, if any, for these taxes and fees is *de minim*is. To the extent there are pre-petition amounts outstanding with respect to these taxes and fees, in the Taxes Motion, the Debtors request the authority to pay such amounts.

93. Paying the Taxes will benefit the Debtors and their creditors by allowing business operations to continue without interference or distraction, and to allow the Debtors to operate their Chapter 11 Cases without interference from the Authorities. Timely payment of the Taxes is integral to the continuing operation of the Debtors' business.

94. I have reviewed the Motion for Joint Administration, the Cash Collateral/DIP Financing Motion, the Cash Management Motion, the Employee Compensation Motion, the Utilities Motion, and the Taxes Motion, the facts stated therein and the descriptions of the relief they request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of such motions and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated: June 16, 2020

By: /s/ Joseph Tedesco
Joseph Tedesco