# EXHIBIT 1

# J.P.Morgan

CREDIT AGREEMENT

dated as of

August 3, 2018

among

Metal Partners Rebar, LLC,
BCG Ownco, LLC, BRG Holding, LLC

and

JPMORGAN CHASE BANK, N.A.

***ASSET BASED LENDING***

## **TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ........................................................................................................... 1
    SECTION 1.01.  Defined Terms ......................................................................................... 1
    SECTION 1.02.  Classification of Loans and Borrowings................................................. 1
    SECTION 1.03.  Terms Generally ...................................................................................... 1
    SECTION 1.04.  Accounting Terms; GAAP ....................................................................... 1
    SECTION 1.05.  Interest Rates .......................................................................................... 2
ARTICLE II THE CREDITS.......................................................................................................... 2
    SECTION 2.01.  Commitment............................................................................................ 2
    SECTION 2.02.  Loans and Borrowings ............................................................................ 2
    SECTION 2.03.  Borrowing Procedures; Requests for Revolving Borrowings.................... 2
    SECTION 2.04.  Protective Advances ............................................................................... 3
    SECTION 2.05.  Letters of Credit ..................................................................................... 3
    SECTION 2.06.  Funding of Borrowings ........................................................................... 6
    SECTION 2.07.  Interest Elections .................................................................................... 6
    SECTION 2.08.  Termination of Commitment ................................................................... 7
    SECTION 2.09.  Repayment and Amortization of Loans; Collection and Application of Collateral
                     Proceeds; Evidence of Debt ................................................................... 7
    SECTION 2.10.  Prepayment of Loans.............................................................................. 8
    SECTION 2.11.  Fees........................................................................................................ 9
    SECTION 2.12.  Interest ................................................................................................. 10
    SECTION 2.13.  Alternate Rate of Interest; Illegality...................................................... 10
    SECTION 2.14.  Increased Costs ..................................................................................... 11
    SECTION 2.15.  Break Funding Payments ...................................................................... 12
    SECTION 2.16.  Taxes.................................................................................................... 12
    SECTION 2.17.  Payments Generally; Allocation of Proceeds ...................................... 13
    SECTION 2.18.  Indemnity for Returned Payments ........................................................ 14
ARTICLE III REPRESENTATIONS AND WARRANTIES............................................................ 14
    SECTION 3.01.  Organization; Powers ........................................................................... 15
    SECTION 3.02.  Authorization; Enforceability ................................................................. 15
    SECTION 3.03.  Governmental Approvals; No Conflicts.................................................. 15
    SECTION 3.04.  Financial Condition; No Material Adverse Change................................. 15
    SECTION 3.05.  Properties.............................................................................................. 15
    SECTION 3.06.  Litigation and Environmental Matters .................................................. 15
    SECTION 3.07.  Compliance with Laws and Agreements; No Default ............................ 16
    SECTION 3.08.  Investment Company Status.................................................................. 16
    SECTION 3.09.  Taxes.................................................................................................... 16
    SECTION 3.10.  ERISA................................................................................................... 16
    SECTION 3.11.  Disclosure ............................................................................................ 16
    SECTION 3.12.  Material Agreements............................................................................. 17
    SECTION 3.13.  Solvency ............................................................................................... 17
    SECTION 3.14.  Insurance .............................................................................................. 17
    SECTION 3.15.  Capitalization and Subsidiaries............................................................. 17
    SECTION 3.16.  Security Interest in Collateral................................................................. 17
    SECTION 3.17.  Employment Matters............................................................................. 17
    SECTION 3.18.  Margin Regulations ............................................................................... 18
    SECTION 3.19.  Use of Proceeds ................................................................................... 18
    SECTION 3.20.  No Burdensome Restrictions ................................................................ 18
    SECTION 3.21.  Anti-Corruption Laws and Sanctions .................................................... 18
    SECTION 3.22.  Affiliate Transactions ............................................................................ 18
    SECTION 3.23.  Common Enterprise.............................................................................. 18
    SECTION 3.24.  Plan Assets; Prohibited Transactions.................................................... 18
ARTICLE IV CONDITIONS......................................................................................................... 19

| | | |
|---|---|---|
| SECTION 4.01. | Effective Date | 19 |
| SECTION 4.02. | Each Credit Event | 19 |
| ARTICLE V AFFIRMATIVE COVENANTS | | 20 |
| SECTION 5.01. | Financial Statements; Borrowing Base and Other Information | 20 |
| SECTION 5.02. | Notices of Material Events | 20 |
| SECTION 5.03. | Existence; Conduct of Business | 20 |
| SECTION 5.04. | Payment of Obligations | 21 |
| SECTION 5.05. | Maintenance of Properties | 21 |
| SECTION 5.06. | Books and Records; Inspection Rights | 21 |
| SECTION 5.07. | Compliance with Laws and Material Contractual Obligations | 21 |
| SECTION 5.08. | Use of Proceeds | 21 |
| SECTION 5.09. | Accuracy of Information | 22 |
| SECTION 5.10. | Insurance | 22 |
| SECTION 5.11. | Casualty and Condemnation | 22 |
| SECTION 5.12. | Appraisals | 22 |
| SECTION 5.13. | Depository Banks | 22 |
| SECTION 5.14. | Additional Collateral; Further Assurances | 23 |
| SECTION 5.15. | Receivables | 23 |
| SECTION 5.16. | Inventory and Equipment | 24 |
| ARTICLE VI NEGATIVE COVENANTS | | 24 |
| SECTION 6.01. | Indebtedness | 24 |
| SECTION 6.02. | Liens | 26 |
| SECTION 6.03. | Fundamental Changes | 26 |
| SECTION 6.04. | Investments, Loans, Advances, Guarantees and Acquisitions | 27 |
| SECTION 6.05. | Asset Sales | 28 |
| SECTION 6.06. | Sale and Leaseback Transactions | 29 |
| SECTION 6.07. | Swap Agreements | 29 |
| SECTION 6.08. | Restricted Payments; Certain Payments of Indebtedness | 29 |
| SECTION 6.09. | Transactions with Affiliates | 30 |
| SECTION 6.10. | Restrictive Agreements | 30 |
| SECTION 6.11. | Amendment of Material Documents | 30 |
| SECTION 6.12. | Financial Covenants | 30 |
| ARTICLE VII EVENTS OF DEFAULT | | 30 |
| ARTICLE VIII MISCELLANEOUS | | 33 |
| SECTION 8.01. | Notices | 33 |
| SECTION 8.02. | Waivers; Amendments | 33 |
| SECTION 8.03. | Expenses; Indemnity; Damage Waiver | 34 |
| SECTION 8.04. | Successors and Assigns | 35 |
| SECTION 8.05. | Survival | 36 |
| SECTION 8.06. | Counterparts; Integration; Effectiveness; Electronic Execution | 37 |
| SECTION 8.07. | Severability | 37 |
| SECTION 8.08. | Right of Setoff | 37 |
| SECTION 8.09. | Governing Law; Jurisdiction; Consent to Service of Process | 37 |
| SECTION 8.10. | WAIVER OF JURY TRIAL | 38 |
| SECTION 8.11. | Headings | 38 |
| SECTION 8.12. | Confidentiality | 38 |
| SECTION 8.13. | Nonreliance; Violation of Law | 39 |
| SECTION 8.14. | USA PATRIOT Act | 39 |
| SECTION 8.15. | Disclosure | 39 |
| SECTION 8.16. | Interest Rate Limitation | 39 |
| SECTION 8.17. | Marketing Consent | 39 |
| SECTION 8.18. | Joint and Several | 39 |
| SECTION 8.19. | No Fiduciary Duty, etc | 40 |
| ARTICLE IX LOAN GUARANTY | | 40 |
| SECTION 9.01. | Guaranty | 40 |
| SECTION 9.02. | Guaranty of Payment | 41 |

SECTION 9.03.   No Discharge or Diminishment of Loan Guaranty ................................................................ 41
SECTION 9.04.   Defenses Waived ................................................................................................................ 41
SECTION 9.05.   Rights of Subrogation ........................................................................................................ 42
SECTION 9.06.   Reinstatement; Stay of Acceleration .................................................................................. 42
SECTION 9.07.   Information .......................................................................................................................... 42
SECTION 9.08.   Termination ........................................................................................................................ 42
SECTION 9.09.   Taxes ................................................................................................................................. 42
SECTION 9.10.   Maximum Liability ............................................................................................................. 42
SECTION 9.11.   Contribution ....................................................................................................................... 43
SECTION 9.12.   Liability Cumulative ........................................................................................................... 43
SECTION 9.13.   Keepwell ............................................................................................................................ 43

SCHEDULES:
Definitions Schedule
Borrowing Base Schedule
Terms Schedule
Reporting Schedule
Financial Covenants Schedule
Closing Conditions Schedule

RIDERS:
Term Loan Rider
Permitted Acquisitions Rider
Alternative Currency Rider

CREDIT AGREEMENT dated as of August 3, 2018 (as it may be amended or modified from time to time, together with all Exhibits, Schedules and Riders annexed hereto from time to time, each of which is hereby incorporated herein and made a part hereof, this "Agreement"), by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG"; and together with Metal Partners and BCG, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender").

The parties hereto agree as follows:

## ARTICLE I
Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the capitalized terms shall have the meanings specified in the Definitions Schedule attached hereto.

SECTION 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits, Schedules and Riders shall be construed to refer to Articles and Sections of, and Exhibits, Schedules and Riders to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. Accounting Terms; GAAP. (a) Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, notwithstanding the occurrence of any change after the date hereof in GAAP or in the application thereof on the operation of any provision hereof, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective unless and until such provision is amended in accordance herewith.

(b) Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute

capital leases in conformity with GAAP on the date hereof shall be considered capital leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

SECTION 1.05. Interest Rates. The Lender does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBO Rate" or with respect to any comparable or successor rate thereto, or replacement rate therefor.

ARTICLE II
The Credits

SECTION 2.01. Commitment. Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Loans to the Borrowers from time to time during the Availability Period in an aggregate principal amount that will not result in the Revolving Exposure exceeding the lesser of (x) the Revolving Commitment, less the Availability Block, if applicable, and (y) the Borrowing Base, subject to the Lender's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.04. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

SECTION 2.02. Loans and Borrowings. (a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type. Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.04.

(b)    Subject to Section 2.13, each Borrowing, if applicable, shall be comprised entirely of CBFR Loans or Eurodollar Loans as the Borrower Representative may request in accordance herewith, provided that all Borrowings made on the Effective Date must be made as CBFR Borrowings. The Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of the Lender to make such Loan (and in the case of an Affiliate, the provisions of Sections 2.13, 2.14, 2.15 and 2.16 shall apply to such Affiliate to the same extent as to the Lender); provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)    At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple equal to $250,000 and not less than $1,000,000. CBFR Borrowings may be in any amount. Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than 5 Eurodollar Borrowings outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Borrower Representative shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03. Borrowing Procedures; Requests for Revolving Borrowings.

(a)    Controlled Disbursement Account; DDA Access Product.  Not later than 1:00 p.m., Chicago time, on each Business Day, the Lender shall, subject to the conditions of this Agreement (but without any further written notice required), make available to the Borrower Representative, by a credit to the Funding Account, the proceeds of a CBFR Borrowing to the extent necessary to pay items to be drawn on the Controlled Disbursement Accounts that day. All other Revolving Loans shall be made upon notice given in accordance with §2.03(b). In addition, if the Borrowers have elected the DDA Access Product, the Borrowers hereby authorize the Lender to, and the Lender shall, subject to the terms and conditions set forth herein (but without any further written notice required), to the extent that from time to time on any Business Day funds are required under the DDA Access Product to reach the Target Balance (a "Deficiency Funding Date"), make available to the applicable Borrower the proceeds of a CBFR Borrowing in the amount of such deficiency up to the Target Balance, by

2

means of a credit to the Funding Account on or before the start of business on the next succeeding Business Day, and such CBFR Borrowing shall be deemed made on such Deficiency Funding Date.

(b)    Notices by the Borrowers to the Lender of requests for Revolving Loans other than pursuant to §2.03(a).  To request a Revolving Borrowing, the Borrower Representative shall notify the Lender of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower Representative or through an Electronic System if arrangements for doing so have been approved by the Lender (or if an Extenuating Circumstance shall exist, by telephone) not later than (i) in the case of a Eurodollar Borrowing, 10:00 a.m., Chicago time, three Business Days before the date of the proposed Borrowing or (ii) in the case of a CBFR Borrowing, noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of a CBFR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(d) may be given not later than 9:00 a.m., Chicago time, on the date of the proposed Borrowing.

Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, facsimile or a communication through Electronic System to the Lender of a written Borrowing Request in a form approved by the Lender and signed by a Responsible Officer of the Borrower Representative.  Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)    the name of the applicable Borrower;

(ii)    the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing;

(iii)    the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be a CBFR Borrowing or a Eurodollar Borrowing; and

(v)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period."

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a CBFR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the applicable Borrowers shall be deemed to have selected an Interest Period of one month's duration.

SECTION 2.04. Protective Advances. Subject to the limitations set forth below, the Lender is authorized by the Borrowers, from time to time in the Lender's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrowers, which the Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances").  Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied.  The Protective Advances shall be secured by the Liens in favor of the Lender in and to the Collateral and shall constitute Obligations hereunder.  All Protective Advances shall be CBFR Borrowings.  The making of a Protective Advance on any one occasion shall not obligate the Lender to make any Protective Advance on any other occasion.

SECTION 2.05. Letters of Credit.  (a) General.  Subject to the terms and conditions set forth herein, the Borrower Representative may request the issuance of Letters of Credit for its own account or for the account of another Borrower denominated in dollars or, as provided in the Alternative Currency Rider attached hereto, Alternative Currency, as the applicant thereof for support of its or the other Borrower's, or its or the other

Borrower's Subsidiaries', obligations, in a form reasonably acceptable to the Lender at any time and from time to time during the Availability Period, and the Lender may, but shall have no obligation to, issue such requested Letters of Credit in accordance with and subject to the terms hereof. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any Letter of Credit Agreement, the terms and conditions of this Agreement shall control. Notwithstanding anything herein to the contrary, the Lender shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit (i) the proceeds of which would be made available to any Person (A) to fund any activity or business of or with any Sanctioned Person, or in any country or territory that, at the time of such funding, is the subject of any Sanctions or (B) in any manner that would result in a violation of any Sanctions by any party to this Agreement, (ii) if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Lender from issuing such Letter of Credit, or any Requirement of Law relating to the Lender or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Lender shall prohibit, or request that the Lender refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Lender with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Lender is not otherwise compensated hereunder) not in effect on the Effective 为X为X为X加 邸!邸 为X为X为X                                        n reimbursed loss, cost or expense which was not applicable on the Effective Date and which the Lender in good faith deems material to it, or (iii) if the issuance of such Letter of Credit would violate one or more policies of the Lender applicable to letters of credit generally; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed not to be in effect on the Effective Date for purposes of clause (ii) above, regardless of the date enacted, adopted, issued or implemented.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower Representative shall deliver by hand or facsimile (or transmit through Electronic System, if arrangements for doing so have been approved by the Lender) to the Lender prior to 9:00 am, Chicago time, at least three Business Days prior to the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. In addition, as a condition to any such Letter of Credit issuance, the applicable Borrower shall have entered into a continuing agreement (or other letter of credit agreement) for the issuance of letters of credit and/or shall submit a letter of credit application, in each case, as required by the Lender and using the Lender's standard form (each, a "Letter of Credit Agreement"). A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrowers shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed the LC Exposure Amount, and (ii) the Revolving Exposure shall not exceed the lesser of (x) the Revolving Commitment, minus the Availability Block, if applicable, and (y) the Borrowing Base.

(c)    Expiration Date. Each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the Lender to the beneficiary thereof) at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, including, without limitation, any automatic renewal provision, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Maturity Date.

(d)    Reimbursement. If the Lender shall make any LC Disbursement in respect of a Letter of Credit, the Borrowers shall reimburse such LC Disbursement by paying to the Lender an amount equal to such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.02 or 2.03 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the

Borrowers' obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing.

(e)    Obligations Absolute.  The Borrowers' joint and several obligation to reimburse LC Disbursements as provided in paragraph (d) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, Letter of Credit Agreement or this Agreement, or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder.  Neither the Lender nor any of its Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Lender; provided that the foregoing shall not be construed to excuse the Lender from liability to the Borrowers to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by the Lender's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Lender (as finally determined by a court of competent jurisdiction), the Lender shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(f)    Disbursement Procedures.  The Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Lender shall promptly notify the Borrower Representative by telephone (confirmed by fax or through Electronic Systems) of such demand for payment and whether the Lender has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve any Borrower of its obligation to reimburse the Lender with respect to any such LC Disbursement.

(g)    Interim Interest.  If the Lender shall make any LC Disbursement, then, unless the Borrowers shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrowers reimburse such LC Disbursement, at the rate per annum then applicable to CBFR Revolving Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrowers fail to reimburse such LC Disbursement when due pursuant to paragraph (d) of this Section, then Section 2.12(d) shall apply.

(h)    Cash Collateralization.  If any Default shall occur and be continuing, on the Business Day that the Borrower Representative receives notice from the Lender demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account with the Lender, in the name and for the benefit of the Lender (the "LC Collateral Account"), an amount in cash equal to 105% of the amount of the LC Exposure as of such date plus accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in clause (h) or (i) of Article VII.  The Borrowers also shall deposit cash collateral in

5

accordance with this paragraph as and to the extent required by Section 2.10(b). Each such deposit shall be held by the Lender as collateral for the payment and performance of the Secured Obligations. The Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and each Borrower hereby grants the Lender a security interest in the LC Collateral Account and all money or other assets on deposit therein or credited thereto. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Lender and at the Borrowers' risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account. Moneys in the LC Collateral Account shall be applied by the Lender for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other Secured Obligations. If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of a Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrowers within three (3) Business Days after all such Defaults have been cured or waived as confirmed in writing by the Lender.

(i) <u>LC Exposure Determination</u>. For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at the time of determination.

(j) <u>Letters of Credit Issued for Account of Subsidiaries</u>. Notwithstanding that a Letter of Credit issued or outstanding hereunder supports any obligations of, or is for the account of, a Subsidiary, or states that a Subsidiary is the "account party," "applicant," "customer," "instructing party," or the like of or for such Letter of Credit, and without derogating from any rights of the Lender (whether arising by contract, at law, in equity or otherwise) against such Subsidiary in respect of such Letter of Credit, the Borrowers (i) shall reimburse, indemnify and compensate the Lender hereunder for such Letter of Credit (including to reimburse any and all drawings thereunder) as if such Letter of Credit had been issued solely for the account of the Borrower and (ii) irrevocably waives any and all defenses that might otherwise be available to it as a guarantor or surety of any or all of the obligations of such Subsidiary in respect of such Letter of Credit. Each Borrower hereby acknowledges that the issuance of such Letters of Credit for its Subsidiaries inures to the benefit of such Borrower, and that such Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

SECTION 2.06. <u>Funding of Borrowings</u>. The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrowers by promptly crediting the amounts in immediately available funds to the Funding Account(s); provided that CBFR Revolving Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(d), deemed requests for Borrowings under Section 2.17(c), and Protective Advances shall be retained by the Lender.

SECTION 2.07. <u>Interest Elections</u>. (a) Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request. Thereafter, the Borrower Representative may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower Representative may elect different options with respect to different portions of the affected Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. This Section shall not apply to Protective Advances, which may not be converted or continued.

(b) To make an election pursuant to this Section, the Borrower Representative shall notify the Lender of such election either in writing (delivered by hand or fax) by delivering an Interest Election Request signed by a Responsible Officer of the Borrower Representative or through Electronic System if arrangements for doing so have been approved by the Lender (or if an Extenuating Circumstance shall exist, by telephone) by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable and each such telephonic Interest Election Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, Electronic

System or facsimile to the Lender of a written Interest Election Request in a form approved by the Lender and signed by a Responsible Officer of the Borrower Representative.

(c)      Each written (or if permitted, telephonic) Interest Election Request (including requests submitted through Electronic System) shall specify the following information in compliance with Section 2.02:

(i)      the name of the applicable Borrower and the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)      the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)      whether the resulting Borrowing is to be a CBFR Borrowing or a Eurodollar Borrowing; and

(iv)      if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(d)      If the Borrower Representative fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to a CBFR Borrowing. Notwithstanding any contrary provision hereof, if a Default has occurred and is continuing and the Lender so notifies the Borrower Representative, then, so long as a Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an CBFR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.08. <u>Termination of Commitment</u>.      (a)      Unless previously terminated, the Revolving Commitment shall terminate on the Maturity Date.

(b)      The Borrowers may at any time terminate the Revolving Commitment upon the Payment in Full of the Secured Obligations.

(c)      The Borrower Representative shall notify the Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof. Each notice delivered by the Borrower Representative pursuant to this Section shall be irrevocable; <u>provided</u> that a notice of termination of the Revolving Commitment delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower Representative (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied. Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09. <u>Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds;</u> <u>Evidence of Debt</u>.

(a)      Each Borrower hereby unconditionally, jointly and severally, promises to pay to the Lender (i) the then unpaid principal amount of each Revolving Loan on the Maturity Date, and (ii) the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the Lender.

(b)     All funds deposited into any Lock Box subject to a Lock Box Agreement or into a Collateral Deposit Account will be swept on a daily basis into a collection account maintained by the Borrowers with the Lender (the "Collection Account"). The Lender shall hold and apply funds received into the Collection Account as provided herein below.

(c)     All amounts deposited in the Collection Account shall be deemed received by the Lender in accordance with Section 2.17.  On each Business Day, the Lender shall apply all immediately available funds credited to the Collection Account, (i) if no Cash Dominion Period is in effect, by depositing such funds into the Borrowers' Funding Account, or (ii) during any Cash Dominion Period, first to prepay any Protective Advances that may be outstanding, and second to prepay the Revolving Loans and to cash collateralize outstanding LC Exposure.

(d)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to the Lender resulting from each Loan made by the Lender, in which the Lender shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.  The entries made in such accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans and other Obligations in accordance with the terms of this Agreement.

(e)     The Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall execute and deliver to the Lender a promissory note payable to the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form prepared by the Lender.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.10. Prepayment of Loans.  (a)  The Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (e) of this Section and, if applicable, payment of any break funding expenses under Section 2.15.

(b)     In the event and on such occasion that the Revolving Exposure exceeds the lesser of (A) the Revolving Commitment, minus the Availability Block, if applicable, and (B) the Borrowing Base, the Borrowers shall prepay the Revolving Loans and LC Exposure or cash collateralize LC Exposure in accordance with Section 2.05(h), as applicable in an aggregate amount equal to such excess.

(c)     In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrowers shall, immediately after such Net Proceeds are received by any Loan Party, prepay the Obligations and cash collateralize LC Exposure as set forth in Section 2.10(d) below in an aggregate amount equal to (x) in the case of a prepayment event described in clause (c) of the definition of the term "Prepayment Event", 50% of such Net Proceeds and (y) in the case of all other Prepayment Events, 100% of such Net Proceeds, provided that, in the case of any event described in clause (a) or (b) of the definition of the term "Prepayment Event", if the Borrower Representative shall deliver to the Lender a certificate of a Financial Officer to the effect that the Loan Parties intend to apply the Net Proceeds from such event (or a portion thereof specified in such certificate), within 180 days after receipt of such Net Proceeds, to acquire (or replace or rebuild) real property, equipment or other tangible assets (excluding inventory) to be used in the business of the Loan Parties, and certifying that no Default or Event of Default has occurred and is continuing, then either (i) so long as a Cash Dominion Period is not in effect, no prepayment shall be required pursuant to this paragraph in respect of the Net Proceeds specified in such certificate or (ii) if a Cash Dominion Period is in effect, then, if the Net Proceeds specified in such certificate are to be applied to acquire, replace or rebuild such assets by (A) the Borrowers, then such Net Proceeds shall be applied by the Lender to reduce the outstanding principal balance of the Revolving Loans (without a permanent reduction of the Revolving Commitment) and upon such application, the Lender shall establish a Reserve against the Borrowing Base in an amount equal to the amount of such proceeds so applied and (B) any Loan Party that is not a Borrower, such Net

Proceeds shall be deposited in a cash collateral account, and in the case of either (A) or (B), thereafter, such funds shall be made available to the applicable Loan Party as follows:

(1)    The Borrower Representative shall request a Revolving Borrowing (specifying that the request is to use Net Proceeds pursuant to this Section) or the applicable Loan Party shall request a release from the cash collateral account be made in the amount needed;

(2)    so long as the conditions set forth in Section 4.02 have been met, the Lender shall make such Revolving Borrowing or the Lender shall release funds from the cash collateral account; and

(3)    in the case of Net Proceeds applied against the Revolving Borrowing, the Reserve established with respect to such insurance proceeds shall be reduced by the amount of such Revolving Loan;

provided that to the extent of any such Net Proceeds therefrom that have not been so applied by the end of such 180-day period, a prepayment shall be required at such time in an amount equal to such Net Proceeds that have not been so applied.

(d)    Subject to the prepayment provisions set forth in any Rider with respect to Loans (other than Revolving Loans) made pursuant to such Rider, all such amounts pursuant to Section 2.10(c), shall be applied, first to prepay any Protective Advances that may be outstanding, and second to prepay the Revolving Loans without a corresponding reduction in the Revolving Commitment and to cash collateralize outstanding LC Exposure.

(e)    The Borrower Representative shall notify the Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Lender, of any prepayment hereunder not later than 10:00 a.m., Chicago time, (A) in the case of prepayment of a Eurodollar Borrowing three Business Days before the date of prepayment, and (B) in the case of prepayment of a CBFR Borrowing on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.12 and (ii) break funding payments pursuant to Section 2.15.

SECTION 2.11. Fees. (a)  The Borrowers agree to pay to the Lender a commitment fee, which shall accrue at the Commitment Fee Percentage on the average daily amount of the Available Revolving Commitment during the period from and including the Effective Date to but excluding the date on which the Revolving Commitment terminates. Accrued commitment fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    The Borrowers agree to pay (i) to the Lender a letter of credit fee with respect to Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Revolving Loans on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which the Revolving Commitment terminates and the date on which the Lender ceases to have any LC Exposure, and (ii) the Lender's standard fees and commissions with respect to the issuance, amendment, cancellation, negotiation, transfer, presentment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Accrued letter of credit fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand. Any other fees payable to the Lender pursuant to this paragraph shall be payable within 10 days after

demand. All letter of credit fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)      [Reserved].

(d)      The Borrowers agree to pay to the Lender the Closing Fee. The entire Closing Fee shall be deemed fully earned by the Lender and shall be due and payable in full on the Effective Date.

(e)      The Borrowers agree to pay to the Lender, during any Cash Dominion Period, a fee equal to the additional interest that the Borrowers would have paid in respect of the Revolving Loans, at the CBFR plus the Applicable Margin, as if each uncollected check had not been received in the Collection Account and credited to the Borrowers until the earlier of (i) the date that such check is actually collected and (ii) three Business Days after the Business Day that such check was actually received in the Collection Account. Such fee will be payable monthly in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand.

(f)      The Borrowers agree to pay to the Lender the Prepayment Fee, if any, set forth on the Terms Schedule.

(g)      All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender. Fees paid shall not be refundable under any circumstances.

SECTION 2.12. Interest. (a)  The Loans comprising CBFR Borrowings shall bear interest at the CBFR plus the Applicable Margin.

(b)      The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)      Each Protective Advance shall bear interest at the CBFR plus the Applicable Margin plus 2%.

(d)      Notwithstanding the foregoing, during the occurrence and continuance of a Default, the Lender may, at its option, by notice to the Borrower Representative, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(e)      Accrued interest on each Loan (for CBFR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitment; provided that (i) interest accrued pursuant to paragraphs (c) and (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a CBFR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)      All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the CB Floating Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Rate Indices shall be determined by the Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.13. Alternate Rate of Interest; Illegality.

(a)    If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(1)    the Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable (including, without limitation, by means of an Interpolated Rate or because the LIBO Screen Rate is not available or published on a current basis) for such Interest Period; or

(2)    the Lender determines the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Lender of making or maintaining its Loans included in such Borrowing for such Interest Period;

then the Lender shall give notice thereof to the Borrower Representative through Electronic System as provided in Section 8.01 as promptly as practicable thereafter and, until the Lender notifies the Borrower Representative that the circumstances giving rise to such notice no longer exist, (A) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and any such Eurodollar Borrowing shall be repaid or converted to a CBFR Borrowing on the last day of the then current Interest Period applicable thereto, and (B) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as a CBFR Borrowing.

(b)    If the Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the Lender or its applicable lending office to make, maintain, fund or continue any Eurodollar Borrowing, or any Governmental Authority has imposed material restrictions on the authority of the Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, on notice thereof by the Lender to the Borrower Representative, any obligations of the Lender to make, maintain, fund or continue Eurodollar Loans or to convert CBFR Borrowings to Eurodollar Borrowings will be suspended until the Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrowers will upon demand from the Lender, either convert or prepay all Eurodollar Borrowings to CBFR Borrowings, either on the last day of the Interest Period therefor, if the Lender may lawfully continue to maintain such Eurodollar Borrowings to such day, or immediately, if the Lender may not lawfully continue to maintain such Loans.  Upon any such conversion or prepayment, the Borrower will also pay accrued interest on the amount so converted or prepaid.

SECTION 2.14.  Increased Costs.  (a) If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)    impose on the Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans hereunder or any Letter of Credit; or

(iii)    subject the Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clause (b) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the Lender of  issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)      If the Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, the Commitments of or the Letters of Credit issued by the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)      A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error.  The Borrowers shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate the Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Lender notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15. Break Funding Payments.   In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default or as a result of any prepayment pursuant to Section 2.10 or any Rider), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.08(c) and is revoked in accordance therewith), then, in any such event, the Borrowers shall compensate the Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to the Lender shall be deemed to include an amount determined by the Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Eurodollar Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Eurodollar Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of the Lender setting forth any amount or amounts that the Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error.  The Borrowers shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.16. Taxes.   (a) Withholding of Taxes; Gross Up.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.16) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for, Other Taxes.

(c)     Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.16, such Loan Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)     Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Loan Party by the Lender shall be conclusive absent manifest error.

(e)     Treatment of Certain Refunds. If the Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes  as to which it has been indemnified pursuant to this Section (including the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid over pursuant to this Section 2.16(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.16(e), in no event will the Lender be required to pay any amount to an indemnifying party pursuant to this Section 2.16 the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This Section 2.16(e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)     Survival.  Each party's obligations under this Section shall survive the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document (including the Payment in Full of the Secured Obligations).

(g)     Defined Terms.  For purposes of this Section 2.16, the term "applicable law" includes FATCA.

SECTION 2.17. Payments Generally; Allocation of Proceeds.    (a)    The Borrowers shall make each payment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.14, 2.15 or 2.16, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due, in immediately available funds, without setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender at its offices at 10 South Dearborn Street, Floor L2, Chicago, Illinois.  Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)     Any payments received by the Lender (including from proceeds of Collateral) (i) not constituting either (A) a specific payment of principal, interest, fees or other sums payable under the Loan Documents (which shall be applied as specified by the Borrower Representative), (B) a mandatory prepayment

(which shall be applied in accordance with Section 2.10 or any applicable Rider), or (C) amounts to be applied from the Collection Account during a Cash Dominion Period (which shall be applied in accordance with Section 2.09(c)), shall be applied by the Lender to the payment of the Secured Obligations in such order as the Lender may elect in its sole discretion.  Notwithstanding the foregoing, amounts received from any Loan Party shall not be applied to any Excluded Swap Obligation of such Loan Party.  Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower Representative, or unless a Default is in existence, the Lender shall not apply any payment which it receives to any Eurodollar Loan of a Class, except (a) on the expiration date of the Interest Period applicable thereto or (b) in the event, and only to the extent, that there are no outstanding CBFR Loans of the same Class and, in any such event, the Borrowers shall pay the break funding payment required in accordance with Section 2.15. The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

(c)     At the election of the Lender, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums chargeable to or required to be paid by the Borrowers under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower Representative pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with the Lender.  Each Borrower hereby irrevocably authorizes (i) the Lender, even if the conditions precedent set forth in Section 4.02 have not been satisfied, to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 8.03) and that all such Borrowings shall be deemed to have been requested pursuant to Sections 2.03 or 2.04, as applicable and (ii) the Lender to charge any deposit account of any Borrower maintained with the Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

(d)     The Lender may from time to time provide the Borrowers with account statements or invoices with respect to any of the Secured Obligations (the "Statements").  The Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrowers' convenience.  Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Secured Obligations. If the Borrowers pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrowers shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Lender's right to receive payment in full at another time.

SECTION 2.18. Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender.  The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.18 shall survive the termination of this Agreement.

ARTICLE III
Representations and Warranties

Each Loan Party represents and warrants to the Lender that:

14

SECTION 3.01. Organization; Powers.    Each Loan Party and each Subsidiary is duly organized, or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02. Authorization; Enforceability.  The Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. Governmental Approvals; No Conflicts.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

SECTION 3.04. Financial Condition; No Material Adverse Change.    (a)    Borrowers have heretofore furnished to the Lender their consolidated and consolidating balance sheets and statements of income, stockholders equity and cash flows (i) as of and for the Reference Fiscal Year, reported on by the Borrowers' Accountants, and (ii) as of and for the Interim Fiscal Period certified by its Financial Officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Borrowers and their consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments (all of which, when taken as a whole, would not be materially adverse) and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the last day of the Reference Fiscal Year.

SECTION 3.05. Properties.   (a)   As of the date of this Agreement, Section 3.05 of the Disclosure Certificate sets forth the address of each parcel of real property that is owned or leased by any Loan Party. Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists.  Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)    Each Loan Party and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth in Section 3.05 of the Disclosure Certificate, and the use thereof by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person, and each Loan Party's and each Subsidiary's rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06. Litigation and Environmental Matters.  (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any Loan Document or the Transactions.

(b)       Except for the Disclosed Matters (i) no Loan Party nor any Subsidiary has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)       Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07. Compliance with Laws and Agreements; No Default.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party and each Subsidiary is in compliance with (i) all Requirement of Law applicable to it or its property and (ii) all indentures, agreements and other instruments binding upon it or its property.  No Default has occurred and is continuing.

SECTION 3.08. Investment Company Status.   No Loan Party or any Subsidiary is an investment company as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09. Taxes.  Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not be expected to result in a Material Adverse Effect.  No Liens have been filed and no claims are being asserted with respect to any such Taxes.

SECTION 3.10. ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of all such underfunded Plans.

SECTION 3.11. Disclosure.   (a) The Loan Parties have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Lender in connection with this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

(b)       As of the Effective Date, to the best knowledge of any Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

SECTION 3.12. <u>Material Agreements</u>.  All Material Agreements to which any Loan Party is a party or is bound as of the date of this Agreement are listed in Section 3.12 of the Disclosure Certificate.  No Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any Material Agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13. <u>Solvency</u>.  (a) Immediately after the consummation of the Transactions to occur on the Effective Date, (i) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, and (iv) no Loan Party will have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted after the Effective Date.

(b)     No Loan Party intends to, nor will permit any Subsidiary to, and no Loan Party believes that it or any Subsidiary will, incur debts beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary.

SECTION 3.14. <u>Insurance</u>.  Section 3.14 of the Disclosure Certificate sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums in respect of such insurance have been paid.  The Borrowers maintain, and have caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15. <u>Capitalization and Subsidiaries</u>.  Section 3.15 of the Disclosure Certificate sets forth (a) a correct and complete list of the name and relationship to the Borrowers of each Subsidiary, (b) a true and complete listing of each class of each of the Borrowers' authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified in Section 3.15 of the Disclosure Certificate, and (c) the type of entity of each Borrower and each Subsidiary.  All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.  There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

SECTION 3.16. <u>Security Interest in Collateral</u>.  The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all of the Collateral in favor of the Lender, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Lender pursuant to any applicable law or agreement and (b) Liens perfected only by possession (including possession of any certificate of title) to the extent the Lender has not obtained or does not maintain possession of such Collateral.

SECTION 3.17. <u>Employment Matters</u>. As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

SECTION 3.18. <u>Margin Regulations</u>.  No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or Letter of Credit extension hereunder will be used to buy or carry any Margin Stock.  Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

SECTION 3.19. <u>Use of Proceeds</u>.  The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.08.

SECTION 3.20. <u>No Burdensome Restrictions</u>.  No Loan Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21. <u>Anti-Corruption Laws and Sanctions</u>.  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and, to the knowledge of such Loan Party, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (a) any Loan Party, any Subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing or Letter of Credit, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22. <u>Affiliate Transactions</u>.  Except as set forth on Section 3.22 of the Disclosure Certificate, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees, or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party.  Notwithstanding anything to the contrary contained herein, Lender acknowledges that the Loan Parties have and will likely continue in the future to engage in arm's length transactions with Affiliates in the ordinary course of business and that, provided such transactions are conducted at arm's length and consistent with existing practice, such transactions shall not result in an Event of Default hereunder.

SECTION 3.23. <u>Common Enterprise</u>.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lender to the Borrowers hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24. <u>Plan Assets; Prohibited Transactions</u>.  No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery or performance of the transactions contemplated under this Agreement, including the making of any Loan and the issuance of any Letter of Credit hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

ARTICLE IV
Conditions

SECTION 4.01. <u>Effective Date</u>.  The obligations of the Lender to make Loans and to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)    <u>Credit Agreement and Loan Documents</u>.  The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed on behalf of each party hereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that each such party has signed a counterpart of this Agreement, (ii) a counterpart of each other Loan Document (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Loan Document, (iii)  such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the Transactions, including all those documents and requirements listed in the Closing Conditions Schedule dated as of the date hereof among the Borrowers and the Lender, in each case in form and substance satisfactory to the Lender, and (iv) evidence satisfactory to the Lender as to the satisfaction of each of the items and requirements set forth in such Closing Conditions Schedule in a manner satisfactory to the Lender.

(b)    <u>Other Documents</u>.  The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower Representative of the Effective Date, and such notice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lender to make Loans and to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 2:00 p.m., Chicago time, on the 5th Business Day following the date of this Agreement (and, in the event such conditions are not so satisfied or waived, the Commitment shall terminate at such time).

SECTION 4.02. <u>Each Credit Event</u>.  The obligation of the Lender to make a Loan on the occasion of any Borrowing, and to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

(b)    At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, (i) no Default shall have occurred and be continuing and (ii) no Protective Advance shall be outstanding.

(c)    After giving effect to any Borrowing or the issuance, amendment, renewal or extension of any Letter of Credit, Availability shall not be less than zero.

Each Borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by each Borrower on the date thereof as to the matters specified in paragraphs (a), (b) and (c) of this Section.

ARTICLE V
Affirmative Covenants

Until all of the Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 5.01. Financial Statements; Borrowing Base and Other Information. The Borrowers will furnish to the Lender the information required under the Reporting Schedule attached hereto within the applicable time periods set forth therein.

SECTION 5.02. Notices of Material Events. The Borrowers will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)    the occurrence of any Default;

(b)    receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party or any Subsidiary in excess of $100,000, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c)    any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)    any loss, damage, or destruction to the Collateral in the amount of $100,000 or more, whether or not covered by insurance;

(e)    within two Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)    all material amendments to any Material Agreement, together with a copy of each such amendment;

(g)    any material change in accounting or financial reporting practices by the Borrower or any Subsidiary;

(h)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding $100,000;

(i)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(j)    any change in the information provided in the Beneficial Ownership Certification delivered to the Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower Representative setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. Existence; Conduct of Business. Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal

existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04. Payment of Obligations. Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; provided, however, each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05. Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06. Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender, or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  Each Loan Party acknowledges that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the Lender with access to its suppliers.

SECTION 5.07. Compliance with Laws and Material Contractual Obligations.  Each Loan Party will, and will cause each Subsidiary to, (i) comply with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws) and (ii) perform in all material respects its obligations under Material Agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08. Use of Proceeds.  (a) The proceeds of the Loans and the Letters of Credit will be used only for working capital and general organizational purposes in the ordinary course of business.  No part of the proceeds of any Loan and no Letter of Credit will be used, whether directly or indirectly, (i) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X or (ii) to make any Acquisition, except as may be permitted by a Rider attached hereto.

(b)      No Borrower will request any Borrowing or Letter of Credit, and no Borrower shall use, and each Borrower shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws to the extent such activity, businesses or transactions would be prohibited by Sanctions, if conducted by a corporation incorporated in the United States or the European Union, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

.

SECTION 5.09. Accuracy of Information.   The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Lender in connection with this Agreement or any other Loan Document contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by each Borrower on the date thereof as to the matters specified in this Section; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10. Insurance. (a) Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  The Borrowers will furnish to the Lender, upon request of the Lender, but no less frequently than annually, information in reasonable detail as to the insurance so maintained.

(b)      In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area").  The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Commitment or the total replacement cost value of the improvements.

(c)      All insurance policies required hereunder or under this Section 5.10 shall name the Lender as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the Lender, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to the Lender; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least 30 days prior written notice given to the Lender.

(d)      All premiums on such insurance shall be paid when due, and copies of the policies delivered to the Lender.  If a Loan Party fails to obtain any insurance as required by this Section, the Lender may obtain such insurance at the Borrowers' expense.    By purchasing such insurance, the Lender shall not be deemed to have waived any Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

SECTION 5.11. Casualty and Condemnation.  The Borrowers will (a) furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with any applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.12. Appraisals.  At any time that the Lender requests, each Loan Party will, and will cause each Subsidiary to, provide the Lender with appraisals or updates thereof of its Inventory, Equipment and real property, as applicable, from an appraiser selected and engaged by the Lender, and prepared on a basis satisfactory to the Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law.

SECTION 5.13. Depository Banks.  Each of the Borrowers and their Subsidiaries will maintain the Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of its business.  Notwithstanding the foregoing,

Lender acknowledges and agrees that the Loan Parties conduct their banking operations at depository institutions other than Lender as of the date of this Agreement and that the Loan Parties will require approximately eight (8) weeks from the date hereof to comply with this Section 5.13. The Loan Parties agree to use their respective best efforts to transition their banking activities to Lender and otherwise to comply with this Section 5.13 as soon as practicable after the date of this Agreement, but in no event later than 90 days after the date of this Agreement.

SECTION 5.14. Additional Collateral; Further Assurances. (a) Subject to applicable Requirements of Law, each Loan Party will cause each Domestic Subsidiary to become a Loan Party by executing a joinder agreement in form satisfactory to the Lender. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Lender, for the benefit of the Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)  Each Loan Party will cause 100% of the issued and outstanding Equity Interests of each of its Domestic Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.

(c)  Without limiting the foregoing, each Loan Party will execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Lender and all at the expense of the Loan Parties.

(d)  If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower Representative will (i) notify the Lender, and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.15. Receivables. (a) Certain Agreements on Receivables. No Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, the Loan Parties may reduce the amount of Accounts arising from the sale of Inventory in accordance with their present policies and in the ordinary course of business.

(b)  Collection of Receivables. Except as otherwise provided in this Agreement or the Security Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivables.

(c)  Delivery of Invoices. The Borrowers will deliver to the Lender immediately upon its request after the occurrence and during the continuation of an Event of Default duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the Lender shall specify.

(d)  Disclosure of Counterclaims on Receivables. If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable exists or (ii) if, to the knowledge of any Loan Party, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to a Receivable, the applicable Borrower will promptly disclose such fact to the Lender in writing. The Borrowers shall send the Lender a copy of each credit memorandum in excess of the $50,000 as soon as issued by any Loan Party, and the applicable Borrower shall promptly report each credit memo and each of the facts

required to be disclosed to the Lender in accordance with this Section 5.15(d) on the Borrowing Base Certificates submitted by it.

SECTION 5.16. Inventory and Equipment. (a) Maintenance of Goods. Each Loan Party will do all things necessary to maintain, preserve, protect and keep its Inventory and Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)   Returned Inventory. If an Account Debtor returns any Inventory to a Loan Party when no Event of Default exists, then such Loan Party shall promptly determine the reason for such return and shall issue a credit memorandum to the Account Debtor in the appropriate amount. The Borrowers shall immediately report to the Lender any return involving an amount in excess of the $50,000. Each such report shall indicate the reasons for the returns and the locations and condition of the returned Inventory. In the event any Account Debtor returns Inventory to a Loan Party when an Event of Default exists, such Loan Party, upon the request of the Lender, shall: (i) hold the returned Inventory in trust for the Lender; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the Lender's written instructions; and (iv) not issue any credits or allowances with respect thereto without the Lender's prior written consent. All returned Inventory shall be subject to the Lender's Liens thereon. Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)   Inventory Count; Perpetual Inventory System. Each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the Lender requests. Each Loan Party, at its own expense, shall deliver to the Lender the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory. Unless waived by the Lender, each Loan Party will maintain a perpetual inventory reporting system at all times.

(d)   Equipment. Each Loan Party shall promptly inform the Lender of any additions to or deletions from the Equipment which individually or in the aggregate exceed the $50,000. Each Loan Party shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Lender does not have a Lien. Each Loan Party will not, without the Lender's prior written consent, alter or remove any identifying symbol or number on any of such Loan Party's Equipment constituting Collateral.

ARTICLE VI
Negative Covenants

Until all Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01. Indebtedness. No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)   the Secured Obligations;

(b)   Indebtedness existing on the date hereof and set forth in Section 6.01 of the Disclosure Certificate and any extensions, renewals, refinancings and replacements of any such Indebtedness in accordance with clause (f) hereof;

(c)   Indebtedness of any Borrower to any Subsidiary and of any Subsidiary to any Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to any Borrower or any other Loan Party shall be subject to Section 6.04 and (ii) Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Secured Obligations on terms reasonably satisfactory to the Lender;

(d)    Guarantees by any Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of any Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by any Borrower or other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)    Indebtedness of any Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) below; provided that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (e) together with any Refinance Indebtedness in respect thereof permitted by clause (f) below, shall not exceed the Purchase Money Debt Limit at any time outstanding;

(f)    Indebtedness which represents extensions, renewals, refinancing or replacements (such Indebtedness being so extended, renewed, refinanced or replaced being referred to herein as the "Refinance Indebtedness") of any of the Indebtedness described in clauses (b),(e), (i) and (j) hereof (such Indebtedness being referred to herein as the "Original Indebtedness"); provided that (i) such Refinance Indebtedness does not increase the principal amount or interest rate of the Original Indebtedness, (ii) any Liens securing such Refinance Indebtedness are not extended to any additional property of any Loan Party or any Subsidiary, (iii) no Loan Party or any Subsidiary that is not originally obligated with respect to repayment of such Original Indebtedness is required to become obligated with respect to such Refinance Indebtedness, (iv) such Refinance Indebtedness does not result in a shortening of the average weighted maturity of such Original Indebtedness, (v) the terms of such Refinance Indebtedness are not less favorable to the obligor thereunder than the original terms of such Original Indebtedness and (vi) if such Original Indebtedness was subordinated in right of payment to the Secured Obligations, then the terms and conditions of such Refinance Indebtedness must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to such Original Indebtedness;

(g)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(h)    Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(i)    Subordinated Indebtedness in an aggregate principal amount not exceeding the Subordinated Debt Limit at any time outstanding;

(j)    other unsecured Indebtedness in an aggregate principal amount not exceeding the Unsecured Debt Limit at any time outstanding;

(k)    Indebtedness of any Person that becomes a Loan Party after the date hereof in connection with a Permitted Acquisition or that is assumed by a Borrower in connection with a Permitted Acquisition; provided that (i) such Indebtedness exists at the time such Permitted Acquisition is consummated and is not created in contemplation of or in connection therewith, and (ii) the aggregate principal amount of Indebtedness permitted by clause (i) above, together with any Refinance Indebtedness in respect thereof permitted by Section 6.01(f) (it being understood that Indebtedness under clause (i) above shall constitute "Original Indebtedness" for purposes of Section 6.01(f)), shall not exceed $1,000,000 at any time outstanding; and

(l)    such other Indebtedness as may be permitted under the terms of any Rider attached hereto.

SECTION 6.02. Liens.  No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a)       Liens created pursuant to any Loan Document;

(b)       Permitted Encumbrances;

(c)       any Lien on any property or asset of any Borrower or any Subsidiary existing on the date hereof and set forth in Section 6.02 of the Disclosure Certificate; provided that (i) such Lien shall not apply to any other property or asset of such Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d)       Liens on fixed or capital assets acquired, constructed or improved by any Borrower or any Subsidiary; provided that (i) such Liens secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 80% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Liens shall not apply to any other property or assets of any Borrower or Subsidiary;

(e)       Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(f)       Liens arising out of Sale and Leaseback Transactions permitted by Section 6.06;

(g)       Liens granted by a Subsidiary that is not a Loan Party in favor of any Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary;

(h)       any Lien existing on any property or asset (other than Accounts and Inventory) prior to the acquisition thereof by a Borrower pursuant to a Permitted Acquisition or existing on any property or asset (other than Accounts and Inventory) of any Person prior to the time such Person becomes a Loan Party in connection with a Permitted Acquisition; provided that (i) such Lien exists at the time such Permitted Acquisition is consummated and is not created in contemplation of or in connection therewith, (ii) such Lien shall not apply to any other property or assets of such Borrower or such Loan Party, and (iii) such Lien shall secure only those obligations which it secures on the date such Permitted Acquisition is consummated and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof; and

(i)       such other Liens as may be permitted under the terms of any Rider attached hereto.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrances and clause (a) above, or (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clause (a) above.

SECTION 6.03. Fundamental Changes.  (a) Absent Lender's prior written consent, no Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Subsidiary of any Borrower may merge into a Borrower in a transaction in which such Borrower is the surviving entity, (ii) any Loan Party (other than a Borrower) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party and (iii) any  Subsidiary that is not a Loan Party may liquidate or dissolve if the Borrower which owns such Subsidiary determines in good faith that such liquidation or dissolution is in the best interests of such Borrower and is not materially disadvantageous to the Lender; provided that any such merger involving a Person

that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)       No Loan Party will, nor will it permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrowers and their Subsidiaries on the date of hereof and businesses reasonably related thereto.

(c)       No Loan Party will, nor will it permit any Subsidiary to, change its fiscal year from the basis in effect on the Effective Date.

(d)       No Loan Party will change the accounting basis upon which its financial statements are prepared.

(e)       No Loan Party will change the tax filing elections it has made under the Code.

(f)       No Loan Party will change the type of entity that it is.

(g)       No Loan Party will change its organization identification number, if any, issued by its state of incorporation or other organization

(h)       No Loan Party will change its state of incorporation or organization, in each case, unless the Lender shall have received at least 30 days prior written notice of such change and the Lender shall have acknowledged in writing that either (1) such change will not adversely affect the validity, perfection or priority of the Lender's security interest in the Collateral, or (2) any reasonable action requested by the Lender in connection therewith has been completed or taken (including any action to continue the perfection of any Liens in favor of the Lender in any Collateral), *provided that*, any new location of incorporation or organization shall be in the continental U.S.

SECTION 6.04. <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.   No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)       Permitted Investments, subject to control agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

(b)       investments in existence on the date hereof and described in Section 6.04 of the Disclosure Certificate;

(c)       investments by the Borrowers and their Subsidiaries in Equity Interests in their respective Subsidiaries, <u>provided</u> that (A) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement  and (B) the aggregate amount of investments by Loan Parties in Subsidiaries that are not Loan Parties (together with outstanding intercompany loans permitted under clause (B) to the proviso to Section 6.04(d) and outstanding Guarantees permitted under the proviso to Section 6.04(e)) shall not exceed the Investment Limit at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(d)       loans or advances made by any Loan Party to any Subsidiary and made by any Subsidiary to a Loan Party or any other Subsidiary, <u>provided</u> that (A) any such loans and advances made by a Loan Party shall be evidenced by a promissory note pledged pursuant to the Security Agreement and (B) the amount of such loans and advances made by Loan Parties to Subsidiaries that are not Loan Parties (together

27

with outstanding investments permitted under clause (B) to the proviso to Section 6.04(c) and outstanding Guarantees permitted under the proviso to Section 6.04(e)) shall not exceed the Investment Limit at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(e)    Guarantees constituting Indebtedness permitted by Section 6.01, provided that the aggregate principal amount of Indebtedness of Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party (together with outstanding investments permitted under clause (B) to the proviso to Section 6.04(c) and outstanding intercompany loans permitted under clause (B) to the proviso to Section 6.04(d)) shall not exceed the Investment Limit at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(f)    loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a maximum of $100,000 at any one time outstanding;

(g)    notes payable, or stock or other securities, issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(h)    investments in the form of Swap Agreements permitted by Section 6.07;

(i)    investments of any Person existing at the time such Person becomes a Subsidiary of a Borrower or consolidates or merges with a Borrower or any of the Subsidiaries so long as such investments were not made in contemplation of such Person becoming a Subsidiary or of such merger;

(j)    investments received in connection with the disposition of assets permitted by Section 6.05;

(k)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;" and

(l)    investments, purchases or acquisitions as may be permitted by the terms of any Rider attached hereto.

SECTION 6.05. Asset Sales. No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)    sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions of assets to any Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof;

(d)    sales, transfers and dispositions of Permitted Investments and other investments permitted by clauses (i) and (j) of Section 6.04;

(e)    Sale and Leaseback Transactions permitted by Section 6.06;

(f)       dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Borrower or any Subsidiary; and

(g)       sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other paragraph of this Section, provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this paragraph (g) shall not exceed $50,000 during any fiscal year of the Borrowers;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for at least 75% cash consideration.

SECTION 6.06. Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by any Borrower or any Subsidiary that is made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within 90 days after such Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset.

SECTION 6.07. Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which any Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of any Borrower or any Subsidiary), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Borrower or any Subsidiary.

SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) any Borrower may declare and pay dividends with respect to its common stock payable solely in additional shares of its common stock, and, with respect to its preferred stock, payable solely in additional shares of such preferred stock or in shares of its common stock, (ii) Subsidiaries may declare and pay dividends ratably with respect to its Equity Interests, and (iii) the Borrowers may make Restricted Payments, not exceeding $50,000 in the aggregate during any fiscal year,  pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrowers and their Subsidiaries, and (iv) so long as (A) the Loan Party is a "pass through" entity for federal income tax purposes, and (B) there exists no Event of Default, the Borrowers may pay dividends or make distributions to its shareholders/members in an aggregate amount not greater than the amount necessary for such shareholders/members to pay their actual state and United States federal income tax liabilities in respect of income earned by the Borrowers, after deducting any unused prior losses, and (v) Borrowers may make Other Restricted Payments (as defined in the Financial Covenants Schedule).

(b)       No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except (i) payment of Indebtedness created under the Loan Documents, (ii) payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited by the subordination provisions thereof, (iii) refinancings of Indebtedness to the extent permitted by Section 6.01, and (iv) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05.

SECTION 6.09. <u>Transactions with Affiliates</u>.  No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among any Borrower and any Subsidiary that is a Loan Party not involving any other Affiliate, (c) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04, (g) the payment of reasonable fees to directors of any Borrower or any Subsidiary who are not employees of such Borrower or Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrowers or their Subsidiaries in the ordinary course of business, (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by a Borrower's board of directors or other similar governing body, and (i) such other transactions involving Affiliates as to which Lender has consented in writing.

SECTION 6.10. <u>Restrictive Agreements</u>.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Section 6.10 of the Disclosure Certificate (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11. <u>Amendment of Material Documents</u>.  No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents or (c) any Material Agreement, to the extent any such amendment, modification or waiver would be adverse to the Lender.

SECTION 6.12. <u>Financial Covenants</u>.  Borrowers will comply in all respects with the financial covenants set forth on the Financial Covenants Schedule attached hereto.

ARTICLE VII
Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)      the Borrowers shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)      the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence) or 5.08 or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of (i) 5 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of Section 5.01, 5.02 (other than Section 5.02(a)), 5.03 through 5.07, 5.10, 5.11, 5.13, 5.15 or 5.16 of this Agreement or (ii) 15 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

(f)    any Loan Party or Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by Section 6.05;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or Subsidiary or its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    any Loan Party or Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)    any Loan Party or Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally to pay its debts as they become due;

(k)    (1) one or more judgments for the payment of money in an aggregate amount in excess of the Judgment Amount shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or Subsidiary to enforce any such judgment; or (2) any Loan Party or Subsidiary shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case,

are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l)     an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m)     a Change in Control shall occur;

(n)     the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(o)     the Loan Guaranty or any Obligation Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty or any Obligation Guaranty or a Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty or any Obligation Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty or any Obligation Guaranty to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08 or any notice of termination delivered pursuant to the terms of any Obligation Guaranty;

(p)     except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien;

(q)     any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r)     any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms, or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms; or

(s)     any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any property of such Loan Party having a fair market value in excess of the $100,000;

then, and in every such event (other than an event described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower Representative, take any or all of the following actions, at the same or different times:  (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any Prepayment Fees) and other Obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and (iii) require cash collateral for the LC Exposure in accordance with Section 2.05(h) hereof; and in the case of any event described in clause (h) or (i) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding and cash collateral for the LC Exposure, together with accrued interest thereon and all fees (including, for the avoidance of doubt, any Prepayment Fees) and other Obligations of the Borrowers accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers. The parties hereto acknowledge and agree that the Prepayment Fee referred to in this Article VII (i) is additional consideration for

providing the Revolving Commitment, (ii) constitutes reasonable liquidated damages to compensate the Lenders for (and is a proportionate quantification of) the actual loss of the anticipated stream of commitment fees upon a termination of the Revolving Commitment (such damages being otherwise impossible to ascertain or even estimate for various reasons, including, without limitation, because such damages would depend on, among other things, (x) when the Revolving Commitment might otherwise be terminated and (y) future changes in interest rates which are not readily ascertainable on the Effective Date), and (iii) is not a penalty to punish the Borrowers for its early termination of the Revolving Commitment or for the occurrence of any Event of Default or the occurrence of any other Prepayment Fee Event, as the case may be.    Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

ARTICLE VIII
Miscellaneous

SECTION 8.01. Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, to the addresses set forth on the Terms Schedule attached hereto.  All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)    Notices and other communications to the Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to item (c) of the Reporting Schedule attached hereto unless otherwise agreed by the Lender.  Each of the Lender and the Borrower Representative (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02. Waivers; Amendments.  (a)  No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that it would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific

instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Lender, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03. Expenses; Indemnity; Damage Waiver. (a) The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender, in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) reasonable out-of-pocket expenses incurred by the Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with: (A) appraisals and insurance reviews; (B) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination; (C) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Lender; (D) Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) filing financing statements and continuations, recording any Mortgages, and other actions to perfect, protect, and continue the Lender's Liens; (E) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (F) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral; provided that the Loan Parties shall not be obligated to reimburse the Lender for more than the number of appraisals and field examinations set forth in the Terms Schedule attached hereto during any calendar year unless a Default has occurred or exists during such calendar year. All of the foregoing fees, costs and expenses may be charged to the Borrowers as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)    The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.16, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the

extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.   This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)      To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)      All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04. Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Lender that issues any Letter of Credit), except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      The Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that, except in the case of an assignment to an Affiliate of the Lender or an Approved Fund, the Borrower Representative must give its prior written consent to such assignment (which consent shall not be unreasonably withheld; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Lender within five Business Days after having received notice thereof); and provided further that no consent of the Borrower Representative shall be required if an Event of Default has occurred and is continuing.  Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of the Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.15, 2.16 and 8.03). Each Borrower and each other Loan Party hereto hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders.  Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

For the purposes of this Section 8.04(b), the terms "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender or (c) an entity or an Affiliate of an entity that administers or manages the Lender.

"Ineligible Institution" means a (a) natural person, (b) holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof; provided that, with respect to clause (b), such holding company, investment vehicle or trust shall not constitute an Ineligible Institution if it (x) has not been established for the primary purpose of acquiring any Loans or Commitments, (y) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (z) has assets greater than $25,000,000 and a significant part of its activities consist of making or purchasing commercial loans and similar extensions of credit in the ordinary course of its business, or (c) a Loan Party or a Subsidiary or other Affiliate of a Loan Party.

(c)      The Lender may, without the consent of, or notice to, the Borrowers, sell participations to one or more banks or other entities other than an Ineligible Institution (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement.      Subject to paragraph (d) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.14, 2.15 and 2.16 (subject to the requirements and limitations therein) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were a Lender.  If the Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitment, Loans, Letters of Credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)      The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05. Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments   delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitment has not expired or terminated.  The provisions of Sections 2.14, 2.15, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated

hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 8.06. Counterparts; Integration; Effectiveness; Electronic Execution. (a) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 8.07. Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08. Right of Setoff. If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or such Affiliate to or for the credit or the account of any Borrower or Loan Guarantor against any and all of the Secured Obligations held by the Lender or such Affiliate, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of the Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness. The rights of the Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender and its Affiliates may have.

SECTION 8.09. Governing Law; Jurisdiction; Consent to Service of Process. (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the Governing State, but giving effect to federal laws applicable to national banks.

(b)    Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or Governing State court sitting in the Primary City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Lender or any of its Related Parties may only) be heard and determined in the Governing State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other

manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)    Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12. <u>Confidentiality</u>. The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower Representative, (h) to holders of Equity Interests in a Borrower, (i) to any Person providing a Guarantee of all or any portion of the Secured Obligations or (j) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrowers. For the purposes of this Section, "Information" means all information received from any Borrower relating to the Borrowers or their business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrowers; provided that, in the case of information received from the Borrowers after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13. <u>Nonreliance; Violation of Law</u>.  The Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrowers in violation of any Requirement of Law.

SECTION 8.14. <u>USA PATRIOT Act</u>.  The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15. <u>Disclosure</u>. Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16. <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by the Lender.

SECTION 8.17. <u>Marketing Consent</u>.  The Borrowers hereby authorize the Lender, at its sole expense, but without any prior approval by the Borrowers, to publish such tombstones and give such other publicity to this Agreement as it may from time to time determine in its sole discretion.  The foregoing authorization shall remain in effect unless and until the Borrowers notify the Lender in writing that such authorization is revoked.

SECTION 8.18. <u>Joint and Several</u>.  Each Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Lender for the Secured Obligations.  In furtherance thereof, each Borrower agrees that wherever in this Agreement it is provided that a Borrower is liable for a payment, such obligation is the joint and several obligation of each Borrower.  Each Borrower acknowledges and agrees that its joint and several liability under this Agreement and the Loan Documents is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Lender or any other Person.  Each Borrower's liability for the Secured Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the credit extended hereunder or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans or other extensions of credit made to, other Borrowers.  Each Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Borrower against any party liable for payment under this Agreement and the Loan Documents unless and until the Lender has been paid in full and all of the Secured Obligations are satisfied and discharged following termination or expiration of all commitments of the Lender to extend credit to the Borrowers.  Each Borrower's joint and several liability hereunder with respect to the Secured Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Secured Obligations or of any other document evidencing all or any part of the Secured Obligations, (ii) the absence of any attempt to collect any of the Secured Obligations from any other Loan Party or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the amendment, modification, waiver, consent, extension, forbearance or granting of any indulgence by the Lender with respect to any provision of any instrument executed by any other Loan Party evidencing or securing the payment of any of the Secured Obligations, or any other agreement now or hereafter executed by any other Loan Party and delivered to the Lender, (iv) the failure by the Lender to take any steps to perfect or maintain the perfected status of its Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Secured Obligations or the Lender's release of any Collateral or of its Liens upon any Collateral, (v) the release or

compromise, in whole or in part, of the liability of any other Loan Party for the payment of any of the Secured Obligations, (vi) any increase in the amount of the Secured Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, in each case, if consented to by any other Borrower, or any decrease in the same, or (vii) any other circumstance that might constitute a legal or equitable discharge or defense of any Loan Party. After the occurrence and during the continuance of any Event of Default, the Lender may proceed directly and at once, without notice to any Borrower, against any or all of Loan Parties to collect and recover all or any part of the Secured Obligations, without first proceeding against any other Loan Party or against any Collateral or other security for the payment or performance of any of the Secured Obligations, and each Borrower waives any provision that might otherwise require the Lender under applicable law to pursue or exhaust its remedies against any Collateral or other Loan Party before pursuing such Borrower or its property. Each Borrower consents and agrees that the Lender shall be under no obligation to marshal any assets in favor of any Loan Party or against or in payment of any or all of the Secured Obligations.

SECTION 8.19. No Fiduciary Duty, etc. Each Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that Lender will not have any obligations except those obligations expressly set forth herein and in the other Loan Documents and Lender is acting solely in the capacity of an arm's length contractual counterparty to each Borrower with respect to the Loan Documents and the transaction contemplated therein and not as a financial advisor or a fiduciary to, or an agent of, any Borrower or any other person. Each Borrower agrees that it will not assert any claim against the Lender based on an alleged breach of fiduciary duty by the Lender in connection with this Agreement and the transactions contemplated hereby. Additionally, each Borrower acknowledges and agrees that the Lender is not advising any Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. Each Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Lender shall have no responsibility or liability to any Borrower with respect thereto. Each Borrower further acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the Lender, together with its affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, the Lender may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, any Borrower and other companies with which any Borrower may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Lender or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, each Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the Lender and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. The Lender will not use confidential information obtained from any Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with such Borrower in connection with the performance by the Lender of services for other companies, and the Lender will not furnish any such information to other companies. Each Borrower also acknowledges that the Lender has no obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to any Borrower, confidential information obtained from other companies.

ARTICLE IX
Loan Guaranty

SECTION 9.01. Guaranty. Each Loan Guarantor, if any, (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, any Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "Guaranteed Obligations"); provided, however, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Loan Guarantor of

(or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02. Guaranty of Payment.    This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Lender to sue any Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03. No Discharge or Diminishment of Loan Guaranty.  (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

SECTION 9.04. Defenses Waived.    To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower, any Loan Guarantor, or any other Obligated Party other than the Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy

available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 9.05. Rights of Subrogation. No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06. Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Obligated Party or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Obligated Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07. Information. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Obligated Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08. Termination. The Lender may continue to make loans or extend credit to the Borrowers based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 9.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of Article VII hereof as a result of any such notice of termination.

SECTION 9.09. Taxes. Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10. Maximum Liability. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11. Contribution.

(a)    To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification are owing.

(e)    The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

SECTION 9.12. Liability Cumulative.    The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

SECTION 9.13. Keepwell.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.13 or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 9.13 shall remain in full force and effect until the termination of all Swap Obligations. Each Qualified ECP Guarantor intends that this Section 9.13 constitute, and this Section 9.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

ARTICLE X

The Borrower Representative

SECTION 10.01.  Appointment; Nature of Relationship.  Metal Partners is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "Borrower Representative") hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents.  The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Article X.  Additionally, the Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the Funding Account(s), at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower, provided that, in the case of a Revolving Loan, such amount shall not exceed such Borrower's Availability.  The Lender and its respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or the Borrowers pursuant to this Section 10.01.

SECTION 10.02.  Powers.  The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto.  The Borrower Representative shall have no implied duties to the Borrowers, or any obligation to the Lender to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

SECTION 10.03.  Employment of Agents.  The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

SECTION 10.04.  Notices.  Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default hereunder referring to this Agreement describing such Default and stating that such notice is a "notice of default."  In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to the Lender.  Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

SECTION 10.05.  Successor Borrower Representative.  Upon the prior written consent of the Lender, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative.

SECTION 10.06.  Execution of Loan Documents; Borrowing Base Certificate.  The Borrowers hereby empower and authorize the Borrower Representative, on behalf of the Borrowers, to execute and deliver to the Lender the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including without limitation, the Borrowing Base Certificate and the Compliance Certificates.  Each Borrower agrees that any action taken by the Borrower Representative or the Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

SECTION 10.07.  Reporting. Each Borrower hereby agrees that such Borrower shall furnish promptly after each fiscal month to the Borrower Representative a copy of its Borrowing Base Certificate and any other certificate or report required hereunder or requested by the Borrower Representative on which the Borrower Representative shall rely to prepare the Borrowing Base Certificate and Compliance Certificates required pursuant to the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

(Signature Page Follows)

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name: _____
Title: _____

*[Signature page to Credit Agreement]*

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By:_____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BCG Ownco, LLC,**
an Illinois limited liability company

By:_____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BRG Holding, LLC,**
a West Virginia limited liability company

By:_____
Name Frank A. Bergren, Jr.
Title: Sole Manager


**JPMORGAN CHASE BANK, N.A.**

By: Robert S. Sheppard
Name: ROBERT S. SHEPPARD
Title: AUTHORIZED OFFICER

*[Signature page to Credit Agreement]*

## Definitions Schedule

The following terms shall have the meanings given to them in the Terms Schedule attached hereto: "Applicable Margin", "Availability Block", "Borrowers' Accountants", "Cash Dominion Period", "Closing Fee", "Commitment Fee Percentage", "Governing State", "Investment Limit", "Judgment Amount", "LC Exposure Amount", "Maturity Date", "Prepayment Fee", "Primary City", "Purchase Money Debt Limit", "Reference Fiscal Year", "Revolving Commitment", "Subordinated Debt Limit", and "Unsecured Debt Limit".

The following terms shall have the meanings assigned to them in the Borrowing Base Schedule attached hereto: "Accounts Advance Rate", "Borrowing Base", "Eligible Accounts", "Eligible Inventory", "Epoxy Line Reserve", "Inventory Advance Rate", "Magnet Crane Reserve" and "NOLV Percentage".

The following terms shall have the meaning given to them in the Security Agreement: "Collateral Access Agreement", "Collateral Deposit Account", "Collection Account", "Control Agreement", "Lock Box Agreement", "Lock Boxes", "Perfection Certificate" and "Receivables".

The following terms shall have the meaning given to them in the Security Agreement: "Applicable Time", "Alternative Currency", "Alternative Currency L/C", "Dollar Equivalent", "EMU Legislation", Euro", "Participating Member State" and "Spot Rate".

The following terms shall have the meaning given to them in the UCC: "Account", "Document", "Equipment", and "Inventory".

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Effective Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period or for any CBFR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Adjusted One Month LIBOR Rate" means, for any day, an interest rate per annum equal to the sum of (i) 2.50% plus (ii) the Adjusted LIBO Rate for a one-month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day); provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the LIBO Screen Rate at approximately 11:00 a.m. London time on such day; provided further, that, if the LIBO Screen Rate at such time shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Anderson Distributions" distributions made to Douglas Anderson between January 1, 2018, and August 3, 2018, in connection with the Limited Liability Company Interest Purchase Agreement in an aggregate amount for all periods equal to the lesser of $400,000 or such actual distributions.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to any of the Borrowers or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"Availability" means, at any time, an amount equal to (a) the lesser of (i) the Revolving Commitment, minus the Availability Block, if applicable, and (ii) the Borrowing Base *minus* (b) the Revolving Exposure.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitment.

"Available Revolving Commitment" means, at any time, the Revolving Commitment minus the Revolving Exposure.

"Banking Services" means each and any of the following bank services provided to any Loan Party by the Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts, cash pooling services, and interstate depository network services), and (e) Lease Financing.

"Banking Services Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services, provided, however, Banking Services Obligations in respect of Lease Financing shall be limited to Lease Deficiency Obligations.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Beneficial Ownership Certification" means a certification regarding the beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Borrower" or "Borrowers" means, individually or collectively, Metal Partners, BCG and BRG.

"Borrower Representative" means Metal Partners, in its capacity as contractual representative of the Borrowers pursuant to Article X.

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, (b) a Protective Advance, and (c) in the case of any other Loan made pursuant to a Rider attached hereto, any such Loan made on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base Certificate" means a certificate, signed and certified as accurate and complete by a Financial Officer of the Borrower Representative, in form which is acceptable to the Lender in its sole discretion.

"Borrowing Request" means a request by the Borrower Representative for a Revolving Borrowing in accordance with Section 2.03 or, for another Class of Loan made pursuant to a Rider attached hereto, in accordance with such Rider.

"Burdensome Restriction" means any consensual encumbrance or restriction of the type described in Section 6.10.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan or a Loan accruing interest at REVLIBOR30 Rate without giving effect to the proviso contained in the definition for "REVLIBOR30 Rate, the term "Business Day" shall also exclude any day on which banks are not open for general business in London.

"Capital Lease Obligations" is defined in the Financial Covenants Schedule attached hereto.

"CB Floating Rate" means the Prime Rate; provided that the CB Floating Rate shall never be less than the Adjusted One Month LIBOR Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day). Any change in the CB Floating Rate due to a change in the Prime Rate or the Adjusted One Month LIBOR Rate shall be effective from and including the effective date of such change in the Prime Rate or the Adjusted One Month LIBOR Rate, respectively.

"CBFR", when used in reference to: (a) a rate of interest, refers to the REVLIBOR30 Rate, unless the REVLIBOR30 Rate shall not be available at such time, then it refers to the CB Floating Rate, and (b) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the REVLIBOR30 Rate or the CB Floating Rate.

"Change in Control" means (a) (i) Frank A. Bergren, Jr. shall cease to own, free and clear of all Liens or other encumbrances, at least 96% of the outstanding voting Equity Interests of Metal Partners on a fully diluted basis; (ii) Frank A. Bergren, Jr. shall cease to own, free and clear of all Liens or other encumbrances, at least 50% of the outstanding voting Equity Interests of BCG on a fully diluted basis; (iii) Frank A. Bergren, Jr., Jacob Gurke and James Reed shall cease to own, free and clear of all Liens or other encumbrances, collectively at least 100% of the outstanding voting Equity Interests of BRG on a fully diluted basis; or (b) occupation at any time of a majority of the seats (other than vacant seats) on the board of directors or other similar governing body of such Borrower by Persons who were not (i) directors of such Borrower on the date of this Agreement, nominated, appointed or approved for consideration by shareholders for election by the board of directors or other similar governing body of such Borrower, (ii) approved by the board of directors or other similar governing body of such Borrower as director candidates prior to their election, nor (iii) appointed by directors so nominated, appointed or approved; or (c) such Borrower shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of each other Loan Party on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by the Lender (or, for purposes of Section 2.14(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

3

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is a Revolving Loan, Protective Advance, or Loan of another Class made pursuant to a Rider attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations.

"Collateral Documents" means, collectively, the Security Agreement, any Mortgages, and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Lender.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Commitment" means the sum of the Revolving Commitment and any other commitment to make Loans pursuant to a Rider attached hereto.

"Commitment Fee Percentage" means 0.25% per annum.

"Compliance Certificate" is defined in the Reporting Schedule.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Controlled Disbursement Account" means any account of the Borrowers maintained with the Lender as a zero balance, cash management account pursuant to and under any agreement between a Borrower and the Lender, as modified and amended from time to time, and through which all disbursements of a Borrower, any Loan Party and any designated Subsidiary of a Borrower are made and settled on a daily basis with no uninvested balance remaining overnight.

"DDA Access Product" means the bank service provided to any Loan Party by the Lender in its sole discretion consisting of direct access to schedule payments from the Funding Account by electronic, internet or other access mechanisms that may be agreed upon from time to time by the Lender and the funding of such payments under the Loan Borrowing Option in the DDA Access Product Agreement.

"DDA Access Product Agreement" means the Lender's Treasury Services End of Day Investment & Loan Sweep Service Terms, as in effect on the date of this Agreement, as the same may be amended from time to time.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Dilution" means with respect to any trailing 12 month period, the percentage obtained by dividing (a) non-cash credits against or other non-cash reductions to Accounts (including, but not limited to returns, adjustments, write-offs, markdowns, discounts and rebates) of Borrowers for such period, as determined by Lender in its

4

discretion, by (b) gross invoiced sales of Borrowers for such period. Dilution may be updated from time to time by Lender in its discretion.

"Disclosure Certificate" means the disclosure certificate prepared, executed and delivered by the Loan Parties to the Lender.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Section 3.06 of the Disclosure Certificate.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrowers, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender or any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (i) the environment, (ii) preservation or reclamation of natural resources, (iii) the management, Release or threatened Release of any Hazardous Material or (iv) health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrowers, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b)

the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition upon any Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, and (b) any withholding Taxes imposed under FATCA.

"Extenuating Circumstance" means any period during which the Lender has determined in its sole discretion (i) that due to unforeseen and/or nonrecurring circumstances, it is impractical and/or not feasible to submit or receive a Borrowing Request or Interest Election Request by email or fax or through Electronic System, and (ii) to accept a Borrowing Request or Interest Election Request telephonically.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as the NYFRB shall set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Financial Officer" means the chief financial officer, chief accounting officer, treasurer or controller of any Borrower.

"Funding Account" means the deposit account of the Borrowers to which the Lender is authorized by the Borrowers to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Hazardous Materials"  means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Impacted Interest Period" has the meaning assigned to such term in the definition of "LIBO Rate".

"In-Transit Inventory L/C Reserve Add-Back" means, as of any date of determination, an amount equal to the product of (a) the LC Exposure for Letters of Credit issued to the sellers of in transit Eligible Inventory, provided the shipping documentation with respect to such in-transit Inventory names Lender as the sole consignee and the Letter of Credit can only be drawn upon acceptance of the underlying Inventory by Borrower or its agent in the United States,  multiplied by (b) the Inventory Advance Rate as of such date.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any earn-out (which for all purposes of this Agreement shall be valued at the maximum potential payable with respect to each such earn-out), (l) any other Off-Balance Sheet Liability of such Person, and (m) all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all

Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Interest Election Request" means a request by the Borrower Representative to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means (a) with respect to any CBFR Loan, the first Business Day of each calendar month and the Maturity Date, (b) with respect to any Eurodollar Loan, the last day of each Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, and (c) with respect to all Loans, the Maturity Date.

"Interest Period" means with respect to any Eurodollar Borrowing the period commencing on the date of such Eurodollar Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months thereafter, as the Borrower Representative may elect; provided, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, thereafter, shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Lender (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which the LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time; provided, that, if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"LC Disbursement" means any payment made by the Lender pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of the Dollar Equivalent of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements relating to Letters of Credit that have not yet been reimbursed by or on behalf of the Borrowers at such time.

"Lease Deficiency Obligation" means after default, repossession and disposition of the Equipment which is the subject of or which secures a Lease Financing, the amount, if any, by which (i) any and all obligations of the Loan Parties to a Lessor, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with a specific Lease Financing, exceeds (ii) the Net Proceeds realized by the Lessor upon the disposition of the Equipment which is the subject of or which secures the specific Lease Financing.

"Lease Financing" means (i) a lease of specific Equipment as defined in Article 2-A of the UCC, and (ii) a secured financing transaction secured by specific Equipment, whether that transaction is called a lease or a loan,

entered into by any Loan Party with the Lender or any of its Affiliates (in this context, the "<u>Lessor</u>").

"<u>Letters of Credit</u>" means the letters of credit issued pursuant to this Agreement, and the term "Letter of Credit" means any one of them or each of them singularly, as the context may require.

"<u>Letter of Credit Agreement</u>" has the meaning assigned to it in <u>Section 2.05(b)</u>.

"<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any applicable Interest Period or for any CBFR Borrowing, the LIBO Screen Rate at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that, if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "<u>Impacted Interest Period</u>"), then the LIBO Rate shall be the Interpolated Rate, subject to Section 2.13 in the event that the Lender shall conclude that it shall not be possible to determine such Interpolated Rate (which conclusion shall be conclusive and binding absent manifest error). Notwithstanding the above, to the extent that "LIBO Rate" or "Adjusted LIBO Rate" is used in connection with a CBFR Borrowing, such rate shall be determined as modified by the definition of Adjusted One Month LIBOR Rate.

"<u>LIBO Screen Rate</u>" means, for any day and time, with respect to any Eurodollar Borrowing for any Interest Period or for any CBFR Borrowing, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion); provided that if the LIBO Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Loan Borrowing Option</u>" has the meaning assigned to such term in the DDA Access Product Agreement.

"<u>Loan Documents</u>" means, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, any Letter of Credit Agreement, the Collateral Documents, the Loan Guaranty, any Obligation Guaranty, and all other agreements, instruments, documents and certificates identified in or contemplated by Section 4.01 executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements, letter of credit applications and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits, riders or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, all waivers thereunder, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Loan Guarantor</u>" means each Loan Party other than a Borrower.

"<u>Loan Guaranty</u>" means Article IX of this Agreement and each separate Guarantee, in form and substance satisfactory to the Lender, delivered by each Loan Guarantor.

"<u>Loan Parties</u>" means the Borrowers, the Borrowers' Domestic Subsidiaries, and any other Person who becomes a party to this Agreement pursuant to a joinder agreement and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Loans" means the loans and advances made by the Lender pursuant to this Agreement, including Protective Advances and any loans made pursuant to a Rider hereto.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations, (c) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"Material Agreements" means all agreements, documents, instruments or contracts which, if cancelled or terminated, would have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties or any Subsidiary in an aggregate principal amount exceeding the $100,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Loan Parties or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party or Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Lender, on real property of a Loan Party.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the Borrower Representative).

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Lender from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the Secured Obligations executed and delivered to the Lender by a guarantor who is not a Loan Party.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all LC Exposure, all accrued and unpaid fees (including, without limitation, any Prepayment Fees) and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the Lender or any indemnified party individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or any of the Letters of Credit or other instruments at any time evidencing any thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.–managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (i) the indefeasible payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (ii) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Lender of a cash deposit, or at the discretion of the Lender a backup standby letter of credit satisfactory to the Lender, in an amount equal to 105% of the LC Exposure as of the date of such payment), (iii) the indefeasible payment in full in cash of the accrued and unpaid fees, including the applicable Prepayment Fee, if any, (iv) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (v) the termination of all Commitments, and (vi) the termination of the Swap Agreement Obligations and the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"Participant" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII; and

(f)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"Permitted Investments" means:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)        money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepayment Event" means:

(a)        any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Section 6.05(a) unless the property or asset was included in the most recent Equipment appraisal delivered to Lender; or

(b)        any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than the $100,000; or

(c)        the issuance by any Borrower of any Equity Interests, or the receipt by any Borrower of any capital contribution; or

(d)        the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Lender) or any similar release by the Federal Reserve Board (as determined by the Lender). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Rate Indices" means CB Floating Rate, Adjusted LIBO Rate, REVLIBOR30 Rate, and LIBO Rate.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all

official rulings and interpretations thereunder or thereof.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Report" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrowers, after the Lender has exercised its rights of inspection pursuant to this Agreement.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person, and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means any and all reserves which the Lender deems necessary, in its Permitted Discretion, to maintain (including, without limitation, an availability reserve, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, volatility reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Swap Agreement Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, unindemnified or under indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"Responsible Officer" means the president, Financial Officer or other executive officer of any Borrower.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party or Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"REVLIBOR30 Rate" means the London interbank offered rate administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a one (1) month period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Lender in its reasonable discretion; in each case the "REVLIBOR30 Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the first Business Day of each month, adjusted monthly on the first Business Day of each month; provided that, (x) if the REVLIBOR30 Screen Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement and (y) if the REVLIBOR30 Screen Rate shall not be available at such time for such a period, then the REVLIBOR30 Rate shall be equal to the CB Floating Rate. Any change in the REVLIBOR30 Rate shall be effective from and include the effective date of such change.

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder up to the amount set forth in the Terms Schedule. The initial amount of the Lender's Revolving Commitment is $60,000,000.

"Revolving Exposure" means, at any time, the sum of (a) the outstanding principal amount of Revolving Loans and LC Exposure at such time, *minus* (b) the In-Transit Inventory L/C Reserve Add-Back, *plus* (c) the aggregate principal amount of Protective Advances outstanding at such time.

"Revolving Loan" means a Loan made pursuant to Section 2.01(a).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sanctioned Country" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State. the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Obligations" means all Obligations, together with all (i) Banking Services Obligations and (ii) Swap Agreement Obligations owing to the Lender or its Affiliates; provided, however, that the definition of "Secured Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor.

"Secured Parties" means (a) the Lender, (b) each Affiliate of the Lender that provides Banking Services, (c) each Affiliate of the Lender that is a counterparty to any Swap Agreement, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Loan Parties and the Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document), or any other Person, for the benefit of the Secured Parties.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentage (including any marginal, special, emergency or supplemental reserves) established by the Federal Reserve Board to which the Lender is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D). Such reserve percentages shall include those imposed pursuant to Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to the Lender under Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Lender.

15

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and/or one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of a Borrower or a Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrowers or the Subsidiaries shall be a Swap Agreement.

"Swap Agreement Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements permitted hereunder with the Lender or an Affiliate of the Lender, and (b) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction permitted hereunder with the Lender or an Affiliate of the Lender.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Target Balance" has the meaning assigned to such term in the DDA Access Product Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" and "Term Loans" means, individually and collectively, the M&E Term Loan, the Real Estate Term Loan and the CapEx Term Loans.

"Transactions" means the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions, the use of the proceeds thereof and the issuance of Letters of Credit hereunder.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the CBFR.

"UCC" means the Uniform Commercial Code as in effect from time to time in the Governing State or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unliquidated Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature cr unliquidated at such time, including any Secured Obligation that is: (i) an obligation to

reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Borrowing Base Schedule**

"Accounts Advance Rate" means, (a) with respect to Borrowing Base Certificates delivered for any period from March 1 of any year through November 30 of such year, 90.0%, and (b) with respect to Borrowing Base Certificates delivered for any period from December 1 of any year through the last day of February of the immediately succeeding year, 92.5%; provided that the foregoing advance rates shall be reduced for each full or partial Dilution percentage point.

"Borrowing Base" means, at any time (other than as otherwise set forth in this paragraph), the sum of (a) the Accounts Advance Rate at such time multiplied by Eligible Accounts at such time, plus (b) the product of the Inventory Advance Rate at such time multiplied by the NOLV Percentage identified in the most recent inventory appraisal ordered by the Lender multiplied by Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time, minus (c) the sum of the Magnet Crane Reserve, the Epoxy Line Reserve and other Reserves. The Lender may, in its Permitted Discretion, after the occurrence and during the continuation of a Default, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"Eligible Accounts" means, at any time, the Accounts of a Borrower which the Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit hereunder. Without limiting the Lender's discretion provided herein, Eligible Accounts shall not include any Account:

(a)    which is not subject to a first priority perfected security interest in favor of the Lender;

(b)    which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)    (i) with respect to which the schedule due date is more than 60 days after the date of the original invoice therefor, (ii) which is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date therefor, or (iii) which has been written off the books of the Borrowers or otherwise designated as uncollectible;

(d)    which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)    which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to such Borrower exceeds 20% of the aggregate Eligible Accounts;

(f)    with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(g)    which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(h)    for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(i)    with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)    which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)    which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)    which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S. or the District of Columbia, Canada, or any province of Canada unless, in any such case, such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender;

(m)    which is owed in any currency other than dollars;

(n)    which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender, or (ii) any government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect or protect the Lien of the Lender in such Account, have been complied with to the Lender's satisfaction;

(o)    which is which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)    which, for any Account Debtor, exceeds a credit limit determined by the Lender, to the extent of such excess;

(q)    which is owed by an Account Debtor or any Affiliate of such Account Debtor to which such Borrower is indebted, but only to the extent of such indebtedness, or is subject to any security deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)    which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent thereof;

(s)    which is evidenced by any promissory note, chattel paper, or instrument;

(t)    which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the applicable Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Borrower has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)    with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(v)    which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w)      which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than the Borrower has or has had an ownership interest in such goods, or which indicates any party other than the Borrower as payee or remittance party;

(x)      which was created on cash on delivery terms; or

(y)      which the Lender determines may not be paid by reason of the Account Debtor's inability to pay or which the Lender otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account of a Borrower which was previously an Eligible Account ceases to be an Eligible Account hereunder, such Borrower or the Borrower Representative shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate. In determining the amount of an Eligible Account of a Borrower, the face amount of an Account may, in the Lender's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Inventory" means, at any time, the Inventory of a Borrower which the Lender determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans, and the issuance of Letters of Credit hereunder. Without limiting the Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)      which is not subject to a first priority perfected Lien in favor of the Lender;

(b)      which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)      which is, in the Lender's opinion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business, or unacceptable due to age, type, category and/or quantity;

(d)      with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true, or which does not conform to all standards imposed by any Governmental Authority;

(e)      in which any Person other than such Borrower shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)      which is spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)      which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers, provided that, up to $25,000,000.00 of Inventory in transit from vendors and suppliers as to which title has passed to a Borrower may be included as Eligible Inventory despite the foregoing provision of this clause (g) so long as:

(i)      the Lender shall have received (1) a true and correct copy of the bill of lading and other shipping documents for such Inventory, and (2) evidence of satisfactory casualty insurance naming the Lender as lender loss payee and otherwise covering such risks as the Lender may reasonably request,

         (ii)      if the bill of lading is non-negotiable, the inventory must be in transit within the U.S., and the Lender shall have received, if requested, a duly executed Collateral Access Agreement, in form and substance satisfactory to the Lender, from the applicable customs broker, freight forwarder or carrier for such Inventory,

         (iii)     if the bill of lading is negotiable, the inventory must be in transit from outside the U.S., and the Lender shall have received (1) confirmation that the bill is issued in the name of the applicable Borrower and consigned to the order of the Lender, and an acceptable agreement has been executed with such Borrower's customs broker, in which the customs broker agrees that it holds the negotiable bill as agent for the Lender and has granted the Lender access to the Inventory, (2) confirmation that such Borrower has paid for the goods, and (3) an estimate from the applicable Borrower of the customs duties and customs fees associated with such Inventory in order to establish an appropriate Reserve,

         (iv)     the common carrier is not an Affiliate of the applicable vendor or supplier, and

         (v)     the customs broker is not an Affiliate of any Borrower;

    (h)      which is located in any location leased by such Borrower unless (A) (i) the lessor has delivered to the Lender a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Lender in its Permitted Discretion and (B) at least $50,000 of Inventory of the Borrowers is located at such location;

    (i)      which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document, unless (other than bills of lading to the extent permitted pursuant to clause (g) above) (A) (i) such warehouseman or bailee has delivered to the Lender a Collateral Access Agreement and such other documentation as the Lender may require or (ii) an appropriate Reserve has been established by the Lender in its Permitted Discretion and (B) at least $50,000 of Inventory is located at such third party warehouse or in possession of such bailee;

    (j)      which is being processed offsite at a third party location or outside processor, or is in transit to or from such third party location or outside processor;

    (k)      which is a discontinued product or component thereof;

    (l)      which is the subject of a consignment by such Borrower as consignor;

    (m)     which is perishable;

    (n)      which contains or bears any intellectual property rights licensed to such Borrower unless the Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

    (o)      which is not reflected in a current perpetual inventory report of such Borrower (unless such Inventory is reflected in a report to the Lender as "in transit" Inventory);

    (p)      for which reclamation rights have been asserted by the seller;

    (q)      which has been acquired from a Sanctioned Person; or

    (r)      which the Lender otherwise determines is unacceptable for any reason whatsoever.

In the event that Inventory of a Borrower which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, such Borrower or the Borrower Representative shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.

"Epoxy Line Reserve" means, from and after the Effective Date, an amount equal to $800,000; provided, however, if no Event of Default then exists, such reserve shall be reduced to Zero Dollars ($0) upon the payment by Borrowers after the Effective Date of the initial $800,000 of expenses related to Borrowers' purchase of a new epoxy coating line.

"Inventory Advance Rate" means, (a) with respect to Borrowing Base Certificates delivered for any period from March 1 of any year through November 30 of such year, 85.0%, and (b) with respect to Borrowing Base Certificates delivered for any period from December 1 of any year through the last day of February of the immediately succeeding year, 87.5%.

"Magnet Crane Reserve" means, from and after the Effective Date, an amount equal to $800,000; provided, however, if no Event of Default then exists, such reserve shall be reduced to Zero Dollars ($0) upon Borrowers' Fixed Charge Coverage Ratio for any test period after the date hereof exceeding 1.0 to 1.0 calculated without giving effect to the Magnet Crane Addback, as reflected on a Compliance Certificate delivered by Borrowers to Lender.

"NOLV Percentage" means, as of any date of determination, the percentage of the book value of Borrower's Inventory that is estimated to be recoverable in an orderly liquidation thereof net of all associated costs of such liquidation, as such percentage is specified in the most recent appraisal received by Lender from an appraiser selected by Lender.

**Terms Schedule**

**Revolving Commitment (Definitions Schedule):** $60,000,000.

        (a)     The Borrowers may request that the Lender increase the Revolving Commitment provided that (i) any such request for an increase shall be in a minimum amount of $1,000,000, (ii) the Borrowers may make a maximum of three (3) such requests, (iii) after giving effect thereto, the sum of the total of the additional Commitments does not exceed $30,000,000, (iv) the procedure described in Section 2.09(e) have been satisfied. **Nothing contained in this section shall constitute, or otherwise be deemed to be, a commitment on the part of the Lender to increase its Commitment hereunder at any time and the Borrowers acknowledge that the Lender may decline the request for any reason, or no reason whatsoever, notwithstanding the absence of a Material Adverse Effect, Default or Event of Default.**

        (b)     The amendment hereto for such an increase shall be in form and substance satisfactory to the Lender.  As a condition precedent to (i) requesting such an increase, the Borrowers shall deliver to the Lender a certificate of each Loan Party signed by an authorized officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such increase, and (B) in the case of the Borrowers, certifying that, before and after giving effect to such increase or addition, (1) the representations and warranties contained in Article III and the other Loan Documents are true and correct, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date, (2) no Default exists, and (3) the Borrowers are in compliance (on a pro forma basis) with the covenants contained in the Financial Covenants Schedule, and (ii) the Lender agreeing to such an increase, the Borrowers shall deliver to the Lender legal opinions and documents consistent with those delivered on the Effective Date, to the extent requested by the Lender.

2.      **Maturity Date (Definitions Schedule):**

August 3, 2021, or any earlier date on which the Revolving Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof.

3.      **Applicable Margin (Definitions Schedule):**

For any day, with respect to any Loan, the "Applicable Margin" shall be the applicable rates per annum set forth below:

|  | CBFR Spread REVLIBOR30 | CBFR Spread CB Floating Rate | Eurodollar Spread |
|---|---|---|---|
| Revolving Loans | 1.85% | -0.65% | 1.85% |
| M&E Term Loan | 2.00% | -0.50% | 2.00% |
| Real Estate Term Loan | 2.00% | -0.50% | 2.00% |
| CapEx Term Loans | 2.00% | -0.50% | 2.00% |

4.      **Availability Block (Section 2.01, etc.):**

Not Applicable.

5.      **LC Exposure (Section 2.05):**

LC Exposure Amount- $30,000,000

6.      **Prepayment Fee (Section 2.08):**

None.

7.      **Cash Dominion Period (Section 2.09, etc.):**

At all times.

8.      **Closing and Administration Fees (Section 2.11):**

Closing Fee- $66,162.00

9.      **Fiscal Periods and Accountants (Section 3.04):**

Reference Fiscal Year- the fiscal year ended December 31, 2017.

Borrower's Accountants- DHJJ, independent public accountants.

Interim Fiscal Period- The quarter and the portion of the fiscal year ended June 30, 2018.

10.     **Debt Limits (Section 6.01):**

Purchase Money Debt Limit- $2,000,000

Subordinated Debt Limit- $1,000,000

Unsecured Debt Limit- $1,000,000

11.     **Investment Limit (Section 6.04):**

$250,000

12.     **Judgment Amount (Article VII):**

$250,000

13.     **Notice Addresses (Section 8.01):**

if to any Loan Party, to the Borrower at:

c/o Metal Partners Rebar, LLC
47 E. Chicago Avenue, Suite 314
Naperville, IL 60540
Attention: Jacob Gurke
Facsimile No: (630) 884-8805

With a copy to:

Kurtzman Steady, LLC
401 S. 2nd Street, Suite 200
Philadelphia, Pennsylvania 19147
Attention: Jeffrey Kurtzman, Esq.
Facsimile No: (609) 482-8011

if to Lender, at:

JPMorgan Chase Bank, N.A.
10 S. Dearborn, 22nd Floor
Chicago, Illinois 60603
Attention: Robert S. Sheppard
Facsimile No: (312) 462-3176

With a copy to:

Thompson Coburn LLP
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
Attention: Victor A. Des Laurier, Esq.
Facsimile No: (312) 580-2201

**14.    Field Examinations and Appraisals (Section 8.03):**

So long as no Default has occurred or exists during such calendar year, the Loan Parties shall not be obligated to reimburse the Lender for more than the number of appraisals and field examinations set forth below during any calendar year:

Field Examinations- one per calendar year, unless Availability is less than 10% of the Revolving Commitment at any time during such calendar year, in which case two per calendar year.

Inventory Appraisals- one per calendar year, unless Availability is less than 10% of the Revolving Commitment at any time during such calendar year, in which case two per calendar year.

**15.    Governing State and Primary City (Section 8.09):**

Governing State- Illinois (including, without limitation, 735 ILCS Section 105/5-1 et seq)

Primary City- Chicago, Illinois

**Reporting Schedule**

The Borrowers will furnish to the Lender:

(a)    within 120 days after the end of each fiscal year of Borrowers, their audited consolidated and consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants acceptable to the Lender (without a "going concern" or like qualification, commentary or exception and without any qualification or exception as to the scope of such audit other than qualifications for not capitalizing lease obligations and for having unconsolidated Variable Interest Entities, provided such issues are addressed in a manner consistent with Borrowers' 2017 audited financial statements) to the effect that such consolidated and consolidating financial statements present fairly in all material respects the financial condition and results of operations of Borrowers and their consolidated Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants;

(b)    within 30 days after the end of each fiscal month of Borrowers, their consolidated and consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower Representative as presenting fairly in all material respects the financial condition and results of operations of the Borrowers and their consolidated Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower Representative in form and detail acceptable to the Lender (each a "Compliance Certificate"), (i) certifying, in the case of the financial statements delivered under clause (b), as presenting fairly in all material respects the financial condition and results of operations of Borrowers and their consolidated Subsidiaries on a consolidated and consolidating basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with the covenants set forth on the Financial Covenants Schedule attached hereto, and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)    during the 30 day period prior to the beginning of each fiscal year of Borrowers, a copy of the plan and forecast (including a projected consolidated and consolidating balance sheet, income statement and funds flow statement) of Borrowers and their consolidated Subsidiaries for each month of such fiscal year in form and detail reasonably satisfactory to the Lender;

(e)    within 20 days of the end of each calendar month, and at such other times as may be necessary to re-determine Availability or as requested by the Lender, as of the period then ended, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request;

(f)    within 20 days of the end of each calendar month, and at such other times as may be requested by the Lender, as of the period then ended, all delivered electronically in a text formatted file acceptable to the Lender (not in an Adobe *.pdf file):

(i)    a detailed aging of the Borrowers' Accounts including all invoices aged by invoice date and due date (with an explanation of the terms offered) prepared in a manner reasonably acceptable to

the Lender, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)    a schedule detailing the Borrowers' Inventory, in form satisfactory to the Lender, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Lender has previously indicated to the Borrower Representative are deemed by the Lender to be appropriate and (2) including a report of any variances or other results of Inventory counts performed by the Borrowers since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Borrowers and complaints and claims made against the Borrowers);

(iii)    a worksheet of calculations prepared by the Borrowers to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion;

(iv)    a reconciliation of the Borrowers' Accounts and Inventory between (A) the amounts shown in the Borrowers' general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above, and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (e) above as of such date; and

(v)    a reconciliation of the loan balance per the Borrowers' general ledger to the loan balance under this Agreement;

(vi)    a schedule and aging of the Borrowers' accounts payable, delivered electronically in a text formatted file acceptable to the Lender;

(g)  promptly upon the Lender's request:

(i)    copies of invoices issued by the Borrowers in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)    copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)    an updated customer list for the Borrowers and their Subsidiaries, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Lender and certified as true and correct by a Financial Officer;

(v)    the Borrowers' sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(vi)    copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(vii)    a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction;

(h)    promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that any Borrower or any ERISA Affiliate may request with respect to any

2

Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if a Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(i)    promptly following any request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors or other similar governing body (or the audit committee of the board of directors) of any Borrower by independent accountants in connection with the accounts or books of any Borrower or any Subsidiary, or any audit of any of them as the Lender may reasonably request; and

(j)    promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may reasonably request, and (y) information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Notwithstanding the foregoing, during any time Availability is less than 10.0% of the total Revolving Commitment, Borrowers shall deliver the reporting required under subsections (e) and (f) above on a weekly basis, not later than the second Business Day of each week with information current through the last Business Day of the immediately preceding week, until such time as Availability is in excess of 10.0% of the total Revolving Commitment for a period of thirty (30) consecutive days.

**Financial Covenants Schedule**

(A)    Financial Covenants Definitions:

"Allowable Addbacks" means:

(a) Expenses for Borrowers' purchase of a magnet crane system from an Affiliate incurred in June, 2018, in the amount of $839,135.00 ("Magnet Crane Addback");

(b) Bad debt write-off expenses incurred in June, 2018 related to Borrowers' Purchase Agreement with Prestige Capital, with respect to IMT Steel, LLC in the aggregate amount of $1,584,000;

(c) fees imposed by BMO Harris Bank as a result of the payoff of Borrowers' obligations owing to BMO Harris Bank on the Effective Date in an amount not to exceed $15,000;

(d) fees and expenses incurred by Borrowers in connection with the initial documentation and closing of this Agreement in an aggregate amount not to exceed $200,000, provided such fees and expenses are incurred not later than 30 days after the Effective Date; and

(e) The initial $800,000 of expenses incurred by Borrowers for the purchase of an epoxy coating line incurred after the Effective Date but not later than June 30, 2019.

"Capital Expenditures" means, without duplication, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of Borrowers and their Subsidiaries prepared in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"EBITDA" means, for any period, Net Income for such period *plus* (a) without duplication and to the extent deducted in determining Net Income for such period, the sum of (i) Interest Expense for such period, (ii) income tax expense for such period, (iii) all amounts attributable to depreciation and amortization expense for such period, (iv) any extraordinary charges approved by Lender for such period and (v) any other non-cash charges for such period (but excluding any non-cash charge in respect of an item that was included in Net Income in a prior period), *minus* (b) without duplication and to the extent included in Net Income, any extraordinary gains and any non-cash items of income for such period, all calculated for Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP.

"Fixed Charge Coverage Ratio" means the ratio, determined as of the end of each of fiscal month of the Borrowers for the twelve fiscal month period then ended, of (a) EBITDA, plus to the extent included therein, Allowable Addbacks, *minus* Unfinanced Capital Expenditures to (b) Fixed Charges, all calculated for Borrowers and their Subsidiaries on a consolidated basis in accordance with GAAP.

"Fixed Charges" means, for any period, without duplication, cash Interest Expense, *plus* prepayments and scheduled principal payments on Indebtedness made during such period, *plus* expense for taxes paid in cash, *plus* Restricted Payments paid in cash (excluding the Anderson Distributions), *plus* Capital Lease Obligation payments, *plus* cash contributions to any Plan, all calculated for Borrowers and their Subsidiaries on a consolidated basis.

"Interest Expense" means, for any period, total interest expense (including that attributable to Capital Lease Obligations) of Borrowers and their Subsidiaries for such period with respect to all outstanding Indebtedness of Borrowers and their Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in

respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for Borrowers and their Subsidiaries for such period in accordance with GAAP.

"Net Income" means, for any period, the consolidated net income (or loss) of Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with a Borrower or a Subsidiary, (b) the income (or deficit) of any Person (other than a Subsidiary) in which a Borrowers or a Subsidiary has an ownership interest, except to the extent that any such income is actually received by such Borrower or Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Other Restricted Payments" None.

"Payment Condition" shall be deemed to be satisfied in connection with a Restricted Payment if:

>       (A)      no Default or Event of Default has occurred and is continuing or would result immediately after giving effect to such Restricted Payment;

>       (B)      immediately after giving effect to and at all times during the 30-day period immediately prior to such Restricted Payment, the Borrowers shall have (x) Availability calculated on a pro forma basis after giving effect to such Restricted Payment of not less than 20% of the Revolving Commitment, and (y) a Fixed Charge Coverage Ratio for the trailing twelve months calculated on a pro forma basis after giving effect to such Restricted Payment of not less than 1.10 to 1.00; and

>       (C)      Borrowers shall have delivered to the Lender a certificate in form and substance reasonably satisfactory to the Lender certifying as to the items described in (A) and (B) above and attaching calculations for item (B).

"Unfinanced Capital Expenditures" means, for any period, Capital Expenditures made during such period which are not financed from the proceeds of any Indebtedness (other than the Revolving Loans; it being understood and agreed that, to the extent any Capital Expenditures are financed with Revolving Loans, such Capital Expenditures shall be deemed Unfinanced Capital Expenditures).

(B)     Financial Covenants.

(i)     Fixed Charge Coverage Ratio. The Borrowers will not permit the Fixed Charge Coverage Ratio, as of the end of any fiscal month from and after the month ending July 31, 2018, to be less than 1.0 to 1.0. For each test period from July 31, 2018, through December 31, 2018, Fixed Charge Coverage Ratio shall be calculated on a cumulative basis for the period beginning January 1, 2018, and ending as of the last day of each test period. For each test period from and after the test period ending January 31, 2019, Fixed Charge Coverage Ratio shall be calculated on a trailing twelve (12) month basis.

**Closing Conditions Schedule**

(a)   Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates.   The Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the each Financial Officer and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management or partnership agreement, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(b)   Financial Statements and Projections.   The Lender shall have received (i) audited consolidated and consolidating financial statements of the Borrowers for the 2017 fiscal year, (ii) unaudited interim consolidated and consolidating financial statements of the Borrowers for each fiscal month and quarter ended after the date of the latest applicable financial statements delivered pursuant to clause (i) of this paragraph as to which such financial statements are available, and such financial statements shall not, in the reasonable judgment of the Lender, reflect any material adverse change in the consolidated financial condition of the Borrowers, as reflected in the financial statements or projections and (iii) satisfactory projections for the 2018 and 2019 fiscal years.

(c)   Fees.   The Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Effective Date.   All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrowers to the Lender on or before the Effective Date.

(d)   Closing Availability.   After giving effect to all Borrowings to be made on the Effective Date and the issuance of any Letters of Credit on the Effective Date and payment of all fees and expenses due hereunder, and with all of the Loan Parties' indebtedness, liabilities, and obligations current, the Borrowers' Availability shall not be less than $3,000,000.

(e)   Filings, Registrations and Recordings.   Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(f)   No Default Certificate.   The Lender shall have received a certificate, signed by the Financial Officer of each Borrower, on the initial Borrowing date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be reasonably requested by the Lender.

(g)   Opinion of Counsel.   Each of the Loan Parties shall have delivered a written opinion of such Loan Party's counsel, addressed to the Lender in form and substance satisfactory to the Lender and its counsel.

(h)   Lien Searches.   The Lender shall have received the results of a recent lien search in such jurisdictions as the Lender shall deem appropriate, and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to a pay-off letter or other documentation satisfactory to the Lender.

(i)   Pay-Off Letter.   The Lender shall have received satisfactory pay-off letters for all existing Indebtedness to be repaid from the proceeds of the initial Borrowing, confirming that all Liens upon any of the property of the Loan Parties constituting Collateral will be terminated concurrently with such payment and all

letters of credit issued or guaranteed as part of such Indebtedness shall have been cash collateralized or supported by a Letter of Credit.

(j)        Funding Account.  The Lender shall have received a notice designating the Funding Account.

(k)        Collateral Access and Control Agreements.  The Lender shall have received each Collateral Access Agreement and Control Agreement required to be provided pursuant to the Security Agreement.

(l)        Solvency.  The Lender shall have received a solvency certificate in form and substance satisfactory to the Lender from a Financial Officer.

(m)        Borrowing Base Certificate.  The Lender shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of a recent date determined by the Lender.

(n)        Money Transfer Authorizations.  The Borrowers shall have delivered money transfer authorizations as the Lender may have reasonably requested.

(o)        Audits, Appraisals. etc. The Loan Parties shall have delivered (i) Collateral audits, satisfactory to the Lender, prepared by an independent firm engaged directly by the Lender and (ii) appraisals, prepared by an independent appraiser engaged directly by the Lender, of the inventory of the Loan Parties and which audits and appraisals shall be satisfactory to the Lender, together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards.

(p)        Insurance.  The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.10 of the Credit Agreement.

(q)        Letter of Credit Application. The Borrowers shall have delivered a properly completed letter of credit application if the issuance of a Letter of Credit will be required on the Effective Date.

(r)        ERISA. If any Borrower has any Plans, such Borrower shall have delivered to the Lender its most recent statement of the unfunded liabilities of such Plan, certified as correct by an actuary enrolled under ERISA.

(s)        USA PATRIOT Act.  The Lender shall have received (i) at least five (5) days prior to the Effective Date, all documentation and other information regarding each Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested in writing of the Borrowers at least ten (10) days prior to the Effective Date, and (ii) to the extent any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Effective Date to the extent the Lender has requested, in a written notice to the Borrowers at least ten (10) days prior to the Effective Date, a Beneficial Ownership Certification in relation to each Borrower.

(t)        Other Closing Deliverables.  The Borrowers shall have delivered to the Lender, in each case in form and substance reasonably satisfactory to the Lender, each of the other agreements, instruments, certificates and items set forth in the closing checklist or schedule of closing documents most recently provided by the Lender (or its counsel) to the Borrowers (or their counsel).

**Term Loan Rider**

This Term Loan Rider (this "Rider"), dated as of August 3, 2018 is hereby made a part of and incorporated into that certain Credit Agreement of even date herewith by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG"; and together with Metal Partners and BCG, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender") (as it may be amended or modified from time to time, together with all Exhibits, Schedules and Riders annexed thereto from time to time, the "Agreement").

1.01    M&E Term Loan. (a) Subject to the terms and conditions of the Credit Agreement and this Rider, Lender agrees to make a term loan to the Borrowers on the Effective Date in the principal amount of $1,594,000 (the "M&E Term Loan"), which M&E Term Loan shall constitute a "Loan" for all purposes under the Agreement. Borrowers shall not be entitled to borrow under the M&E Term Loan after the Effective Date or to reborrow any amounts repaid with respect to the M&E Term Loan.

1.02    Real Estate Term Loan. (a) Subject to the terms and conditions of the Credit Agreement and this Rider, Lender agrees to make a term loan to Borrowers on the Effective Date in the principal amount of $1,568,000 (the "Real Estate Term Loan"), which Real Estate Term Loan shall constitute a "Loan" for all purposes under the Agreement.  Borrowers shall not be entitled to borrow under the Real Estate Term Loan after the Effective Date or to reborrow any amounts repaid with respect to the Real Estate Term Loan.

1.03    Capital Expenditure Facility. (a) Subject to the terms and conditions of the Credit Agreement and this Rider, Lender agrees to make a Capital Expenditure Facility available to the Borrowers from the Effective Date through the one (1) year anniversary of the Effective Date in the principal amount not to exceed $3,000,000 (the "CapEx Commitment," and the loans thereunder shall each be a CapEx Term Loan, and shall be collectively referred to herein as the CapEx Term Loans").

(b) The CapEx Commitment shall be made available in multiple draws.  Each draw shall be (i) limited to an amount equal to 80% of the hard cost of the equipment eligible to be purchased, and (ii) drawn within one year from the Effective Date.

(c) Each draw shall be in a minimum amount of $200,000.00.

(d) If the Revolving Commitment is terminated for any reason, the CapEx Commitment shall be immediately terminated, without presentment, notice or demand.

(e) To request a CapEx Term Loan, the Borrower Representative shall notify the Lender of such request in writing (delivered by hand or fax) by delivering a CapEx Borrowing Request in the form of Exhibit A attached to this Term Loan Rider signed by a Responsible Officer of the Borrower Representative or through an Electronic System if arrangements for doing so have been approved by the Lender not later than (i) in the case of a Eurodollar Borrowing, 10:00 a.m., Chicago time, three Business Days before the date of the proposed Borrowing or (ii) in the case of a CBFR Borrowing, noon, Chicago time, on the date of the proposed Borrowing. Each such CapEx Borrowing Request shall be irrevocable.

2.    Interest. A. The principal balance of the M&E Term Loan outstanding from time to time shall bear interest in accordance with Section 2.12 of the Agreement. All interest on the M&E Term Loan shall be due and payable accordance with Section 2.12 of the Agreement.

B. The principal balance of the Real Estate Term Loan outstanding from time to time shall bear interest in accordance with Section 2.12 of the Agreement.  All interest on the Real Estate Term Loan shall be due and payable accordance with Section 2.12 of the Agreement.

C. The principal balance of each Cap Ex Term Loan outstanding from time to time shall bear interest in accordance with Section 2.12 of the Agreement. All interest on the Cap Ex Term Loans shall be due and payable accordance with Section 2.12 of the Agreement.

3.    Principal Payments. Payments with respect to the Term Loans shall be made in dollars and in immediately available funds, without any offset or counterclaim, as follows:

(a)(i)    in respect of the M&E Term Loan, The Borrowers hereby unconditionally promise to pay to the Lender on the first Business Day of the month commencing with the first month occurring after the Effective Date, installments of principal each in the amount of $18,976.19. To the extent not previously paid, the unpaid balance of the M&E Term Loan shall be paid in full in cash by the Borrowers on the Maturity Date.

(ii) in respect of Real Estate Term Loan, the Borrowers hereby unconditionally promise to pay to the Lender on the first Business Day of each month commencing with the first month occurring after the Effective Date, installments of principal each in the amount of $8,711.11. To the extent not previously paid, the unpaid balance of the Real Estate Term Loan shall be paid in full in cash by the Borrowers on the Maturity Date.

(iii) in respect of the CapEx Commitment and each CapEx Term Loan thereunder, the Borrowers hereby unconditionally promise to pay to the Lender on the first Business Day of each quarter commencing with the first quarter occurring after the one-year anniversary of the CapEx Term Loan, installments of principal in equal amounts utilizing a six-year amortization period. To the extent not previously paid, the unpaid balance of the CapEx Term Loans shall be paid in full in cash by the Borrowers on the Maturity Date.

(b)    The Borrowers may make voluntary prepayments of the Term Loans in accordance with the provisions of Section 2.10(a) of the Agreement.

(c)    Notwithstanding the provisions of Section 2.10(d) of the Agreement, any amounts required to be prepaid pursuant to Section 2.10(c) of the Agreement which comprise Net Proceeds from (i) any event described in clause (a) or (b) of the definition of the term "Prepayment Event" that are proceeds of Equipment, Fixtures and real property, or (ii) any event described in clause (c) or (d) of the definition of the term "Prepayment Event", shall be applied, first to prepay any Protective Advances that may be outstanding, second, to prepay the Term Loans in such allocation and application of those proceeds as shall be determined by the Lender, in its Permitted Discretion], and third, to prepay the Revolving Loans without a corresponding reduction in the Revolving Commitment and to cash collateralize outstanding LC Exposure. If the precise amount of insurance or condemnation proceeds allocable to Equipment, Fixtures and real property, as compared to Inventory, is not otherwise determined, the allocation and application of those proceeds shall be determined by the Lender, in its Permitted Discretion.

(d)    All partial prepayments of the Term Loans shall be applied to installments of principal in respect of the Term Loan in the inverse order of their maturities.

4.    Definitions. Capitalized terms contained in this Rider, unless otherwise defined herein, shall have the meanings attributable to such terms under the Agreement.

5.    Incorporation by Reference.   The terms, covenants and conditions of the Agreement are incorporated into and made a part of this Rider. This Rider shall form a part of the Agreement and shall constitute a part of the Loan Documents.

Exhibit A

CapEx Borrowing Request Form

To: JPMorgan Chase Bank, N.A., as Lender

Reference is hereby made to that certain Credit Agreement dated as of August 3, 2018, (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG"; and together with Metal Partners and BCG, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party thereto, if any, and JPMORGAN CHASE BANK, N.A. (the "Lender"). Terms used but not otherwise defined herein are used herein as defined in the Credit Agreement.

The undersigned hereby gives irrevocable notice, pursuant to Section 1.03 of the Term Loan Rider attached to the Credit Agreement, of a request for a CaEx Term Loan Borrowing as follows:

      (i)      The requested borrowing date for the proposed CapEx Term Loan Borrowing (which is a Business Day) is _____, _____.

      (ii)      The aggregate amount of the proposed CapEx Term Loan Borrowing is $_____ (cannot be less than $200,000 for CBFR Loans or $250,000 for Eurodollar Loans unless otherwise approved by Lender).

      (iii)      The type of CapEx Term Loan comprising the proposed Borrowing is a [CBFR Loan] or [Eurodollar Loan].

      (iv)      The duration of the Interest Period for each Eurodollar Loan made as part of the proposed CapEx Term Loan Borrowing, if applicable, is _____ months (which shall be 1, 2, 3 or 6).

      The undersigned hereby certifies that on the date hereof and on the date of borrowing set forth above, and immediately after giving effect to the borrowing requested hereby: (i) there exists and there shall exist no Default or Event of Default under the Credit Agreement; and (ii) each of the representations and warranties contained in the Credit Agreement and the other Loan Documents is true and correct as of the date hereof, except to the extent that such representation or warranty expressly relates to another date and except for changes therein expressly permitted or expressly contemplated by the Credit Agreement.

      Borrowers have caused this CapEx Borrowing Request to be executed and delivered by its officer thereunto duly authorized on _____, _____.

                  **Metal Partners Rebar, LLC,**
                  an Illinois limited liability company, as Borrower Representative


                  By:_____
                  Name: Frank A. Bergren, Jr.
                  Title: Sole Manager

## Permitted Acquisitions Rider

(1)     "Permitted Acquisition" is added to the exceptions permitted by Section 6.04 and means any Acquisition by any Loan Party in a transaction that satisfies each of the following requirements:

(a)     such Acquisition is not a hostile or contested acquisition;

(b)     the business acquired in connection with such Acquisition is (i) located in the U.S., (ii) organized under applicable U.S. and state laws, and (iii) not engaged, directly or indirectly, in any line of business other than the businesses in which the Loan Parties are engaged on the Effective Date and any business activities that are substantially similar, related, or incidental thereto;

(c)     both before and after giving effect to such Acquisition and the Loans (if any) requested to be made in connection therewith, each of the representations and warranties in the Loan Documents is true and correct (except any such representation or warranty which relates to a specified prior date) and no Default exists, will exist, or would result therefrom;

(d)     as soon as available, but not less than 30 days prior to such Acquisition, the Borrower Representative has provided the Lender (i) notice of such Acquisition and (ii) a copy of all business and financial information reasonably requested by the Lender including pro forma financial statements, statements of cash flow, and Availability projections;

(e)     if the Accounts and Inventory acquired in connection with such Acquisition are proposed to be included in the determination of the Borrowing Base, the Lender shall have conducted an audit and field examination of such Accounts and Inventory, the results of which shall be satisfactory to the Lender;

(f)     [Reserved].

(g)     if such Acquisition is an acquisition of the Equity Interests of a Person, such Acquisition is structured so that the acquired Person shall become a wholly-owned Subsidiary of Borrowers and a Loan Party pursuant to the terms of this Agreement;

(h)     if such Acquisition is an acquisition of assets, the Acquisition is structured so that a Borrower shall acquire such assets;

(i)     if such Acquisition is an acquisition of Equity Interests, such Acquisition will not result in any violation of Regulation U;

(j)     if such Acquisition involves a merger or a consolidation involving any Borrower or any other Loan Party, such Borrower or such Loan Party, as applicable, shall be the surviving entity;

(k)     no Loan Party shall, as a result of or in connection with any such Acquisition, assume or incur any direct or contingent liabilities (whether relating to environmental, tax, litigation, or other matters) that could have a Material Adverse Effect;

(l)     in connection with an Acquisition of the Equity Interests of any Person, all Liens on property of such Person shall be terminated unless the Lender in its sole discretion consents otherwise, and in connection with an Acquisition of the assets of any Person, all Liens on such assets shall be terminated;

(m)     the Fixed Charge Coverage Ratio shall be greater than 1.10 to 1.00 for the most recently completed twelve month period prior to the date such Acquisition is consummated for which the Borrowers are then required to have delivered interim financial statements to the Lender in accordance with the terms of the Reporting Schedule attached hereto, as calculated on a pro forma basis as if such Acquisition (and any Loans made in connection therewith) had been consummated on the last day of such period;

(n)      the Borrower Representative shall certify to the Lender (and provide the Lender with a pro forma calculation in form and substance reasonably satisfactory to the Lender) that, after giving effect to the completion of such Acquisition, on a pro forma basis and at all times during the 30-day period prior to the consummation of such Acquisition, Availability will not be less than 20% of the Revolving Commitment which includes all consideration given in connection with such Acquisition, other than Equity Interests of any applicable Borrower delivered to the seller(s) in such Acquisition, as having been paid in cash at the time of making such Acquisition;

(o)      all actions required to be taken with respect to any newly acquired or formed wholly-owned Subsidiary of a Borrower or a Loan Party, as applicable, required under Section 5.14 shall have been taken;

(p)      the Borrower Representative shall have delivered to the Lender the final executed acquisition agreement and all other material documentation relating to such Acquisition within 10 days following the consummation thereof; and

(q)      no Default or Event of Default has occurred and is continuing or would result immediately after giving effect to such Restricted Payment; and

(r)      Borrowers shall have delivered to the Lender a certificate in form and substance reasonably satisfactory to the Lender certifying as to the items described in (a) and (q) above and attaching calculations for item (n).

## Alternative Currency Rider

This Alternative Currency Rider (this "Rider"), dated as of August 3, 2018 is hereby made a part of and incorporated into that certain Credit Agreement of even date herewith by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG"; and together with Metal Partners and BCG, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender") (as it may be amended or modified from time to time, together with all Exhibits, Schedules and Riders annexed thereto from time to time, the "Agreement").

(I)    Alternative Currency Defined Terms:

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by Lender to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Alternative Currency" means Euros and any additional currencies determined after the Effective Date by mutual agreement of the Borrowers and Lender; provided that each such currency is a lawful currency that is readily available, freely transferable and not restricted, able to be converted into dollars and available in the London interbank deposit market.

"Alternative Currency L/C" means a Letter of Credit issued in Alternative Currency.

"Dollar Equivalent" means, for any amount, at the time of determination thereof, (a) if such amount is expressed in dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in dollars determined by using the rate of exchange for the purchase of dollars with the Alternative Currency in the London foreign exchange market at or about 11:00 a.m. London time (or New York time, as applicable) on a particular day as displayed by ICE Data Services as the "ask price", or as displayed on such other information service which publishes that rate of exchange from time to time in place of ICE Data Services (or if such service ceases to be available, the equivalent of such amount in dollars as determined by Lender using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in dollars as determined by Lender using any method of determination it deems appropriate in its sole discretion.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Euro" means the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Participating Member State" shall mean each state so described in any EMU Legislation.

"Spot Rate" for a currency means the rate determined by Lender to be the rate quoted by Lender as the spot rate for the purchase by Lender of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; provided that Lender may obtain such spot rate from another financial institution designated by

Lender if Lender does not have as of the date of determination a spot buying rate for any such currency.

II.      Alternative Currency Terms.  Borrowers and Lender hereby acknowledge and agree that notwithstanding anything to the contrary set forth in the Credit Agreement, the following terms, conditions and provisions shall govern all Alternative Currency L/Cs:

(A) Alternative Currency L/Cs.  Lender may, in its discretion, issue Letters of Credit in Alternative Currency, provided (i) the aggregate Dollar Equivalent of the Stated Amount of such Alternative Currency L/Cs shall not to exceed $7,500,000 or such greater amount approved by Lender in its sole discretion, (ii) all Alternative Currency L/Cs shall be trade Letters of Credit, (iii) the expiration date for any Alternative Currency L/C shall not extend beyond 60 days after the issuance date thereof unless otherwise approved by Lender in its sole discretion, and (iv) requests for Alternative Currency L/Cs may only be made by and for the account of Metal Partners.

(B) Reimbursement.  If the Lender shall make any LC Disbursement in respect of an Alternative Currency L/C, the Borrowers shall reimburse such LC Disbursement by paying to Lender an amount equal to the Dollar Equivalent of such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrowers may, if approved by Lender in writing with respect to each such Alternative Currency L/C, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.02 or 2.03 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing.  Notwithstanding the foregoing, Lender may, in its sole discretion, require Borrowers to reimburse one or more LC Disbursements in the Alternative Currency in which such Letter of Credit was issued.

(C) Interim Interest.  If Borrowers are required to pay interest on any LC Disbursement pursuant to Section 2.05(h) for an Alternative Currency L/C, then the interest rate applicable thereto shall be the rate per annum then applicable to CBFR Revolving Loans.

(D) Cash Collateralization.  If Borrowers are required to provide cash collateral for any Alternative Currency L/C pursuant to Section 2.05(h), such cash collateral shall be deposited by Borrowers with Lender in the applicable Alternative Currency (or, if required by Lender, in U.S. dollars in an amount equal to the Dollar Equivalent of the Alternative Currency).  If Lender requires such cash collateral to be made in U.S. dollars for any Alternative Currency L/C, the LC Exposure for such Alternative Currency L/C may be revaluated by Lender from time to time using the current Spot Rate.  Borrowers shall deposit with Lender within two Business Days of Lender's demand therefor, additional cash collateral in order to fully cash collateralize such Alternative Currency L/C in accordance with Section 2.05(h).

(E) Revaluation.  For all purposes under the Agreement, Lender may, in its sole discretion from time to time, revalue the LC Exposure for Alternative Currency L/Cs by utilizing the current Spot Rate at the time of such revaluation.

(F) Payments in Alternative Currency.  If Lender requires Borrowers to make payments in the Alternative Currency with respect to reimbursements by Borrowers of Alternative Currency L/C draws, any interest thereon or any fees associated with Alternative Currency L/Cs, such payments shall be made by Borrowers to Lender in immediately available funds not later than the Applicable Time specified by Lender.  Payments received after such times shall in each

case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue, on the date due; and funds received after that hour shall be deemed to have been received by Lender on the following Business Day.

(G) Payments in the United States. Without limiting the generality of the foregoing, Lender may require that any payments due with respect to Alternative Currency L/Cs be made in the United States.  If, for any reason, the Borrowers are prohibited by any applicable laws, rules or regulations from making any required payment hereunder in an Alternative Currency, the Borrowers shall make such payment in U.S. dollars in the Dollar Equivalent of the required payment amount.

(H) Liability for Losses.  Lender shall not be liable for, or be responsible for any loss, cost or expense suffered by any Borrower, any other Loan Party, or any Subsidiary, as a result of, any determination by Lender of the Revolving Exposure, or any of the component amounts thereof, or any exchange rate or Dollar Equivalent, with respect to any matter relating to Alternative Currency.

(I) Changes in Law.  Each provision of the Agreement shall be subject to such reasonable changes of construction as Lender may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.  Lender shall not be obligated to issue any Alternative Currency L/Cs if there shall have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of Lender, would make it impracticable for such Alternative Currency L/Cs to be denominated in the relevant Alternative Currency.

(J) Indemnification.  Each Borrower hereby agrees that upon demand by Lender (which demand shall be accompanied by a statement setting forth the basis for the amount being claimed) Borrowers will indemnify Lender against any net loss, expense, tax or other cost  which Lender may sustain or incur (including any net loss, expense, tax or other cost incurred by reason of foreign currency exchange rate fluctuations or the liquidation or reemployment of deposits or other funds acquired by Lender to fund or maintain any Alternative Currency L/C), as reasonably determined by Lender, as a result of Lender's issuance of Alternative Currency L/Cs.

**JPMORGAN CHASE BANK, N.A.**

**METAL PARTNERS REBAR, LLC D/B/A METAL PARTNERS INTERNATIONAL AND FGH REBAR, BCG OWNCO, LLC, AND BRG HOLDING, LLC D/B/A TRINITY REBAR**
**CREDIT FACILITY**
**AUGUST, 2018**

## CLOSING BOOK

JPMorgan Chase Bank, N.A. ("Lender")
10 S. Dearborn, 22nd Floor
Chicago, Illinois 60603
Attn: Mr. Stephen Christ
(312) 732-7366 - Telephone Number
(312) 361-8399 – Facsimile Number
email: stephen.d.christ@jpmorgan.com
                    and
Attn: Mr. Kevin M. Podwika
(312) 732-7406 - Telephone Number
(312) 732-7593 – Facsimile Number
email: kevin.m.podwika@jpmorgan.com
                    and
Attention:  Ms. Danielle N. Schuck
(312) 732-1194– Telephone Number
email: danielle.n.schuck@jpmorgan.com

Counsel for Lender:
Thompson Coburn LLP ("TC")
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
Attention:  Victor A. Des Laurier, Esq.
(312) 580-2246 - Telephone Number
(312) 580-2201 - Facsimile Number
email:  vdeslaurier@thompsoncoburn.com
                    and
Attention: Diona E. Rogers, Esq.
(312) 580-5062 – Telephone Number
(312) 580-2201 - Facsimile Number
email:  drogers@thompsoncoburn.com

Metal Partners Rebar, LLC, BCG Ownco, LLC, BRG
Holdings LLC (collectively, "Borrower")
47 E. Chicago Avenue, Suite 314
Naperville, IL 60540
Attention: Jacob Gurke
(630) 884-8805 - Telephone Number
Email: jgurke@metalpi.com

Counsel for Borrower:
Kurtzman Steady, LLC
401 S. 2nd Street, Suite 200
Philadelphia, Pennsylvania 19147
Attention: Jeffrey Kurtzman, Esq.
(215) 883-1600 – Telephone Number
(609) 482-8011 - Facsimile Number
email: kurtzman@kurtzmansteady.com

| NO. | I.  LOAN DOCUMENTS |
|-----|--------------------|
| 1. | Credit Agreement |
| 2. | Security Agreement |
| 3. | Company General Certificate (Metal Partners Rebar, LLC)<br>    A.  Articles of Organization<br>    B.  Operating Agreement<br>    C.  Good Standing Certificate<br>    D.  Resolutions (on TC Form) |
| 4. | Company General Certificate (BCG Ownco, LLC)<br>    A.  Articles of Organization<br>    B.  Operating Agreement<br>    C.  Good Standing Certificate<br>    D.  Resolutions (on TC Form) |
| 5. | Company General Certificate (BRG Holdings LLC)<br>    A.  Articles of Organization<br>    B.  Operating Agreement<br>    C.  Good Standing Certificate<br>    D.  Resolutions (on TC Form) |
| 6. | Disclosure Certificate (form provided by TC) |
| 7. | Insurance Certificates naming Lender as Lender's Loss Payee and Additional Insured (Acord 25 and Acord 27) |
| 8. | Perfection Certificate (form provided by TC) |
| 9. | Closing Certificate |
| 10. | Solvency Certificate |
| 11. | Disbursement Request |
| 12. | UCC Pre-file Authorization Letter |
| 13. | Opinion Letter (form provided by TC) |
| 14. | California Deed of Trust Opinion Letter |
| 15. | Landlord Waivers (form provided by TC):<br>    A.  Naperville, IL [TO BE PROVIDED POST-CLOSING]<br>    B.  New Castle, DE<br>    C.  Hammond, IN [WAIVED BY BANK]<br>    D.  Winfield, WV |

| NO. | I.  LOAN DOCUMENTS |
|---|---|
| 16. | Copy of Leases:<br>    A.  Naperville, IL<br>    B.  New Castle, DE<br>    C.  Hammond, IN [WAIVED BY BANK]<br>    D.  Winfield, WV<br>    E.  Bakersfield, CA |
| 17. | UCC-1 Financing Statements<br>    A.  Metal Partners Rebar, LLC<br>    B.  BCG Ownco, LLC<br>    C.  BRG Holdings LLC |
| 18. | UCC-3 Amendments (HYG Financial (3 Filings)) [TO BE PROVIDED POST-CLOSING] |
| 19. | Full Lien Searches<br>    A.  Metal Partners Rebar, LLC<br>    B.  BCG Ownco, LLC<br>    C.  BRG Holdings LLC |
| 20. | Borrowing Base Certificate |
| 21. | Compliance Certificate Form |
| 22. | 2018 Monthly Projections [IN POSSESSION OF BANK] |
| 23. | Post-Closing Agreement |
| 24. | Prior Lender Payoff Letter |
| 25. | Prior Lender Releases [TO BE PROVIDED POST-CLOSING] |
| 26. | UCC Termination Statements [TO BE PROVIDED POST-CLOSING] |
| 27. | Appointment of Delegated Authority ("AODA") |
| 28. | Wire instructions on Metal Partners Letterhead with the following signed by someone on the AODA form: Bank name, ABA or Routing Number, Account Name and Account Number [IN POSSESSION OF BANK] |
| 29. | New Client Handbook [IN POSSESSION OF BANK] |
| 30. | Deposit Account Control Agreement (BMO) [TO BE PROVIDED POST-CLOSING] |
| 31. | Customs Broker/Freight Forwarder Agreements [TO BE PROVIDED POST-CLOSING] |

| NO | II. MORTGAGE DOCUMENTS |
|---|---|
| 1. | Recorded Deed of Trust (CA) |
| 2. | Recorded Tenant Estoppel Certificate and Subordination Agreement |
| 3. | Environmental Indemnity Agreement |
| 4. | Closing Escrow Agreement |
| 5. | Title Policy |
| 6. | Title Affidavits (Owner's and GAP) |
| 7. | Affidavit of No Change |
| 8. | UCC Fixture Filing |
| 9. | ALTA Survey Certified to Lender and Title Company |
| 10. | Flood Certificate [IN POSSESSION OF BANK] |
| 11. | Appraisal [IN POSSESSION OF BANK] |
| 12. | Environmental Report [IN POSSESSION OF BANK] |

# EXHIBIT 2

RECEIVED

IL SECRETARY OF STATE
UNIFORM COMMERCIAL CODE

20180731    1725

$20.00    Electronic

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**23611848**                                                    FS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Lien Solutions                    800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| uccfilingreturn@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> LIEN SOLUTIONS
>
> P.O. Box 29071
>
> Glendale, CA, 91209-9071

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only *one* Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

OR
| 1a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| METAL PARTNERS REBAR, LLC |||||
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 47 E. CHICAGO AVE., SUITE 314 | NAPERVILLE | IL | 60540 | USA |

**2. DEBTOR'S NAME:** Provide only *one* Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

OR
| 2a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only *one* secured party name (3a or 3b)

OR
| 3a. ORGANIZATION'S NAME |||||
|---|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. |||||
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10 S. DEARBORN ST., 22ND FLOOR | CHICAGO | IL | 60603 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

All assets, personal property, fixtures, rights and interests of Debtor, whether now existing or hereafter arising or acquired and wherever located.

5. Check *only* if applicable and check *only* one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check *only* if applicable and check *only* one box.  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility    6b. Check *only* if applicable and check *only* one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
IL-0-65863623-55608136

**FILING OFFICE COPY -** UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| **Wolters Kluwer Lien Solutions**          800-331-3282 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| **uccfilingreturn@wolterskluwer.com** |

| C. SEND ACKNOWLEDGMENT TO:   (Name and Address) |
|---|
| **Lien Solutions**<br>**P.O. Box 29071**<br>**Glendale, CA 91209-9071**<br>**USA** |

State of West Virginia
Secretary of State
Business and Licensing Division
UCC Section
Filed

2018E073100104

07/31/2018 6:28:33 PM

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **BRG Holding, LLC** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **47 E. Chicago Ave., Suite 314** | **Naperville** | **IL** | **60540** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **JPMorgan Chase Bank, N.A.** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **10 S. Dearborn St., 22nd Floor** | **Chicago** | **IL** | **60603** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets, personal property, fixtures, rights and interests of Debtor, whether now existing or hereafter arising or acquired and wherever located.**

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien  ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor |
|---|

8. OPTIONAL FILER REFERENCE DATA:
**65863681**

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

1/1

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
|---|---|
| Victor A. Des Laurier | 312-346-7500 |

B. E-MAIL CONTACT AT FILER (optional)
vdeslaurier@thompsoncoburn.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Thompson Coburn  LLP
55 E. Monroe Street
37th Floor
Chicago, IL  60603

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BCG Ownco, LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 47 E. Chicago Avenue, Suite 314 | Naperville | IL | 60540 | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10 S. Dearborn Street, 22nd Floor | Chicago | IL | 60603 | |

4. COLLATERAL: This financing statement covers the following collateral:

See Exhibit "A" attached hereto and made a part hereof for a description of the Collateral, including but not limited to, all machinery, equipment, furniture, fixtures and articles of personal property.

The Real Estate is described in Exhibit "B" attached hereto and made a part hereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility       6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: CA - Kern County

F#645244
A#891116

# EXHIBIT 3

RECORDING REQUESTED BY:

Chicago Title Company
FWKN-TO18001278
WHEN RECORDED MAIL TO, AND UNLESS
OTHERWISE STATED BELOW, MAIL
FUTURE TAX STATEMENTS TO:
Thompson Coburn LLP
2029 Century Park East, 19th Floor
Los Angeles, CA 90067
Attn. Barry M. Weisz, Esq.

Jon Lifquist, Assessor-Recorder
Kern County Official Records

JL
8/06/2018
02:00 PM

Recorded Electronically by:
620  Chicago Title Bakersfield

DOC #: 218101183



218101183

| Stat Types: | 3 | Pages: 22 |
|---|---|---|
| FEES | | 129.00 |
| TAXES | | .00 |
| OTHER | | 225.00 |
| PAID | | 354.00 |

This page has been added to provide adequate space for recording information

Documentary Transfer Tax  $_____
☐ Computed on full value of property conveyed, or
☐ Computed on full value less liens & encumbrances remaining at time of sale.

_____
Signature of declarant or agent/firm name determining tax.

# Document Title(s): Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing

Documents believed to be exempt from paying the $75 Building Homes & Jobs Act fee
must cite a valid exemption on the face of the document.  The following exemptions may apply:

(check applicable)

☐ GC 27388.1(a)(1): Recorded document is expressly exempted from payment of recording fees (FBO Govt. agency);                    or

☐ GC 27388.1(a)(2): Recorded in connection with a transfer subject to the imposition of documentary transfer tax;                    or

☐ GC 27388.1: Recorded in connection with a previous transfer of real property that was subject to documentary
transfer tax, recorded on _____, in document _____;                    or
*(Must have been recorded on or after January 1, 2018)*

☐ GC 27388.1(a)(2): Recorded in connection with a transfer of real property that is a residential dwelling to an
owner-occupier; *a Preliminary Change of Ownership Report (PCOR) is required with submission;*                    or

☐ GC 27388.1(a)(2): Recorded in connection with a previous transfer of real property that is a residential dwelling
to an owner-occupier; recorded on _____, in document _____;                    or
*(Must have been recorded on or after January 1, 2018)*

☒ GC 27388.1(a)(1): The fee cap of $225 reached;                    or

☐ GC 27388.1(a)(1): The fee cap of $225 reached previously in the following document(s) which were recorded
on _____, in document(s) _____;                    or
*(Must have been recorded on or after January 1, 2018)*

☐ GC 27388.1(a)(1): Not related to real property.

Failure to include a valid exemption will result in the imposition of the $75 Building Homes &
Jobs Act fee.  Fees collected are deposited to the state and may not be available for refund.

Building Homes & Jobs Act
KERN COVER PAGE 01/01/18

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

Thompson Coburn LLP
2029 Century Park East, 19th Floor
Los Angeles, CA  90067
Attn:  Barry M. Weisz, Esq.

(Space above this line for Recorder's use)

THIS INSTRUMENT SECURES OBLIGATIONS WHICH MAY CONTAIN
PROVISIONS FOR ADJUSTMENTS IN THE INTEREST RATE AND PAYMENT
AMOUNTS AND/OR A BALLOON PAYMENT.

THIS INSTRUMENT CONSTITUTES A SECURITY AGREEMENT AS THAT TERM
IS DEFINED IN THE CALIFORNIA UNIFORM COMMERCIAL CODE.  PORTIONS
OF THE COLLATERAL ARE GOODS THAT ARE OR ARE TO BECOME FIXTURES
ON THE LAND DESCRIBED IN EXHIBIT A HERETO.  THIS INSTRUMENT IS
INTENDED TO SERVE AS A FIXTURE FILING AND IS TO BE RECORDED IN THE
REAL ESTATE RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY
PORTION THEREOF IS LOCATED AND INDEXED AS BOTH A DEED OF TRUST
AND A FIXTURE FILING.  GRANTOR IS THE OWNER OF A RECORD INTEREST
IN THE LAND DESCRIBED IN EXHIBIT A HERETO.  THE ADDRESS OF GRANTOR
(DEBTOR) AND LENDER (SECURED PARTY) ARE SET FORTH ON THE FIRST
PAGE OF THIS DEED OF TRUST.

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY
AGREEMENT AND FIXTURE FILING (this "Deed of Trust") is made as of August 3, 2018,
by BCG OWNCO, LLC, an Illinois limited liability company ("Grantor"), as trustor, whose
address is c/o Metal Partners Rebar, LLC, 47 East Chicago Avenue, Suite 314, Naperville,
Illinois 60540, to Chicago Title Company as trustee ("Trustee"), whose address is 2540 West
Shaw Lane, Suite 112, Fresno, California 93711, for the benefit of JPMORGAN CHASE
BANK, N.A. ("Lender"), as beneficiary, whose address is 10 South Dearborn Street, 22nd Floor,
Chicago, Illinois 60603.

<u>W I T N E S S E T H</u>

A.      Contemporaneously herewith, Lender is providing certain loans, extensions of credit and other financial accommodations (the "<u>Financial Accommodations</u>") to Grantor, Metal Partners Rebar, LLC, an Illinois limited liability company ("<u>Metal Partners</u>"), and BRG Holding, LLC, a West Virginia limited liability company ("<u>BRG</u>") (Grantor, Metal Partners and BRG are individually a "<u>Borrower</u>" and are collectively the "<u>Borrowers</u>"), pursuant to (i) that certain Credit Agreement of even date herewith by and among Borrowers and Lender, as amended, renewed, restated or replaced from time to time, (collectively, the "<u>Credit Agreement</u>") and (ii) the other agreements, documents and instruments executed and delivered in connection with the foregoing. Capitalized terms used but not otherwise defined herein are used herein as defined in the Credit Agreement;

B.      The Financial Accommodations shall include, without limitation, all Loans now or at any time hereafter provided by Lender to Borrowers or any Borrower under the Credit Agreement, including, without limitation, (i) the Revolving Loan in the original maximum principal amount of $60,000,000.00, (ii) the M&E Term Loan in the original principal amount of $1,594,000.00, (iii) the Real Estate Term Loan in the original principal amount of $1,568,000.0, and (iv) the CapEx Term Loans in the original maximum principal amount of $3,000,000.00.

C.      Pursuant to the Credit Agreement, Grantor is required to execute and deliver this Mortgage to Lender.

NOW, THEREFORE, in consideration of Lender agreeing to make the Loans, and for other good and valuable consideration set forth in the Credit Agreement, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees as follows:

## ARTICLE I.
## GRANT

1.1      <u>GRANT</u>.      <u>GRANTOR HEREBY IRREVOCABLY GRANTS, BARGAINS, SELLS, CONVEYS, MORTGAGES, TRANSFERS AND ASSIGNS TO TRUSTEE, ITS SUCCESSORS AND ASSIGNS, IN TRUST, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION AS PROVIDED BELOW, FOR THE BENEFIT OF LENDER, ALL OF ITS PRESENT AND FUTURE FEE ESTATE, INCLUDING ALL RIGHT, TITLE AND INTEREST OF GRANTOR IN AND TO THE FOLLOWING DESCRIBED PROPERTY,</u> whether such property is now or hereafter in existence (the "<u>Mortgaged Property</u>"):

(a) All that certain real property located in Bakersfield, California, more particularly described in <u>Exhibit A</u> attached hereto (the "<u>Land</u>");

(b) All estate, right, title and interest of Grantor in and to any and all buildings, improvements, appurtenances and fixtures of any kind located on the Land, now existing or hereafter constructed including but not limited to all apparatus, equipment and appliances used in connection with the operation or occupancy of the Land, such as heating and air-conditioning systems and facilities used to provide any utility services, refrigeration, ventilation, or other services on the Land, and all window coverings, drapes and rods, carpeting and floor coverings,

2

it being intended and agreed that all such items will be conclusively considered to be a part of Grantor's real property estate conveyed by this Deed of Trust, whether or not attached or affixed to the Land (the "Improvements");

(c) All appurtenances, easements, rights of way and other privileges or rights relating to the Land, together with any present or future interest of Grantor in the Land or in any other land or property arising by or constructed on the Land (together with the Land and the Improvements, the "Real Property");

(d) All leases, subleases and subtenancies, occupancy agreements and concessions affecting or relating to the Real Property, including, without limitation, all rents, royalties, income and profits arising from the Real Property or from any lease, subleases, subtenancies, occupancy agreements or concessions, including without limitation, any security deposits;

(e) All interest of Grantor in and to any condemnation awards, insurance proceeds, or any causes of action, damages or recoveries relating to the Real Property or Grantor's fee estate;

(f) All minerals, oil, gas and other hydrocarbon substances on the Real Property, as well as to any development rights, air rights, solar rights, water, water rights, and water stock relating to the Real Property;

(g) All goods, equipment, trade fixtures, furniture, appliances, lighting fixtures, machinery inventory and other personal property located on the Real Property which are owned by Grantor and used in the occupancy of the Real Property;

(h) All deposit accounts or other accounts of Grantor maintained with respect to the Mortgaged Property;

(i) All water rights relating to the Real Property;

(j) All contracts related to the repair, maintenance, insurance and operation of the Real Property, including, without limitation, all contracts related to property management, maintenance, utilities and security; and

(k) All proceeds, products and substitutions of any of the foregoing.

TO HAVE AND TO HOLD the Mortgaged Property unto Trustee forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee against every Person whomsoever lawfully claiming or to claim the same or any part thereof or against parties claiming by, through, or under Grantor and not otherwise.

1.2    Obligations Secured. This Deed of Trust secures all of the Obligations, including, but not limited to:

3

(a) The payment and performance of Borrowers' indebtedness and obligations under the Credit Agreement and the other Loan Documents, including, without limitation, the Revolving Loan, the M&E Term Loan, the Real Estate Term Loan, the CapEx Loans and any other Loans provided by Lender to Borrowers or any Borrower from time to time;

(b) Any and all modifications, extensions and renewals of the Loans or to the Credit Agreement;

(c) The payment of all sums advanced or paid out by Lender under any provision of this Deed of Trust or to protect the security of this Deed of Trust;

(d) The payment of all Banking Services Obligations and all Swap Obligations, but excluding all Excluded Swap Obligations, and

(e) The payment of the principal and interest on all other future loans or advances made by Lender to Borrowers (or any partners in or successors-in-interest to Borrowers) when any document evidencing the loan or advance specifically states that it is secured by this Deed of Trust ("Future Advances"), including all extensions, renewals and modifications of any Future Advances.

## ARTICLE II.
## COVENANTS OF GRANTOR

To protect the security of this Deed of Trust, Grantor covenants for the benefit of Lender as follows:

2.1    Payment of Indebtedness.  Grantor shall pay and perform all Obligations that are secured by this Deed of Trust in accordance with any of the agreements or covenants set forth herein.

2.2    Insurance and Events of Loss.  Grantor shall keep the Improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by the Grantor subject to Lender's right to disapprove Grantor's choice, which right shall not be exercised unreasonably.  Lender may require Grantor to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Grantor shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Grantor.

If Grantor fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Grantor's expense.  Lender is under no obligation to

4

purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Grantor, Grantor's equity in the Real Property, or the contents of the Real Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Grantor acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Grantor could have obtained. Any amounts disbursed by Lender under this Section 2.2 shall become additional debt of Grantor secured by this Deed of Trust. These amounts shall bear interest at the Prime Rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Grantor requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgagee clause, and shall name Lender as mortgagee and/or as an additional lender loss payee and Grantor further agrees to generally assign rights to mortgagee and/or as an additional lender loss payee and Grantor further agrees to generally assign rights to insurance proceeds to Lender up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Grantor shall promptly give to Lender all receipts of paid premiums and renewal notices. If Grantor obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Real Property, such policy shall include a standard mortgagee clause and shall name Lender as mortgagee and/or as an additional lender loss payee and Grantor further agrees to generally assign rights to insurance proceeds to the Lender up to the amount of the outstanding loan balance.

In the event of loss, Grantor shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Grantor. Unless Lender and Grantor otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied in restoration or repair of the Real Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Real Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or applicable law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Grantor any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Grantor shall not be paid out of the insurance proceeds and shall be the sole obligation of Grantor. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Deed of Trust, whether or not then due, with the excess, if any, paid to Grantor. Such insurance proceeds shall be applied in the order provided for in Section 7.3.

If Grantor abandons the Real Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Grantor does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In any event, or if Lender acquires the Real Property under Section 7.1 or otherwise, Grantor hereby assigns to Lender (a) Grantor's rights to any insurance proceeds in an amount not to exceed the amounts

5

unpaid under the Credit Agreement or this Deed of Trust, and (b) any other of Grantor's rights (other than the right to any refund of unearned premiums paid by Grantor) under all insurance policies covering the Real Property, insofar as such rights are applicable to the coverage of the Real Property. Lender may use the insurance proceeds either to repair or restore the Real Property or to pay amounts unpaid under the Credit Agreement or this Deed of Trust, whether or not then due.

2.3    Payment of Taxes; Claims. Grantor shall pay prior to delinquency all taxes and assessments which are or may become a lien on the Mortgaged Property or which are assessed against the Mortgaged Property or its rents, royalties, profits and income. Grantor shall pay when due all lawful claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Mortgaged Property.

2.4    Waste; Maintenance and Repair. Grantor shall not commit any waste on the Mortgaged Property or take any actions that might invalidate any insurance carried on the Mortgaged Property. Grantor will maintain the Mortgaged Property in good condition and repair. No Improvements may be removed, demolished or altered without the prior written consent of Lender.

2.5    Compliance with Laws. Grantor shall construct, keep, and maintain the Mortgaged Property in compliance with any and all laws relating to public safety, building safety and the condition of the environment. Grantor covenants that, so long as Grantor owns any interest in the Mortgaged Property, Grantor and its agents, contractors, authorized representatives, and employees shall not engage in any of the following prohibited activities, and Grantor shall use diligent efforts to assure that Grantor's invitees and tenants, and such tenant's employees, agents, and invitees shall not: (a) cause or permit any release or discharge of any waste, contaminant, hazardous substance, pollutant, toxic material, corrosive material, hazardous material or other material harmful or potentially harmful to humans, animals or the environment (collectively, "Hazardous Materials") on the Mortgaged Property other than in full compliance with all applicable laws regulating or relating to the environment or the use, storage, transportation, or disposal of, or other activity with respect to, Hazardous Materials (collectively, "Hazardous Materials Laws"); (b) cause or permit any manufacturing, storage, holding, handling, usage, placement, transporting, spilling, leaking, discharging, or dumping of Hazardous Materials in or on any portion of the Mortgaged Property other than in full compliance with all Hazardous Materials Law; or (c) suffer or permit any other act upon or concerning the Mortgaged Property that would result in a violation of any Hazardous Materials Law or require any alterations or improvements to be made on the Mortgaged Property under any of the Hazardous Materials Law. Grantor will: (i) take all actions that are necessary or desirable to clean up any Hazardous Materials affecting the Mortgaged Property, including removal, treatment, containment or any other remedial action required to restore the Mortgaged Property to a safe condition in compliance with applicable laws and regulations, including Hazardous Materials Law; (ii) take all actions that are necessary or desirable to modify the Mortgaged Property so as to achieve compliance with applicable laws and regulations; and/or (iii) attempt, through appropriate legal or administrative proceedings, to appeal, contest, or obtain a stay of enforcement proceedings if Grantor believes in good faith that Grantor is not required by law to cure such Hazardous Materials condition or to make alterations to comply with other laws and regulations.

6

2.6     Indemnification.  Grantor shall indemnify, protect, defend and hold Lender, its officers, directors, shareholders, direct and indirect owners, agents, representatives, successors and assigns (collectively, the "Indemnified Parties") harmless from and against any and all claims, demands, damages, losses, liens, liabilities, penalties, fines, lawsuits and other proceedings and costs and expenses (including attorneys' fees and disbursements) that result in actual cost and expense to Lender and arise directly or indirectly from or out of, or in any way connected with: (a) any activities on the Mortgaged Property during Grantor's ownership, possession or control of the Mortgaged Property that directly or indirectly result in the Mortgaged Property or any nearby property becoming contaminated with Hazardous Materials; (b) the discovery and/or cleanup of Hazardous Materials that were deposited on or were existing on the Mortgaged Property prior to any transfer of the Mortgaged Property pursuant to foreclosure proceedings or deed in lieu thereof or that were deposited on any nearby property as a result of Grantor's actions or omissions; or (c) any alleged or actual failure of any improvements now or hereafter constructed on the Mortgaged Property to continuously comply with all applicable laws and regulations now or hereafter enacted.  Grantor acknowledges that, as between Grantor and Lender, Grantor will be solely responsible for all costs and expenses relating to the cleanup of Hazardous Materials from the Mortgaged Property or the cleanup of any Hazardous Materials from any nearby property as a result of Grantor's actions or omissions and the modification and correction of any of the improvements constructed on the Mortgaged Property so as to comply fully with all applicable laws and regulations.  Without limiting the generality of this Section, the indemnification contained herein is intended to operate as an agreement pursuant to Section 107 (e) of CERCLA (42 U.S.C. 9607 (e)) and Section 25364 of the California Health and Safety Code to insure, protect, hold harmless and indemnify the Lender for, from and against liability pursuant to said statutes.  Any amounts payable to an Indemnified Party by reason of the application of this paragraph shall be secured by this Deed of Trust and shall become immediately due and payable and shall bear interest at the default rate stated in the Credit Agreement from the date loss or damage is sustained by the Indemnified Party until paid.  The obligations and liabilities of Grantor under this paragraph shall survive the termination, satisfaction, or assignment of this Deed of Trust and the exercise by Lender of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

2.7     Actions Affecting Lender's Security.  Grantor shall, at its own expense, appear in and defend any action or proceeding that might affect Lender's security or the rights or powers of Lender or Trustee or that purports to affect any of the Mortgaged Property.  If Grantor fails to perform any of its covenants or liabilities secured by this Deed of Trust, or if any action or proceeding of any kind (including, but not limited to, any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding) is commenced which might affect Lender's or Trustee's interest in the Mortgaged Property or Lender's right to enforce its security, then Lender and/or Trustee may, at their option, make any appearances, disburse any sums and take any actions as may be necessary or desirable to protect or enforce the security of this Deed of Trust or to remedy the failure of Grantor to perform its covenants (without, however, waiving any default of such Grantor).  Grantor agrees to pay all costs and expenses of Lender and Trustee thus incurred (including but not limited to reasonable fees and disbursements of counsel).  Any sums disbursed or advanced by Lender or Trustee pursuant to this Section 2.7 will be additional obligations of Grantor secured by this Deed of Trust, and will be payable by Grantor upon demand.  Any such sums so disbursed or advanced by Lender pursuant to this Section 2.7 will

bear interest at a rate equal to the Default Rate as set forth in the Credit Agreement, and any such sums so disbursed or advanced by Trustee will bear interest at the maximum rate permitted to be charged by Trustee under applicable law.  This paragraph will not be construed to require Lender or Trustee to incur any expenses, make any appearances, or take any actions.

## ARTICLE III.
## ASSIGNMENT OF LEASES AND RENTS

3.1    <u>Assignment</u>.  As additional security for the payment and performance by Grantor of the Obligations, Grantor hereby absolutely, presently, unconditionally and irrevocably assigns to Lender all of the existing and future leases and other occupancy agreements and all existing and future rents, royalties, income and profits that arise from the use or occupancy of the Mortgaged Property.

3.2    <u>Revocable License</u>.  Until the occurrence of an Event of Default, Grantor shall have a license to collect and receive all rents, royalties, income and profits related to the use and occupancy of the Mortgaged Property.  Upon the occurrence and during the continuance of an Event of Default, Lender may terminate such license in its discretion at any time upon notice to Grantor and Lender may thereafter collect the rents, royalties, income and profits itself or by an agent or receiver.  No action taken by Lender to collect any rents, royalties, income or profits will make Lender a "mortgagee-in-possession" of the Mortgaged Property, unless Lender personally or by agent enters into actual possession of the Mortgaged Property.  Possession by a court appointed receiver will not be considered possession by Lender.  All rents, royalties, income and profits collected by Lender or a receiver will be applied to pay all expenses of collection, and to the payment of all costs of operation and management of the Mortgaged Property, and to the payment of the Obligations in whatever order Lender directs in its absolute discretion and without regard to the adequacy of its security.  Lender's right to a receiver shall be absolute and unconditional, and a receiver may be obtained in an independent action, regardless of whether Lender seeks any relief other than the appointment of a receiver; Grantor expressly waives any express or implied legal requirement that might otherwise require the initiation or pendency of an action or proceeding seeking other relief as a condition to the appointment of a receiver.  The receiver may be appointed without regard to the adequacy of any security for the Obligations and Grantor shall immediately surrender possession of the Mortgaged Property to the receiver upon his appointment.

## ARTICLE IV.
## ALIENATION

Grantor shall not voluntarily or involuntarily, by operation of law or otherwise, suffer or permit its interest in the Mortgaged Property to be sold, pledged, encumbered, transferred, hypothecated or otherwise disposed of until the Obligations shall have been repaid in full.  If Grantor takes or permits any such action without the prior written consent of Lender, Lender may, at its option and without limiting any other right or remedy available to Lender at law, in equity or by agreement with Grantor, accelerate the maturity of the Grantor's Obligations provided for in the Credit Agreement and require the payment of the then existing outstanding principal balance and all other sums due under the Credit Agreement and under this Deed of Trust.  The giving of consent by Lender to the transfer or disposition of the Mortgage Property in

any one or more instances shall not limit or waive the need for such consent in any other or subsequent instance.

## ARTICLE V.
## PERSONAL PROPERTY SECURITY PROVISIONS

5.1 <u>Security Interest</u>. This Deed of Trust is also intended to encumber and create a security interest in, and Grantor hereby grants to Lender a security interest in, all portions of the Mortgaged Property constituting personal property and all other fixtures, chattel paper, deposit accounts, equipment, goods, inventory, contract rights, documents, instruments, investment property, general intangibles, and all other personal property of every type or description owned by Grantor and used in connection with the Real Property, all renewals, replacements, additions to, or substitutions of any of the aforementioned items, or articles in substitution therefor or in addition thereto or the proceeds thereof, whether or not the same shall be attached or related to the Real Property in any manner (all such personal property being referred to collectively as the "<u>Personal Property Collateral</u>"). Except as permitted under the Credit Agreement, all of the Personal Property Collateral shall be owned by Grantor and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Lender. Grantor shall, from time to time upon the request of Lender, supply Lender with a current inventory of all of the Personal Property Collateral in which Lender is granted a security interest hereunder, in such detail as Lender may reasonably require. Grantor shall promptly replace all of the Personal Property Collateral when worn or obsolete with an article comparable to the worn out or obsolete Personal Property Collateral when new and will not, without the prior written consent of Lender, remove from the Property any of the Personal Property Collateral subject to this Deed of Trust except such as is replaced by an article of equal suitability and value as above provided, owned by Grantor free and clear of any lien or security interest except that created by this Deed of Trust.

5.2 <u>Security Agreement</u>. This Deed of Trust constitutes a security agreement between Grantor and Lender with respect to the Personal Property Collateral in which Lender is granted a security interest hereunder, and, cumulative of all other rights and remedies of Lender hereunder, Lender shall have all of the rights and remedies of a secured party under the California Uniform Commercial Code (the "<u>UCC</u>"). Grantor hereby authorizes the Lender to file with the appropriate filing officer or office such financing statements, continuation statements or other instruments as Lender may require in order to perfect or continue the perfection of the lien or security interest created hereby. Grantor shall have possession of the Personal Property Collateral, except where Lender chooses to perfect its security interest by possession in addition to the filing of a financing statement. Where Personal Property Collateral is in the possession of a third party, Grantor will join with Lender in notifying such third party of Lender's security interest and obtaining an acknowledgment from the third party that it is holding the Personal Property Collateral for the benefit of Lender. Grantor agrees to furnish Lender in writing with notice of any change in the name, organizational structure, or principal place of business or mailing address of Grantor thirty (30) days prior to the effective date of any such change.

5.3 <u>UCC Remedies</u>. Upon the occurrence and during the continuance of any Event of Default, Lender shall have the right to cause any of the Personal Property Collateral to be sold at any one or more public or private sales as permitted by applicable law, and Lender shall further

9

have all other rights and remedies, whether at law, in equity, or by statute, as are available to secured creditors under applicable law. Any such disposition may be conducted by an employee or agent of Lender or Trustee. Any person, including Grantor and Lender, shall be eligible to purchase any part or all of such property at any such disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall be borne by Grantor and shall include Lender's and Trustee's reasonable attorneys' fees and legal expenses. Grantor, upon demand of Lender, shall assemble such personal property and make it available to Lender at the Real Property, a place which is hereby deemed to be reasonably convenient to Lender and Grantor. Lender shall give Grantor at least ten (10) days' prior written notice of the time and place of any public sale or other disposition of such property or of the time of or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Grantor, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Grantor.

5.4    Parties.  The name and principal place of business of Grantor, as "Debtor", and Lender, as "Secured Party", under the UCC are as set forth in the first paragraph of this Deed of Trust.

## ARTICLE VI.
## EVENTS OF DEFAULT

An Event of Default hereunder shall mean any "Event of Default" under the Credit Agreement.

## ARTICLE VII.
## REMEDIES

7.1    Remedies.  Upon the occurrence of any Event of Default, Lender may, at its option, and without notice to or demand upon Grantor:

7.1.1    Declare any or all Obligations to be due and payable immediately;

7.1.2    Bring a court action to foreclose this Deed of Trust or to enforce its provisions or any of the Obligations secured by this Deed of Trust;

7.1.3    Cause any or all of the Mortgaged Property to be sold under the power of sale granted by this Deed of Trust in any manner permitted by applicable law; and/or

7.1.4    Exercise any other right or remedy available under law or in equity.

7.2    Power of Sale.  For any sale under the power of sale granted by this Deed of Trust, Lender or Trustee must record and give all notices required by law and then, upon the expiration of such time as is required by law, Trustee may sell the Mortgaged Property upon any terms and conditions specified by Lender and permitted by applicable law. Trustee may postpone any sale by public announcement at the time and place noticed for the sale. If the Mortgaged Property consists of several lots, parcels or items of property, Lender may, in its sole discretion: (a) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (b) elect to sell such lots, parcels or items through a single sale, or through two or more

successive sales or in any other manner Lender deems in its best interest. Any person, including Grantor, Trustee or Lender, may purchase at any sale hereunder, and Lender shall have the right to purchase at any sale hereunder by crediting upon the bid price the amount of all or any part of the indebtedness hereby secured. Should Lender desire that more than one sale or other disposition of the Mortgaged Property be conducted, Lender may, at its option, cause the same to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Mortgaged Property not sold until all Obligations secured hereby have been fully paid. In the event Lender elects to dispose of the Mortgaged Property through more than one sale, Grantor agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein the same may be made, including reasonable compensation to Trustee and Lender, their agents and counsel, and to pay all expenses, liabilities and advances made or incurred by Trustee with regard to such sale or sales, together with interest on all such advances made by Trustee at the maximum rate permitted by law to be charged by Trustee. Upon any sale hereunder, Trustee shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold, but without any covenant or warranty whatsoever, express or implied, whereupon such purchaser or purchasers shall be let into immediate possession; and the recitals in any such deed or deeds of fact, such as default, the giving of notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or disposition shall be conclusive proof of the truth of such facts and any such deed or deeds shall be conclusive against all persons as to such facts recited therein.

7.3    <u>Application of Proceeds</u>. The proceeds of any sale under this Deed of Trust will be applied to the following in any order Lender chooses:

7.3.1    Payment of the costs and expenses of the sale, including but not limited to Trustee's fees, legal fees and disbursements, title charges and transfer taxes, and payment of all expenses, liabilities and advances of Trustee, together with interest on all advances made by Trustee at the maximum rate permitted to be charged by Trustee under applicable law.

7.3.2    Payment of all sums expended by Lender under the terms of this Deed of Trust and not yet repaid, together with interest on such sums at the Default Rate.

7.3.3    Payment of the Obligations in any order that Lender chooses.

7.3.4    The remainder, if any, to the Person or Persons legally entitled to it.

7.4    <u>Waivers by Grantor</u>. Grantor waives all rights to direct the order in which any of the Mortgaged Property will be sold in the event of any sale under this Deed of Trust, and also any right to have any of the Mortgaged Property marshaled upon any sale.

7.5    <u>No Waiver by Lender</u>. All remedies contained in this Deed of Trust are cumulative, and Lender also has all other remedies provided by law or in any other agreement between Grantor and Lender. No delay or failure by Lender to exercise any right or remedy under this Deed of Trust will be construed to be a waiver of that right or remedy of any default by Grantor. Lender may exercise any one or more of its rights and remedies at its option without regard to the adequacy of its security.

7.6     Enforcement Costs.  Grantor will pay all of Lender's and Trustee's expenses incurred in any efforts to enforce any terms of this Deed of Trust, whether or not any lawsuit is filed, including but not limited to reasonable legal fees and disbursements, foreclosure costs and title charges.

## ARTICLE VIII.
## MISCELLANEOUS

8.1     Fixture Filing.  This Deed of Trust constitutes a financing statement filed as a Fixture Filing in the Official Public Records of real property of the county in which the Mortgaged Property is located with respect to any and all fixtures included within the term "Mortgaged Property" as used herein and with respect to any goods or other personal property that may now be or hereafter become such fixtures.

8.2     Invalidity.  The invalidity or unenforceability of any one or more provisions of this Deed of Trust will in no way affect any other provisions of this Deed of Trust.

8.3     Statement of Status.  Grantor agrees to pay Lender a reasonable charge, not to exceed the maximum allowed by law, for giving any statement of the status of the obligations secured by this Deed of Trust.

8.4     Notices.  All notices given under this Deed of Trust shall be given in accordance with the Terms Schedule in the Credit Agreement.  However, the service of any notice of default or notice of sale under this Deed of Trust as required by law will, if mailed, be effective on the date of mailing.

8.5     Actions by Lender.  Without affecting Grantor's liability for the payment of any of the indebtedness secured by this Deed of Trust, Lender may from time to time and without notice to Grantor (a) release any person liable for the payment of that indebtedness, (b) accept additional real or personal property of any kind as security, or alter, substitute or release any property securing that indebtedness, or (c) cause Trustee to consent to the making of any map or plot of the Mortgaged Property, or to reconvey any part of the Mortgaged Property, or to join in granting any easement or creating any restriction on the Mortgaged Property, or to join in any subordination or other agreement affecting this Deed of Trust.

8.6     Entry by Lender.  Lender may at any reasonable time and subject to the rights of any tenant in possession of any portion of the Mortgaged Property, enter upon and inspect the Mortgaged Property in person or by agent.

8.6.1     Reconveyance.  Upon the payment in full in cash of all Obligations, Lender agrees to request Trustee to reconvey the Mortgaged Property, and upon payment of its fees and all other sums owing to it under this Deed of Trust, Trustee will reconvey the Mortgaged Property without warranty to the Person or Persons legally entitled to it.  Such Person or Persons must pay all costs of recordation.  The recitals in the reconveyance of any facts will be conclusive on all Persons.  The grantee in the reconveyance may be described as "the Person or Persons legally entitled thereto."

8.7    Statute of Limitations.    Grantor waives all present and future statutes of limitations as a defense to any action to enforce the provisions of this Deed of Trust or to collect any indebtedness secured by this Deed of Trust to the fullest extent permitted by law.

8.8    Definitions.    The term "Grantor" includes both the original Grantor and any subsequent owner or owners of any of the Mortgaged Property and/or any successor-in-interest of Grantor under the Loan, and the term "Lender" includes the original Lender and also any successors and/or assigns or any interest therein.    Whenever the context requires, the singular includes the plural and vice versa and each gender includes each other gender.    The headings of the articles of this Deed of Trust are for convenience only and do not limit its provisions.

8.9    No Waiver.    Lender's consent to any act or omission by Grantor will not be a consent to any other or subsequent act or omission or a waiver of the need for such consent in any future or other instance.

8.10    Successors and Assigns.    The terms of this Deed of Trust will bind and benefit the heirs, legal representatives, successors and assigns of Grantor and Lender and the successors-in-interest of Trustee.

8.11    No Assignment.    Grantor acknowledges and agrees that the Obligations are personal to Grantor, and that the identity of Grantor, the relationship between Grantor and Lender, and Grantor's creditworthiness, business expertise, financial condition, and continued control of the Mortgaged Property were material inducements upon which Lender relied in continuing the Obligations.    Accordingly, without Lender's prior written consent (which shall not be unreasonably withheld, delayed or conditioned) Grantor shall not (a) voluntarily sell, convey, assign, encumber, or otherwise transfer any of its right, title, or interest in and to the Mortgaged Property or any other Mortgaged Property asset; or (b) sell, assign, or transfer its interest as obligor under the Obligations.    Any attempted assignment without such prior written consent shall be null and void, and of no effect, and shall also constitute, at Lender's option, a default by Grantor under this Deed of Trust.

8.12    Governing Law.    In all matters of construction and performance of this Deed of Trust and the obligations arising hereunder, this Deed of Trust shall be governed by, and construed in accordance with, the internal laws of the State of California applicable to contracts made and to be performed in such state without regard to principles of conflicts of laws.

8.13    The Trustee.    Lender may remove Trustee or any successor Trustee at any time or times and appoint a successor Trustee by recording a written substitution in the county where the real property covered by this Deed of Trust is located, or in any other manner permitted by law. Upon that appointment, all of the powers, rights and authority of Trustee will immediately become vested in its successor.    Such substitution and appointment shall be at Lender's expense unless an Event of Default has occurred, in which case, Grantor shall pay such expenses.

## ARTICLE IX.
## ADDITIONAL STATE-SPECIFIC PROVISIONS

9.1 Principles Of Construction.    In the event of any inconsistencies between the terms and conditions of this Article VIII and the other terms and conditions of this Deed of Trust, the terms

and conditions of this <u>Article VIII</u> shall control and be binding.

9.2 <u>Environmental Provisions</u>.  To the extent permitted under applicable law:

(a) Lender may waive its lien against the Mortgaged Property or any portion thereof, whether fixtures or personal property, to the extent such property is found to be "environmentally impaired" or an "affected parcel" in accordance with California Code of Civil Procedure Section 726.5 and may exercise any and all rights and remedies of an unsecured creditor against Grantor and all of Grantor's assets and property for the recovery of any deficiency and Environmental Costs (as hereafter defined), including, but not limited to, seeking an attachment order under California Code of Civil Procedure Section 483.010.  The term "<u>Environmental Costs</u>" shall mean any costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other reasonable out-of-pocket costs or expenses actually incurred or advanced by Lender relating to the cleanup, remediation or other response action required under applicable law or which Lender reasonably believes necessary to protect the Mortgaged Property.  As between Lender and Grantor, for purposes of California Code of Civil Procedure Section 726.5, Grantor shall have the burden of proving that Grantor or any related party (or any Affiliate or agent of Grantor or any related party) was not in any way negligent in permitting the release or threatened release of the Hazardous Materials.  Grantor acknowledges and agrees that, if this <u>clause (a)</u> applies, then notwithstanding any term or provision contained herein or in the Loan Documents, all judgments and awards entered against Grantor shall be exceptions to any nonrecourse or exculpatory provision of the Loan Documents, and Grantor shall be fully and personally liable for all judgments and awards entered against it relating to Environmental Costs and such liability shall not be limited to the original principal amount of the obligations secured by this Deed of Trust and Grantor's obligations shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance, or any other transfer of the Mortgaged Property or this Deed of Trust.  For the purposes of any action brought by or on behalf of Lender under this Section 9.2, Grantor hereby waives the defense of laches and any applicable statute of limitations.

(b) In the event Lender elects, in accordance with California Code of Civil Procedure Section 726.5, to waive all or part of the security of this Deed of Trust and proceed against Grantor on an unsecured basis, the valuation of the Mortgaged Property, the determination of the environmentally impaired status of such security and any cause of action for a money judgment shall, at the request of Lender, be referred to a referee in accordance with California Code of Civil Procedure Sections 638 et seq.  Such referee shall be an impartial M.A.I. appraiser selected by Lender and approved by Grantor, which approval shall not be unreasonably withheld or delayed.  If the parties cannot agree on an M.A.I. appraiser approved by Grantor, either party may apply to the presiding judge of the Superior Court in which the Mortgaged Property is located to make such appointment.  The decision of such referee shall be binding upon both Grantor and Lender, and judgment upon the award rendered by such referee shall be entered in the court in which such proceeding was commenced in accordance with California Code of Civil Procedure Sections 644 and 645.  Grantor shall pay all reasonable costs and expenses incurred by Lender in connection with any proceeding under California Code of Civil Procedure 726.5, as such Section may be amended from time to time.

14

(c) Lender or its agents, acting by themselves or through a court appointed receiver, may upon reasonable advance notice to Grantor, enter upon the Mortgaged Property or any part thereof and may perform such acts and things as Lender deems reasonably necessary or desirable to inspect, investigate, assess, and protect the security hereof, including without limitation of any of its other rights: (i) obtain a court order to enforce Lender's right to enter and inspect the Mortgaged Property under California Civil Code Section 2929.5, to which the decision of Lender as to whether there exists a release or threatened release of any Hazardous Material shall be deemed reasonable and conclusive as between the parties hereto; and (ii) have a receiver appointed under California Code of Civil Procedure Section 564 to enforce Lender's right to enter and inspect the Real Property and/or the Improvements for Hazardous Substances. Subject to the Loan Documents, all costs and expenses incurred by Lender with respect to the audits, tests, inspections, and examinations which Lender or its agents or employees may conduct, including the fees of the engineers, laboratories, contractors, consultants and attorneys, shall become part of the indebtedness secured hereby and shall be paid by Grantor upon demand with interest at the Default Rate from the date when paid by Lender.

(d) Lender may seek a judgment that Grantor has breached its covenants, representations, warranties and/or other provisions with respect to this Deed of Trust or the other Loan Documents by commencing and maintaining an action or actions in any court of competent jurisdiction for breach of contract pursuant to California Code of Civil Procedure Section 736, whether commenced prior to or after foreclosure of the Mortgaged Property, and may seek the recovery of Environmental Costs, it being conclusively presumed between Lender and Grantor that all such Environmental Costs incurred or advanced by Lender relating to the cleanup, remediation or other response action of or to the Mortgaged Property were made by Lender in good faith, Grantor acknowledges that such an action shall not constitute an action within the meaning of Section 726(a) of the California Code of Civil Procedure or constitute a money judgment for a deficiency or a deficiency judgment within the meaning of Sections 580a, 580b, 580d or 726(b) of the California Code of Civil Procedure. All Environmental Costs incurred by Lender (including court costs, consultant fees and attorneys' fees and disbursements, whether incurred in litigation or not and whether before or after judgment) shall bear interest at the Default Rate from the date of expenditure until said sums have been paid. Lender shall be entitled to bid, at the sale of the Mortgaged Property held under any provision of this Deed of Trust, the amount of said costs, expenses and interest in addition to the amount of the other obligations hereby secured as a credit bid, the equivalent of cash.

(e) Without limiting any of the remedies provided in the Loan Documents, Grantor acknowledges and agrees that the provisions of this Section 9.2 and the Environmental Indemnity executed in connection herewith are "environmental provisions" (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Grantor relating to the Mortgaged Property (the "Environmental Provisions"). Grantor's breach or a failure to comply with the Environmental Provisions shall constitute a breach of contract entitling Lender to all remedies provided under Section 736 of the California Code of Civil Procedure for the recovery of damages and for the enforcement of the Environmental Provisions. Pursuant to Section 736 of the California Code of Civil Procedure, Lender's action for recovery of damages or enforcement of the Environmental Provisions shall not constitute an action within the meaning of Section 726(a) of the California Code of Civil Procedure or constitute a money judgment for a deficiency or a deficiency judgment within the meaning of Sections 580a, 580b, 580d and 726(b)

15

of the California Code of Civil Procedure. The rights and remedies provided for under the Loan Documents are separate and distinct causes of action that shall not be abrogated, modified, limited or otherwise affected by the remedies provided under Section 736(a) of the California Code of Civil Procedure.

(f) Nothing herein shall be deemed to limit the right of Lender to recover, in accordance with California Code of Civil Procedure Section 736 (as such Section may be amended from time to time), any reasonable costs, expenses, liabilities or damages, including reasonable attorneys' fees and costs, incurred by Lender and arising from any covenant, obligation, liability, representation or warranty contained in any Loan Document given to Lender (including, without limitation, the Environmental Indemnity), or any order, consent decree or settlement relating to the cleanup of Hazardous Materials or any other "environmental provision" (as defined in such Section 736 of the California Code of Civil Procedure) relating to the Mortgaged Property or any portion thereof or the right of Lender to waive, in accordance with the California Code of Civil Procedure Section 726.5 (as such Section may be amended from time to time), the security of this Deed of Trust as to any parcel of the Mortgaged Property that is "environmentally impaired" or is an "affected parcel" (as such terms are defined in such Section 726.5), and as to any personal property attached to such parcel, and thereafter to exercise against Grantor, to the extent permitted by such Section 726.5, the rights and remedies of any unsecured creditor, including reduction of Lender's claim against Grantor to judgment, and any other rights and remedies permitted by law.

9.3 <u>Trustee's Deed Recitals</u>. The recitals of facts in any instrument delivered upon completion of any sales, as described in Section 9.2 above, such as the existence of a default, the giving of written notice of default and notice of sale, and other facts affecting the regularity or validity of such sale or disposition, shall be conclusive proof of the trust of such facts and any such instruments shall be conclusive against all persons as to such fact recited therein.

9.4 <u>Right Of Entry</u>. In addition to any other rights or remedies granted under this Deed of Trust but subject to the terms and conditions of the Credit Agreement and the rights of lessees, upon the occurrence and during the continuance of an Event of Default. Lender and its agents, acting by themselves or through a court appointed receiver, upon reasonable advance notice to Grantor and an opportunity to be present, shall have the right to enter upon the Mortgaged Property or any part thereof and perform such acts and things as Lender deems necessary or desirable to inspect, investigate, assess, and protect the security thereof. Without limitation of any of its other rights and subject to the provisions of the Credit Agreement, upon the occurrence and during the continuance of an Event of Default. Lender shall have the right to: (i) obtain a court order to enforce Lender's right to enter and inspect the Mortgaged Property under California Civil Code Section 2929.5 to which the decision of Lender as to whether there exists a release or threatened release of Hazardous Substances onto the Mortgaged Property shall be deemed reasonable and conclusive as between the parties hereto and (ii) have a receiver appointed under California Code of Civil Procedure Section 564 to enforce Lender's right to enter and inspect the Mortgaged Property for Hazardous Substances. Subject to the Credit Agreement, all costs and expenses incurred by Lender with respect to the audits, tests, inspections, and examinations which Lender or its agents or employees may conduct, including the fees of the engineers, laboratories, contractors, consultants, and attorneys, shall be paid by Grantor ten (10) days following demand with interest at the Default Rate from the date paid by

16

Lender. Such costs, if not paid for by Grantor following demand, may be added to the principal balance of the sums due under the Credit Agreement and this Deed of Trust and shall bear interest thereafter until paid at the Default Rate.

9.5 <u>Reconveyance</u>. If the Obligations are paid and all obligations secured by this Deed of Trust are fully performed in accordance with the terms of this Deed of Trust, the Credit Agreement and the other Loan Documents, then Lender agrees to request Trustee to reconvey the Mortgaged Property or any applicable portion thereof in accordance with the provisions of the Credit Agreement upon payment by Grantor of Trustee's fees and all other sums owing to it under this Deed of Trust and the other Loan Documents. Trustee will reconvey the Mortgaged Property without warranty to the person or persons legally entitled thereto. The grantee in the reconveyance may be described as "the person or persons legally entitled thereto." No reconveyance hereof shall impair Grantor's warranties and indemnities contained herein.

9.6 <u>Border Zone Property</u>. To Grantor's actual knowledge, Grantor represents and warrants that no portion of the Real Property and/or the Improvements has been designated as Border Zone Property under the provisions of California Health and Safety Code, Sections 25220 et seq. or any regulation adopted in accordance therewith, and there has been no occurrence or condition on any real property adjoining the Mortgaged Property that is reasonably likely to cause the Mortgaged Property or any part thereof to be designated as Border Zone Property.

9.7 <u>Insurance Notice</u>. Lender hereby notifies Grantor of the provisions of Section 2955.5(a) of the California Civil Code, which reads as follows:

> "No lender shall require a borrower, as a condition of receiving or maintaining a loan secured by real property, to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the property."

This disclosure is being made by Lender to Grantor pursuant to Section 2955.5(b) of the California Civil Code. Grantor hereby acknowledges receipt of this disclosure and acknowledges that this disclosure has been made by Lender before execution of any note or security document evidencing or securing the Loan.

9.8 <u>Commercial Loan</u>. Grantor represents and warrants that the Loan is for commercial purposes, and not for personal, household or consumer purposes.

## REQUESTS FOR NOTICES

9.9 <u>Requests for Notices</u>. Grantor requests that a copy of any notice of default and notice of sale required by law be mailed to it at the Real Property and to the address(es) specified in the Terms Schedule to the Credit Agreement.

*[Signatures appear on the following page.]*

17

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust the day and year first hereinabove written.

**Grantor:**

**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

*[Signature Page to Deed of Trust]*

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _Illinois_ )

COUNTY OF _Dupage_ )

On July _31_, 2018, before me, _Cortney Musser_, a Notary Public, personally appeared Frank A. Bergren, Jr., as the sole Manager of BCG Ownco, LLC, an Illinois limited liability company, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Cortney Musser_

SIGNATURE                                        SEAL

CORTNEY MUSSER
Official Seal
Notary Public - State of Illinois
My Commission Expires Mar 2, 2020

*[Notary pate to Deed of Trust]*

## EXHIBIT A

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1:** APN 405-330-18

THOSE PORTIONS OF PARCEL 2 OF PARCEL MAP 3947, IN THE CITY OF BAKERSFIELD, COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED APRIL 7, 1977, IN BOOK 18, PAGE 45 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY AND LOT 16 OF SECTION 13, TOWNSHIP 30 SOUTH, RANGE 27 EAST, M.D.M., PER KERN COUNTY SALES MAP NO. 1 OF LANDS OF J.B. HAGGIN FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON MAY 3, 1889, DESCRIBED AS PARCEL "A" OF LOT LINE ADJUSTMENT P96-0649 IN CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 3, 1996, INSTRUMENT NO. 0196128736, AND RE-RECORDED FEBRUARY 16, 2017 AS INSTRUMENT NO. 0217021062 OF OFFICIAL RECORDS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE EAST QUARTER CORNER OF SAID SECTION 13; THENCE NORTH 89° 57' 04" WEST ALONG THE SOUTH LINE OF THE NORTHEAST QUARTER OF SAID SECTION, 205.00 FEET; THENCE NORTH 00°01' 34" West, 49.00 FEET TO THE TRUE POINT OF BEGINNING;

THENCE (1) NORTH 89° 57' 04" WEST, 194.95 FEET TO THE BEGINNING OF A 1951.00 FOOT RADIUS TANGENT CURVE, CONCAVE NORTHERLY;

THENCE (2) WESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 03° 08' 20" AN ARC DISTANCE OF 106.88 FEET TO A POINT OF REVERSE CURVE, CONCAVE TO THE SOUTH HAVING A RADIUS OF 2049.00 FEET;

THENCE (3) WESTERLY ALONG SAID CURVE, THROUGH A CENTRAL ANGLE OF 03° 08' 20" AN ARC DISTANCE OF 112.25 FEET;

THENCE (4) NORTH 89° 57' 04" WEST, ALONG THE NORTH LINE OF THE SOUTH 55 FEET OF THE NORTHEAST QUARTER OF SAID SECTION 13, 526.92 FEET TO A POINT OF INTERSECTION WITH THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE ASPHALTO BRANCH OF THE SOUTHERN PACIFIC RAILROAD;

THENCE (5) NORTH 40° 34' 38" EAST, ALONG SAID SOUTHEASTERLY RIGHT OF WAY LINE, 632.14 FEET TO THE NORTHWESTERLY CORNER OF PARCEL 2;

THENCE (6) DEPARTING FROM SAID SOUTHEASTERLY RIGHT OF WAY LINE AND ALONG THE NORTHERLY LINE OF SAID PARCEL 2, SOUTH 89° 56' 39" EAST, 393.48 FEET;

THENCE (7) DEPARTING FROM SAID NORTHERLY LINE, SOUTH 00° 01' 34" EAST, 174.50 FEET TO THE SOUTHERLY LINE OF SAID PARCEL 2;

THENCE (8) SOUTH 89° 56' 39" EAST, 136.00 FEET ALONG SAID SOUTHERLY LINE;

THENCE (9) DEPARTING FROM SAID SOUTHERLY LINE, SOUTH 00° 01' 34" EAST, 311.92 FEET TO THE POINT OF BEGINNING.

**PARCEL 2:**

AN EASEMENT FOR INGRESS, EGRESS AND ROAD PURPOSES AS CONVEYED IN THE DEED RECORDED APRIL 6, 1977 IN BOOK 5018, PAGE 2148 OF OFFICIAL RECORDS, AND AS SHOWN ON PARCEL MAP NO. 3947 RECORDED IN BOOK 18 AT PAGE 45 OF PARCEL MAPS, KERN COUNTY RECORDS, AND AS SHOWN ON LOT LINE ADJUSTMENT NO. P96-0649 RECORDED WITH CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 3, 1996 AS INSTRUMENT NO. 0196128736 AND RE-RECORDED FEBRUARY 16, 2017 AS INSTRUMENT NO. 0217021062 OF SAID OFFICIAL RECORDS .

Common address:        1800 White Lane
                       Bakersfield, California 93304

6777381.3

DEED OF TRUST
Exhibit A

# EXHIBIT 4

## FIRST AMENDMENT TO CREDIT AGREEMENT

This First Amendment to Credit Agreement (this "First Amendment") is made and entered into as of September 19, 2018, by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG") (Metal Partners, BCG and BRG are collectively, the "Borrowers" and each, individually, a "Borrower") and JPMORGAN CHASE BANK, N.A., a national banking association ("Lender").

## W I T N E S S E T H :

**WHEREAS,** prior hereto, Lender provided certain loans, extensions of credit and other financial accommodations to the Borrowers pursuant to (a) that certain Credit Agreement dated as of August 3, 2018, by and among Borrowers, the other Loan Parties thereto and Lender (the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

**WHEREAS,** the Borrowers desire Lender to, among other things, (a) modify the Inventory Advance Rate, and (b) modify the concentration limit for Eligible Accounts due from an Account Debtor (collectively, the "Additional Financial Accommodations"); and

**WHEREAS,** Lender is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this First Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein, and other good and valuable consideration, the receipt and sufficiency of such consideration is hereby acknowledged, the parties hereto hereby agree as set forth in this First Amendment.

I.    **Definitions.**

A.    Use of Defined Terms.  Except as expressly set forth in this First Amendment, all terms which have an initial capital letter where not required by the rules of grammar are used herein as defined in the Credit Agreement.

B.    New Definitions.  Effective as of the date of this First Amendment, the Definitions Schedule attached to the Credit Agreement is hereby amended by adding the following new definitions thereto in the appropriate alphabetical order:

"First Amendment Effective Date" shall mean September 19, 2018.

"Myer Salit Accounts" shall mean Accounts owing from Myer Salit to Borrowers, or any Borrower, in connection with the Myer Salit Transaction.

"Myer Salit" shall mean Myer Salit Limited, a New York corporation.

"Myer Salit Termination Date" shall mean the first to occur of November 30, 2018, or the actual or purported termination or substantial completion of the Myer Salit Transaction.

"Myer Salit Transaction" shall mean a transaction consummated on or before November 30, 2018, by and among Borrowers and Myer Salit in connection with the transport and delivery of certain stainless rebar inventory by a Turkish mill to Myer Salit on behalf of Borrowers.

II.    **Amendment to Credit Agreement**. Effective as of the First Amendment Effective Date and subject to the full satisfaction of the conditions precedent set forth in Section III below, the Credit Agreement is hereby amended as follows:

A.    Eligible Accounts. The Borrowing Base Schedule attached to the Credit Agreement is hereby amended by deleting subsection (e) of the section entitled "Eligible Accounts" therein and substituting therefor the following:

"(e)    which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to such Borrower exceeds 20% of the aggregate Eligible Accounts; provided, however, Myer Salit Accounts shall not be subject to the foregoing concentration limitation from the First Amendment Effective Date through the Myer Salit Termination Date."

B.    Inventory Advance Rate. The Borrowing Base Schedule attached to the Credit Agreement is hereby amended by deleting the section entitled "Inventory Advance Rate" therein and substituting therefor the following:

"Inventory Advance Rate" means, (a) with respect to Borrowing Base Certificates delivered from and after the First Amendment Effective Date through but not including the Myer Salit Termination Date, 90.0%, and (b) effective with respect to Borrowing Base Certificates delivered from and after the Myer Salit Termination Date, (i) with respect to Borrowing Base Certificates delivered for any period from March 1 of any year through November 30 of such year, 85.0%, and (ii) with respect to Borrowing Base Certificates delivered for any period from December 1 of any year through the last day of February of the immediately succeeding year, 87.5%."

III.    **Conditions Precedent**. Lender's obligation to provide the Additional Financial Accommodations to Borrowers is subject to the full and timely performance of the following covenants prior to or contemporaneously with the execution of this First Amendment:

A.    Borrowers executing and delivering, or causing to be executed and delivered to Lender, the following documents, each of which shall be in the form and substance acceptable to Lender:

(i)    a fully executed original of this First Amendment;

(ii)    an In Transit Inventory Agreement duly executed by Metal Partners and Livingston International (or such other customs broker retained by Metal Partners to clear goods through Canadian customs with respect to the Myer Salit Transaction); and

(iii)    such other agreements, documents and instruments as Lender may reasonably request.

B.    No Default exists under the Credit Agreement, as amended by this First Amendment, or the other Loan Documents;

C.       No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Lender prior to the date of hereof shall be pending or known to be threatened against any Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the reasonable opinion of the Lender is likely to materially or adversely affect the financial position or business of any Borrower or the capability of any Borrower to pay their respective obligations and liabilities to Lender; and

D.       There shall have been no material or adverse change in the business, financial condition or results of operations for any Borrower since the date of Borrowers' most recently delivered financial statements to the Lender.

E.       Lender shall have received evidence in form and substance satisfactory to Lender of the commencement of the Myer Salit Transaction.

IV.      **Myer Salit Inventory**.  Not later than seven (7) days after the First Amendment Effective Date, Borrowers shall execute and deliver or cause to be delivered to Lender the following, each in form and substance satisfactory to Lender in its sole discretion: (a) a Collateral Access Agreement with respect to all locations of Inventory that will store Inventory to be sold pursuant to the Myer Salit Transaction, and (b) a security agreement governed by applicable Canadian law with respect to Inventory and other assets located in Canada.   Borrowers hereby authorize Lender to file Personal Property Security Act registrations in each Province of Canada, describing all or any portion of Borrowers' personal property assets as collateral thereunder and otherwise in form and substance satisfactory to Lender.

V.       **Organizational Information**.  Borrowers hereby represent and warrant to Lender that (a) the formation and organizational documents of each Borrower attached to the Company General Certificates each dated as of August 3, 2018, executed and delivered by each such Borrower to Lender have not been modified or altered in any way (the "Original Certificates"), (b) the officers or managers, as applicable for each such Borrower set forth in the Original Certificates that are authorized to execute documents on behalf of each such Borrower remain duly authorized officers or managers of each such Borrower, (c) the resolutions attached to each such Original Certificates have not been modified, rescinded or altered in any way and are sufficient to authorize the execution and delivery of this First Amendment and the other agreements, documents and instruments executed and delivered in connection herewith, and (d) as of the date of this First Amendment, each such Borrower is and continues to be in good standing in the state of its formation and in all other states where it is required to be authorized to do business where the failure to do so could reasonably be expected to have a Material Adverse Effect.

VI.      **Conflict**.  If, and to the extent, the terms and provisions of this First Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this First Amendment shall govern and control; provided, however, to the extent the terms and provisions of this First Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this First Amendment, shall remain in and have its intended full force and effect, and Lender and Borrowers hereby affirm, confirm and ratify the same.

VII.     **Severability.**  Wherever possible, each provision of this First Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this First Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of

this First Amendment, the balance of which shall remain in and have its intended full force and effect. Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VIII.    **Reaffirmation**.    Borrowers each hereby reaffirm and remake all of their respective representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement and the Collateral Documents, as amended hereby.

IX.    **Fees, Costs and Expenses**.

A.    Contemporaneously herewith, Borrowers shall pay to Lender a fully earned non-refundable loan amendment fee in the amount of Ten Thousand and no/100 Dollars ($10,000.00) (the "Amendment Fee"). Borrowers hereby acknowledge and agree that the Amendment Fee shall be paid from the proceeds of the Revolving Loan and Lender is hereby authorized to make advances under the Revolving Loan pursuant to Section 2.17(c) of the Credit Agreement to pay the Amendment Fee.

B.    Borrowers agree to pay, upon demand, all fees, costs and expenses of Lender, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this First Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

X.    **Choice of Law**.    This First Amendment shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

XI.    **Counterpart**.    This First Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile or email transmitted executed counterpart to this First Amendment and the other agreements, documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this First Amendment and such other agreements, documents and instruments; provided, however, Borrowers shall be required to deliver to Lender original executed signature pages in substitution for said facsimile or email transmitted signature pages upon the Lender's request therefor.

XII.    **References to Borrowers**.    All references to "Borrowers" and "Borrower" shall mean each of Metal Partners, BCG and BRG, individually and collectively, as the context may require, and jointly and severally, and all representations, warranties, duties, covenants, agreements and obligations of Borrowers shall be the individual and collective representations, warranties, duties, covenants, agreements and obligations of each of Metal Partners, BCG and BRG.

XIII.    **Waiver of Jury Trial.**    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS FIRST AMENDMENT, THE CREDIT AGREEMENT, THE SECURITY AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR

4

ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[signature page follows]

**IN WITNESS WHEREOF,** Lender, Borrowers have caused this First Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager


**JPMORGAN CHASE BANK, N.A.**


By: _____
Name: Robert S. Sheppard
Title: Authorized Officer


*[signature page to First Amendment]*

6809718.5

IN WITNESS WHEREOF, Lender, Borrowers have caused this First Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name: Robert S. Sheppard
Title: Authorized Officer

*[signature page to First Amendment]*

6809718.5

# EXHIBIT 5

## SECOND AMENDMENT TO CREDIT AGREEMENT

This Second Amendment to Credit Agreement (this "Second Amendment") is made and entered into as of October 2, 2018, by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG") (Metal Partners, BCG and BRG are collectively, the "Borrowers" and each, individually, a "Borrower") and JPMORGAN CHASE BANK, N.A., a national banking association ("Lender").

## WITNESSETH:

**WHEREAS**, prior hereto, Lender provided certain loans, extensions of credit and other financial accommodations to the Borrowers pursuant to (a) that certain Credit Agreement dated as of August 3, 2018, as amended by that certain First Amendment to Credit Agreement dated as of September 19, 2018, each by and among Borrowers, the other Loan Parties thereto and Lender (collectively, the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

**WHEREAS**, the Borrowers desire Lender to, among other things, increase the Revolving Commitment from $60,000,000 to $70,000,000 (collectively, the "Additional Financial Accommodations"); and

**WHEREAS**, Lender is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this Second Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein, and other good and valuable consideration, the receipt and sufficiency of such consideration is hereby acknowledged, the parties hereto hereby agree as set forth in this Second Amendment.

I.    **Definitions.**

A.    <u>Use of Defined Terms</u>.  Except as expressly set forth in this Second Amendment, all terms which have an initial capital letter where not required by the rules of grammar are used herein as defined in the Credit Agreement.

B.    <u>Amended Definitions Schedule Definitions</u>. Effective as of the date of this Second Amendment, the Definitions Schedule attached to the Credit Agreement is hereby amended by deleting the definitions of "Revolving Commitment" and "Revolving Exposure" contained therein and substituting therefor the following, respectively:

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder up to the amount set forth in the Terms Schedule. As of the Second Amendment Effective Date, the amount of the Lender's Revolving Commitment is $70,000,000.

"Revolving Exposure" means, at any time, the sum of (a) the outstanding principal amount of Revolving Loans and LC Exposure at such time, plus (b) the aggregate principal

amount of Protective Advances outstanding at such time.

C.    <u>Amended Borrowing Base Schedule Definitions</u>. Effective as of the date of this Second Amendment, the Borrowing Base Schedule attached to the Credit Agreement is hereby amended by (i) deleting the definition of In-Transit Inventory L/C Reserve Add-Back in its entirety; and (ii) deleting the definition of "Borrowing Base" contained therein and substituting therefor the following:

"<u>Borrowing Base</u>" means, at any time (other than as otherwise set forth in this paragraph), the sum of (a) the Accounts Advance Rate at such time multiplied by Eligible Accounts at such time, plus (b) the product of the Inventory Advance Rate at such time multiplied by the NOLV Percentage identified in the most recent inventory appraisal ordered by the Lender multiplied by Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time, plus (c) the product of the Inventory Advance Rate at such time multiplied by the LC Exposure for Letters of Credit issued to the sellers of in transit Eligible Inventory at such time, provided the shipping documentation with respect to such in transit Inventory names Lender as the sole consignee and the Letter of Credit can only be drawn upon acceptance of the underlying Inventory by Borrower or its agent in the United States, minus (d) the sum of the Magnet Crane Reserve, the Epoxy Line Reserve and other Reserves. The Lender may, in its Permitted Discretion, after the occurrence and during the continuation of a Default, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

D.    <u>New Definition</u>. Effective as of the date of this Second Amendment, the Definitions Schedule attached to the Credit Agreement is hereby amended by adding the following new definition thereto in the appropriate alphabetical order:

"<u>Second Amendment Effective Date</u>" shall mean October 2, 2018.

II.    **Amendment to Credit Agreement**. Effective as of the Second Amendment Effective Date and subject to the full satisfaction of the conditions precedent set forth in Section III below, the Terms Schedule attached to the Credit Agreement is hereby amended by deleting the reference to "**Revolving Commitment (Definitions Schedule: $60,000,000**" and subsection (a) immediately following such reference and substituting therefor the following:

"1.    "**Revolving Commitment (Definitions Schedule): $70,000,000**.

(a)    The Borrowers may request that the Lender increase the Revolving Commitment provided that (i) any such request for an increase shall be in a minimum amount of $1,000,000, (ii) the Borrowers may make a maximum of three (3) such requests, (iii) after giving effect thereto, the sum of the total of the additional Commitments does not exceed $20,000,000, (iv) the procedure described in Section 2.09(e) have been satisfied. **Nothing contained in this section shall constitute, or otherwise be deemed to be, a commitment on the part of the Lender to increase its Commitment hereunder at any time and the Borrowers acknowledge that the Lender may decline the request for any reason, or no reason whatsoever, notwithstanding the absence of a Material Adverse Effect, Default or Event of Default.**"

III.    **Conditions Precedent**. Lender's obligation to provide the Additional Financial Accommodations to Borrowers is subject to the full and timely performance of the following covenants prior to or contemporaneously with the execution of this Second Amendment:

A.    Borrowers executing and delivering, or causing to be executed and delivered to Lender, the following documents, each of which shall be in the form and substance acceptable to Lender:

(i)     a fully executed original of this Second Amendment;

(ii)    a Company General Certificate executed and delivered by each Borrower to Lender;

(iii)   a Closing Certificate executed and delivered by each Borrower to Lender;

(iv)    a First Amendment to Deed of Trust executed and delivered by BCG to Lender, together with an update to the lender's title policy for the subject property; and

(v)     such other agreements, documents and instruments as Lender may reasonably request.

B.      No Default exists under the Credit Agreement, as amended by this Second Amendment, or the other Loan Documents;

C.      No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Lender prior to the date of hereof shall be pending or known to be threatened against any Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the reasonable opinion of the Lender is likely to materially or adversely affect the financial position or business of any Borrower or the capability of any Borrower to pay their respective obligations and liabilities to Lender; and

D.      There shall have been no material or adverse change in the business, financial condition or results of operations for any Borrower since the date of Borrowers' most recently delivered financial statements to the Lender.

E.      Lender shall have received evidence in form and substance satisfactory to Lender of the commencement of the Myer Salit Transaction.

IV.     **Commitment Fee Calculation**. Borrowers and Lender acknowledge and agree that prior to the Second Amendment Effective Date, the Commitment Fee payable by Borrowers pursuant to Section 2.11 was not calculated utilizing the Available Revolving Commitment based upon the Revolving Exposure definition as in effect prior to the Second Amendment Effective Date, but rather was calculated utilizing the Revolving Exposure definition as modified by this Second Amendment. The parties hereby ratify the calculation of such fees, notwithstanding that such calculation varies from the Credit Agreement as in effect prior to the Second Amendment Effective Date.

V.      **Conflict**. If, and to the extent, the terms and provisions of this Second Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this Second Amendment shall govern and control; provided, however, to the extent the terms and provisions of this Second Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this Second Amendment, shall remain in and have its intended full force and effect, and Lender and Borrowers hereby affirm, confirm and ratify the same.

3

VI.    **Severability.**  Wherever possible, each provision of this Second Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Second Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of this Second Amendment, the balance of which shall remain in and have its intended full force and effect. Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VII.    **Reaffirmation**.    Borrowers each hereby reaffirm and remake all of their respective representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement and the Collateral Documents, as amended hereby.

VIII.    **Fees, Costs and Expenses**.

A.    Contemporaneously herewith, Borrowers shall pay to Lender a fully earned non-refundable loan amendment fee in the amount of Ten Thousand and no/100 Dollars ($10,000.00) (the "Amendment Fee"). Borrowers hereby acknowledge and agree that the Amendment Fee shall be paid from the proceeds of the Revolving Loan and Lender is hereby authorized to make advances under the Revolving Loan pursuant to Section 2.17(c) of the Credit Agreement to pay the Amendment Fee.

B.    Borrowers agree to pay, upon demand, all fees, costs and expenses of Lender, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this Second Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

IX.    **Choice of Law**.  This Second Amendment shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

X.    **Counterpart**.  This Second Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile or email transmitted executed counterpart to this Second Amendment and the other agreements, documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this Second Amendment and such other agreements, documents and instruments; provided, however, Borrowers shall be required to deliver to Lender original executed signature pages in substitution for said facsimile or email transmitted signature pages upon the Lender's request therefor.

XI.    **References to Borrowers**.  All references to "Borrowers" and "Borrower" shall mean each of Metal Partners, BCG and BRG, individually and collectively, as the context may require, and jointly and severally, and all representations, warranties, duties, covenants, agreements and obligations of Borrowers shall be the individual and collective representations, warranties, duties, covenants, agreements and obligations of each of Metal Partners, BCG and BRG.

XII.    **Waiver of Jury Trial.** EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY

4

JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS SECOND AMENDMENT, THE CREDIT AGREEMENT, THE SECURITY AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[signature page follows]

IN WITNESS WHEREOF, Lender, Borrowers have caused this Second Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

**JPMORGAN CHASE BANK, N.A.**


By: _____
Name: Robert S. Sheppard
Title: Authorized Officer


*[signature page to Second Amendment]*

6816899.3

IN WITNESS WHEREOF, Lender, Borrowers have caused this Second Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

**JPMORGAN CHASE BANK, N.A.**

By: _Robert S. Sheppard_____
Name: Robert S. Sheppard
Title: Authorized Officer


*[signature page to Second Amendment]*

6816899.3

# EXHIBIT 6

<u>**THIRD AMENDMENT TO CREDIT AGREEMENT**</u>

This Third Amendment to Credit Agreement (this "Third Amendment") is made and entered into as of March 15, 2019, by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG") (Metal Partners, BCG and BRG are collectively, the "Borrowers" and each, individually, a "Borrower") and JPMORGAN CHASE BANK, N.A., a national banking association ("Lender").

**W I T N E S S E T H:**

**WHEREAS,** prior hereto, Lender provided certain loans, extensions of credit and other financial accommodations to the Borrowers pursuant to (a) that certain Credit Agreement dated as of August 3, 2018, as amended by that certain First Amendment to Credit Agreement dated as of September 19, 2018, and that certain Second Amendment to Credit Agreement dated as of October 4, 2018, each by and among Borrowers, the other Loan Parties thereto and Lender (collectively, the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

**WHEREAS,** the Borrowers desire Lender to, among other things, modify Epoxy Line Reserve (the "Additional Financial Accommodations"); and

**WHEREAS,** Lender is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this Third Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein, and other good and valuable consideration, the receipt and sufficiency of such consideration is hereby acknowledged, the parties hereto hereby agree as set forth in this Third Amendment.

I.    <u>**Definitions.**</u>

A.    <u>Use of Defined Terms</u>.  Except as expressly set forth in this Third Amendment, all terms which have an initial capital letter where not required by the rules of grammar are used herein as defined in the Credit Agreement.

B.    <u>Amended Borrowing Base Schedule Definitions</u>. Effective as of the date of this Third Amendment, the Borrowing Base Schedule attached to the Credit Agreement is hereby amended by deleting the definition of "Epoxy Line Reserve" contained therein in its entirety and substituting therefor the following:

"<u>Epoxy Line Reserve</u>" means, from and after the Third Amendment Effective Date, an amount equal to Zero Dollars ($0).

C.    <u>New Definition</u>.  Effective as of the date of this Third Amendment, the Definitions Schedule attached to the Credit Agreement is hereby amended by adding the following new definition thereto in the appropriate alphabetical order:

"Third Amendment Effective Date" shall mean March 15, 2019.

II.    **Reporting Schedule**. Effective as of the Third Amendment Effective Date and subject to the full satisfaction of the conditions precedent set forth in Section III below, the Reporting Schedule attached to the Credit Agreement is hereby amended by deleting the Reporting Schedule in its entirety and substituting therefor the Reporting Schedule attached hereto and incorporated herein.

III.    **Conditions Precedent**. Lender's obligation to provide the Additional Financial Accommodations to Borrowers is subject to the full and timely performance of the following covenants prior to or contemporaneously with the execution of this Third Amendment:

    A.    Borrowers executing and delivering, or causing to be executed and delivered to Lender, the following documents, each of which shall be in the form and substance acceptable to Lender:

        (i)    a fully executed original of this Third Amendment; and

        (ii)    such other agreements, documents and instruments as Lender may reasonably request.

    B.    No Default exists under the Credit Agreement, as amended by this Third Amendment, or the other Loan Documents;

    C.    No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Lender prior to the date of hereof shall be pending or known to be threatened against any Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the reasonable opinion of the Lender is likely to materially or adversely affect the financial position or business of any Borrower or the capability of any Borrower to pay their respective obligations and liabilities to Lender; and

    D.    There shall have been no material or adverse change in the business, financial condition or results of operations for any Borrower since the date of Borrowers' most recently delivered financial statements to the Lender.

IV.    **Conflict**.  If, and to the extent, the terms and provisions of this Third Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this Third Amendment shall govern and control; provided, however, to the extent the terms and provisions of this Third Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this Third Amendment, shall remain in and have its intended full force and effect, and Lender and Borrowers hereby affirm, confirm and ratify the same.

V.    **Severability.**  Wherever possible, each provision of this Third Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Third Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of this Third Amendment, the balance of which shall remain in and have its intended full force and effect. Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of

2

law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VI.     **Organizational Information**.  Borrowers hereby represent and warrant to Lender that (a) the formation and organizational documents of each Borrower attached to the Company General Certificates each dated as of August 3, 2018, executed and delivered by each such Borrower to Lender have not been modified or altered in any way, (b) the officers or managers, as applicable for each such Borrower set forth in the Company General Certificates each dated as of October 4, 2018, executed and delivered by each such Borrower to Lender (the "October 2018 Certificates"), that are authorized to execute documents on behalf of each such Borrower remain duly authorized officers or managers of each such Borrower, (c) the resolutions attached to each such October 2018 Certificates have not been modified, rescinded or altered in any way and are sufficient to authorize the execution and delivery of this Third Amendment and the other agreements, documents and instruments executed and delivered in connection herewith, and (d) as of the date of this Third Amendment, each such Borrower is and continues to be in good standing in the state of its formation and in all other states where it is required to be authorized to do business where the failure to do so could reasonably be expected to have a Material Adverse Effect.

VII.    **Reaffirmation**.    Borrowers each hereby reaffirm and remake all of their respective representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement and the Collateral Documents, as amended hereby.

VIII.   **Fees, Costs and Expenses**.

        A.      Contemporaneously herewith, Borrowers shall pay to Lender a fully earned non-refundable loan amendment fee in the amount of Ten Thousand and no/100 Dollars ($10,000.00) (the "Amendment Fee"). Borrowers hereby acknowledge and agree that the Amendment Fee shall be paid from the proceeds of the Revolving Loan and Lender is hereby authorized to make advances under the Revolving Loan pursuant to Section 2.17(c) of the Credit Agreement to pay the Amendment Fee.

        B.      Borrowers agree to pay, upon demand, all fees, costs and expenses of Lender, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this Third Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

IX.     **Choice of Law**.  This Third Amendment shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

X.    **Counterpart**.  This Third Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile or email transmitted executed counterpart to this Third Amendment and the other agreements, documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this Third Amendment and such other agreements, documents and instruments; provided, however, Borrowers shall be required to deliver to Lender original executed signature pages in substitution for said facsimile or email transmitted signature pages upon the Lender's request therefor.

XI.    **References to Borrowers**.  All references to "Borrowers" and "Borrower" shall mean each of Metal Partners, BCG and BRG, individually and collectively, as the context may require, and jointly and severally, and all representations, warranties, duties, covenants, agreements and obligations of Borrowers shall be the individual and collective representations, warranties, duties, covenants, agreements and obligations of each of Metal Partners, BCG and BRG.

XII.    **Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS THIRD AMENDMENT, THE CREDIT AGREEMENT, THE SECURITY AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[signature page follows]

**IN WITNESS WHEREOF,** Lender, Borrowers have caused this Third Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager

**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

LENDER:

**JPMORGAN CHASE BANK, N.A.**

By: _____
Name: Robert S. Sheppard
Title: Authorized Officer

*[signature page to Third Amendment]*

**IN WITNESS WHEREOF,** Lender, Borrowers have caused this Third Amendment to be executed and delivered by their duly authorized officers as of the date first set forth above.

BORROWERS:

**Metal Partners Rebar, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BCG Ownco, LLC,**
an Illinois limited liability company

By: _____
Name: Frank A. Bergren, Jr.
Title: Sole Manager


**BRG Holding, LLC,**
a West Virginia limited liability company

By: _____
Name Frank A. Bergren, Jr.
Title: Sole Manager

LENDER:

**JPMORGAN CHASE BANK, N.A.**

By: Robert S. Sheppard
Name: Robert S. Sheppard
Title: Authorized Officer


*[signature page to Third Amendment]*

**Reporting Schedule**

The Borrowers will furnish to the Lender:

(a)        within 120 days after the end of each fiscal year of Borrowers, their audited combined and combining balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants acceptable to the Lender (without a "going concern" or like qualification, commentary or exception and without any qualification or exception as to the scope of such audit other than qualifications for not capitalizing lease obligations and for having unconsolidated Variable Interest Entities, provided such issues are addressed in a manner consistent with Borrowers' 2017 audited financial statements) to the effect that such combined and combining financial statements present fairly in all material respects the financial condition and results of operations of Borrowers and their consolidated Subsidiaries on a combined and combining basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants;

(b)        within 30 days after the end of each fiscal month of Borrowers, their combined and combining balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Borrower Representative as presenting fairly in all material respects the financial condition and results of operations of the Borrowers and their consolidated Subsidiaries on a combined and combining basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)        concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower Representative in form and detail acceptable to the Lender (each a "Compliance Certificate"), (i) certifying, in the case of the financial statements delivered under clause (b), as presenting fairly in all material respects the financial condition and results of operations of Borrowers and their consolidated Subsidiaries on a combined and combining basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) setting forth reasonably detailed calculations demonstrating compliance with the covenants set forth on the Financial Covenants Schedule attached hereto, and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)        during the 30 day period prior to the beginning of each fiscal year of Borrowers, a copy of the plan and forecast (including a projected combined and combining balance sheet, income statement and funds flow statement) of Borrowers and their consolidated Subsidiaries for each month of such fiscal year in form and detail reasonably satisfactory to the Lender;

(e)        within 20 days of the end of each calendar month, and at such other times as may be necessary to re-determine Availability or as requested by the Lender, as of the period then ended, a

Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request;

(f)    within 20 days of the end of each calendar month, and at such other times as may be requested by the Lender, as of the period then ended, all delivered electronically in a text formatted file acceptable to the Lender (not in an Adobe *.pdf file):

(i)    a detailed aging of the Borrowers' Accounts including all invoices aged by invoice date and due date (with an explanation of the terms offered) prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)    a schedule detailing the Borrowers' Inventory, in form satisfactory to the Lender, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Lender has previously indicated to the Borrower Representative are deemed by the Lender to be appropriate and (2) including a report of any variances or other results of Inventory counts performed by the Borrowers since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Borrowers and complaints and claims made against the Borrowers);

(iii)    a worksheet of calculations prepared by the Borrowers to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion;

(iv)    a reconciliation of the Borrowers' Accounts and Inventory between (A) the amounts shown in the Borrowers' general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above, and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (e) above as of such date; and

(v)    a reconciliation of the loan balance per the Borrowers' general ledger to the loan balance under this Agreement;

(vi)    a schedule and aging of the Borrowers' accounts payable, delivered electronically in a text formatted file acceptable to the Lender;

(g)  promptly upon the Lender's request:

(i)    copies of invoices issued by the Borrowers in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)    copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)    an updated customer list for the Borrowers and their Subsidiaries, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Lender and certified as true and correct by a Financial Officer;

(v)    the Borrowers' sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(vi)    copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(vii)    a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction;

(h)    promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that any Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if a Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(i)    promptly following any request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors or other similar governing body (or the audit committee of the board of directors) of any Borrower by independent accountants in connection with the accounts or books of any Borrower or any Subsidiary, or any audit of any of them as the Lender may reasonably request; and

(j)    promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may reasonably request, and (y) information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

Notwithstanding the foregoing, during any time Availability is less than 10.0% of the total Revolving Commitment, Borrowers shall deliver the reporting required under subsections (e) and (f) above on a weekly basis, not later than the second Business Day of each week with information current through the last Business Day of the immediately preceding week, until such time as Availability is in excess of 10.0% of the total Revolving Commitment for a period of thirty (30) consecutive days.

7284863.2

# EXHIBIT 7

Execution Version

# FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

This FORBEARANCE AGREEMENT AND FOURTH AMENDMENT (this "Agreement") dated as of January 28, 2020, among METAL PARTNERS REBAR, LLC, an Illinois limited liability company ("Metal Partners"), BCG OWNCO, LLC, an Illinois limited liability company ("BCG"), and BRG HOLDING, LLC, a West Virginia limited liability company ("BRG", together with BCG and Metal Partners, collectively, the "Borrowers", and each, individually, a "Borrower") and JPMORGAN CHASE BANK, N.A., as lender ("Lender").

## R E C I T A L S:

WHEREAS, Lender and Borrowers have entered into certain financing arrangements pursuant to that certain Credit Agreement dated as of August 3, 2018, among Lender, Borrowers, the other Loan Parties from time to time party thereto (as amended hereby, and as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated, replaced or otherwise modified, the "Credit Agreement");

WHEREAS, as of the date hereof, multiple Events of Default under the Credit Agreement and the other Loan Documents have occurred and are continuing;

WHEREAS, Borrowers have requested that, subject to the terms and conditions of this Agreement, Lender forbear from exercising its rights as a result of such Events of Default, which are continuing, and that Lender agree to provide further Revolving Loans and other financial accommodations to Borrowers notwithstanding such Events of Default; and

WHEREAS, Lender is willing to agree to forbear from exercising certain of its rights and remedies and provide certain further Revolving Loans and other financial accommodations to Borrowers solely for the period and on the terms and conditions specified herein.

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree as follows:

**SECTION 1.  DEFINITIONS**

1.1.    **Interpretation.**  All capitalized terms used herein (including the recitals hereto) will have the respective meanings ascribed thereto in the Credit Agreement unless otherwise defined herein.  The foregoing recitals, together with all exhibits attached hereto, are incorporated by this reference and made a part of this Agreement.  Unless otherwise provided herein, all section and exhibit references herein are to the corresponding sections and exhibits of this Agreement.

1.2.    **Additional Definitions.**  As used herein, the following terms will have the respective meanings given to them below:

(a)    "Affiliate Entities" means ADR Rebar, LLC, BGD LV Holding, LLC and F&M Transportation, LLC.

(b)      "Budget" means as in effect at any given time, the Four Week Cash Flow Forecast, the Long Term Cash Flow Forecast, or the Short Term Disbursement Budget, as applicable.

(c)      "Change of Control Default" means an Event of Default under Article 7(m) of the Credit Agreement, due to Jose D. Carrero becoming majority owner and/or manager of one or more Borrowers.

(d)      "Existing Defaults" means, collectively, the Events of Default identified on Exhibit B hereto.

(e)      "Financial Advisor" means High Ridge Partners, LLC (or another advisory firm acceptable to Lender).

(f)      "Four-Week Cash Flow Forecast" means a 4-week cash flow forecast prepared by the Borrowers' management and Borrowers' Financial Advisor, in form and substance acceptable to Lender.

(g)      "Forbearance Period" means the period commencing on the date hereof and ending on the date which is the earliest of (i) February 28, 2020; (ii) at the election of Lender, the occurrence or existence of any Event of Default, other than the Existing Defaults; or (iii) the occurrence of any Termination Event.

(h)      "Long-Term Cash Flow Forecast" means a 13-week cash flow forecast prepared by the Borrowers' chief restructuring officer in form and substance satisfactory to Lender.

(i)      "Short Term Disbursement Budget" means a 2-week forecast of disbursements, prepared by the Borrowers' management and Borrowers' Financial Advisor, in form and substance acceptable to Lender. The initial Short Term Disbursement Budget is attached hereto as Exhibit A.

(j)      "Strategic Transaction" means a transaction between Borrowers and an investor and/or lender acceptable to Lender that provides for a new debt, equity or another capital infusion into Borrowers (on terms and conditions acceptable to Lender).

(k)      "Termination Event" means (i) the initiation of any action by any Borrower, any Releasing Party (as defined herein), or any other Person to invalidate or limit the enforceability of any of the acknowledgments set forth in Section 2, the release set forth in Section 8.6 or the covenant not to sue set forth in Section 8.7, or (ii) the occurrence of an Event of Default under Article 7(h) of the Credit Agreement.

## SECTION 2.  ACKNOWLEDGMENTS

2.1.      **Acknowledgment of Obligations.**  Each Borrower hereby acknowledges, confirms and agrees that as of the open of business on January 22, 2020, (a) Borrowers are indebted to Lender in respect of the Revolving Loan in the principal amount of $30,714,743.70, (b) Borrowers are indebted to Lender in respect of the Letters of Credit in the principal amount of $100,000.00 and (c) Borrowers are indebted to Lender in respect of the Term Loans in the principal amount of

$2,256,315.90. Each Borrower hereby acknowledges, confirms and agrees that all such Loans, together with interest accrued and accruing thereon, and all fees, costs, expenses and other Secured Obligations now or hereafter payable by any Borrower to Lender, are unconditionally owing by Borrowers to Lender, without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2.    **Acknowledgment of Security Interests.**  Each Borrower hereby acknowledges, confirms and agrees that Lender has, and will continue to have, valid, enforceable and perfected first-priority continuing liens upon and security interests in the Collateral heretofore granted to Lender, for the benefit of Lender, pursuant to the Credit Agreement and the Loan Documents or otherwise granted to or held by Lender.

2.3.    **Binding Effect of Documents.**  Each Borrower hereby acknowledges, confirms and agrees that: (a) this Agreement constitutes a Loan Document, (b) each of the Credit Agreement and the other Loan Documents to which it is a party has been duly executed and delivered to Lender by such Borrower, and each is and will remain in full force and effect as of the date hereof except as modified pursuant hereto, (c) the agreements and obligations of such Borrower contained in such documents and in this Agreement constitute the legal, valid and binding Secured Obligations of such Borrower, enforceable against it in accordance with their respective terms, and such Borrower has no valid defense to the enforcement of such Secured Obligations, (d) Lender is and will be entitled to the rights, remedies and benefits provided for under the Credit Agreement and the other Loan Documents and applicable law and (e) each Borrower shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Credit Agreement or any of the other Loan Documents during the continuance of any Event of Default, and except to the extent expressly provided otherwise in this Agreement, any right or action of any Borrower set forth in the Credit Agreement or the other Loan Documents that is conditioned on the absence of any Event of Default may not be exercised or taken as a result of the Existing Defaults.

## SECTION 3.  FORBEARANCE IN RESPECT OF EXISTING DEFAULTS

3.1.    **Acknowledgment of Default.**  Each Borrower hereby acknowledges and agrees that the Existing Defaults have occurred and are continuing, each of which constitutes an Event of Default and entitles Lender to exercise its rights and remedies under the Credit Agreement and the other Loan Documents, applicable law or otherwise.  Each Borrower represents and warrants that as of the date hereof, no Events of Default exist other than the Existing Defaults.  Each Borrower hereby acknowledges and agrees that Lender has the exercisable right to declare the Secured Obligations to be immediately due and payable under the terms of the Credit Agreement and the other Loan Documents.  Each Borrower acknowledges that, except after giving effect to this Agreement, Lender is no longer obligated to make any disbursements of the Revolving Loan.

3.2.    **Forbearance.**

(a)    In reliance upon the representations, warranties and covenants of the Borrowers contained in this Agreement, and subject to the terms and conditions of this Agreement and any documents or instruments executed in connection herewith, Lender agrees to forbear during the Forbearance Period from exercising its rights and remedies under the Credit Agreement and the

other Loan Documents or applicable law in respect of the Existing Defaults against MPR, BCG and their respective assets.

(b)     Upon the expiration or termination of the Forbearance Period, the foregoing agreement of Lender to forbear will automatically and without further action terminate and be of no force and effect, it being expressly agreed that the effect of such termination will be to permit Lender to exercise immediately all rights and remedies under the Credit Agreement and the other Loan Documents and applicable law, including, but not limited to, (i) ceasing to make any further Loans or issuing any further Letters of Credit and (ii) accelerating all of the Secured Obligations, in all events, without any further notice to any Borrower, passage of time or forbearance of any kind.

3.3.    **No Waivers; Reservation of Rights.**

(a)     Lender has not waived, is not by this Agreement waiving, and has no intention of waiving, any Events of Default (other than as expressly set forth in Section 3.5 below) which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same or similar to the Existing Defaults or otherwise), and Lender has not agreed to forbear with respect to any of its rights or remedies concerning any Events of Default (other than, during the Forbearance Period, the Existing Defaults to the extent expressly set forth herein) occurring at any time.

(b)     Subject to Section 3.2 above (solely with respect to the Existing Defaults), Lender reserves the right, in its discretion, to exercise any or all of its rights and remedies under the Credit Agreement and the other Loan Documents as a result of any other Events of Default occurring at any time.  Lender has not waived any of such rights or remedies, and nothing in this Agreement, and no delay on its part in exercising any such rights or remedies, may or will be construed as a waiver of any such rights or remedies.

3.4.    **Additional Events of Default.**  The parties hereto acknowledge, confirm and agree that any misrepresentation by any Borrower, or any failure of any Borrower to comply with the covenants, conditions and agreements contained in this Agreement, the Credit Agreement or any other Loan Document or in any other agreement, document or instrument at any time executed or delivered by any Borrower with, to or in favor of Lender will constitute an immediate Event of Default under this Agreement, the Credit Agreement and the other Loan Documents.  In the event that any Person, other than Lender, will at any time exercises for any reason (including, without limitation, by reason of any Existing Defaults, any other present or future Event of Default, or otherwise) any of its rights or remedies against any Borrower or any obligor providing credit support for any Borrower's obligations, or against any Borrower's or such obligor's properties or assets, such event will constitute an immediate Event of Default hereunder and an Event of Default under the Credit Agreement and the other Loan Documents (without any notice or grace or cure period)

3.5.    **Limited Waiver.** Subject to the satisfaction of the conditions set forth in Section 7 below, and in reliance upon the agreements, representations and warranties of Borrowers set forth herein, Lender hereby waives the Change of Control Default.  This is a limited waiver and shall not be deemed to constitute a waiver of any other Existing Default, other Event of Default or any future

breach by Borrowers of the Credit Agreement or any of the other Loan Documents or any other requirements of any provision of the Credit Agreement or any other Loan Documents.

## SECTION 4.  AMENDMENTS.

4.1.    In reliance upon the representations and warranties of the Borrowers set forth in Section 6 below and subject to the conditions to effectiveness set forth in Section 7 below, the Credit Agreement is hereby amended and modified as follows:

(a)    The Definitions Schedule attached to the Credit Agreement is hereby amended by deleting the definition of "Financial Officer" contained therein and substituting therefor the following:

"Financial Officer" means the chief financial officer, chief accounting officer, treasurer or controller of any Borrower, or any other officer or individual duly authorized by the chief restructuring officer or executive committee of any Borrower that is also acceptable to Lender in its discretion.

(b)    The Definitions Schedule attached to the Credit Agreement is hereby amended by deleting the definition of "Revolving Commitment" contained therein and substituting therefor the following:

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder up to the amount set forth in the Terms Schedule.

(c)    The Definitions Schedule attached to the Credit Agreement is hereby amended by inserting the following definition in applicable alphabetical order:

"Fourth Amendment" means that certain Forbearance Agreement and Fourth Amendment, dated January 28, 2020, by and among Lender and Borrowers, as amended, modified or supplemented from time to time.

(d)    The Borrowing Base Schedule attached to the Credit Agreement is hereby amended by deleting the definitions of "Accounts Advance Rate", "Borrowing Base" and "Inventory Advance Rate" contained therein and substituting therefor the following, respectively:

"Accounts Advance Rate" means, at all times, 90%, provided that the foregoing advance rate shall be reduced for each full or partial Dilution percentage point.

"Borrowing Base" means, at any time (other than as otherwise set forth in this paragraph), the sum of (a) the Accounts Advance Rate at such time multiplied by Eligible Accounts at such time, plus (b) the product of the Inventory Advance Rate at such time multiplied by the NOLV Percentage identified in the most recent inventory appraisal ordered by the Lender multiplied by Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time, plus (c) the product of the Inventory Advance Rate at such time multiplied by the LC Exposure for Letters of Credit issued to the sellers of in transit Eligible

Inventory at such time, provided the shipping documentation with respect to such in transit Inventory names Lender as the sole consignee and the Letter of Credit can only be drawn upon acceptance of the underlying Inventory by Borrower or its agent in the United States, plus (d) the Additional Amount, minus (e) the sum of the Reserves. The Lender may, in its Permitted Discretion, after the occurrence and during the continuation of a Default, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"Inventory Advance Rate" means, at all times, 85.0%.

(e)    The Borrowing Base Schedule attached to the Credit Agreement is hereby amended by adding the following new definition thereto in appropriate alphabetical order:

"Additional Amount" means (i) during the "Forbearance Period" (as defined in the Fourth Amendment), $2,500,000, provided that such amount shall reduce each Friday during the Forbearance Period by $100,000, and (ii) at all other times, $0.

(f)    The Borrowing Base Schedule attached to the Credit Agreement is hereby amended by restating subsection (o) in the definition of "Eligible Accounts" therein with the following:

(o)    which is owed by ADR Rebar, LLC ("ADR"), Advanced Rebar Supply and Placement ("ARSP") or any of their Affiliates, any Affiliate of any Loan Party, or any employee, officer, director, agent or stockholder of ADR, ARSP or any Loan Party or any of their respective Affiliates;

(g)    The Terms Schedule attached to the Credit Agreement is hereby amended (i) to replace the reference to "$70,000,000" in Section 1 thereof (Revolving Commitment) with "$60,000,000" and (ii) to restate the definitions of "LC Exposure" contained therein as follows:

LC Exposure Amount – $5,000,000

## SECTION 5.  COVENANTS

5.1.    **Budget**.

(a)    On or before January 29, 2020, Borrowers shall deliver a supplement to the Short Term Disbursement Budget for an additional two week period, in form and substance acceptable to Lender .

(b)    On or before February 12, 2020, Borrowers shall deliver the Four-Week Cash Flow Forecast to Lender.

(c)    On or before February 24, 2020, Borrowers shall deliver the Long-Term Cash Flow Forecast to Lender.

(d)     During the Forbearance Period, Borrowers shall only use proceeds of Revolving Loan advances to pay such expenses set forth in the Budget, as and when such expenses are due and payable in accordance with the Budget.

(e)     Borrowers shall not be entitled to request, and Lender shall not be required to make, any advances of Revolving Loans during the Forbearance Period except in accordance with this Section 5.1 and to the extent of positive Availability (after giving effect to any requested advance).  Solely during the Forbearance Period, any statement by Borrowers regarding the absence of Events of Default (or other compliance with the Credit Agreement, including, without limitation, its representation and warranties) that is required to be made in a Borrowing Base report or Revolving Loan request to Lender shall be deemed to exclude the Existing Defaults.

(f)     On or before the end of business on the third business day of each week during the Forbearance Period (the "Budget Delivery Date"), Borrowers shall deliver to Lender a borrowing base certificate, which shall (a) be in form and substance satisfactory to Lender, (b) include a report reconciling Borrowers' actual performance for the week ended the preceding Friday with Borrowers' budgeted performance for such week, and (c) include written explanation (in form and substance acceptable to Lender) describing the cause of any negative variances as compared to forecasted performance for the prior week (to the extent exceeding 5%).

5.2.    **Chief Restructuring Officer.**

(a)     Within two Business Days after written notice from Lender, Borrowers shall retain and engage a chief restructuring officer acceptable to Lender to be the senior-most executive of Borrowers (reporting only to their board) with final decision-making authority for management of Borrowers (including, without limitation, hiring and firing decisions and control over all disbursements), pursuant to documentation and otherwise on terms and conditions acceptable to Lender (the "CRO"). Borrowers shall continue to engage the Borrowers' CRO on such basis at all times during the Forbearance Period; removal or resignation of the CRO will be an Event of Default.

(b)     Borrowers hereby do, and will continue to, authorize and instruct the CRO to (i) share with Lender, among other information, all budgets, records, projections, financial information, reports and other information relating to the Collateral, the financial condition, operations and prospects of the Borrowers and their Affiliates, and Borrowers' capital raising process, all as requested by Lender from time to time and (ii) make itself available to Lender as reasonably requested by Lender from time to time, including, without limitation, during a weekly update call with Lender. Borrowers will at all times fully cooperate with the CRO and provide the CRO complete access, in the course of CRO's duties, to all of the Borrowers' books and records, all of the Borrowers' premises, and the Borrowers' management.

(c)     At all times during the Forbearance Period, until the CRO is engaged as set forth above, the Borrowers will continue to retain and engage the Financial Advisor (or another advisory firm acceptable to Lenders) on terms and conditions acceptable to Lender.

(d)     All fees and expenses of the CRO and the Financial Advisor shall be solely the responsibility of Borrowers and in no event shall Lender have any obligation, liability, or

responsibility of any kind or nature whatsoever for the payment of any such fees, expenses, or other obligations, nor shall Lender have any obligation or liability to the Borrowers, their Affiliates, or any other Person by reason of any acts or omissions whatsoever of Borrowers' CRO or Financial Advisor at any time.

5.3.    **Strategic Transaction.**

(a)    At all times during the Forbearance Period, Borrowers and its management, employees and agents will work expeditiously and in good faith towards a Strategic Transaction. In this regard, Borrowers agree to cooperate with all reasonable document and information requests regarding such a Strategic Transaction, and Borrowers hereby authorize the CRO (effective upon appointment) and the Financial Advisor to respond promptly with all such requests without further notice or consent.

(b)    In the event that Jose D. Carrero stops actively pursuing a Strategic Transaction, an Event of Default under this Agreement and the Credit Agreement will be deemed to have occurred.

5.4.    **Eurodollar Loans.** Borrowers hereby acknowledge and agree that, as a result of the occurrence and continuance of the Existing Defaults, Borrowers may not request, convert, or continue any Loan as a Eurodollar Borrowing in accordance with Section 2.07(d) of the Credit Agreement.

5.5.    **Default Rate.** Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, Borrowers hereby acknowledge and agree that, at the end of the Forbearance Period, Lender may, at its discretion, charge the Obligations at the Default Rate retroactive as of the date of first occurrence of an Existing Default in accordance with Section 2.12 of the Credit Agreement.

5.6.    **Real Estate Appraisal**. Each Borrower acknowledges and agrees that (a) Lender shall obtain an updated Real Estate Appraisal of Borrowers' property located at 1800 White Lane, Bakersfield, CA 93304, (b) it will cooperate on a timely basis with all requests from any appraiser retained by Lender for information regarding or access to such property, and (c) all costs and expenses incurred by Lender in connection with such appraisal shall be promptly reimbursed by Borrowers.

5.7.    **Updated Inventory Appraisal.** Borrowers will cooperate in all respects with an appraiser retained by Lender to produce an updated appraisal report of Borrowers' inventory as of November 2019, such that the appraisal report is delivered to Lender no later than January 31, 2020. Borrowers acknowledge and agree that all fees and expenses incurred by Lender in connection with such appraisal shall be paid by Borrowers.  Lender agrees that, solely during the Forbearance Period, the results of such appraisal will not be implemented in connection with determining the Borrrowing Base.

5.8.    **ADR & F&M.** Borrowers will cause ADR Rebar, LLC and F&M Transportation, LLC to permit (a) Lender, at its election, may conduct a field examination of such entities and (b) Borrowers' Financial Advisor full access to such entities' books and records, and any delay in ADR

Rebar, LLC and F&M Transportation, LLC providing information or access in connection with any such field examination or access by Borrowers' Financial Advisor will constitute an Event of Default.

5.9.    **November 2019 Financial Statements.** On or before January 31, 2020, Borrowers shall deliver to Lender financial statements for the fiscal month ending November 30, 2019, as required under the Credit Agreement (in form and substance acceptable to Lender)

5.10.    **Bank Statements.** On or before January 31, 2020, Borrowers shall deliver to Lender bank statements from July 2019 through December 2019 for F&M Transportation, LLC (in form and substance acceptable to Lender).

5.11.    **Designated Persons**.  Each Borrower acknowledges and agrees that it has named, by action of its executive committee or otherwise, Mr. Joseph Tedesco and Mr. Michael Eber as "Designated Persons" to handle the administration and operation of the Credit Agreement in the name of Borrowers.

5.12.    **Borrowing Base Certificate**.    Solely during the Forbearance Period, the certification contained in the form of Borrowing Base Certificate to be submitted by Borrowers to Lender shall be as set forth on Exhibit C hereto.

## SECTION 6.    REPRESENTATIONS AND WARRANTIES

Each Borrower hereby represents, warrants and covenants as follows:

6.1.    **Representations in the Credit Agreement and the Other Loan Documents.** Each of the representations and warranties made by or on behalf of each Borrower to Lender in the Credit Agreement or any of the other Loan Documents was true and correct when made, and is, except for the Existing Defaults, true and correct on and as of the date of this Agreement with the same full force and effect as if each of such representations and warranties had been made by each Borrower on the date hereof and in this Agreement.

6.2.    **Binding Effect of Documents.** This Agreement has been duly authorized, executed and delivered to Lender by each Borrower, is enforceable in accordance with its terms and is in full force and effect.

6.3.    **No Conflict.** The execution, delivery and performance of this Agreement by each Borrower will not violate any requirement of law or contractual obligation of any Borrower and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues.

## SECTION 7. CONDITIONS TO EFFECTIVENESS OF CERTAIN PROVISIONS OF THIS AGREEMENT

The effectiveness of the terms and provisions of this Agreement (other than the terms and provisions of Sections 2 and 7, which will be effective immediately upon the execution of this Agreement) is subject to the following conditions precedent:

(a)     Lender's receipt of this Agreement, duly authorized, executed and delivered by each Borrower;

(b)     Lender's receipt of all fees and other amounts payable on or prior to the closing date of this Agreement, including all attorneys', consultants' and other professionals' fees and expenses incurred by Lender;

(c)     Lender's receipt of evidence (in form and substance acceptable to Lender) that Borrowers have received all necessary corporation authorizations and consents necessary to enter into this Agreement;

(d)     Lender's receipt of a detailed, current accounts receivable aging report for ADR Rebar, LLC and detailed accounts receivable aging reports (current and for December 2019) for F&M Transportation, LLC (in form and substance acceptable to Lender); and

(e)     Lender's receipt of evidence, in form and substance acceptable to Lender, that Jose D. Carrero has executed his option to acquire 50% or more of BRG and has become sole manager of BRG.

## SECTION 8.  MISCELLANEOUS

8.1.    **Continuing Effect of Credit Agreement.**  Except as modified pursuant hereto, no other changes or modifications to the Credit Agreement or any other Loan Document are intended or implied by this Agreement and in all other respects the Credit Agreement and the other Loan Documents hereby are ratified and reaffirmed by all parties hereto as of the date hereof.  To the extent of any conflict between the terms of this Agreement, the Credit Agreement and the other Loan Documents, the terms of this Agreement will govern and control.  The Credit Agreement and this Agreement will be read and construed as one agreement.

8.2.    **Costs and Expenses.**  In addition to, and without in any way limiting, the obligations of Borrowers set forth in Section 8.03 of the Credit Agreement, each Borrower absolutely and unconditionally agrees to pay to Lender, on demand by Lender at any time, whether or not all or any of the transactions contemplated by this Agreement are consummated:  all fees, costs and expenses incurred by Lender and any of its directors, officers, employees or agents (including, without limitation, fees, costs and expenses incurred of any counsel to Lender), regardless of whether Lender or any such other Person is a prevailing party, in connection with (a) the preparation, negotiation, execution, delivery or enforcement of this Agreement, the Credit Agreement, the other Loan Documents and any agreements, documents or instruments contemplated hereby and thereby, and (b) any investigation, litigation or proceeding related to this Agreement, the Credit Agreement, or any other Loan Document or any act, omission, event or circumstance in any matter related to any of the foregoing.

8.3.    **Effect of Certain Agreements.** With respect to Borrowers' or Affiliate Entities' rights under any confidentiality agreement, consulting agreement, non-disclosure agreement or similar agreement, upon expiration or termination of the Forbearance Period, Lender shall be entitled to enforce, waive or otherwise modify the restrictions under all such agreements on the potential buyers, lenders, current and former employees or other Persons party thereto. Borrowers

and each of the Affiliate Entities hereby consent to such third-parties disclosing to Lender matters subject to such agreements.

8.4. **Further Assurances.**  At Borrowers' expense, the parties hereto will execute and deliver such additional documents and take such further action as may be necessary or desirable to effectuate the provisions and purposes of this Agreement.

8.5. **Communication with Borrowers**. Notwithstanding anything to the contrary, Lender shall be entitled to communicate with any member, officer or advisor of the Borrowers regarding any matter subject to such agreement, and Borrowers hereby authorize all such Persons to communicate with Lender regarding any matters.

8.6. **Successors and Assigns; No Third-Party Beneficiaries.**  This Agreement will be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.  No Person other than the parties hereto and, in the case of Sections 8.6 and 8.7 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Releasees under Sections 8.6 and 8.7 hereof) are hereby expressly disclaimed.

8.7. **Survival of Representations, Warranties and Covenants.**  All representations, warranties, covenants and releases of each Borrower made in this Agreement or any other document furnished in connection with this Agreement will survive the execution and delivery of this Agreement and the Forbearance Period, and no investigation by Lender, or any closing, will affect the representations and warranties or the right of Lender to rely upon them.

8.8. **Release.**

(a)    In consideration of the agreements of Lender contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Borrower, on behalf of itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (each Borrower and all such other Persons being hereinafter referred to collectively as the "Releasing Parties" and individually as a "Releasing Party"), hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, and each of its respective successors and assigns, and its respective present and former shareholders, members, managers, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives (Lender and all such other Persons being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from any and all demands, actions, causes of action, suits, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every kind and nature, known or unknown, suspected or unsuspected, at law or in equity, which any Releasing Party or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with this Agreement, the Credit Agreement, any of the other Loan Documents or any

-11-

of the transactions hereunder or thereunder.  Releasing Parties hereby represent to the Releasees that they have not assigned or transferred any interest in any Claims against any Releasee prior to the date hereof.

(b)     Each Borrower understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense to any Claim and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)     Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered will affect in any manner the final, absolute and unconditional nature of the release set forth above.

8.9.    **Covenant Not to Sue.**  Each Releasing Party hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by any Releasing Party pursuant to Section 8.6 above.  If any Releasing Party violates the foregoing covenant, each Borrower, for itself and its successors and assigns, and its present and former members, managers, shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents, legal representatives and other representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.10.    **Severability.**   Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable will not impair or invalidate the remainder of this Agreement.

8.11.    **Reviewed by Attorneys.**  Each Borrower represents and warrants to Lender that it (a) understands fully the terms of this Agreement and the consequences of the execution and delivery of this Agreement, (b) has been afforded an opportunity to discuss this Agreement with, and have this Agreement reviewed by, such attorneys and other persons as such Borrower may wish, and (c) has entered into this Agreement and executed and delivered all documents in connection herewith of its own free will and accord and without threat, duress or other coercion of any kind by any Person.  The parties hereto acknowledge and agree that neither this Agreement nor the other documents executed pursuant hereto will be construed more favorably in favor of one than the other based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation and preparation of this Agreement and the other documents executed pursuant hereto or in connection herewith.

8.12.    **Disgorgement**.  If Lender is, for any reason, compelled by a court or other tribunal of competent jurisdiction to surrender or disgorge any payment, interest or other consideration described hereunder to any person because the same is determined to be void or voidable as a preference, fraudulent conveyance, impermissible set-off or for any other reason, such indebtedness or part thereof intended to be satisfied by virtue of such payment, interest or other consideration will be revived and continue as if such payment, interest or other consideration had not been received by Lender, and Borrowers will be liable to, and will indemnify, defend and hold Lender

harmless for, the amount of such payment or interest surrendered or disgorged. The provisions of this Section will survive repayment of the Obligations or any termination of the Credit Agreement or any other Loan Document.

8.13.    **Tolling of Statute of Limitations.** Each and every statute of limitations or other applicable law, rule or regulation governing the time by which Lender must commence legal proceedings or otherwise take any action against any Borrower with respect to any breach or default that exists on or prior to the expiration or termination of the Forbearance Period and arises under or in respect of the Credit Agreement or any other Loan Document shall be tolled during the Forbearance Period. Each Borrower agrees, to the fullest extent permitted by law, not to include such period of time as a defense (whether equitable or legal) to any legal proceeding or other action by Lender in the exercise of its rights or remedies referred to in the immediately preceding sentence.

8.14.    **Relationship**. Each Borrower agrees that the relationship between Lender and such Borrower is that of creditor and debtor and not that of partners or joint venturers. This Agreement does not constitute a partnership agreement, or any other association between Lender and any Borrower. Each Borrower acknowledges that Lender has acted at all times only as a creditor to such Borrower within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Lender attempted to exercise any control over such Borrower or its business or affairs. Each Borrower further acknowledges that Lender has not taken or failed to take any action under or in connection with its respective rights under the Credit Agreement or any of the other Loan Documents that in any way or to any extent has interfered with or adversely affected such Borrower's ownership of Collateral.

8.15.    **No Effect on Rights Under Subordination or Intercreditor Agreements.** Lender's agreement pursuant to Section 3.2 of this Agreement shall not extend to any of Lender's rights or remedies under any subordination agreement in favor of Lender (including without limitation, the Intercreditor Agreement and the Intercompany Subordination Agreement or any other intercompany subordination agreement), governing any other debt (including, without limitation, the Subordinated Debt and Term Loan Debt respectively), which may arise as a result of the Existing Defaults, it being understood that the Existing Defaults shall at all times constitute Events of Default for purposes of any such agreement in favor of Lender (including without limitation, the Intercreditor Agreement and the Intercompany Subordination Agreement or any other intercompany subordination agreement), and Lender shall at all times be permitted to enforce all rights and remedies in respect thereof (including, without limitation, blocking payments to any holders of a subordinated debt, including, without limitation, the Subordinated Debt and Term Loan Debt, in accordance with the respective subordination Agreement).

8.16.    **Governing Law: Consent to Jurisdiction and Venue.** THIS AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING GOVERNING LAW, FORUM SELECTION, AND CONSENT TO JURISDICTION SET FORTH IN SECTIONS 8.09 OF THE CREDIT AGREEMENT, AND SUCH PROVISION IS HEREBY INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

8.17.    **Waivers.**

-13-

(a)    **Mutual Waiver of Jury Trial.**  THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN LENDER AND ANY BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR THE CREDIT AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

(b)    **Waivers by the Borrowers.**  The Borrowers hereby waive any rights any Borrower may have upon payment in full of the Obligations to require Lender to terminate its security interest in the Collateral, other collateral or in any other property of any Borrower until termination of the Credit Agreement in accordance with its terms and the execution by each Borrower of an agreement indemnifying Lender from any loss or damage Lender may incur as the result of dishonored checks or other items of payment received by Lender from any Borrower or any account debtor and applied to the obligations and releasing and indemnifying, in the same manner as described in Section 8.6 of this Agreement, the Releasees from all claims arising on or before the date of such termination.  Each Borrower acknowledges that the foregoing waiver is a material inducement to Lender in entering this Agreement and that Lender is relying upon the foregoing waiver in its future dealings with the Borrowers.

8.18.    **Counterparts.**  This Agreement may be executed and delivered via facsimile or email (in .pdf format) transmission with the same force and effect as if an original were executed and may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

[*signatures on following page*]

IN WITNESS WHEREOF, this Agreement is executed and delivered as of the day and year first above written.

METAL PARTNERS REBAR, LLC, as a Borrower

By _____
Name Jose Carrero
Title Authorized Representative

BCG OWNCO, LLC, as a Borrower

By _____
Name Jose Carrero
Title Authorized Representative

BRG HOLDING, LLC, as a Borrower

By _____
Name Jose Carrero
Title Authorized Representative

Signature Page to Forbearance Agreement

JP MORGAN CHASE BANK, N.A., as Lender

By _Lindsay Griffard_
Name _Lindsay R. Griffard_
Title _Authorized Officer_

Execution Version

**EXHIBIT A**
to
**FORBEARANCE AGREEMENT**

**Initial Short Term Disbursement Budget**

| Week ending | 1 1/17/2020 | 2 1/24/2020 | 3 1/31/2020 | 4 2/7/2020 | Total |
|---|---|---|---|---|---|
| | FORECAST | | | | |
| **CASH DISBURSEMENTS** | | | | | |
| **Payroll and benefits** | | | | | |
| MPR - Payroll and Payroll Taxes | 298,133 | - | 315,000 | - | 613,133 |
| F&M - Payroll and Payroll Taxes | 130,072 | - | 125,000 | - | 255,072 |
| RSI - Payroll and Payroll Taxes | 101,755 | 100,000 | 100,000 | 100,000 | 401,755 |
| BGD - Payroll and Payroll Taxes | 75,983 | - | 75,000 | - | 150,983 |
| Benefits (insurance/401(k),etc) | - | 13,000 | - | 143,221 | 156,221 |
| **Total payroll and benefits** | **605,943** | **113,000** | **615,000** | **243,221** | **1,577,164** |
| **Cost of Sales** | | | | | |
| Materials | 1,983,127 | 2,091,143 | 2,126,861 | 1,945,328 | 8,146,459 |
| Freight & Transload Services | 34,446 | 37,304 | 3,332 | 54,035 | 129,117 |
| Cutting, Fabrication, & Detailing | 81,558 | 45,042 | - | 36,077 | 162,677 |
| Outside Processing | 8,591 | 176,259 | 29,796 | 13,010 | 227,656 |
| Other | 34,926 | 28,134 | 51,471 | 29,657 | 144,189 |
| **Total COGS** | **2,142,650** | **2,377,881** | **2,211,460** | **2,078,107** | **8,810,098** |
| **Operating Disbursements** | | | | | |
| Rent | - | - | 142,763 | - | 142,763 |
| Insurance | 51,236 | - | - | 17,070 | 68,306 |
| Repairs and maintenance | 18,330 | 21,937 | 9,621 | 8,073 | 57,961 |
| Professional Fees | 68,702 | 70,000 | 50,000 | 50,000 | 238,702 |
| Property, Sales & Use tax | - | 225,000 | - | - | 225,000 |
| Credit card | 15,200 | - | - | 8,000 | 23,200 |
| Fuel /Tolls (F&M) | 30,718 | 15,044 | 11,684 | 50,232 | 107,679 |
| Utilities | - | - | - | 15,000 | 15,000 |
| IT | 22,657 | 1,025 | 3,750 | 4,450 | 31,882 |
| Other | 10,000 | 10,000 | 10,000 | 10,000 | 40,000 |
| **Total Operating Disbursements** | **216,843** | **343,007** | **227,818** | **162,826** | **950,493** |
| **Affiliated Company** | | | | | |
| F&M | 125,000 | 150,000 | 150,000 | 150,000 | 575,000 |
| **Total Affiliate Funding** | **125,000** | **150,000** | **150,000** | **150,000** | **575,000** |
| **Debt Service** | | | | | |
| Line of credit interest | - | - | - | 39,367 | 39,367 |
| P&I - real estate loan | - | - | - | 8,711 | 8,711 |
| P&I - cap-ex term loan | - | - | - | 18,976 | 18,976 |
| P&I - capital leases | - | - | 3,289 | 37,255 | 40,544 |
| **Total debt service** | **-** | **-** | **3,289** | **104,310** | **107,598** |
| **Total Disbursements** | **$2,965,436** | **$2,833,887** | **$3,057,567** | **$2,588,463** | **$11,445,353** |

**EXHIBIT B**
**to**
**FORBEARANCE AGREEMENT**

**Existing Defaults**

1.　　Multiple Events of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' failure to comply with the Fixed Coverage Charge Ratio for the fiscal months ending November 30, 2018, December 31, 2018, January 31, 2019, February 29, 2019, March 31, 2019, April 30, 2019, May 31, 2019, June 30, 2019, July 31, 2019, and August 31, 2019, in violation of Section B(i) of the Financial Covenants Schedule attached to the Credit Agreement.

2.　　Multiple Events of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' failure to timely deliver Borrowing Base Certificates from time to time, in violation of Section (e) of the Reporting Schedule attached to the Credit Agreement.

3.　　An Event of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' inclusion of amounts due from Traxys North America LLC, a Delaware limited liability company ("Traxys"), as Eligible Accounts, notwithstanding the existence of a contra-account owing to Traxys, in violation of Section (q) and Section (r) of the Eligible Accounts definition set forth in the Borrowing Base Schedule attached to the Credit Agreement.

4.　　An Event of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' failure to deliver to Lender certified financial statements within 30 days of the end of the fiscal months of September 30, 2019, October 31, 2019, and November 30, 2019, in violation of Section 5.01 of the Credit Agreement.

5.　　Multiple Events of Default under Article 7(d) of the Credit Agreement as a result of Borrowers' use of proceeds of the Loans in connection with various transactions or, loans to ADR Rebar, LLC, F&M Transportation, LLC and BGD LV Holding, LLC ("BGD") without Lender's prior written consent, constituting (a) failures to use proceeds of the Loans only for working capital and general organization purposes, in violation of Section 5.08(a) of the Credit Agreement, (b) making advances that are not permitted under Section 6.04 of the Credit Agreement (including, without limitation, the $350,000 payment to Andrew Dietzel on account of his interests in ADR), and (c) engaging in transactions with Affiliates in violation of Section 6.09 of the Credit Agreement.

6.　　An Event of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' distribution to Mr. Frank A. Bergren, Jr. in the amount of $**[150,000]**, in violation of Section 6.08(a) of the Credit Agreement.

7.　　An Event of Default under Article 7(e) of the Credit Agreement as a result of Borrowers' failure to close accounts at other depository institutions, in violation of Section 5.13 of the Credit Agreement.

8.    Events of Default under Articles 7(c) and (e) of the Credit Agreement as a result of Borrowers providing Lender financial and Collateral information, reporting and certificates containing material misstatements of fact, including, without limitation, inclusion of false accounts payable, accounts receivable and inventory in such items delivered to Lender.

9.    An Event of Default under Article 7(c) of the Credit Agreement as a result of Metal Partners delivering that certain Company General Certificate to Lender at closing of the Credit Agreement, which contained material misstatements of fact, including, without limitation, an incorrect and misleading operating agreement.

**EXHIBIT C**
to
**FORBEARANCE AGREEMENT**

**Borrowing Base Certificate Language**

Pursuant to, and in accordance with, the terms and provisions of that certain Credit Agreement dated as of August 3, 2018,  (as it may be amended or modified from time to time, the "Agreement") among JPMorgan Chase Bank, N.A., as the Lender, Metal Partners Rebar, LLC, an Illinois limited liability company ("Company"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BRG Holding, LLC, a West Virginia limited liability company ("BRG"; and together with Metal Partners and BCG, collectively, the "Borrowers" and each, individually, a "Borrower"), the Company, on behalf of Borrowers, is executing and delivering to the Lender this BORROWING BASE CERTIFICATE accompanied by supporting data (collectively referred to as the "Certificate").  The Company, on behalf of Borrowers, warrants and represents to Lender that this Certificate is true, correct, and is based on information contained solely in Borrowers' own financial accounting records;  provided that Lender acknowledges that the Person submitting this Certificate on behalf of the Borrowers makes no representation or warranty concerning the accuracy and completeness of the Borrowers' financial accounting records or the supporting data that accompanies the Certificate.  The Company, on behalf of the Borrowers, by the execution of this Certificate, hereby ratifies, confirms and affirms all of the terms, conditions and provisions of the Agreement, and further certifies on this ___ day of _____, _____, that, except for the Events of Default set forth on Exhibit B to the Fourth Amendment, the Borrowers are in material compliance with the Agreement.  Further, the representations and warranties of the Loan Parties set forth in the Agreement and the other Loan Documents are true and correct on and as of the date hereof.  Except for the Events of Default set forth on Exhibit B to the Fourth Amendment, no Default or Event of Default has occurred or is continuing or would result after giving effect to any Borrowing as of the date hereof.  Unless otherwise defined herein, capitalized terms used herein without definition are used as defined in the Agreement.

# EXHIBIT 8

# JPMorgan

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of**

**June ___, 2020**

**between**

**Metal Partners Rebar, LLC**

**and**

**JPMORGAN CHASE BANK, N.A.**

**ASSET BASED LENDING**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I DEFINITIONS ........................................................................................ 2

SECTION 1.01.   Defined Terms ................................................................................ 2

SECTION 1.02.   Classification of Loans and Borrowings ...................................... 2

SECTION 1.03.   Terms Generally .............................................................................. 2

SECTION 1.04.   Accounting Terms; GAAP .............................................................. 2

SECTION 1.05.   Interest Rates; LIBOR Notifications ............................................ 3

SECTION 1.06.   Business Day Convention .............................................................. 3

ARTICLE II THE CREDITS ...................................................................................... 4

SECTION 2.01.   Commitment .................................................................................... 4

SECTION 2.02.   Loans and Borrowings .................................................................. 4

SECTION 2.03.   Borrowing Procedures; Requests for Revolving Borrowings. .................... 4

SECTION 2.04.   Protective Advances ...................................................................... 5

SECTION 2.05.   Letters of Credit ............................................................................ 5

SECTION 2.06.   Funding of Borrowings .................................................................. 9

SECTION 2.07.   [**Reserved**] ................................................................................ 9

SECTION 2.08.   Termination of Commitment.......................................................... 9

SECTION 2.09.   Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds; Evidence of Debt. .................................. 10

SECTION 2.10.   Prepayment of Loans ..................................................................... 10

SECTION 2.11.   Fees ................................................................................................ 12

SECTION 2.12.   Interest .......................................................................................... 13

SECTION 2.13.   Alternate Rate of Interest; Illegality........................................... 13

SECTION 2.14.   Increased Costs ............................................................................ 15

SECTION 2.15.   Break Funding Payments .............................................................. 16

SECTION 2.16.   Taxes .............................................................................................. 16

SECTION 2.17.   Payments Generally; Allocation of Proceeds ............................... 17

SECTION 2.18.   Indemnity for Returned Payments................................................. 19

ARTICLE III REPRESENTATIONS AND WARRANTIES...................................... 19

SECTION 3.01.   Organization; Powers ................................................................... 19

SECTION 3.02.   Authorization; Enforceability....................................................... 19

SECTION 3.03.    Governmental Approvals; No Conflicts ....................................................... 19

SECTION 3.04.    Financial Condition; No Material Adverse Change .................................... 20

SECTION 3.05.    Properties ................................................................................................... 20

SECTION 3.06.    Litigation and Environmental Matters ........................................................ 20

SECTION 3.07.    Compliance with Laws and Agreements; No Default ................................. 21

SECTION 3.08.    Investment Company Status ....................................................................... 21

SECTION 3.09.    Taxes ........................................................................................................... 21

SECTION 3.10.    ERISA .......................................................................................................... 21

SECTION 3.11.    Disclosure ................................................................................................... 21

SECTION 3.12.    Material Agreements ................................................................................... 22

SECTION 3.13.    Solvency ...................................................................................................... 22

SECTION 3.14.    Insurance ..................................................................................................... 22

SECTION 3.15.    Capitalization and Subsidiaries .................................................................. 23

SECTION 3.16.    Security Interest in Collateral ..................................................................... 23

SECTION 3.17.    Employment Matters ................................................................................... 23

SECTION 3.18.    Margin Regulations ..................................................................................... 24

SECTION 3.19.    Use of Proceeds .......................................................................................... 24

SECTION 3.20.    No Burdensome Restrictions ....................................................................... 24

SECTION 3.21.    Anti-Corruption Laws and Sanctions ......................................................... 24

SECTION 3.22.    Affiliate Transactions ................................................................................. 24

SECTION 3.23.    Common Enterprise .................................................................................... 25

SECTION 3.24.    Plan Assets; Prohibited Transactions ......................................................... 25

ARTICLE IV CONDITIONS ............................................................................................................. 25

SECTION 4.01.    Effective Date .............................................................................................. 25

SECTION 4.02.    Each Credit Event ....................................................................................... 26

ARTICLE V AFFIRMATIVE COVENANTS .................................................................................... 26

SECTION 5.01.    Financial Statements; Borrowing Base and Other Information ................. 27

SECTION 5.02.    Notices of Material Events .......................................................................... 27

SECTION 5.03.    Existence; Conduct of Business .................................................................. 28

SECTION 5.04.    Payment of Obligations ............................................................................... 28

SECTION 5.05.    Maintenance of Properties ........................................................................... 28

SECTION 5.06.    Books and Records; Inspection Rights ....................................................... 28

SECTION 5.07.    Compliance with Laws and Material Contractual Obligations .................. 29

SECTION 5.08.    Use of Proceeds .................................................................................... 29

SECTION 5.09.    Accuracy of Information ........................................................................ 29

SECTION 5.10.    Insurance ................................................................................................ 29

SECTION 5.11.    Casualty and Condemnation.................................................................. 30

SECTION 5.12.    Appraisals .............................................................................................. 30

SECTION 5.13.    Depository Banks ................................................................................... 30

SECTION 5.14.    Additional Collateral; Further Assurances ............................................ 31

SECTION 5.15.    Receivables ............................................................................................ 31

SECTION 5.16.    Inventory and Equipment ...................................................................... 32

SECTION 5.17.    Chief Restructuring Officer ................................................................... 33

SECTION 5.18.    Sale Milestones ..................................................................................... 33

SECTION 5.19.    Bankruptcy Matters ............................................................................... 33

ARTICLE VI NEGATIVE COVENANTS ....................................................................... 33

SECTION 6.01.    Indebtedness .......................................................................................... 33

SECTION 6.02.    Liens ...................................................................................................... 35

SECTION 6.03.    Fundamental Changes ............................................................................ 36

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions ................. 37

SECTION 6.05.    Asset Sales............................................................................................. 38

SECTION 6.06.    Sale and Leaseback Transactions .......................................................... 39

SECTION 6.07.    Swap Agreements................................................................................... 39

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness ......................... 39

SECTION 6.09.    Transactions with Affiliates ................................................................... 40

SECTION 6.10.    Restrictive Agreements ......................................................................... 41

SECTION 6.11.    Amendment of Material Documents ...................................................... 41

SECTION 6.12.    Financial Covenants ............................................................................... 41

SECTION 6.13.    Financing Order...................................................................................... 41

ARTICLE VII EVENTS OF DEFAULT ......................................................................... 42

ARTICLE VIII MISCELLANEOUS ............................................................................... 48

SECTION 8.01.    Notices ................................................................................................... 48

SECTION 8.02.    Waivers; Amendments ........................................................................... 49

SECTION 8.03.    Expenses; Indemnity; Damage Waiver .................................................. 49

SECTION 8.04.    Successors and Assigns .......................................................................... 51

SECTION 8.05.    Survival .................................................................................................. 52

SECTION 8.06.    Counterparts; Integration; Effectiveness; Electronic Execution. ................ 52

SECTION 8.07.    Severability ......................................................................................... 53

SECTION 8.08.    Right of Setoff .................................................................................... 53

SECTION 8.09.    Governing Law; Jurisdiction; Consent to Service of Process ................... 53

SECTION 8.10.    WAIVER OF JURY TRIAL .................................................................. 54

SECTION 8.11.    Headings ............................................................................................ 54

SECTION 8.12.    Confidentiality .................................................................................... 54

SECTION 8.13.    Nonreliance; Violation of Law ............................................................. 55

SECTION 8.14.    USA PATRIOT Act .............................................................................. 55

SECTION 8.15.    Disclosure ........................................................................................... 55

SECTION 8.16.    Interest Rate Limitation ....................................................................... 55

SECTION 8.17.    Marketing Consent ............................................................................... 56

SECTION 8.18.    Joint and Several .................................................................................. 56

SECTION 8.19.    No Fiduciary Duty, etc ......................................................................... 57

SECTION 8.20.    Acknowledgement Regarding Any Supported QFCs ................................ 57

ARTICLE IX LOAN GUARANTY ............................................................................... 58

SECTION 9.01.    Guaranty ............................................................................................. 58

SECTION 9.02.    Guaranty of Payment ........................................................................... 59

SECTION 9.03.    No Discharge or Diminishment of Loan Guaranty ................................... 59

SECTION 9.04.    Defenses Waived ................................................................................. 59

SECTION 9.05.    Rights of Subrogation ........................................................................... 60

SECTION 9.06.    Reinstatement; Stay of Acceleration ...................................................... 60

SECTION 9.07.    Information ........................................................................................... 60

SECTION 9.08.    Termination .......................................................................................... 60

SECTION 9.09.    Taxes .................................................................................................. 61

SECTION 9.10.    Maximum Liability ............................................................................... 61

SECTION 9.11.    Contribution. ....................................................................................... 61

SECTION 9.12.    Liability Cumulative ............................................................................. 62

SECTION 9.13.    Keepwell ............................................................................................. 62

ARTICLE X THE BORROWER REPRESENTATIVE ...................................................... 62

SECTION 10.01.    Appointment; Nature of Relationship .................................................... 62

SECTION 10.02.    Powers ............................................................................................... 63

SECTION 10.03.    Employment of Agents ........................................................................ 63

SECTION 10.04.    Notices .......................................................................................................... 63

SECTION 10.05.    Successor Borrower Representative ......................................................... 63

SECTION 10.06.    Execution of Loan Documents; Borrowing Base Certificate .................... 63

SECTION 10.07.    Reporting .......................................................................................................... 63

<u>SCHEDULES</u>:

Definitions Schedule
Borrowing Base Schedule Terms Schedule
Reporting Schedule
Financial Covenants Schedule
Closing Conditions Schedule

<u>RIDERS</u>:

Term Loan Rider
Alternative Currency Rider

<u>EXHIBITS</u>:
Approved Budget

DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of June __, 2020 (as it may be amended or modified from time to time, together with all Exhibits, Schedules and Riders annexed hereto from time to time, each of which is hereby incorporated herein and made a part hereof, this "Agreement") by and among debtor-in-possession Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners", and together with any other Person that becomes party to this Agreement as a borrower after the date hereof, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender").

WHEREAS, on June 16, 2020 (the "Filing Date"), Metal Partners, BRG Holding, LLC, a West Virginia limited liability company ("BRG"), BCG Ownco, LLC, an Illinois limited liability company ("BCG"), and BGD LV Holding, LLC, a Nevada limited liability company ("LV Holding"; together with Metal Partners, BCG, and BRG, collectively, the "Debtors" and each, individually, a "Debtor") filed voluntary petitions for relief that commenced cases under chapter 11 of the Bankruptcy Code that are jointly administered as Bankruptcy Case No. _____ (the "Case") before the United Stated Bankruptcy Court for the District of Nevada (together with any other court having competent jurisdiction over the Case from time to time, the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to that certain Credit Agreement, dated as of August 3, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Metal Partners, BCG, and BRG (in such capacities, collectively, the "Prepetition Borrowers"), and JPMorgan Chase Bank N.A. (in such capacity, the "Prepetition Lender"), Prepetition Lender made certain revolving loans, term loans, and other financial accommodations to the Prepetition Borrowers prior to the Filing Date on the terms and conditions set forth therein, which loans and other financial accommodations and all other Prepetition Obligations (as defined below) are secured by Liens on substantially all the assets of the Prepetition Borrowers;

WHEREAS, the Borrowers have requested the Lender provide a secured revolving credit facility (the "DIP Facility") to the Borrowers to (i) fund certain fees and expenses associated with the DIP Facility incurred during the Case, (ii) finance the ongoing general corporate needs of the Borrowers and other Loan Parties, subject to the Approved Budget, (iii) pay for certain other administrative expenses incurred during the Case, subject to the Approved Budget, and (iv) provide for adequate protection in favor of the Prepetition Lender; and

WHEREAS, Lender is willing to provide the DIP Facility on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

SECTION 1.01.    Defined Terms. As used in this Agreement, the capitalized terms shall have the meanings specified in the Definitions Schedule attached hereto.

SECTION 1.02.    Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "REVLIBOR30 Loan") or by Class and Type (e.g., a " REVLIBOR30 Revolving Loan"). Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "REVLIBOR30 Borrowing") or by Class and Type (e.g., a " REVLIBOR30 Revolving Borrowing").

SECTION 1.03.    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof"' and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits, Schedules and Riders shall be construed to refer to Articles and Sections of, and Exhibits, Schedules and Riders to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04.    Accounting Terms; GAAP.

(a)    Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, notwithstanding the occurrence of any change after the date hereof in GAAP or in the application thereof on the operation of any provision hereof, such provision shall be interpreted

on the basis of GAAP as in effect and applied immediately before such change shall have become effective unless and until such provision is amended in accordance herewith.

(b)     Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2019, such lease shall not be considered a capital lease, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

SECTION 1.05.    Interest Rates; LIBOR Notifications. The interest rate on REVLIBOR30 Loans is determined by reference to the REVLIBOR30 Rate, which is derived from the London interbank offered rate ("LIBOR"). LIBOR is intended to represent the rate at which contributing banks may obtain short-term borrowings from each other in the London interbank market. In July 2017, the U.K. Financial Conduct Authority announced that, after the end of 2021, it would no longer persuade or compel contributing banks to make rate submissions to the ICE Benchmark Administration (together with any successor to the ICE Benchmark Administrator, the "IBA") for purposes of the IBA setting LIBOR. As a result, it is possible that commencing in 2022, LIBOR may no longer be available or may no longer be deemed an appropriate reference rate upon which to determine the interest rate on REVLIBOR30 Loans. In light of this eventuality, public and private sector industry initiatives are currently underway to identify new or alternative reference rates to be used in place of LIBOR.  In the event a Benchmark Transition Event occurs, Section 2.13(c) of this Agreement provides a mechanism for determining an alternative rate of interest. The Lender will notify the Borrower, pursuant to Section 2.13(c), in advance of any change to the reference rate upon which the interest rate of REVLIBOR30 Loans is based. However, the Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to LIBOR or other rates in the definition of "REVLIBOR30 Rate" or with respect to any alternative, successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of the REVLIBOR30 Rate or have the same volume or liquidity as did LIBOR prior to its discontinuance or unavailability.

SECTION 1.06.    Business Day Convention. If any report, financial statement, certificate, notice or other communication required to be delivered under this Agreement or any other Loan Document is due on a day that is not a Business Day (or if the last day such report, financial statement, certificate, notice or other communication may be delivered hereunder in accordance with the terms hereof is not a Business Day), then such report, financial statement, certificate or notice may be delivered on the next succeeding Business Day and if made on such Business Day shall be deemed to have been delivered in compliance with the terms hereof or thereof.  If any Sale Milestone deadline or other deadline under this Agreement or any other Loan Document falls on a day that is not a Business Day, then such Sale Milestone deadline or other deadline shall be extended until the next succeeding Business Day and if satisfied on such Business Day shall be deemed to have been satisfied in compliance with the terms hereof or thereof.

## ARTICLE II
## THE CREDITS

SECTION 2.01.    Commitment. Subject to the terms and conditions set forth herein and the Financing Order, the Lender agrees to make Revolving Loans to the Borrowers from time to time during the Availability Period in an aggregate principal amount that will not result in the Revolving Exposure plus the Prepetition Revolver Obligations outstanding at any time (including any Reinstated Prepetition Revolver Obligations then outstanding) exceeding the lesser of (x) the Revolving Commitment, less the Availability Block, if applicable, and (y) the Borrowing Base, subject to the Lender's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.04. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

SECTION 2.02.    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type. Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.04.

(b)    Subject to Section 2.13, each Borrowing, if applicable, shall be comprised entirely of CBFR Loans.

(c)    CBFR Borrowings may be in any amount. Borrowings of more than one Type and Class may be outstanding at the same time.

SECTION 2.03.    Borrowing Procedures; Requests for Revolving Borrowings.

(a)    [Reserved].

(b)    Notices by the Borrowers to the Lender of requests for Revolving Loans other than Pursuant to 2.03(a). To request a Revolving Borrowing, the Borrower Representative shall notify the Lender of such request either in writing (delivered by hand, fax or other means acceptable to Lender) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower Representative or through an Electronic System if arrangements for doing so have been approved by the Lender (or if an Extenuating Circumstance shall exist, by telephone) not later than noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of a CBFR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(d) may be given not later than 9:00 a.m., Chicago time, on the date of the proposed Borrowing.

Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, facsimile or a communication through Electronic System to the Lender of a written Borrowing Request in a form approved by the Lender and signed by a Responsible Officer of the Borrower Representative. Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)      the name of the applicable Borrower;

(ii)      the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing; and

(iii)      the date of such Borrowing, which shall be a Business Day.

For the avoidance of doubt, no Borrower may request, and Lender shall have no obligation to make, any Revolving Loan (a) to the extent a prepayment obligation exists or would arise under Section 2.10(b), or (b) if the proceeds thereof would be used for an expense not set forth in the Approved Budget (subject to the Permitted Variances) and otherwise in accordance with the Financing Order.

Upon entry of the Interim Order, in addition to such other advance requests that Borrowers may make in accordance herewith, (a) Borrowers shall be deemed to have made an irrevocable Borrowing Request for a Revolving Borrowing in an amount equal to the Prepetition Professional Retainers and (b) the proceeds of such Revolving Borrowing shall be used to repay an equal amount of Prepetition Revolver Obligations.

Upon the entry of the Final Financing Order, Borrowers shall be deemed to have made an irrevocable Borrowing Request for (i) advances of the M&E Term Loan and Real Estate Term Loan in the aggregate amount of the then outstanding Prepetition Term Loan Obligations and (iii) a Revolving Loan Borrowing in the amount of the then outstanding Prepetition Revolving Loan Obligations.

SECTION 2.04.   Protective Advances. Subject to the limitations set forth below, the Lender is authorized by the Borrowers, from time to time in the Lender's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrowers, which the Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances"). Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the Lender in and to the Collateral and shall constitute Obligations hereunder. All Protective Advances shall be CBFR Borrowings. The making of a Protective Advance on any one occasion shall not obligate the Lender to make any Protective Advance on any other occasion.

SECTION 2.05.   Letters of Credit.

(a)      General. Upon entry of the Interim Order, the Prepetition Letter of Credit shall be deemed issued by Lender and outstanding as a Letter of Credit hereunder. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of the Letter of Credit Agreement governing such Letter of Credit, the terms and conditions of this Agreement shall control. Notwithstanding anything herein to the contrary, the Lender shall have no obligation hereunder to issue, and shall not issue, any other Letters of Credit.

(b)    **[Reserved]**

(c)    <u>Expiration Date</u>. Each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the Lender to the beneficiary thereof) at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit and (ii) the date that is five Business Days prior to the Maturity Date.

(d)    <u>Reimbursement</u>. If the Lender shall make any LC Disbursement in respect of a Letter of Credit, the Borrowers shall reimburse such LC Disbursement by paying to the Lender an amount equal to such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrowers may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.02 or 2.03 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing.

(e)    <u>Obligations Absolute</u>. The Borrowers' joint and several obligation to reimburse LC Disbursements as provided in paragraph (d) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, Letter of Credit Agreement or this Agreement, or any term or provision herein or therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the Lender under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder. Neither the Lender nor any of its Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Lender; <u>provided</u> that the foregoing shall not be construed to excuse the Lender from liability to the Borrowers to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by any Borrower that are caused by the Lenders failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Lender (as finally determined by a court of competent jurisdiction), the Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or

refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(f)    <u>Disbursement Procedures</u>. The Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Lender shall promptly notify the Borrower Representative by telephone (confirmed by fax or through Electronic Systems) of such demand for payment and whether the Lender has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not relieve any Borrower of its obligation to reimburse the Lender with respect to any such LC Disbursement.

(g)    <u>Interim Interest</u>. If the Lender shall make any LC Disbursement, then, unless the Borrowers shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrowers reimburse such LC Disbursement, at the rate per annum then applicable to CBFR Revolving Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrowers fail to reimburse such LC Disbursement when due pursuant to paragraph (d) of this Section, then Section 2.12(d) shall apply.

(h)    <u>Cash Collateralization</u>. If any Default shall occur and be continuing, on the Business Day that the Borrower Representative receives notice from the Lender demanding the deposit of cash collateral pursuant to this paragraph, the Borrowers shall deposit in an account with the Lender, in the name and for the benefit of the Lender (the "<u>LC Collateral Account</u>") an amount in cash equal to 105% of the amount of the LC Exposure as of such date plus accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in clause (h) or (i) of Article VII. The Borrowers also shall deposit cash collateral in accordance with this paragraph as and to the extent required by Section 2.10(b). Each such deposit shall be held by the Lender as collateral for the payment and performance of the Secured Obligations. The Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and each Borrower hereby grants the Lender a security interest in the LC Collateral Account and all money or other assets on deposit therein or credited thereto. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Lender and at the Borrowers' risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account. Moneys in the LC Collateral Account shall be applied by the Lender for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, if the maturity of the Loans has been accelerated, be applied to satisfy other Secured Obligations. If the Borrowers are required to provide an amount of cash collateral hereunder as a result of the occurrence of a Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrowers within three (3) Business Days after all such Defaults have been cured or waived as confirmed in writing by the Lender.

(i)      LC Exposure Determination. For all purposes of this Agreement, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at the time of determination.

(j)      **[Reserved]**

SECTION 2.06.    Funding of Borrowings. The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrowers by promptly crediting the amounts in immediately available funds to the Funding Account(s); provided that CBFR Revolving Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(d), deemed requests for Borrowings under Section 2.17(c), and Protective Advances shall be retained by the Lender.

SECTION 2.07.    **[Reserved]**.

SECTION 2.08.    Termination of Commitment.

(a)      Unless previously terminated, the Revolving Commitment shall terminate on the Maturity Date.

(b)      The Borrowers may at any time terminate the Revolving Commitment upon the Payment in Full of the Prepetition Obligations (including any Reinstated Prepetition Revolver Obligations then outstanding) and the Secured Obligations.

(c)      The Borrower Representative shall notify the Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof. Each notice delivered by the Borrower Representative pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitment delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower Representative (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied. Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09.    Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds; Evidence of Debt.

(a)      Each Borrower hereby unconditionally, jointly and severally, promises to pay to the Lender (i) the then unpaid Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding) upon entry of the Final Financing Order and on the Maturity Date, (ii) the then unpaid principal amount of each Revolving Loan on the Maturity Date, and (iii) the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the Lender.

(b)      All funds deposited into any Lock Box subject to a Lock Box Agreement or into a Collateral Deposit Account will be swept on a daily basis into a collection account

maintained by the Borrowers with the Lender (the "Collection Account"). The Lender shall hold and apply funds received into the Collection Account as provided herein below.

(c)     All amounts deposited in the Collection Account shall be deemed received by the Lender in accordance with Section 2.17. On each Business Day, the Lender shall apply all immediately available funds credited to the Collection Account first to prepay any Protective Advances that may be outstanding, and second to prepay the Revolving Loans and to cash collateralize outstanding LC Exposure, except as otherwise set forth in the Financing Order, *provided* that, subject to the terms of the Financing Order, the Prepetition Obligations (including any Reinstated Prepetition Revolver Obligations then outstanding) will be Paid in Full before any payment is applied to the Secured Obligations (unless otherwise elected by Lender).

(d)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to the Lender resulting from each Loan made by the Lender, in which the Lender shall record (i) the amount of each Loan made hereunder, the Class and Type thereof and the interest period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder. The entries made in such accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans and other Obligations in accordance with the terms of this Agreement.

(e)     The Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall execute and deliver to the Lender a promissory note payable to the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form prepared by the Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.10.   Prepayment of Loans.

(a)     Subject to the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding) being fully and finally paid, the Borrowers shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (e) of this Section and, if applicable, payment of any break funding expenses under Section 2.15.

(b)     In the event and on such occasion that the Revolving Exposure plus the Prepetition Revolver Obligations outstanding at any time (including any Reinstated Prepetition Revolver Obligations then outstanding) exceeds the lesser of (A) the Revolving Commitment, and (B) the Borrowing Base, the Borrowers shall prepay the Revolving Loans and LC Exposure or cash collateralize LC Exposure in accordance with Section 2.05(h), as applicable in an aggregate amount equal to such excess.

(c)     In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrowers shall, immediately

after such Net Proceeds are received by any Loan Party, prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding), prepay the Obligations and cash collateralize LC Exposure as set forth in Section 2.10(d) below in an aggregate amount equal to 100% of such Net Proceeds, in all cases in accordance with the terms of the Financing Order.

(d)     All such amounts pursuant to Section 2.10(c), shall be applied, first to prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding), second to prepay any Protective Advances that may be outstanding, and third to prepay the Revolving Loans and Term Loans with a corresponding reduction in the Revolving Commitment and to cash collateralize outstanding LC Exposure.

(e)     The Borrower Representative shall notify the Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the Lender, of any prepayment hereunder not later than 10:00 a.m., Chicago time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Prepayments shall be accompanied by (I) accrued interest to the extent required by Section 2.12 and (ii) break funding payments pursuant to Section 2.15.

(f)     In the event that the Prepetition Lender is required to repay or disgorge to any Debtor, or any representatives of any Debtor's estate (as agents, with derivative standing or otherwise) all or any portion of the Prepetition Revolver Obligations or the Prepetition Term Loan Obligations authorized to be repaid pursuant to the Financing Order, or any payment on account of such Prepetition Obligations made to any Prepetition Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, Borrowers shall prepay the outstanding principal amount of the Revolving Loans or Term Loans, as applicable in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by Borrowers or any representative of any Borrower's estate, for application in accordance with Section 2.10(d) above.

SECTION 2.11.    Fees.

(a)     The Borrowers agree to pay to the Lender a commitment fee, which shall accrue at the Commitment Fee Percentage on the average daily amount of the Available Revolving Commitment during the period from and including the Effective Date to but excluding the date on which the Revolving Commitment terminates. Accrued commitment fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof. All

-10-

commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    The Borrowers agree to pay (i) to the Lender a letter of credit fee with respect to Letters of Credit, which shall accrue at the same Applicable Margin used to determine the interest rate applicable to REVLIBOR30 Revolving Loans on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which the Revolving Commitment terminates and the date on which the Lender ceases to have any LC Exposure, and (ii) the Lender's standard fees and commissions with respect to the issuance, amendment, cancellation, negotiation, transfer, presentment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Accrued letter of credit fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand. Any other fees payable to the Lender pursuant to this paragraph shall be payable within 10 days after demand. All letter of credit fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    [**Reserved**].

(d)    [**Reserved**].

(e)    The Borrowers agree to pay to the Lender, a fee equal to the additional interest that the Borrowers would have paid in respect of the Revolving Loans, at the CBFR plus the Applicable Margin, as if each uncollected check had not been received in the Collection Account and credited to the Borrowers until the earlier of (i) the date that such check is actually collected and (ii) three Business Days after the Business Day that such check was actually received in the Collection Account. Such fee will be payable monthly in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand.

(f)    [**Reserved**].

(g)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender. Fees paid shall not be refundable under any circumstances, subject only to the terms and conditions of the Financing Order.

SECTION 2.12.    Interest.

(a)    The Loans comprising CBFR Borrowings shall bear interest at the CBFR plus the Applicable Margin.

(b)    [**Reserved**].

(c)    Each Protective Advance shall bear interest at the CBFR plus the Applicable Margin plus 2%.

(d)       Notwithstanding the foregoing, during the occurrence and continuance of a Default, the Lender may, at its option, by notice to the Borrower Representative, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(e)       Accrued interest on each Loan (for CBFR Loans, accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitment; provided that (i) interest accrued pursuant to paragraphs (c) and (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a CBFR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)       All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the CB Floating Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Rate Indices shall be determined by the Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.13.    Alternate Rate of Interest; Illegality.

(a)       If the CBFR is determined at the REVLIBOR30 Rate and:

(i)       the Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the REVLIBOR30 Rate (including, without limitation, because the LIBO Screen Rate is not available or published on a current basis) for the applicable period; provided that no Benchmark Transition Event shall have occurred at such time; or

(ii)       the Lender determines the REVLIBOR30 Rate will not adequately and fairly reflect the cost to the Lender of making or maintaining its Loans (or Loan) included in such Borrowing for the applicable period; provided that no Benchmark Transition Event shall have occurred at such time;

then the Lender shall give notice thereof to the Borrower Representative through Electronic System as provided in Section 8.01 as promptly as practicable thereafter and, until the Lender notifies the Borrower Representative that the circumstances giving rise to such notice no longer exist, (A) each REVLIBOR30 Borrowing shall be ineffective and any such REVLIBOR30 Borrowing shall be converted to a CBFR Borrowing on the last day of the then current interest period applicable thereto, and (B) if any Borrowing Request requests a Borrowing, such Borrowing shall be made as a CBFR Borrowing.

(b)       If the Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the Lender or its applicable lending office to make, maintain, fund or continue any REVLIBOR30 Borrowing, or any

-12-

Governmental Authority has imposed material restrictions on the authority of the Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, the Borrowers will upon demand from the Lender, either convert all REVLIBOR30 Borrowings to CBFR Borrowings, or prepay such REVLIBOR30 Borrowings.  Upon any such conversion or prepayment, the Borrowers will also pay accrued interest on the amount so converted or prepaid.

(c)      If a Benchmark Transition Event occurs, then the Lender may, by notice to Borrower Representative, select an alternate rate of interest for the REVLIBOR30 Rate that gives due consideration to the then-evolving or prevailing market convention for determining a rate of interest for loans in US Dollars at such time (the "Alternate Rate"); each Borrower acknowledges that the Alternate Rate may include a mathematical adjustment using any then-evolving or prevailing market convention or method for determining a spread adjustment for the replacement of the REVLIBOR30 Rate. For avoidance of doubt, all references to the REVLIBOR30 Rate shall be deemed to be references to the Alternate Rate when the Alternate Rate becomes effective in accordance with this section. In addition, the Lender will have the right, from time to time by notice to Borrower Representative to make technical, administrative or operational changes (including, without limitation, changes to the definition of "CB Floating Rate", timing and frequency of determining rates and making payments of interest and other administrative matters) that the Lender decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of the Alternate Rate. The Alternate Rate, together with all such technical, administrative and operational changes as specified in any notice, shall become effective at the later of (i) the fifth Business Day after the Lender has provided notice to the Borrower Representative (the "Notice Date") and (ii) a date specified by the Lender in the notice, without any further action or consent of the Borrower Representative, so long as Lender has not received, by 5:00pm Eastern time on the Notice Date, written notice of objection to the Alternate Rate from the Borrower Representative. Any determination, decision, or election that may be made by the Lender pursuant to this section, including any determination with respect to a rate or adjustment or the occurrence or non-occurrence of an event, circumstance or date, and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from the Borrower Representative. Until an Alternate Rate shall be determined in accordance with this section, the interest rate shall be equal to the sum of (a) the greater of (x) Prime Rate and (y) 2.50%, plus (b) the Applicable Rate with respect to the appropriate "CBFR Spread" specified within such Applicable Rate definition. In no event shall the Alternate Rate be less than zero.

SECTION 2.14.    Increased Costs.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the Lender (except any such reserve requirement reflected in the REVLIBOR30 Rate);

(ii)    impose on the Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans hereunder or any Letter of Credit; or

(iii)    subject the Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clause (b) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the Lender of issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)    If the Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, the Commitments of or the Letters of Credit issued by the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)    A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error. The Borrowers shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate the Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Lender notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15.    Break Funding Payments. In the event of any payment of principal of any REVLIBOR30 Loan other than on the last day of the applicable period, or the conversion of any REVLIBOR30 Loan hereunder, then, in any such event, the Borrowers shall compensate the Lender for the loss, cost and expense attributable to such event. In the case of a REVLIBOR30 Loan, such loss, cost or expense to the Lender shall be deemed to include an amount determined by the Lender to be the excess, if any, of (i) the amount of interest which would have accrued on

the principal amount of such Loan had such event not occurred, at the rate that would have been applicable to such REVLIBOR30 Loan, for the period from the date of such event to the last day of the applicable period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of the Lender setting forth any amount or amounts that the Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower Representative and shall be conclusive absent manifest error. The Borrowers shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.16.    Taxes.

(a)    Withholding of Taxes; Gross Up. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.16) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for, Other Taxes.

(c)    Evidence of Payment. Upon request by Lender, after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.16, such Loan Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)    Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by the Lender shall be conclusive absent manifest error.

(e)    Treatment of Certain Refunds. If the Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts

-15-

pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid over pursuant to this Section 2.16(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.16(e), in no event will the Lender be required to pay any amount to an indemnifying party pursuant to this Section 2.16 the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.16(e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)     Survival. Each party's obligations under this Section shall survive the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document (including the Payment in Full of the Secured Obligations).

(g)     Defined Terms. For purposes of this Section 2.16, the term "applicable law" includes FATCA.

SECTION 2.17.    Payments Generally; Allocation of Proceeds.

(a)     The Borrowers shall make each payment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.14, 2.15 or 2.16, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Lender at its offices at 10 South Dearborn Street, Floor L2, Chicago, Illinois. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Subject to the terms of the Financing Order, any payments received by the Lender (including from proceeds of Collateral) (i) not constituting either (A) a specific payment of principal, interest, fees or other sums payable under the Loan Documents (which shall be applied as specified by the Borrower Representative), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.10 or any applicable Rider), or (C) amounts to be applied from the Collection Account during a Cash Dominion Period (which shall be applied in accordance with Section 2.09(c)), shall be applied by the Lender to the payment of the Secured Obligations in such order as the Lender may elect in its sole discretion. Notwithstanding anything to the contrary contained in this Agreement, unless so directed by the Borrower Representative or the Financing

Order (or other order of the Bankruptcy Court), or unless a Default is in existence, the Lender shall not apply any payment which it receives to any REVLIBOR30 Loan of a Class, except (a) on the expiration date of the period applicable thereto or (b) in the event, and only to the extent, that there are no outstanding CBFR Loans of the same Class and, in any such event, the Borrowers shall pay the break funding payment required in accordance with Section 2.15. The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding) or the Secured Obligations.

(c)     At the election of the Lender, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums chargeable to or required to be paid by the Borrowers under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower Representative pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of any Borrower maintained with the Lender. Each Borrower hereby irrevocably authorizes (i) the Lender, even if the conditions precedent set forth in Section 4.02 have not been satisfied, to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Loans (but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 8.03) and that all such Borrowings shall be deemed to have been requested pursuant to Sections 2.03 or 2.04, as applicable and (ii) the Lender to charge any deposit account of any Borrower maintained with the Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

(d)     The Lender may from time to time provide the Borrowers with account statements or invoices with respect to any of the Secured Obligations (the "Statements"). The Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrowers' convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Secured Obligations. If the Borrowers pay the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrowers shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Lender's right to receive payment in full at another time.

SECTION 2.18.    Indemnity for Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender. The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender

-17-

in reliance upon such payment or application of proceeds. The provisions of this Section 2.18 shall survive the termination of this Agreement.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Lender that:

SECTION 3.01.    Organization; Powers.    Each Loan Party and each Subsidiary is duly organized, or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.    Authorization; Enforceability. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Subject to entry by the Bankruptcy Court of the Financing Order, each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.    Governmental Approvals; No Conflicts. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

**SECTION 3.04.    [Reserved].**

SECTION 3.05.    Properties.

(a)    As of the date of this Agreement, Section 3.05 of the Disclosure Certificate sets forth the address of each parcel of real property that is owned or leased by any Loan Party. Subject to the commencement of the Case, each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no default by any party to any such lease or sublease exists. Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

-18-

(b)      Each Loan Party and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth in Section 3.05 of the Disclosure Certificate, and the use thereof by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person, and each Loan Party's and each Subsidiary's rights thereto are not subject to any licensing agreement or similar arrangement.

SECTION 3.06.    Litigation and Environmental Matters.

(a)      Other than the Case, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any Loan Document or the Transactions (other than the Disclosed Matters).

(b)      (i) Except for the Disclosed Matters no Loan Party nor any Subsidiary has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)      Since the Filing Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.    Compliance with Laws and Agreements; No Default.  Each Loan Party and each Subsidiary is in compliance with (i) all Requirement of Law applicable to it or its property and (ii) except as directly caused by the filing of a petition for relief under the Bankruptcy Code, all indentures, agreements and other instruments binding upon it or its property. No Default has occurred and is continuing.

SECTION 3.08.    Investment Company Status. No Loan Party or any Subsidiary is an investment company as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.    Taxes. Except for Disclosed Matters, each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not be expected to result in unpaid Taxes greater than $100,000 in

the aggregate. No Liens have been filed and no claims are being asserted with respect to any such Taxes.

SECTION 3.10.    ERISA. Except as a result of the Case and the effects thereof, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of all such underfunded Plans.

SECTION 3.11.    Disclosure.

(a)    The Loan Parties have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Lender in connection with this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

(b)    As of the Effective Date, to the best knowledge of any Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to any Lender in connection with this Agreement is true and correct in all respects.

SECTION 3.12.    Material Agreements. All Material Agreements to which any Loan Party is a party or is bound as of the date of this Agreement are listed in Section 3.12 of the Disclosure Certificate. Other than for Events of Default caused by the filing for relief under the Bankruptcy Code, no Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any Material Agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13.    Solvency.  No Loan Party intends to, nor will permit any Subsidiary to, and no Loan Party believes that it or any Subsidiary will, incur debts from and after the Effective Date beyond its ability to pay such debts as they mature, taking into account the timing of and

amounts of cash to be received by it or any such Subsidiary and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness of any such Subsidiary. [1]

SECTION 3.14.   Insurance. Section 3.14 of the Disclosure Certificate sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. As of the Effective Date, all premiums in respect of such insurance have been paid. The Borrowers maintain, and have caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15.   Capitalization and Subsidiaries. Section 3.15 of the Disclosure Certificate sets forth (a) a correct and complete list of the name and relationship to the Borrowers of each Subsidiary, (b) a true and complete listing of each class of each of the Borrowers' authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified in Section 3.15 of the Disclosure Certificate, and (c) the type of entity of each Borrower and each Subsidiary. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable. There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

SECTION 3.16.   Security Interest in Collateral.

(a)     Subject to entry by the Bankruptcy Court of the Financing Order, the provisions of this Agreement and the other Loan Documents create legal and valid Liens on all of the Collateral in favor of the Lender, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of "Permitted Priority Liens" (as defined in the Financing Order).

(b)     The entry of the Financing Order is effective to create in favor of Lender, for the benefit of Lender, as security for the Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Case having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout.  Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the pledge or grant by any Loan Party of the Liens

---

[1] Discuss.

purported to be created in favor of Lender pursuant to this Agreement or any of the Loan Documents.

SECTION 3.17.    Employment Matters. There are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

SECTION 3.18.    Margin Regulations. No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or Letter of Credit extension hereunder will be used to buy or carry any Margin Stock. Following the application of the proceeds of each Borrowing or drawing under each Letter of Credit, not more than 25% of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

SECTION 3.19.    Use of Proceeds. The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.08.

SECTION 3.20.    No Burdensome Restrictions. No Loan Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21.    Anti-Corruption Laws and Sanctions. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and, to the knowledge of such Loan Party, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) any Loan Party, any Subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party or Subsidiary, employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or Letter of Credit, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22.    Affiliate Transactions. Except as set forth on Section 3.22 of the Disclosure Certificate, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees, or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly

indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party. Notwithstanding anything to the contrary contained herein, Lender acknowledges that the Loan Parties have and will likely continue in the future to engage in arm's length transactions with Affiliates in the ordinary course of business and that, provided such transactions are conducted at arm's length and consistent with existing practice, such transactions shall not result in an Event of Default hereunder.

SECTION 3.23.   Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lender to the Borrowers hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24.   Plan Assets; Prohibited Transactions. No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery or performance of the transactions contemplated under this Agreement, including the making of any Loan and the issuance of any Letter of Credit hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

**ARTICLE IV**
**CONDITIONS**

SECTION 4.01.   Effective Date. The obligations of the Lender to make Loans and to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)   Credit Agreement and Loan Documents. The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed on behalf of each party hereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that each such party has signed a counterpart of this Agreement, (ii) a counterpart of each other Loan Document (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Loan Document, (iii) such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the Transactions, including all those documents and requirements listed

in the Closing Conditions Schedule dated as of the date hereof among the Borrowers and the Lender, in each case in form and substance satisfactory to the Lender, and (iv) evidence satisfactory to the Lender as to the satisfaction of each of the items and requirements set forth in such Closing Conditions Schedule in a manner satisfactory to the Lender.

(b)    Other Documents. The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower Representative of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lender to make Loans and to issue Letters of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 2:00 p.m., Chicago time, on the 2nd Business Day following the date of this Agreement (and, in the event such conditions are not so satisfied or waived, the Commitment shall terminate at such time).

(c)    The Interim Order is in full force and effect and is not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such order and has not been reversed, modified, stayed or vacated absent Lender's written consent.

SECTION 4.02.    Each Credit Event. The obligation of the Lender to make a Loan on the occasion of any Borrowing, and to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

(b)    At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, (i) no Default or Event of Default shall have occurred and be continuing and (ii) no Protective Advance shall be outstanding.

(c)    After giving effect to any Borrowing or the issuance, amendment, renewal or extension of any Letter of Credit, Availability shall not be less than zero.

(d)    With respect to any Loan or Letter of Credit to be made or issued thirty (30) days after the Filing Date (or such later date acceptable to the Lender in its sole discretion), the Bankruptcy Court shall have entered the Final Financing Order, which Final Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of Lender.

Each Borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by each Borrower on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

# ARTICLE V
# **AFFIRMATIVE COVENANTS**

Until all of the Prepetition Obligations (including any Reinstated Obligations then outstanding) and Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 5.01.    Financial Statements; Borrowing Base and Other Information. The Borrowers will furnish to the Lender the information required under the Reporting Schedule attached hereto within the applicable time periods set forth therein.

SECTION 5.02.    Notices of Material Events. The Borrowers will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary that (i) seeks damages in excess of $100,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party or any Subsidiary in excess of $100,000, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c)    any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)    any loss, damage, or destruction to the Collateral in the amount of $50,000 or more, whether or not covered by insurance;

(e)    within two Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)    all material amendments to or termination of any Material Agreement, together with a copy of each such amendment;

(g)    any material change in accounting or financial reporting practices by the Borrower or any Subsidiary;

(h)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding $50,000;

(i)       any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(j)       any change in the information provided in the Beneficial Ownership Certification delivered to the Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower Representative setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Existence; Conduct of Business. Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.    Payment of Obligations. Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes, that first accrue on or after the Filing Date before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) the failure to make payment pending such contest could not reasonably be expected to result in aggregate liabilities in excess of $100,000 and (d) such Tax need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code; provided, however, each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.    Maintenance of Properties. Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.    Books and Records; Inspection Rights. Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender, or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent

accountants, all at such reasonable times and as often as reasonably requested. Each Loan Party acknowledges that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the Lender with access to its suppliers.

SECTION 5.07.    Compliance with Laws and Material Contractual Obligations. Each Loan Party will, and will cause each Subsidiary to, (i) comply with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws), (ii) perform in all material respects its obligations under Material Agreements to which it is a party, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in aggregate liabilities in excess of $100,000, and (iii) comply with its obligations under the Traxys TRO Agreement. Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08.    Use of Proceeds.

(a)    The proceeds of the Loans and the Letters of Credit will be used only to pay expenses in the Approved Budget as and when such expenses are due and payable and in accordance with the other terms and conditions of the Financing Order and this Agreement. No part of the proceeds of any Loan and no Letter of Credit will be used, whether directly or indirectly, (i) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X or (ii) to make any Acquisition.

(b)    No Borrower will request any Borrowing or Letter of Credit, and no Borrower shall use, and each Borrower shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws to the extent such activity, businesses or transactions would be prohibited by Sanctions, if conducted by a corporation incorporated in the United States or the European Union, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09.    Accuracy of Information. The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Lender in connection with this Agreement or any other Loan Document contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by each Borrower on the date thereof as to the matters specified in this Section; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10.    Insurance.

(a)    Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents. The Borrowers will furnish to the Lender, upon request of the Lender, but no less frequently than annually, information in reasonable detail as to the insurance so maintained.

(b)    In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area"). The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Commitment or the total replacement cost value of the improvements.

(c)    All insurance policies required hereunder or under this Section 5.10 shall name the Lender as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the Lender, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to the Lender; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least 30 days prior written notice given to the Lender.

(d)    All premiums on such insurance shall be paid when due, and copies of the policies delivered to the Lender. If a Loan Party fails to obtain any insurance as required by this Section, the Lender may obtain such insurance at the Borrowers' expense.  By purchasing such insurance, the Lender shall not be deemed to have waived any Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

SECTION 5.11.    Casualty and Condemnation. The Borrowers will (a) furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with any applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.12.    Appraisals. At any time that the Lender requests, each Loan Party will, and will cause each Subsidiary to, provide the Lender with appraisals or updates thereof of its Inventory, Equipment and real property, as applicable, from an appraiser selected and engaged by

the Lender, and prepared on a basis satisfactory to the Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law.

SECTION 5.13.    Depository Banks. Each of the Borrowers and their Subsidiaries will maintain the Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of its business.

SECTION 5.14.    Additional Collateral; Further Assurances.

(a)    Each Loan Party will obtain the prior written consent of Lender (which will be provided in Lender's sole discretion) before acquiring, creating, or allowing to be created or acquired, any direct or indirect Subsidiary. Subject to applicable Requirements of Law and Lender's approval, each Loan Party will cause each Subsidiary to become a Loan Party by executing a joinder agreement in form satisfactory to the Lender. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Lender, for the benefit of the Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)    Each Loan Party will cause 100% of the issued and outstanding Equity Interests of each of its Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.

(c)    Without limiting the foregoing, each Loan Party will execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Lender and all at the expense of the Loan Parties.

(d)    If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower Representative will (i) notify the Lender, and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

SECTION 5.15.    Receivables.

(a)    Certain Agreements on Receivables. No Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, the Loan Parties may reduce the amount of Accounts arising from the sale of Inventory in accordance with their present policies and in the ordinary course of business.

(b)    Collection of Receivables. Except as otherwise provided in this Agreement or the Security Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivables.

(c)    Delivery of Invoices. At Lender's request, the Borrowers will deliver to the Lender alongside delivery to customers duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the Lender shall specify.

(d)    Disclosure of Counterclaims on Receivables. If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable exists or (ii) if, to the knowledge of any Loan Party, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to a Receivable, the applicable Borrower will promptly disclose such fact to the Lender in writing. The Borrowers shall send the Lender a copy of each credit memorandum in excess of the $50,000 as soon as issued by any Loan Party, and the applicable Borrower shall promptly report each credit memo and each of the facts required to be disclosed to the Lender in accordance with this Section 5.15(d) on the Borrowing Base Certificates submitted by it.

SECTION 5.16.    Inventory and Equipment.

(a)    Maintenance of Goods. Each Loan Party will do all things necessary to maintain, preserve, protect and keep its Inventory and Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)    Returned Inventory. If an Account Debtor returns any Inventory to a Loan Party when no Event of Default exists, then such Loan Party shall promptly determine the reason for such return and shall issue a credit memorandum to the Account Debtor in the appropriate amount. The Borrowers shall immediately report to the Lender any return involving an amount in excess of the $50,000. Each such report shall indicate the reasons for the returns and the locations and condition of the returned Inventory. In the event any Account Debtor returns Inventory to a Loan Party when an Event of Default exists, such Loan Party, upon the request of the Lender, shall: (i) hold the returned Inventory in trust for the Lender; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the Lender's written instructions; and (iv) not issue any credits or allowances with respect thereto without the Lender's prior written consent. All returned Inventory shall be subject to the Lenders Liens thereon. Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent

-30-

of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)     Inventory Count; Perpetual Inventory System. At Lender's request, each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the Lender requests. Each Loan Party, at its own expense, shall deliver to the Lender the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory. Unless waived by the Lender, each Loan Party will maintain a perpetual inventory reporting system at all times.

(d)     Equipment. Each Loan Party shall promptly inform the Lender of any additions to or deletions from the Equipment which individually or in the aggregate exceed the $50,000. Each Loan Party shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the Lender does not have a Lien. Each Loan Party will not, without the Lender's prior written consent, alter or remove any identifying symbol or number on any of such Loan Party's Equipment constituting Collateral.

SECTION 5.17.     Responsible Officer. Borrowers will (a) retain, at all times, a Responsible Officer satisfactory to Lender, and on terms and conditions satisfactory to Lender and (b) provide reasonable, direct access to such Responsible Officer for Lender, at Borrowers' expense.

SECTION 5.18.     Financial Advisor.  Borrowers will at all times (a) retain and engage High Ridge Partners (together with any such other financial advisor satisfactory to Lender from time to time, the "Financial Advisor") on terms and conditions acceptable to Lender, (b) provide reasonable, direct access to the Financial Advisor for Lender, at Borrower's expense and (c) authorize Financial Advisor to respond and have direct communications with Lender concerning Loan Parties' financial and operational affairs as Lender may reasonably request from time to time, at Borrower's expense.

SECTION 5.19.     Sale Milestones. Borrowers will timely perform and deliver each of the items set forth on Schedule 5.19 attached hereto (each a "Sale Milestone") on or before the dates specified therein (provided that any milestone deadline occurring on a day that is not a Business Day will automatically be extended to the following Business Day), or by such later date as agreed by the Borrower and Lender.

SECTION 5.20.     Bankruptcy Matters. Borrowers will: (a) contemporaneously with the filing thereof, deliver to Lender copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Loan Parties in the Case, which copies of such papers and documents may be provided to or served on Lender's counsel, and (b) contemporaneously with the receipt thereof, deliver to Lender copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts) with respect to any of the Collateral.

-31-

SECTION 5.21.    <u>Post-Closing Matters</u>. On or before the date that is 30 days after the Closing Date (or such later date as Lender may agree, in writing, in its sole discretion), Borrowers shall deliver to Lender a lender's policy of title insurance (or commitment to issue such a policy having the effect of a policy of title insurance) issued by a nationally recognized title insurance company reasonably acceptable to Lender in form and substance reasonably acceptable to Lender regarding Rebar's real property located at 1800 White Lane, Bakersfield, California 93304.

**ARTICLE VI**
**NEGATIVE COVENANTS**

Until all Prepetition Obligations (including any Reinstated Obligations then outstanding), and Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01.    <u>Indebtedness</u>. No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)    the Secured Obligations and the Prepetition Obligations (including any Reinstated Prepetition Obligations);

(b)    Indebtedness existing on the Filing Date;

(c)    Guarantees by any Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of any Borrower or any other Subsidiary, <u>provided</u> that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by any Borrower or other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(d)    To the extent included in the Approved Budget, Indebtedness of any Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals and replacements of any such Indebtedness in accordance with clause (f) below; provided that (i) such Indebtedness is incurred prior to or within 20 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (e) together with any Refinance Indebtedness in respect thereof permitted by clause (f) below, shall not exceed the Purchase Money Debt Limit at any time outstanding;

(e)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(f)    Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business;

(g)    [**reserved**];

(h)    [**reserved**];

(i)    [**reserved**]; and

(j)    such other Indebtedness as may be permitted under the terms of any Rider attached hereto.

SECTION 6.02.    Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a)    Liens created pursuant to any Loan Document or Prepetition Loan Document;

(b)    Permitted Encumbrances;

(c)    Permitted Priority Liens

(d)    any Lien on any property or asset of any Borrower or any Subsidiary existing on the Filing Date;

(e)    **[reserved]**;

(f)    Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(g)    **[reserved]**;

(h)    **[reserved]**;

(i)    **[reserved]**; and

(j)    such other Liens as may be permitted under the terms of any Rider attached hereto.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrances and clause (a) above, or (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clause (a) above.

SECTION 6.03.    Fundamental Changes.

(a)    Absent a confirmed chapter 11 plan of reorganization or an order approving a sale pursuant to 11 U.S.C § 363, in each case provided that the terms and conditions thereof are satisfactory to Lender in its discretion, no Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or otherwise Dispose of a material amount of its assets.

(b)    No Loan Party will, nor will it permit any Subsidiary to, consummate a Division as the Dividing Person, without the prior written consent of the Lender.  Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of the Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.14 and the other further assurances obligations set forth in the Loan Documents and become a Loan Party under this Agreement and the other Loan Documents

(c)    No Loan Party will, nor will it permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrowers and their Subsidiaries on the date of hereof and businesses reasonably related thereto.

(d)    No Loan Party will, nor will it permit any Subsidiary to, change its fiscal year from the basis in effect on the Effective Date.

(e)    No Loan Party will change the accounting basis upon which its financial statements are prepared.

(f)    No Loan Party will change the tax filing elections it has made under the Code.

(g)    No Loan Party will change the type of entity that it is.

(h)    No Loan Party will change its organization identification number, if any, issued by its state of incorporation or other organization

(i)    No Loan Party will change its state of incorporation or organization.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions. No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)    Permitted Investments, subject to control agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

-34-

(b)      investments in existence on the date hereof and described in Section 6.04 of the Disclosure Certificate;

(c)      investments by the Borrowers and their Subsidiaries in Equity Interests in their respective Subsidiaries, <u>provided</u> that (A) any such Equity Interests held by a Loan Party shall be pledged pursuant to the Security Agreement and (B) the aggregate amount of investments by Loan Parties in Subsidiaries that are not Loan Parties (together with outstanding intercompany loans permitted under clause (B) to the proviso to Section 6.04(d) and outstanding Guarantees permitted under the proviso to Section 6.04(e)) shall not exceed the Investment Limit at any time outstanding (in each case determined without regard to any write-downs or write-offs);

(d)      [**reserved**];

(e)      Guarantees constituting Indebtedness permitted by Section 6.01;

(f)      loans or advances made by a Loan Party to its employees on an arms-length basis in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes up to a maximum of $100,000 at any one time outstanding;

(g)      [**reserved**];

(h)      [**reserved**];

(i)      [**reserved**];

(j)      investments received in connection with the disposition of assets permitted by Section 6.05;

(k)      investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;" and

(l)      investments, purchases or acquisitions as may be permitted by the terms of any Rider attached hereto.

SECTION 6.05.    <u>Asset Sales</u>. No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to another Borrower or another Subsidiary in compliance with Section 6.04), except:

(a)      sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business;

(b)      [**reserved**];

-35-

(c)      sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business;

(d)      sales, transfers and dispositions of Permitted Investments and other investments permitted by clauses (i) and (j) of Section 6.04;

(e)      [reserved];

(f)      dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Borrower or any Subsidiary; and

(g)      [reserved];

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for at least 75% cash consideration.

SECTION 6.06.    Sale and Leaseback Transactions. No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction").

SECTION 6.07.    Swap Agreements. No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement.

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.

(a)      No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, excluding Restricted Payments by a Loan Party to another Loan Party that are expressly set forth in the Approved Budget and permitted by the Financing Order.

(b)      No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness without prior written consent of Lender and such payments must be in accordance with the Financing Order, except (i) payment of Indebtedness created under the Loan Documents, (ii) payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01 and paid in accordance with the Approved Budget and (iii) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05, paid in accordance with the Financing Order and any order of the Bankruptcy Court authorizing such sale or transfer.

SECTION 6.09.    Transactions with Affiliates. No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) any investment permitted by Sections 6.04(c) or 6.04(d), (d) any Indebtedness permitted under Section 6.01(c), (e) any Restricted Payment permitted by Section 6.08, (f) loans or advances to employees permitted under Section 6.04, (g) the payment of reasonable fees to directors of any Borrower or any Subsidiary who are not employees of such Borrower or Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrowers or their Subsidiaries to the extent set forth in the Approved Budget, (h) such other transactions involving Affiliates as to which Lender has consented in writing or (i) so long as it is expressly contemplated by the Approved Budget, with respect to any other transactions occurring on or after the Effective Date.

SECTION 6.10.    Restrictive Agreements. No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any Loan Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Section 6.10 of the Disclosure Certificate (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.    Amendment of Material Documents. No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents or (c) any Material Agreement.

SECTION 6.12.    Financial Covenants. Borrowers will comply in all respects with the financial covenants set forth on the Financial Covenants Schedule attached hereto.

SECTION 6.13.    <u>Financing Order</u>.  Loan Parties will not:

(a)    seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by Lender;

(b)    seek the use of "Cash Collateral" (as defined in the Financing Order) in a manner inconsistent with the terms of the Financing Order without the prior written consent of Lender;

(c)    suffer to exist at any time a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any super priority claim which is equal or superior to the priority of the Lender or the Lenders in respect of the Obligations or the Prepetition Lender in respect of the Prepetition Obligations, except for the Carveout;

(d)    directly or indirectly seek, consent to, or allow to exist at any time after the Effective Date any Lien on any properties, assets or rights except for Permitted Liens; or

(e)    prior to the date on which the Prepetition Obligations (and any Reinstated Prepetition Obligations then outstanding) and Obligations have been paid in full, pay any administrative expenses, except administrative expenses incurred in accordance with the Approved Budget.

**ARTICLE VII**
**EVENTS OF DEFAULT**

If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrowers shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrowers shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five days;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been materially incorrect when made or deemed made;

-38-

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02, 5.03 through 5.07, 5.08, 5.10, 5.11, 5.13, 5.15, 5.16, 5.17, 5.18, 5.19, or 5.21 or in Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of 5 days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

(f)    any Loan Party or Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by Section 6.05;

(h)    [**reserved**];

(i)    [**reserved**];

(j)    any Loan Party or Subsidiary shall become unable, admit in writing its inability, or publicly declare its intention not to, or fail generally to pay its debts first arising after the Filing Date as they become due;

(k)    (1) one or more judgments for the payment of money in an aggregate amount in excess of the Judgment Amount shall be rendered after the Filing Date against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 10 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or Subsidiary to enforce any such judgment; or (2) any Loan Party or Subsidiary shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l)    an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m)    a Change in Control shall occur;

(n)     the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any period of grace therein provided;

(o)     the Loan Guaranty or any Obligation Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty or any Obligation Guaranty or a Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty or any Obligation Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty or any Obligation Guaranty to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08 or any notice of termination delivered pursuant to the terms of any Obligation Guaranty;

(p)     except as permitted by the terms of any Collateral Document, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (ii) any Lien securing any Secured Obligation shall cease to be a perfected, first priority Lien;

(q)     any Collateral Document shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(r)     any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms, or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms; or

(s)     any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any property of such Loan Party;

(t)     any event or condition occurs (including, without limitation, the entry of an order, any grant of relief from the automatic stay, any filing of a motion, or the entry of a judgment) with respect to the Traxys Litigation that is adverse to the interests of the Loan Parties or Lender in an amount that could reasonably be expected to exceed $50,000 (individually or in the aggregate); and

(u)     Any of the following occur:

(i)     any Financing Order is stayed, revised, revoked, remanded, rescinded, amended, reversed, vacated, or modified in any manner not acceptable to Lender;

(ii)     any Loan Party shall file a pleading seeking to modify or otherwise alter the Interim Order or the Final Financing Order without the prior consent of Lender;

(iii)    an order with respect to the Case shall be entered by the Bankruptcy Court (A) appointing a trustee under Section 1104 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business of the Loan Parties under Section 1106(b) of the Bankruptcy Code or (B) terminating any Loan Party's exclusive rights to file and solicit acceptances for its plan;

(iv)    (A) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of Lender, or Prepetition Lender, claims or rights against the Loan Parties or any of their Subsidiaries or to subject any Collateral to assessment pursuant to Section 506(c) or 552(b) of the Bankruptcy Code, (B) any Lien, security interest or superpriority claim created by this Agreement, the Prepetition Credit Agreement, the Financing Order shall, for any reason, ceases to be valid or (C) any action is commenced by any Loan Party or any of its Subsidiaries which contests the validity, perfection or enforceability of any of the Liens and security interests of Lender or Prepetition Lender created by this Agreement, the Prepetition Credit Agreement or the Financing Order;

(v)    any filing of a motion by any Loan Party, or any of their respective Affiliates to dismiss the Case or convert the Case to a case under chapter 7 of the Bankruptcy Code or an order with respect to the Case shall be entered by the Bankruptcy Court dismissing the Case or converting the Case (or any case comprising part of the Case) to a case under chapter 7 of the Bankruptcy Code;

(vi)    any plan of reorganization is filed that, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan in the Bankruptcy Case which, does not contain a provision for termination of this Agreement and, if in effect at such time, the Prepetition Credit Agreement and the payment in full in cash of the Obligations, and, if any remain, the Prepetition Obligations and any Reinstated Prepetition Obligations on or before the effective date of such plan;

(vii)    any motion by the Loan Parties is filed to sell, all or substantially all assets pursuant to Section 363 of the Bankruptcy Code that does not provide sufficient proceeds to cause the payment in full (or other treatment approved by Lender and Prepetition Lender, as applicable) of the Obligations, the Prepetition Obligations and Reinstated Prepetition Obligations, without the prior consent of Lender;

(viii)    an order with respect to the Case shall be entered without the express prior written consent of Lender, except as contemplated herein, (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement and the transactions contemplated hereby, any Loan Document or the Financing Order, or (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to Borrowers' equal or superior to the priority of the Lender and Prepetition Lender in respect of the Obligations and the Prepetition Obligations, except for the Permitted Priority Liens;

(ix)    Granting of relief from the automatic stay in the Case to permit foreclosure or enforcement on assets of Borrower or any Guarantor that have a value that exceeds $50,000;

(x)    a motion shall be filed by the Loan Parties seeking authority, or an order shall be entered in the Case, that (A) permits any Loan Party or any Subsidiary of any Loan Party to incur Indebtedness secured by any claim under Bankruptcy Code Section 364(c)(1) or by a Lien pari passu with or superior to the Lien granted under the Loan Documents and the Prepetition Loan Documents and Bankruptcy Code Sections 364(c)(2) or (d), unless (1) all of the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations have been paid in full at the time of the entry of any such order, (2) the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations are paid in full with such debt, or (3) such Indebtedness is subject to an intercreditor agreement in form and substance satisfactory to Lender in its sole discretion or (B) permits any Loan Party or any Subsidiary of any Loan Party the right to use Collateral other than in accordance with the terms of the Financing Order, unless all of the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations shall have been paid in full;

(xi)    proceeds of any sale of all or substantially all assets of Loan Parties are not directly remitted to Lender at the closing thereof, and the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations are not paid in full (or such other treatment as is acceptable to Lender and Prepetition Lender in their discretion, as applicable) in accordance with the terms of this Agreement from such proceeds;

(xii)    any motions by the Loan Parties to sell Collateral or approve procedures regarding the same, any plan or disclosure statement filed by the Loan Parties or supplements or amendments thereto, or any orders approving or amending any of the foregoing, are not in form and substance reasonably acceptable to Lender;

(xiii)    the automatic stay terminates or expires unless all of the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations shall have been paid in full;

(xiv)    the termination or shortening of the Loan Parties' exclusivity periods under Section 1121 of the Bankruptcy Code;

(xv)    (A) any Loan Party, any Subsidiary of any Loan Party, or any of their respective Affiliates challenges the extent, validity or priority of the Obligations or the Prepetition Obligations or the application of any payments or collections received by Lender or Prepetition Lender to the Obligations or Prepetition Obligations as provided for herein or in the Financing Order or (B) any other Person challenges the extent, validity or priority of the Obligations or the Prepetition Obligations or the application of any payments or collections received by Lender or Prepetition Lender to the Obligations or Prepetition Obligations as provided for herein or in the Financing Order and, in the case of this subclause (B), such challenge is not resolved in a manner satisfactory to Prepetition Lender within thirty (30) days of the assertion of such challenge;

(xvi)    (A) any Loan Party, any Subsidiary of any Loan Party, or any of their respective Affiliates challenges the validity, extent, perfection or priority of any Liens granted in the Collateral to secure the Obligations or the Prepetition Obligations or (B) any other Person challenges the validity, extent, perfection or priority of any Liens granted in the Collateral to secure the Obligations or the Prepetition Obligations and, in the case of this subclause (B), such challenge is not resolved in a manner satisfactory to Postpetition Lender or Prepetition Lender (as applicable) within thirty (30) days of the assertion of such challenge;

(xvii)    (i) Lender, Prepetition Lender or the Collateral are surcharged, or (ii) a Loan Party seeks to surcharge Lender, Prepetition Lender or the Collateral, pursuant to Sections 105, 506(c), 552 or any other section of the Bankruptcy Code or (iii) the extent of the Liens on Collateral are otherwise limited by any such Section of the Bankruptcy Code;

(xviii)    payment of or granting adequate protection with respect to pre-petition debt (other than to the Prepetition Lenders);

(xix)    any Loan Party or any Subsidiary of any Loan Party shall fail to maintain sufficient projected borrowing capacity under this Agreement to pay all accrued administrative obligations and other administrative claims when due;

(xx)    any guarantor or co-obligor of the Prepetition Obligations or the Obligations asserts any right of subrogation or contribution against any Loan Party before the payment in full of the Obligations, Prepetition Obligations and Reinstated Prepetition Obligations; or

(xxi)    any willful and uncured violation by any Debtor of the terms of the Financing Order.

then, and in every such event (other than an event described in clause (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Lender may, by notice to the Borrower Representative, take any or all of the following actions, at the same or different times, subject to the terms and conditions of the Financing Order: (i) terminate the Commitment, whereupon the Commitment shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers, and (iii) require cash collateral for the LC Exposure in accordance with Section 2.05(h) hereof; and in the case of any event described in clause (h) or (i) of this Article, the Commitment shall automatically terminate and the principal of the Loans then outstanding and cash collateral for the LC Exposure, together with accrued interest thereon and all fees and other Obligations of the Borrowers accrued hereunder, shall automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby

waived by the Borrowers. Upon the occurrence and during the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loans and other Obligations as set forth in this Agreement and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE VIII
## MISCELLANEOUS

SECTION 8.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by e-mail, to the addresses set forth on the Terms Schedule attached hereto. All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by e-mail shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)    Notices and other communications to the Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to item (c) of the Reporting Schedule attached hereto unless otherwise agreed by the Lender. Each of the Lender and the Borrower Representative (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.    Waivers; Amendments.

(a)    No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers and the Lender, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.    Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel (including, without limitation, local counsel) for the Lender, in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) reasonable out-of-pocket expenses incurred by the Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with: (A) appraisals and insurance reviews; (B) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination; (C) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Lender; (D) Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) filing financing statements and continuations, recording any Mortgages, and other actions to perfect, protect, and continue the Lender's Liens; (E) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (F) forwarding loan proceeds,

collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral. All of the foregoing fees, costs and expenses may be charged to the Borrowers as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)    The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.16, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04.    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Lender that issues any Letter of Credit), except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    The Lender may assign to one or more Persons  all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it). Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of the Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.15, 2.16 and 8.03). Each Borrower and each other Loan Party hereto hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(c)    The Lender may, without the consent of, or notice to, the Borrowers, sell participations to one or more banks or other entities (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement.  Subject to paragraph (d) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.14, 2.15 and 2.16 (subject to the requirements and limitations therein) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were a Lender. If the Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of

each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitment, Loans, Letters of Credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f. 103-1 (c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)    The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05.    Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitment has not expired or terminated. The provisions of Sections 2.14, 2.15, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 8.06.    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  To

the extent of any conflict between the terms of the Financing Order and the terms of this Agreement, the terms of the Financing Order shall govern and control.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 8.07.    Severability. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.    Right of Setoff. Subject to the terms and conditions of the Financing Order, the Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or such Affiliate to or for the credit or the account of any Borrower or Loan Guarantor against any and all of the Secured Obligations held by the Lender or such Affiliate, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of the Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness. The rights of the Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender and its Affiliates may have.

SECTION 8.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement and the Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the Governing State, but giving effect to federal laws applicable to national banks.

(b)    Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or Governing State court sitting in the Primary City and the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or

proceeding may (and any such claims, cross-claims or third party claims brought against the Lender or any of its Related Parties may only) be heard and determined in the Governing State or, to the extent permitted by law, in such federal court and each of the parties agrees to waive any rights it may have to object to adjudication by a judge of the Bankruptcy Court on the basis of a right to have matters adjudicated in front of an Article III judge. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10.   WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.   Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12.   Confidentiality. The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information

confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (9) with the consent of the Borrower Representative, (h) to holders of Equity Interests in a Borrower, (i) to any Person providing a Guarantee of all or any portion of the Secured Obligations or (j) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrowers. For the purposes of this Section, "Information" means all information received from any Borrower relating to the Borrowers or their business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrowers; provided that, in the case of information received from the Borrowers after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.    Nonreliance; Violation of Law. The Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein. Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrowers in violation of any Requirement of Law.

SECTION 8.14.    USA PATRIOT Act. The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.    Disclosure. Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16.    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the

interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by the Lender.

SECTION 8.17.  <u>Marketing Consent</u>. The Borrowers hereby authorize the Lender, at its sole expense, but without any prior approval by the Borrowers, to publish such tombstones and give such other publicity to this Agreement as it may from time to time determine in its sole discretion. The foregoing authorization shall remain in effect unless and until the Borrowers notify the Lender in writing that such authorization is revoked.

SECTION 8.18.  <u>Joint and Several</u>. Each Borrower hereby unconditionally and irrevocably agrees it is jointly and severally liable to the Lender for the Secured Obligations. In furtherance thereof, each Borrower agrees that wherever in this Agreement it is provided that a Borrower is liable for a payment, such obligation is the joint and several obligation of each Borrower. Each Borrower acknowledges and agrees that its joint and several liability under this Agreement and the Loan Documents is absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever by the Lender or any other Person. Each Borrower's liability for the Secured Obligations shall not in any manner be impaired or affected by who receives or uses the proceeds of the credit extended hereunder or for what purposes such proceeds are used, and each Borrower waives notice of borrowing requests issued by, and loans or other extensions of credit made to, other Borrowers. Each Borrower hereby agrees not to exercise or enforce any right of exoneration, contribution, reimbursement, recourse or subrogation available to such Borrower against any party liable for payment under this Agreement and the Loan Documents unless and until the Lender has been paid in full and all of the Secured Obligations and Prepetition Obligations are satisfied and discharged following termination or expiration of all commitments of the Lender to extend credit to the Borrowers. Each Borrower's joint and several liability hereunder with respect to the Secured Obligations shall, to the fullest extent permitted by applicable law, be the unconditional liability of such Borrower irrespective of (i) the validity, enforceability, avoidance or subordination of any of the Secured Obligations or of any other document evidencing all or any part of the Secured Obligations, (ii) the absence of any attempt to collect any of the Secured Obligations from any other Loan Party or any Collateral or other security therefor, or the absence of any other action to enforce the same, (iii) the amendment, modification, waiver, consent, extension, forbearance or granting of any indulgence by the Lender with respect to any provision of any instrument executed by any other Loan Party evidencing or securing the payment of any of the Secured Obligations, or any other agreement now or hereafter executed by any other Loan Party and delivered to the Lender, (iv) the failure by the Lender to take any steps to perfect or maintain the perfected status of its Lien upon, or to preserve its rights to, any of the Collateral or other security for the payment or performance of any of the Secured Obligations or the Lender's release of any Collateral or of its Liens upon any Collateral, (v) the release or compromise, in whole or in part, of the liability of any other Loan Party for the payment of any of the Secured Obligations, (vi) any increase in the amount of the Secured Obligations beyond any limits imposed herein or in the amount of any interest, fees or other charges payable in connection therewith, in each case, if consented to by any other Borrower, or any decrease in the same, or (vii) any other circumstance that might constitute a legal or equitable discharge or defense of any Loan Party. After the occurrence and during the continuance of any Event of Default, the Lender may

proceed directly and at once, without notice to any Borrower, against any or all of Loan Parties to collect and recover all or any part of the Secured Obligations, without first proceeding against any other Loan Party or against any Collateral or other security for the payment or performance of any of the Secured Obligations, and each Borrower waives any provision that might otherwise require the Lender under applicable law to pursue or exhaust its remedies against any Collateral or other Loan Party before pursuing such Borrower or its property. Each Borrower consents and agrees that the Lender shall be under no obligation to marshal any assets in favor of any Loan Party or against or in payment of any or all of the Secured Obligations.

SECTION 8.19.    No Fiduciary Duty, etc. Each Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that Lender will not have any obligations except those obligations expressly set forth herein and in the other Loan Documents and Lender is acting solely in the capacity of an arm's length contractual counterparty to each Borrower with respect to the Loan Documents and the transaction contemplated therein and not as a financial advisor or a fiduciary to, or an agent of, any Borrower or any other person. Each Borrower agrees that it will not assert any claim against the Lender based on an alleged breach of fiduciary duty by the Lender in connection with this Agreement and the transactions contemplated hereby. Additionally, each Borrower acknowledges and agrees that the Lender is not advising any Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. Each Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Lender shall have no responsibility or liability to any Borrower with respect thereto. Each Borrower further acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the Lender, together with its affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, the Lender may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, any Borrower and other companies with which any Borrower may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the Lender or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, each Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the Lender and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. The Lender will not use confidential information obtained from any Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with such Borrower in connection with the performance by the Lender of services for other companies, and the Lender will not furnish any such information to other companies. Each Borrower also acknowledges that the Lender has no obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to any Borrower, confidential information obtained from other companies.

SECTION 8.20.    **[Reserved]**.

# ARTICLE IX
# LOAN GUARANTY

SECTION 9.01.    Guaranty. Each Loan Guarantor, if any, (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and (other than with respect to LV Holdings) the Prepetition Obligations (including Reinstated Obligations then outstanding), and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Prepetition Obligations (including Reinstated Obligations then outstanding) or the Secured Obligations from, or in prosecuting any action against, any Borrower, any Loan Guarantor or any other guarantor of all or any part of the Prepetition Obligations (including Reinstated Obligations then outstanding) or Secured Obligations (such costs and expenses, together with the Prepetition Obligations (including Reinstated Obligations then outstanding) and Secured Obligations, collectively the "Guaranteed Obligations"). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.    Guaranty of Payment. This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Lender to sue any Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03.    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision

of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

SECTION 9.04.    Defenses Waived. To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower, any Loan Guarantor, or any other Obligated Party other than the Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 9.05.    Rights of Subrogation. No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06.    Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or

reorganization of any Obligated Party or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Obligated Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07.    Information. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Obligated Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08.    Termination. The Lender may continue to make loans or extend credit to the Borrowers based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations. Nothing in this Section 9.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of Article VII hereof as a result of any such notice of termination.

SECTION 9.09.    Taxes. Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10.    Maximum Liability. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11.    <u>Contribution</u>.

(a)    To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "<u>Guarantor Payment</u>") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "<u>Allocable Amount</u>" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification are owing.

(e)    The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

SECTION 9.12.    <u>Liability Cumulative</u>. The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

**SECTION 9.13.    [<u>Reserved</u>]**.

# ARTICLE X
# THE BORROWER REPRESENTATIVE

SECTION 10.01. Appointment; Nature of Relationship. Metal Partners is hereby appointed by each of the Borrowers as its contractual representative (herein referred to as the "Borrower Representative") hereunder and under each other Loan Document, and each of the Borrowers irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Article X. Additionally, the Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the Funding Account(s), at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower, provided that, in the case of a Revolving Loan, such amount shall not exceed such Borrower's Availability. The Lender and its respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or the Borrowers pursuant to this Section 10.01.

SECTION 10.02. Powers. The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Borrower Representative shall have no implied duties to the Borrowers, or any obligation to the Lender to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

SECTION 10.03. Employment of Agents. The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

SECTION 10.04. Notices. Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default hereunder referring to this Agreement describing such Default and stating that such notice is a "notice of default." In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to the Lender. Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

SECTION 10.05. Successor Borrower Representative. Upon the prior written consent of the Lender, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative.

SECTION 10.06. Execution of Loan Documents; Borrowing Base Certificate. The Borrowers hereby empower and authorize the Borrower Representative, on behalf of the Borrowers, to execute and deliver to the Lender the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including without limitation, the Borrowing Base Certificate and the Compliance Certificates. Each Borrower agrees that any action taken by the Borrower Representative or the Borrowers in accordance with the terms of this Agreement or the other Loan

-58-

Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Borrowers.

SECTION 10.07. <u>Reporting</u>. Each Borrower hereby agrees that such Borrower shall furnish promptly after each fiscal month to the Borrower Representative a copy of its Borrowing Base Certificate and any other certificate or report required hereunder or requested by the Borrower Representative on which the Borrower Representative shall rely to prepare the Borrowing Base Certificate and Compliance Certificates required pursuant to the provisions of this Agreement.

**(Signature Page Follows)**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

BORROWERS:

Metal Partners Rebar, LLC,
an Illinois limited liability company

By:_____
Name: _____
Title: _____

OTHER LOAN PARTIES:

BRG Holding, LLC,
a West Virginia limited liability company

By:_____
Name: _____
Title: _____

BGD LV Holding, LLC,
a Nevada limited liability company

By:_____
Name: _____
Title: _____

BCG Ownco, LLC,
an Illinois limited liability company

By:_____
Name: _____
Title: _____

<u>LENDER</u>:

JPMORGAN CHASE BANK, N.A.

By:_____
Name: _____
Title: _____

## Definitions Schedule

The following terms shall have the meanings given to them in the Terms Schedule attached hereto: "Applicable Margin", "Availability Block" "Borrowers' Accountants", "Cash Dominion Period", "Commitment Fee Percentage", "Governing State", "Investment Limit", "Judgment Amount" "LC Exposure Amount", "Maturity Date", "Primary City", "Purchase Money Debt Limit", "Reference Fiscal Year" "Revolving Commitment", "Subordinated Debt Limit" and "Unsecured Debt Limit".

The following terms shall have the meanings assigned to them in the Borrowing Base Schedule attached hereto: "Accounts Advance Rate", "Borrowing Base", "Eligible Accounts", "Eligible Inventory", "Epoxy Line Reserve", "Inventory Advance Rate", and "Magnet Crane Reserve".

The following terms shall have the meaning given to them in the Security Agreement: "Collateral Access Agreement", "Collateral Deposit Account", "Collection Account" "Control Agreement", "Lock Box Agreement", "Lock Boxes", "Perfection Certificate" and "Receivables".

The following terms shall have the meaning given to them in the Security Agreement: "Applicable Time", "Alternative Currency", "Alternative Currency L/C", "Dollar Equivalent", "EMU Legislation", "Euro" "Participating Member State" and "Spot Rate".

The following terms shall have the meaning given to them in the UCC: "Account" "Document", "Equipment", and "Inventory".

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Effective Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Alternative Rate" has the meaning assigned to it in Section 2.13(c).

"Approved Budget" means the "Budget" approved by Lender and in effect from time to time as defined in the Financing Order. A copy of the initial Approved Budget is attached hereto as Exhibit A.

"Availability" means, at any time, an amount equal to (a) the lesser of (i) the Revolving Commitment, and (ii) the Borrowing Base minus (b) the Revolving Exposure plus the Prepetition

Revolver Obligations constituting Revolving Exposure under the Prepetition Loan Documents outstanding at any time (including any Reinstated Prepetition Revolver Obligations then outstanding).

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitment.

"Available Revolving Commitment" means, at any time, the Revolving Commitment minus the Revolving Exposure.

"Avoidance Action" means any and all claims and causes of action of any Borrowers' estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning set forth in Section 2.10(f) of this Agreement.

"Banking Services" means each and any of the following bank services provided to any Loan Party by the Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts, cash pooling services, and interstate depository network services), and (e) Lease Financing.

"Banking Services Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services, provided, however, Banking Services Obligations in respect of Lease Financing shall be limited to Lease Deficiency Obligations.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Bankruptcy Event" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or

such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the REVLIBOR30 Rate:

(1) a public statement or publication of information by or on behalf of the administrator of the REVLIBOR30 Screen Rate announcing that such administrator has ceased or will cease to provide the REVLIBOR30 Screen Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the REVLIBOR30 Screen Rate;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the REVLIBOR30 Screen Rate, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for the REVLIBOR30 Screen Rate, a resolution authority with jurisdiction over the administrator for the REVLIBOR30 Screen Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the REVLIBOR30 Screen Rate, which states that the administrator of the REVLIBOR30 Screen Rate has ceased or will cease to provide the REVLIBOR30 Screen Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the REVLIBOR30 Screen Rate; or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the REVLIBOR30 Screen Rate announcing that the REVLIBOR30 Screen Rate is no longer representative.

"Beneficial Ownership Certification" means a certification regarding the beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Borrower" or "Borrowers" is defined in the Recitals hereto.

"Borrower Representative" means Metal Partners, in its capacity as contractual representative of the Borrowers pursuant to Article X.

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date, (b) a Protective Advance, and (c) in the case of any other Loan made pursuant to a Rider attached hereto, any such Term Loan made on the same date.

"Borrowing Base Certificate" means a certificate, signed and certified as accurate and complete by a Financial Officer of the Borrower Representative, in form which is acceptable to the Lender in its sole discretion.

"Borrowing Request" means a request by the Borrower Representative for a Revolving Borrowing in accordance with Section 2.03 or, for another Class of Loan made pursuant to a Rider attached hereto, in accordance with such Rider.

"Burdensome Restriction" means any consensual encumbrance or restriction of the type described in Section 6.10.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Loan accruing interest at REVLIBOR30 Rate without giving effect to the proviso contained in the definition for "REVLIBOR30 Rate", the term "Business Day" shall also exclude any day on which banks are not open for general business in London.

"Capital Lease Obligations" is defined in the Financial Covenants Schedule attached hereto.

"Carveout" has the meaning specified in the Financing Order.

"Carveout Reserve" means, a reserve in an amount equal to the projected Carveout amount set forth in the Approved Budget for the period commencing on the Filing Date and ending at the end of the week of any given date of determination to the extent in excess of the Prepetition Professional Retainers; provided that a portion of the Carveout Reserve shall be released from time to time on account of fees and expenses of the Carveout Professionals (as defined in the Financing Order) that are set forth in the Approved Budget and allowed by the Bankruptcy Court and have been duly paid.

"Case" has the meaning given to it in the Recitals.

"Cash Management Order" means that certain order entered in the Case authorizing Debtors to continue using their current Cash Management Services, in form and substance satisfactory to Lender.

"CB Floating Rate" means the Prime Rate; provided that the CB Floating Rate shall never be less than the REVLIBOR30 Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day). Any change in the CB Floating Rate due to a change in the Prime Rate or the REVLIBOR30 Rate shall be effective from and including the effective date of such change in the Prime Rate or the REVLIBOR30 Rate, respectively.

"CBFR", when used in reference to: (a) a rate of interest, refers to the REVLIBOR30 Rate, unless the REVLIBOR30 Rate shall not be available at such time, then it refers to the CB Floating Rate, and (b) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the REVLIBOR30 Rate or the CB Floating Rate.

"Change in Control" means (a) Jose D. Carrero fails to own free and clear of all Liens or other encumbrances (i) 50% of the issued and outstanding voting Equity Interests of BCG, (ii) 65% of the issued and outstanding voting Equity Interests of LV Holding, and (iii) 80% of the issued and outstanding voting Equity Interests of each of the Loan Parties (unless otherwise indicated herein), (b) occupation at any time of a majority of the seats (other than vacant seats) on the board of directors or other similar governing body of such Borrower by Persons who were not (i) directors of such Borrower on the date of this Agreement, nominated, appointed or approved for consideration by shareholders for election by the board of directors or other similar governing

body of such Borrower, (ii) approved by the board of directors or other similar governing body of such Borrower as director candidates prior to their election, nor (iii) appointed by directors so nominated, appointed or approved; or (c) such Borrower shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of each other Loan Party on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by the Lender (or, for purposes of Section 2.14(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Responsible Officer" means Mr. Joseph Tedesco, or any successor or replacement acceptable to Lender in its Permitted Discretion.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is a Revolving Loan, Protective Advance, or Loan of another Class made pursuant to a Rider attached hereto.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations.

"Collateral Documents" means, collectively, the Security Agreement, any Mortgages, and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Lender.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Commitment" means the sum of the Revolving Commitment and any other commitment to make Loans pursuant to a Rider attached hereto.

"Commitment Fee Percentage" means 0.25% per annum.

"Compliance Certificate" is defined in the Reporting Schedule.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtors" has the meaning given to it in the Recitals.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Dilution" means with respect to any trailing 12 month period, the percentage obtained by dividing (a) non-cash credits against or other non-cash reductions to Accounts (including, but not limited to returns, adjustments, write-offs, markdowns, discounts and rebates) of Borrowers for such period, as determined by Lender in its discretion, by (b) gross invoiced sales of Borrowers for such period. Dilution may be updated from time to time by Lender in its discretion.

"DIP Facility" has the meaning given to it in the Recitals.

"Disclosure Certificate" means the disclosure certificate prepared, executed and delivered by the Loan Parties to the Lender.

"Disclosed Matters" means the actions, suits and proceedings, tax payment or reporting delinquencies and environmental matters disclosed in Section 3.06 of the Disclosure Certificate.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division.  A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

"ECP" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrowers, Intralinkse, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender or any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (i) the environment, (ii) preservation or reclamation of natural resources, (iii) the management, Release or threatened Release of any Hazardous Material or (iv) health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrowers, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, concerning the imposition upon any Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, and (b) any withholding Taxes imposed under FATCA.

"Extenuating Circumstance" means any period during which the Lender has determined in its sole discretion (i) that due to unforeseen and/or nonrecurring circumstances, it is impractical and/or not feasible to submit or receive a Borrowing Request or Interest Election Request by email or fax or through Electronic System, and (ii) to accept a Borrowing Request or Interest Election Request telephonically.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depository institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that, if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Filing Date" has the meaning given to it in the Recitals.

"Final Financing Order" means the Final Order as defined in the Interim Order.

"Financing Order" means, as applicable, the Interim Order and Final Order, as the same may be amended or modified from time to time with Lender's written consent.

"Financial Officer" means the chief financial officer, chief accounting officer, treasurer or controller of any Borrower.

"Funding Account" means the deposit account of the Borrowers to which the Lender is authorized by the Borrowers to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any earn-out (which for all purposes of this Agreement shall be valued at the maximum potential payable with respect to each such earn-out), (l) any other Off-Balance Sheet Liability of such Person, and (m) [reserved]. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief

"Interim Order" means that certain Order Authorizing the Debtors (A) Use Cash Collateral on an Emergency Basis Pending a Final Hearing; (B) Incur Postpetition Debt on an Emergency Basis Pending a Final Hearing; and (C) Grant Adequate Protection and Provide Security and Other Relief to JPMorgan Chase Bank, N.A, as Lender, entered on June [___], 2020 in the Case at docket number [__].

-10-

"Interest Election Request" means a request by the Borrower Representative to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the first Business Day of each calendar month and the Maturity Date.

"LC Disbursement" means any payment made by the Lender pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of the Dollar Equivalent of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements relating to Letters of Credit that have not yet been reimbursed by or on behalf of the Borrowers at such time.

"Lease Deficiency Obligation" means after default, repossession and disposition of the Equipment which is the subject of or which secures a Lease Financing, the amount, if any, by which (i) any and all obligations of the Loan Parties to a Lessor, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with a specific Lease Financing, exceeds (ii) the Net Proceeds realized by the Lessor upon the disposition of the Equipment which is the subject of or which secures the specific Lease Financing.

"Lease Financing" means (i) a lease of specific Equipment as defined in Article 2-A of the UCC, and (ii) a secured financing transaction secured by specific Equipment, whether that transaction is called a lease or a loan, entered into by any Loan Party with the Lender or any of its Affiliates (in this context, the "Lessor").

"Letters of Credit" means the letters of credit issued pursuant to this Agreement, and the term "Letter of Credit" means any one of them or each of them singularly, as the context may require.

"Letter of Credit Agreement" has the meaning assigned to it in Section 2.05(b).

"LIBO Screen Rate" means, for any day and time, with respect to any CBFR Borrowing, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a period equal in length to such Interest Period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion); provided that if the LIBO Screen Rate as so determined would be less than 1.00%, such rate shall be deemed to 1.00% for the purposes of this Agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing)

relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means, collectively, this Agreement, the Financing Order, any promissory notes issued pursuant to this Agreement, any Letter of Credit Agreement, the Collateral Documents, the Loan Guaranty, any Obligation Guaranty, and all other agreements, instruments, documents and certificates identified in or contemplated by Section 4.01 executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements, letter of credit applications and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits, riders or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, all waivers thereunder, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" means each Loan Party other than a Borrower.

"Loan Guaranty" means Article IX of this Agreement and each separate Guarantee, in form and substance satisfactory to the Lender, delivered by each Loan Guarantor.

"Loan Parties" means the Borrowers, the Borrowers' Domestic Subsidiaries, LV Holding, BRG, BCG and any other Person who becomes a party to this Agreement pursuant to a joinder agreement and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Loans" means the loans and advances made by the Lender pursuant to this Agreement, including Protective Advances and any loans made pursuant to a Rider hereto.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations, (c) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"Material Agreements" means all agreements, documents, instruments or contracts which, if cancelled or terminated, would have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit) of any one or more of the Loan Parties or any Subsidiary in an aggregate principal amount exceeding the $100,000.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Lender, on real property of a Loan Party.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of the following amounts to the extent consented to by Lender (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the Borrower Representative).

"Notice Date" has the meaning assigned to it in Section 2.13(c)

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Lender from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates are so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the Secured Obligations executed and delivered to the Lender by a guarantor who is not a Loan Party.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all LC Exposure, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the Lender or any indemnified party individually or collectively, existing on the Effective Date or

arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or any of the Letters of Credit or other instruments at any time evidencing any thereof.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan, Letter of Credit or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (i) the indefeasible payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (ii) the termination, expiration, or cancellation and return of all outstanding Letters of Credit (or alternatively, with respect to each such Letter of Credit, the furnishing to the Lender of a cash deposit, or at the discretion of the Lender a backup standby letter of credit satisfactory to the Lender, in an amount equal to 105% of the LC Exposure as of the date of such payment), (iii) the indefeasible payment in full in cash of the accrued and unpaid fees, (iv) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (v) the termination of all Commitments, (vi) the termination of the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties

thereto; (vii) the indefeasible payment in full in cash of the Prepetition Obligations (including any Reinstated Prepetition Obligations) and (viii) delivery of a general release of any and all claims and causes of action of Loan Parties against Lender.  Any reference herein or in any Loan Document to the satisfaction, repayment, or payment in full of the Prepetition Obligations or Reinstated Prepetition Obligations shall mean the payment or repayment in full in immediately available funds of all outstanding Prepetition Obligations or Reinstated Prepetition Obligations.

"Participant" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

> (a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

> (b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

> (c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

> (d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

> (e)    judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII; and

> (f)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"Permitted Investments" means:

> (a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations

are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)      money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Permitted Priority Liens" mean (a) the Carveout, (b) all Liens in favor of third parties, which third-party liens, as of the Filing Date, had priority under applicable law over the Liens in favor of the Prepetition Lender, solely to the extent that such Liens are valid and non-avoidable as of the Filing Date and are either perfected as of the Filing Date or subject to perfection after the Filing Date pursuant to section 546(b) of the Bankruptcy Code, were not subordinated by agreement or applicable law, and do not secure Indebtedness incurred on or after the Filing Date; in each case subject to the terms of the Financing Order and otherwise agreed to by Lender and (c) the Liens in favor of Prepetition Lender securing the Prepetition Obligations.

"Permitted Protest" means the right of any Loan Party to protest any Taxes; provided that (a) a reserve with respect to such obligation is established on  Borrowers' or their Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower or its Subsidiary, as applicable, in good faith, and (c) Lender is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Variances" mean one hundred ten percent (110%) of (a) the projected disbursements in any given line item in the Approved Budget during any consecutive four week period (each, a "Variance Testing Period") and (b) the total projected disbursements for all line items during each Variance Testing Period.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Borrower or any ERISA Affiliate is (or, if such plan were terminated,

-16-

would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepetition Lender" has the meaning given to it in the Financing Order.

"Prepetition Borrowers" has the meaning given to it in the Recitals.

"Prepetition Credit Agreement" as the meaning given to it in the Recitals.

"Prepetition Letter of Credit" means that certain letter of credit issued by Lender and outstanding under the Prepetition Loan Documents as of the Filing Date in the original face amount of $100,000.

"Prepetition Loan Documents" means the "Loan Documents" as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" means collectively, the Prepetition Revolver Obligations and the Prepetition Term Loan Obligations, provided that (solely for purposes of this Agreement) Prepetition Obligations shall not include Reinstated Prepetition Obligations.

"Prepetition Professional Retainers" means the $**[490,000]** of proceeds of revolving loans under the Prepetition Credit Agreement that were used by Borrowers to pay advance retainers to their professionals by wire transfer on or about June 16, 2020, but prior to the commencement of the Bankruptcy Case.

"Prepetition Revolver Obligations" means the "Secured Obligations" as defined in the Prepetition Credit Agreement (other than the "M&E Term Loan" and "Real Estate Term Loans", each as defined in the Prepetition Credit Agreement), provided that (solely for purposes of this Agreement) Prepetition Obligations shall not include Reinstated Prepetition Revolver Obligations.

"Prepetition Term Loan Obligations" means the "Obligations" as defined in the Prepetition Credit Agreements solely with respect to the "M&E Term Loan" and "Real Estate Term Loans" (as defined in the Prepetition Credit Agreement), provided that (solely for purposes of this Agreement) Prepetition Obligations shall not include Reinstated Prepetition Obligations.

"Prepayment Event" means:

(a)    any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Section 6.05(a) unless the property or asset was included in the most recent Equipment appraisal delivered to Lender; or

(b)    any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than the $10,000; or

(c)    the issuance by any Borrower of any Equity Interests, or the receipt by any Borrower of any capital contribution; or

(d)    the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Lender) or any similar release by the Federal Reserve Board (as determined by the Lender). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"Rate Indices" means CB Floating Rate and REVLIBOR30 Rate.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Reinstated Prepetition Obligations" means collectively, the Reinstated Prepetition Revolver Obligations and the Reinstated Prepetition Term Loan Obligations.

"Reinstated Prepetition Revolver Obligations" means any Prepetition Revolver Obligations constituting an Avoided Payment, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of, a final and nonappealable order of the Bankruptcy Court.

"Reinstated Prepetition Term Obligations" means any Prepetition Term Obligations constituting an Avoided Payment, to the extent such obligations have been reinstated, in each case, pursuant to, and subject to the requirements and terms of, a final and nonappealable order of the Bankruptcy Court.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"Report" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrowers, after the Lender has exercised its rights of inspection pursuant to this Agreement.

"Requirement of Law" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person; and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means any and all reserves which the Lender deems necessary, in its Permitted Discretion, to maintain (including, without limitation, Carveout Reserves, an availability reserve, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, volatility reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for contingent liabilities of any Loan Party, reserves for amounts claimed by Traxys, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, unindemnified or under indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"Responsible Officer" means Mr. Joseph Tedesco, or such other executive officer of any Borrower that is acceptable to Lender from time to time.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party or Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"REVLIBOR30 Rate" means LIBOR administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars) for a one (1) month period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Lender in its reasonable discretion; in each case the "REVLIBOR30 Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the first Business Day of each month, adjusted

monthly on the first Business Day of each month; provided that, (x) if the REVLIBOR30 Screen Rate shall be less than 1.00%, the REVLIBOR30 Screen Rate shall be deemed to be 1.00% for purposes of this Agreement and (y) if the REVLIBOR30 Screen Rate shall not be available at such time for such a period, then the REVLIBOR30 Rate shall be equal to the CB Floating Rate. Any change in the REVLIBOR30 Rate shall be effective from and include the effective date of such change.

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder up to the amount set forth in the Terms Schedule. The initial amount of the Lender's Revolving Commitment is $33,000,000.

"Revolving Exposure" means, at any time, the sum of (a) the outstanding principal amount of Revolving Loans and LC Exposure at such time, plus  (b) the aggregate principal amount of Protective Advances outstanding at such time.

"Revolving Loan" means a Loan made pursuant to Section 2.01(a).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale Milestone" has the meaning specified therefor in Section 5.18 of the Agreement.

"Sanctioned Country" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State. the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Second Amendment Effective Date" shall mean October 2, 2018.

"Secured Obligations" means all Obligations, together with all Banking Services Obligations owing to the Lender or its Affiliates.

"Secured Parties" means (a) the Lender, (b) each Affiliate of the Lender that provides Banking Services, (c) [reserved], (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the successors and assigns of each of the foregoing.

"Security Agreement" means that certain Security Agreement (including any and all supplements thereto), dated as of the date hereof, among the Loan Parties and the Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document), or any other Person, for the benefit of the Secured Parties.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Lender.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and/or one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of a Borrower or a Loan Party, as applicable.

"Swap Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrowers or the Subsidiaries shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" and "Term Loans" means, individually and collectively, the M&E Term Loan and  the Real Estate Term Loan.

"Transactions" means compliance with the Financing Order, the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents, the borrowing

of Loans and other credit extensions, the use of the proceeds thereof and the issuance of Letters of Credit hereunder.

"<u>Traxys</u>" means Traxys North America LLC, a Delaware limited liability company, together with its affiliates.

"<u>Traxys Litigation</u>" means that certain action captioned Traxys North America LLC v. Metal Partners Rebar, LLC, et al (Case No. 1:20-cv-02766 in the United States District Court for the Southern District of New York) (JGK).

"<u>Traxys TRO Agreement</u>" means that certain Agreement dated as of May 11, 2020, by and among Traxys, Rebar, LV Holding, and Lender.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the REVLIBOR30 Rate or the CBFR.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the Governing State or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"<u>Unliquidated Obligations</u>" means, at any time, any Prepetition Obligations (including Reinstated Obligations then outstanding), Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"<u>U.S.</u>" means the United States of America.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools. Required to Intercept and Obstruct Terrorism Act of 2001.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Borrowing Base Schedule**

"Accounts Advance Rate" means 86.7%.

"Borrowing Base" means, at any time (other than as otherwise set forth in this paragraph), the sum of (a) the Accounts Advance Rate at such time multiplied by Eligible Accounts at such time, plus (b) the Inventory Advance Rate at such time multiplied by the Eligible Inventory at such time, plus (c) the Overadvance Amount, minus (d) Reserves (other than any Reserves for amounts claimed by Traxys). The Lender may, in its Permitted Discretion, after the occurrence and during the continuation of a Default, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"Eligible Accounts" means, at any time, the Accounts of a Borrower which the Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the issuance of Letters of Credit hereunder. Without limiting the Lender's discretion provided herein, Eligible Accounts shall not include any Account:

(a)    which is not subject to a first priority perfected security interest in favor of the Lender;

(b)    which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)    (i) with respect to which the schedule due date is more than 60 days after the date of the original invoice therefor, (ii) which is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date therefor, or (iii) which has been written off the books of the Borrowers or otherwise designated as uncollectible;

(d)    which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)    which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to such Borrower exceeds 20% of the aggregate Eligible Accounts.

(f)    with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(g)    which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon such Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(h)    for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such Borrower or if such Account was invoiced more than once;

(i)    with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)    which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)    which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)    which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S. or the District of Columbia, Canada, or any province of Canada unless, in any such case, such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender;

(m)    which is owed in any currency other than dollars;

(n)    which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a Letter of Credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender, or (ii) any government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect or protect the Lien of the Lender in such Account, have been complied with to the Lender's satisfaction;

(o)    which is which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)    which, for any Account Debtor, exceeds a credit limit determined by the Lender, to the extent of such excess;

(q)    which is owed by an Account Debtor or any Affiliate of such Account Debtor to which such Borrower is indebted, but only to the extent of such indebtedness, or is subject to any security deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)    which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent thereof;

(s)    which is evidenced by any promissory note, chattel paper, or instrument;

(t)    which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the applicable Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Borrower has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)    with respect to which such Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Borrower created a new receivable for the unpaid portion of such Account;

(v)    which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than the Borrower has or has had an ownership interest in such goods, or which indicates any party other than the Borrower as payee or remittance party;

(x)    which was created on cash on delivery terms; or

(y)    which the Lender determines may not be paid by reason of the Account Debtor's inability to pay or which the Lender otherwise determines is unacceptable for any reason whatsoever.

In the event that an Account of a Borrower which was previously an Eligible Account ceases to be an Eligible Account hereunder, such Borrower or the Borrower Representative shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate. In determining the amount of an Eligible Account of a Borrower, the face amount of an Account may, in the Lender's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that such Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by such Borrower to reduce the amount of such Account.

"Eligible Inventory" means, at any time, the Inventory of a Borrower which the Lender determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans, and the issuance of Letters of Credit hereunder. Without limiting the Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)    which is not subject to a first priority perfected Lien in favor of the Lender;

(b)    which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)    which is, in the Lender's opinion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business, or unacceptable due to age, type, category and/or quantity;

(d)    with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true, or which does not conform to all standards imposed by any Governmental Authority;

(e)    in which any Person other than such Borrower shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)    which is spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)    which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers, provided that Inventory in transit from vendors and suppliers located in the United States as to which title has passed to a Borrower may be included as Eligible Inventory despite the foregoing provision of this clause (g) so long as:

(i)    the Lender shall have received (1) a true and correct copy of the bill of lading and other shipping documents for such Inventory, and (2) evidence of satisfactory casualty insurance naming the Lender as lender loss payee and otherwise covering such risks as the Lender may reasonably request,

(ii)    the inventory must be in transit within the U.S., and the Lender shall have received, if requested, a duly executed Collateral Access Agreement, in form and substance satisfactory to the Lender, from the applicable freight forwarder or carrier for such Inventory, and

(iii)    the common carrier is not an Affiliate of the applicable vendor or supplier;

(h)    which is located in any location leased by such Borrower unless (A) (i) the lessor has delivered to the Lender a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Lender in its Permitted Discretion and (B) at least $50,000 of Inventory of the Borrowers is located at such location;

(i)    which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document, unless (other than bills of lading to the extent permitted pursuant to clause (g) above) (A) (i) such warehouseman or

bailee has delivered to the Lender a Collateral Access Agreement and such other documentation as the Lender may require or (ii) an appropriate Reserve has been established by the Lender in its Permitted Discretion and (B) at least $50,000 of Inventory is located at such third party warehouse or in possession of such bailee;

(j)  which is being processed offsite at a third party location or outside processor, or is in transit to or from such third party location or outside processor;

(k)  which is a discontinued product or component thereof;

(l)  which is the subject of a consignment by such Borrower as consignor;

(m)  which is perishable;

(n)  which contains or bears any intellectual property rights licensed to such Borrower unless the Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o)  which is not reflected in a current perpetual inventory report of such Borrower (unless such Inventory is reflected in a report to the Lender as "in transit" Inventory);

(p)  for which reclamation rights have been asserted by the seller;

(q)  which has been acquired from a Sanctioned Person; or

(r)  which the Lender otherwise determines is unacceptable for any reason whatsoever.

In the event that Inventory of a Borrower which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, such Borrower or the Borrower Representative shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.

"Inventory Advance Rate" means 77.4%.

"Overadvance Amount" means, as of any date of determination, the amount of the projected "Overadvance" in the Approved Budget for the week during which determination is made.

**Terms Schedule**

1.  <u>Revolving Commitment</u> (Definitions Schedule): $33,000,000.

2.  <u>Maturity Date</u> (Definitions Schedule):

    the "Termination Date" under and as defined in the Financing Order.

3.  <u>Applicable Margin</u> (Definitions Schedule):

    For any day, with respect to any Loan, the "<u>Applicable Margin</u>" shall be the applicable rates per annum set forth below:

    |  | REVLIBOR30 | CB Floating Rate |
    |---|---|---|
    | Revolving Loans | 3.00% | 0.50% |
    | M&E Term Loan | 3.75% | 1.25% |
    | Real Estate Term Loan | 3.75% | 1.25% |

4.  <u>Availability Block</u> (Section 2.01, etc.):

    Not applicable.

5.  <u>LC Exposure</u> (Section 2.05):

    LC Exposure Amount- $100,000

6.  <u>Cash Dominion Period</u> (Section 2.09, etc.):

    At all times.

7.  <u>Fiscal Periods and Accountants</u> (Section 3.04):

    **[Reserved].**

8.  <u>Debt Limits</u> (Section 6.01):

    Purchase Money Debt Limit- $0.00

    Subordinated Debt Limit- $0.00

    Unsecured Debt Limit- $0.00

9.  <u>Investment Limit</u> (Section 6.04):

    $0.0

10.     <u>Judgment Amount</u> (Article VII): $0.00

11.     <u>Notice Addresses</u> (Section 8.01):

if to any Loan Party, to the Borrower at:

c/o Metal Partners Rebar, LLC
302 Knights Run Avenue #1104
Tampa, Florida  33602
Attention: Joseph Tedesco
Email:  tedesco@metalpi.com

With a copy to:

Saul Ewing Arnstein & Lehr LLP
161 North Clark Street, Suite 4200
Chicago, Illinois  60601
Attention:  Michael L. Gesas, Esq.
Email:  michael.gesas@saul.com

if to Lender, at:

JPMorgan Chase Bank, N.A.
10 S. Dearborn, 22nd Floor
Chicago, Illinois 60603
Attention:  Lindsay Griffard
Email: lindsay.r.griffard@jpmorgan.com

With a copy to:

Goldberg Kohn Ltd.
55 East Monroe Street, Suite 3300
Chicago, Illinois 60603
Attention: Jeremy M. Downs, Esq.
Email:  jeremy.downs@goldbergkohn.com

12.     <u>Field Examinations and Appraisals</u> (Section 8.03):

No limitation.

13.     <u>Governing State and Primary City</u> (Section 8.09):

Governing State- Illinois (including, without limitation, 735 ILCS Section 105/5-1 et seq.)

Primary City- Chicago, Illinois

## Reporting Schedule

The Borrowers will furnish to the Lender:

(a)    not later than Wednesday of each week with information current through the last Business Day of the immediately preceding week, and at such other times as may be requested by the Lender, as of the period then ended, all delivered electronically in a text formatted file acceptable to the Lender (not in an Adobe *.pdf file):

(i)    a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request;

(ii)    a detailed aging of Borrowers' Accounts including all invoices aged by invoice date and due date (with an explanation of the terms offered) prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name, address, and balance due for each Account Debtor;

(iii)    a schedule detailing the Borrowers' Inventory, in form satisfactory to the Lender, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Lender has previously indicated to the Borrower Representative are deemed by the Lender to be appropriate and (2) including a report of any variances or other results of Inventory counts performed by the Borrowers since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Borrowers and complaints and claims made against the Borrowers);

(iv)    a worksheet of calculations prepared by the Borrowers to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion; and

(v)    a schedule and aging of the Borrowers' accounts payable, delivered electronically in a text formatted file acceptable to the Lender;

(b)    concurrently with any delivery of the financial information under clause (a) above, a certificate of a Financial Officer of the Borrower Representative in form and detail acceptable to the Lender (each a "Compliance Certificate"), (i) certifying, in the case of all financial information delivered under clause (a), as presenting fairly in all material respects the financial condition and results of operations of Borrowers and (ii) certifying that no Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto;

(c)    promptly upon the Lender's request:

(i)    copies of invoices issued by the Borrowers in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)    copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)    an updated customer list for the Borrowers and their Subsidiaries, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Lender and certified as true and correct by a Financial Officer;

(v)    the Borrowers' sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(vi)    copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(vii)    a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction;

(d) on June 25, 2020, and each such following Thursday (each such day being a "Variance Report Date"), Borrowers shall deliver to Lender a variance report certified as true and correct in all material respects by an officer of Borrower Representative (each such report, a "Variance Report") that includes a (i) reconciliation of the Loan Parties' actual performance for the 1-week period ending the prior Friday to the projected performance for such week in the Approved Budget, (ii) a reconciliation of the Loan Parties' actual to budgeted performance for the period beginning on the Petition Date through the prior Friday, and (iii) a written explanation in reasonable detail of the reasons for material line item variances during the applicable reconciliation periods;

(e) promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that any Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if a Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

(f) promptly following any request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors or other similar governing body (or the audit committee of the board of directors) of any Borrower by independent accountants in connection with the accounts or books of any Borrower or any Subsidiary, or any audit of any of them as the Lender may reasonably request; and

(g) promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may reasonably request, and (y) information and documentation reasonably requested by the Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

**Financial Covenants Schedule**

Borrowers agree that actual disbursements of the type described in each line item in the Approved Budget, and the aggregate amount of all disbursement (comprising all line items), shall not exceed the applicable Permitted Variance during any Variance Testing Period.

**Closing Conditions Schedule**

(a)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>.  The Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the each Financial Officer and any other officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management or partnership agreement, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(b)    <u>Approved Budget</u>. The Lender shall have received a satisfactory Approved Budget.

(c)    <u>Fees</u>. The Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Effective Date. All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrowers to the Lender on or before the Effective Date.

(d)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(e)    <u>No Default Certificate</u>. The Lender shall have received a certificate, signed by the Financial Officer of each Borrower, on the initial Borrowing date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be reasonably requested by the Lender.

(f)    <u>Funding Account</u>. The Lender shall have received a notice designating the Funding Account.

(g)    <u>Borrowing Base Certificate</u>. The Lender shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of a recent date determined by the Lender.

(h)    <u>Money Transfer Authorizations</u>. The Borrowers shall have delivered money transfer authorizations as the Lender may have reasonably requested.

(i)    <u>Insurance</u>. The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.10 of the Credit Agreement.

(j)    ERISA. If any Borrower has any Plans, such Borrower shall have delivered to the Lender its most recent statement of the unfunded liabilities of such Plan, certified as correct by an actuary enrolled under ERISA.

(k)    USA PATRIOT Act. The Lender shall have received (i) at least five (5) days prior to the Effective Date, all documentation and other information regarding each Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, to the extent requested in writing of the Borrowers at least ten (10) days prior to the Effective Date, and (ii) to the extent any Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Effective Date to the extent the Lender has requested, in a written notice to the Borrowers at least ten (10) days prior to the Effective Date, a Beneficial Ownership Certification in relation to each Borrower.

(l)    Case Commencement. The Case shall have been commenced in the Bankruptcy Court, no trustee or examiner shall have been appointed with respect to any of the Loan Parties or any property of or any estate of any Loan Party and the Bankruptcy Court shall have entered all "first day" orders, each in form and substance reasonably satisfactory to Lender.

(m)    Interim Order.  The Bankruptcy Court shall have entered the Interim Order, which Interim Order (x) shall have been entered upon an application or motion of the Loan Parties satisfactory in form and substance satisfactory to Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; (y) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Revolving Loans, or the performance by the Loan Parties of any of the Obligations shall be the subject of a presently effective stay, and (z) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein.

(n)    Cash Management Order. The Bankruptcy Court shall have entered a Cash Management Order authorizing the Loan Parties to maintain and continue to use their Cash Management System in the ordinary course of business, in form and substance reasonably satisfactory to Lender.

(o)    Other Closing Deliverables. The Borrowers shall have delivered to the Lender, in each case in form and substance reasonably satisfactory to the Lender, each of the other agreements, instruments, certificates and items set forth in the closing checklist or schedule of closing documents most recently provided by the Lender (or its counsel) to the Borrowers (or their counsel).

## Term Loan Rider

This Term Loan Rider (this "Rider"), dated as of June ___, 2020 is hereby made a part of and incorporated into that certain Credit Agreement of even date herewith by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"; and together with any other Person that becomes party to this Agreement after the date hereof, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender").

1.      M&E Term Loan.  Subject to the terms and conditions of the Credit Agreement, this Rider and the Financing Order, upon entry of the Final Financing Order, Lender agrees to make, and Borrower agrees to borrow, a term loan in the principal amount of $682,126.72 (the "M&E Term Loan"), which M&E Term Loan shall constitute a "Loan" for all purposes under the Agreement. Borrowers shall not be entitled to borrow under the M&E Term Loan after the initial borrowing thereunder, or to reborrow any amounts repaid with respect to the M&E Term Loan.

2.      Real Estate Term Loan.  Subject to the terms and conditions of the Credit Agreement, this Rider and the Financing Order, upon entry of the Final Financing Order, Lender agrees to make, and Borrower agrees to borrow, a term loan in the principal amount of $1,191,355.58 (the "Real Estate Term Loan"), which Real Estate Term Loan shall constitute a "Loan" for all purposes under the Agreement. Borrowers shall not be entitled to borrow under the Real Estate Term Loan after the initial borrowing thereunder, or to reborrow any amounts repaid with respect to the Real Estate Term Loan.

3.      Interest.  The principal balance of the Term Loans outstanding from time to time shall bear interest in accordance with Section 2.12 of the Agreement. All interest on the Term Loan shall be due and payable accordance with Section 2.12 of the Agreement

4.      Principal Payments. Payments with respect to the Term Loans shall be made in dollars and in immediately available funds, without any offset or counterclaim, as follows:

(a)      To the extent not previously paid, the unpaid balance of the Term Loans shall be paid in full in cash by the Borrowers on the Maturity Date.

(b)      The Borrowers may make voluntary prepayments of the Term Loans in accordance with the provisions of Section 2.10(a) of the Agreement.

(c)      Notwithstanding the provisions of Section 2.10(d) of the Agreement, any amounts required to be prepaid pursuant to Section 2.10(c) of the Agreement which comprise Net Proceeds from (i) any event described in clause (a) or (b) of the definition of the term "Prepayment Event" that are proceeds of Equipment, Fixtures and real property, or (ii) any event described in clause (c) or (d) of the definition of the term "Prepayment Event", shall be applied, first to prepay any Protective Advances that may be outstanding, second to prepay the Term Loan in such allocation and application of those proceeds as shall be determined by the Lender, in its Permitted Discretion], and third, to prepay the Revolving Loans without a corresponding reduction in the Revolving Commitment and to cash collateralize outstanding LC Exposure.

(d)    All partial prepayments of the Term Loans shall be applied to installments of principal in respect of the Term Loan in the inverse order of their maturities.

5.    <u>Definitions</u>. Capitalized terms contained in this Rider, unless otherwise defined herein, shall have the meanings attributable to such terms under the Agreement.

6.    <u>Incorporation by Reference</u>. The terms, covenants and conditions of the Agreement are incorporated into and made a part of this Rider. This Rider shall form a part of the Agreement and shall constitute a part of the Loan Documents.

## Alternative Currency Rider

This Alternative Currency Rider (this "Rider"), dated as of June ___, 2020 is hereby made a part of and incorporated into that certain Credit Agreement of even date herewith by and among Metal Partners Rebar, LLC, an Illinois limited liability company ("Metal Partners"; and together with any other Person that becomes party to this Agreement after the date hereof, collectively, the "Borrowers" and each, individually, a "Borrower"), the Loan Parties party hereto, and JPMORGAN CHASE BANK, N.A. (the "Lender") (as it may be amended or modified from time to time, together with all Exhibits, Schedules and Riders annexed thereto from time to time, the "Agreement").

    I.    Alternative Currency Defined Terms:

"Applicable Time" means, with respect to any borrowings and payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by Lender to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"Alternative Currency" means Euros and any additional currencies determined after the Effective Date by mutual agreement of the Borrowers and Lender; provided that each such currency is a lawful currency that is readily available, freely transferable and not restricted, able to be converted into dollars and available in the London interbank deposit market.

"Alternative Currency L/C" means a Letter of Credit issued in Alternative Currency.

"Dollar Equivalent" means, for any amount, at the time of determination thereof, (a) if such amount is expressed in dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in dollars determined by using the rate of exchange for the purchase of dollars with the Alternative Currency last provided (either by publication or otherwise provided to the Lender by the applicable Thompson Reuters Corp., Refinitiv, or any successor thereto ("Reuters") source on the Business Day (New York City time), immediately preceding the date of determination or if such service ceases to be available or ceases to provide a rate of exchange for the purchase of dollars with the Alternative Currency, as provided by such other publicly available information service which provides that rate of exchange at such time in place of Reuters chosen by the Lender in its sole discretion (or if such service ceases to be available or ceases to provide such rate of exchange, the equivalent of such amount in dollars as determined by the Lender using any method of determination it deems appropriate in its sole discretion), and (c) if such amount is denominated in any other currency, the equivalent of such amount in dollars as determined by the Lender using any method of determination it deems appropriate in its sole discretion.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"Euro" means the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"Participating Member State" shall mean each state so described in any EMU Legislation.

"Spot Rate" for a currency means the rate determined by Lender to be the rate quoted by Lender as the spot rate for the purchase by Lender of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; provided that Lender may obtain such spot rate from another financial institution designated by Lender if Lender does not have as of the date of determination a spot buying rate for any such currency.

II.     Alternative Currency Terms. Borrowers and Lender hereby acknowledge and agree that notwithstanding anything to the contrary set forth in the Credit Agreement, the following terms, conditions and provisions shall govern all Alternative Currency L/Cs:

(A)     Alternative Currency L/Cs. Lender may, in its discretion, issue Letters of Credit in Alternative Currency, provided (i) the aggregate Dollar Equivalent of the Stated Amount of such Alternative Currency UCs shall not to exceed $7,500,000 or such greater amount approved by Lender in its sole discretion, (ii) all Alternative Currency UCs shall be trade Letters of Credit, (iii) the expiration date for any Alternative Currency L/C shall not extend beyond 60 days after the issuance date thereof unless otherwise approved by Lender in its sole discretion, and (iv) requests for Alternative Currency UCs may only be made by and for the account of Metal Partners.

(B)     Reimbursement. If the Lender shall make any LC Disbursement in respect of an Alternative Currency UC, the Borrowers shall reimburse such LC Disbursement by paying to Lender an amount equal to the Dollar Equivalent of such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrowers may, if approved by Lender in writing with respect to each such Alternative Currency UC, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.02 or 2.03 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrowers' obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing. Notwithstanding the foregoing, Lender may, in its sole discretion, require Borrowers to reimburse one or more LC Disbursements in the Alternative Currency in which such Letter of Credit was issued.

(C)     Interim Interest. If Borrowers are required to pay interest on any LC Disbursement pursuant to Section 2.05(h) for an Alternative Currency UC, then the interest rate applicable thereto shall be the rate per annum then applicable to CBFR Revolving Loans.

(D)     Cash Collateralization. If Borrowers are required to provide cash collateral for any Alternative Currency L/C pursuant to Section 2.05(h), such cash collateral shall be deposited by Borrowers with Lender in the applicable Alternative Currency (or, if required by Lender, in U.S. dollars in an amount equal to the Dollar Equivalent of the Alternative Currency). If Lender requires such cash collateral to be made in U.S. dollars for any Alternative Currency L/C, the LC Exposure for such Alternative Currency UC may be revaluated by Lender from time to time using the current Spot Rate. Borrowers shall deposit with Lender within two Business Days

of Lender's demand therefor, additional cash collateral in order to fully cash collateralize such Alternative Currency UC in accordance with Section 2.05(h).

(E)     Revaluation. For all purposes under the Agreement, Lender may, in its sole discretion from time to time, revalue the LC Exposure for Alternative Currency UCs by utilizing the current Spot Rate at the time of such revaluation.

(F)     Payments in Alternative Currency. If Lender requires Borrowers to make payments in the Alternative Currency with respect to reimbursements by Borrowers of Alternative Currency UC draws, any interest thereon or any fees associated with Alternative Currency UCs, such payments shall be made by Borrowers to Lender in immediately available funds not later than the Applicable Time specified by Lender. Payments received after such times shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue, on the date due; and funds received after that hour shall be deemed to have been received by Lender on the following Business Day.

(G)     Payments in the United States. Without limiting the generality of the foregoing, Lender may require that any payments due with respect to Alternative Currency L/Cs be made in the United States. if, for any reason, the Borrowers are prohibited by any applicable laws, rules or regulations from making any required payment hereunder in an Alternative Currency, the Borrowers shall make such payment in U.S. dollars in the Dollar Equivalent of the required payment amount.

(H)     Liability for Losses. Lender shall not be liable for, or be responsible for any loss, cost or expense suffered by any Borrower, any other Loan Party, or any Subsidiary, as a result of, any determination by Lender of the Revolving Exposure, or any of the component amounts thereof, or any exchange rate or Dollar Equivalent, with respect to any matter relating to Alternative Currency.

(I)     Changes in Law. Each provision of the Agreement shall be subject to such reasonable changes of construction as Lender may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro. Lender shall not be obligated to issue any Alternative Currency L/Cs if there shall have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of Lender, would make it impracticable for such Alternative Currency L/Cs to be denominated in the relevant Alternative Currency.

(J)     Indemnification. Each Borrower hereby agrees that upon demand by Lender (which demand shall be accompanied by a statement setting forth the basis for the amount being claimed) Borrowers will indemnify Lender against any net loss, expense, tax or other cost which Lender may sustain or incur (including any net loss, expense, tax or other cost incurred by reason of foreign currency exchange rate fluctuations or the liquidation or reemployment of deposits or other funds acquired by Lender to fund or maintain any Alternative Currency L/C), as reasonably determined by Lender, as a result of Lender's issuance of Alternative Currency L/Cs.

**Schedule 5.18**

**Sale Milestones**

1. No later than three (3) business days after the Filing Date, Borrowers will have filed (i) a motion to sell substantially all of their assets pursuant to 11 U.S.C. § 363 and seeking approval of sale procedures (the "<u>Sale Procedures Motion</u>") and (ii) a motion to shorten notice on the Sale Procedures Motion (the "<u>Motion to Shorten Notice</u>").

2. No later fourteen (14) days after the Filing Date, Borrowers will have obtained an order granting the Sale Procedures Motion, in form and substance acceptable to Lender, in its Permitted Discretion.

**EXHIBIT A**

**Approved Budget**