| | |
|---|---|
| LARSON & ZIRZOW, LLC | SAUL EWING ARNSTEIN & LEHR LLP |
| ZACHARIAH LARSON, ESQ., NV# 7787 | MICHAEL L. GESAS, ESQ., IB# 6186924 |
| E-mail: zlarson@lzlawnv.com | E-mail: michael.gesas@saul.com |
| MATTHEW C. ZIRZOW, ESQ., NV# 7222 | Tel: 312-876-7125 |
| E-mail: mzirzow@lzlawnv.com | DAVID A. GOLIN, ESQ., IB# 6180517 |
| 850 E. Bonneville Ave. | E-mail: david.golin@saul.com |
| Las Vegas, Nevada 89101 | Tel: 312-876-7805 |
| Tel: 702-382-1170 | *Admitted Pro Hac Vice* |
| Fax: 702-382-1169 | 161 North Clark St., Suite 4200 |
| | Chicago, Illinois 60601 |
| Attorneys for Debtors and | |
| Debtors in Possession | Attorneys for Debtors and |
| | Debtors in Possession |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re METAL PARTNERS REBAR, LLC,<br>☒  Affects this Debtor. | BK-20-12878-abl<br>Chapter 11 (Lead Case)<br>(Jointly Administered) |
| In re BGD LV HOLDING, LLC,<br>☒  Affects this Debtor. | BK-20-12876-abl<br>Chapter 11 |
| In re BRG HOLDING, LLC,<br>☒  Affects this Debtor. | BK-20-12879-abl<br>Chapter 11 |
| In re BCG OWNCO, LLC,<br>☒  Affects this Debtor. | BK-20-12880-abl<br>Chapter 11 |
| | Date:  October 5, 2020<br>Time: 9:30 a.m. |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR APPROVAL OF SALE OF SUBSTANTIALLY ALL ASSETS, AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Metal Partners Rebar, LLC, an Illinois limited liability company, d/b/a Metal Partners International ("MPR"), BGD LV Holding, LLC, a Nevada limited liability company, d/b/a Metal Partners International ("BGD"), BRG Holding, LLC, a West Virginia limited liability company, d/b/a Reinforcing Steel Installer, f/d/b/a Trinity Rebar ("BRG"), and BCG Ownco, LLC, an Illinois limited liability company ("BCG"), debtors and debtors in possession (collectively, the "Debtors"), submit their Omnibus Reply to the objections or limited

1

objections filed by Traxys North America LLC ("Traxys") [ECF No. 432], Wells Fargo Equipment Finance, Inc. ("Wells Fargo Finance") [ECF No. 426], Wells Fargo Financial Leasing, Inc. ("Wells Fargo Leasing") as agent for HYG Financial Services, Inc. [ECF No. 427], STORE Capital Acquisitions, LLC [ECF No. 409], and Crestmark Vendor Finance, a division of MetaBank [ECF No. 424] to the Debtors' *Motion for (I) an Order (A) Establishing Bidding and Sale Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of the Sale; (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of Claims, Liens and Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 146] and the supplement thereto (the "Supplement") [ECF No. 296] (collectively, the "Sale Motion").[1]  This Omnibus Reply is supported by the Declarations of J. Scott Victor, a principal from the Debtors' investment banker SSG Advisors, LLC, Brian Shapiro, the Debtors' sale manager, and Wayne Kress, BCG's real estate broker, the papers and pleadings on file in these Chapter 11 Cases, judicial notice of which is requested, and any arguments of counsel made at any hearings on the Motion.

## I.  PROCEDURAL HISTORY

1.  On June 16, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases principally to facilitate a sale of their assets on a going concern basis, and in order to preserve value and maximize a recovery for all creditors and parties in interest.  Just prior to the Petition Date, the Debtors entered into an agreement with JRC OpCo LLC, a Delaware limited liability company (the "Stalking Horse Buyer"), for the sale of substantially all of the Debtors assets, subject to an auction process in the Chapter 11 Cases.  The manager of the Stalking Horse

---

[1] Unless otherwise indicated, call capitalized terms herein shall have the same meanings as in the Sale Motion.

Buyer is Jose D. Carrero ("Carrero") who is also the manager of each of the Debtors and the owner of at least fifty percent of the equity of each of the Debtors. Thus, the Stalking Horse Buyer is an insider of the Debtors pursuant to section 101(31) of the Bankruptcy Code.

2. On July 14, 2020, the Debtors filed their Sale Motion, which included a proposed original form of Stalking Horse Agreement [ECF No. 146, Ex. 2], as negotiated among only the Debtors, the Stalking Horse Buyer, and JPMorgan Chase Bank, N.A. ("Chase") as the senior secured lender.

3. After the filing of the Sale Motion, as is common in a chapter 11 case, the parties also involved the then recently appointed Official Committee of Unsecured Creditors (the "Committee"), and engaged in substantial negotiations related to the proposed Sale, as well as final approval of the Debtors' *Motion for Entry of Interim Order and, After Further Notice and Hearing, Final Order Authorizing Debtors to: (A) Use Cash Collateral; (B) Incur Postpetition Debt; and (C) Grant Adequate Protection and Provide Security and Other Relief to JPMorgan Chase Bank, N.A.* (the "Cash Collateral/DIP Financing Motion") [ECF No. 5], which was also pending final approval at the time. The product of these integrated negotiations was various resolutions to revise the relevant documents to make various significant concessions and clarifications, which were all ultimately presented to the Court for approval, and were set forth in the Supplement, including the Amended Stalking Horse Agreement [ECF No. 296, Ex. 1]. As the redline comparisons attached to the Supplement indicate, the form of purchase agreement and related filings were substantially revised in light of the negotiations with the Committee.

4. The Sale Motion was initially presented to this Court on August 7, 2020. Thereafter, on August 11, 2020, this Court entered an *Order (A) Establishing Bidding Procedures for the Sale of All, or Substantially All, of the Debtors' Assets; (B) Approving Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of the Sale, Cure and Other Notices; and (E) Scheduling an Auction and a Hearing to Consider the Approval of*

37535925.1

*the Sale* (the "Bidding and Sale Procedures Order"). [ECF No. 311]. The Bidding and Sale Procedures Order authorized the Debtors to enter into the Amended Stalking Horse Agreement and to solicit higher and better offers.

5. On August 11, 2020, the Debtors served the Sale Notice, by first class mail, postage prepaid, on certain of the Debtors creditors. [ECF No. 331].

6. On August 11, 2020, the Debtors served the Cure Notice, by first class mail, postage prepaid, on all counterparties to executory contracts and unexpired leases that might be assumed and assigned. [ECF Nos. 334 and 336].

7. On September 25, 2020, this Court entered an *Order Granting Debtors' Motion: (I) to Amend Sale Procedures Order; (II) Shorten Time for Supplemental Service of Sale Notice; and (III) Shorten Time for Objection to Sale Approval Hearing for Supplemental Notice Parties* [ECF No. 446]. On September 25, 2020, the Debtors caused the Supplemental Sale Notice to be served, by first class mail, postage prepaid, on all of the Debtors' creditors who did not receive the original Sale Notice. [ECF No. 451]. By agreement of all parties, the Bid Deadline was extended to September 30, 2020. No competing Qualified Bids were received.

8. The Purchased Assets were fully marketed to all potential strategic buyers as well as other potential financial buyers. No other Qualified Bids were received. Accordingly, no Auction was held and the Stalking Horse Buyer was declared the Successful Bidder.

9. Five creditors or parties in interest filed objections to final approval of the Motion. Only Traxys objects to the entire Sale, whereas the other four objections were filed by counterparties to executory contracts or unexpired leases and are limited to issues relating to the assumption and assignment of such contract or lease for the sale of the specific property covered by such contract or lease. Significantly, the Committee supports the Sale and will be filing a Joinder to the Debtors' reply to Traxys' objections to the entire Sale.

10. The Court should authorize the Sale of the Purchased Assets to the Stalking Horse Buyer because:

37535925.1

- The Purchased Assets have been fully marketed;
- The Purchase Price represents the highest and best price for the Purchased Assets;
- The Sale will enable all of the Debtors' current employees (approximately 250-300) to continue to be employed during the current pandemic;
- In addition to the cash portion of the Purchase Price, the Purchaser is assuming certain substantial liabilities of the Debtors;
- Upon a Closing of the Sale, Chase will provide the Debtors with additional funds to satisfy all accrued administrative expenses;
- Upon a Closing of the Sale, Chase will provide the Debtors with an additional $600,000 to be used to pay creditors in accordance with their priority;
- Upon a Closing of the Sale, and the payment to Chase of the sale proceeds, Chase will subordinate its remaining unsecured claims to all other unsecured claims;
- All chapter 5 causes of action and commercial tort claims will remain in the Debtors' estates free of any lien; and
- There are sound business reasons justifying the immediate sale of the Purchased Assets. If the Sale does not close, the Debtors will have no source of funding to operate and will have no choice but to cease operations and liquidate.

## II. TRAXYS' OBJECTION

11. The Traxys objection is full of assertions and accusations but bereft of facts in support. Further, it is ironic that Traxys accuses the Debtors and Chase of inappropriately using the chapter 11 process when it is Traxys that is doing just that. It is clear that Traxys' objection to the Sale is an attempt to eliminate the Debtors' estates' ability to defend the claims asserted by Traxys and, more importantly, prosecute the Debtors' estates' claims against Traxys, by forcing a liquidation which would result in the Debtors' estates becoming administratively insolvent. Moreover, it is readily transparent that Traxys, in opposing the Sale, is attempting to put pressure on Chase to resolve claims that Traxys has asserted directly against Chase.

12. In particular, as this Court is aware, Traxys commenced litigation pre-petition against the Debtors and Chase in New York, among other jurisdictions, which New York

37535925.1

litigation has since been transferred to the U.S. District Court for the District of Nevada, where it currently remains pending as Case No. 2:20-cv-01684-RFB-NJK, and which is supposed to be transferred, by general order of reference, to the Bankruptcy Court.  This litigation remains stayed as against the Debtors and the Debtors continue to dispute Traxys' claims therein, and further assert that they have substantial counterclaims to offset some potential liability.  As such, Traxys' claims against the Debtors are simply disputed general unsecured claims in the Chapter 11 Cases, and indeed not even some of the largest of the claims asserted.

13. The simple fact is that Traxys comes before this Court with unclean hands.  First, Traxys breached the Joint Venture Agreement by failing to properly account for and reimburse the Debtors for Joint Venture expenses.  Second, prior to the Petition Date, Traxys directed mutual customers of the Joint Venture and the Debtors to pay Traxys for all of those customers' accounts receivable (i.e. including amounts owed directly to the Debtors).  Moreover, as recently as September 17, 2020, Traxys made a demand on a current customer of the Debtors demanding payment on invoices issued by the Debtors for pre-petition debts.  Third, as an insider with regard to the Joint Venture's operations, Traxys received preferential payments from the Debtors within one year of Debtors' bankruptcy filings that total millions of dollars.  Pursuant to Traxys' First Amended Complaint, Traxys alleges that it maintained control over the Joint Venture's finances.  Accordingly, Traxys should be considered an insider with respect to the Debtors' business operations as a Joint Venture partner.  From June 16, 2019 through February 9, 2020, the Debtors' records reflect disbursements to Traxys, on account, in an amount in excess of $4.4 million.  The Debtors' records further reflect setoffs for the benefit of Traxys, during the period of Debtors' prior management, totaling approximately $8 million dollars, which require further reconciliation and audit. All of these claims will be adjudicated by the Court in the pending transferred New York complaint and Committee prosecution of all of the potential Chapter 5 avoidance actions at the appropriate time. It is hard to understand how every interested party, including the Committee, the Investment Baker, and the Sale Manager, supports the proposed Sale, if Traxys was objecting to the Sale in good faith. More importantly,

Traxys has not proposed an alternative that would benefit all of the creditors and protect the Debtors' employees during a worldwide pandemic. Their strategic plan to blow up every attempt by the Debtors and the Committee to maximize the value of the Debtors' assets and preserve jobs is outrageous at best.

**A.     Debtors Have Adequately Disclosed the Terms of the Sale**

14.    The Debtors disclosed in the Sale Motion the fact that Chase would be providing the financing for the Stalking Horse Buyer. The terms of the financing are not relevant to the Court's determination as to whether the Sale should be approved, and indeed, if anything, the fact that Chase, which is one of the largest, well-known, money center banks, is providing the financing should inspire significant confidence that the transaction, if approved by the Court, will actually close.

**B.     The Sale Satisfies Heightened Scrutiny Standard Applicable to an Insider Sale.**

15.    As noted by Traxys, a sale of a debtor's assets to an insider is subject to "heightened scrutiny." The Sale to the Stalking Horse Buyer satisfies this standard. As explained by Bankruptcy Judge Bason of the Central District of California earlier this year:

> [T]he involvement of insiders means that the proposed sale is subject to greater <u>scrutiny</u>; but that itself does not mean the proposed sale is improper. To the contrary, for a variety of perfectly legitimate reasons insiders often are willing to bid more than other prospective buyers for assets or equity interests. . . . Sometimes insiders have skills and knowledge that can only be gained by actually having run the business, so they are best qualified to purchase the assets and maximize the value of those assets in future. Or they might simply have more confidence than others – warranted or not – in their ability to realize future growth and profits from the assets.

<u>In re Catalina Sea Ranch, LLC</u>, Case No. 2:19-bk-24467-NB, 2020 WL 1900308, at *7 (Bankr. C.D. Cal. Apr. 13, 2020).

16.    As further explained by an earlier decision of Bankruptcy Judge Robles also of the Central District of California:

> Nothing in the Bankruptcy Code prohibits a sale to insiders.

7

> However, insider sales are subject to "heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." In re Family Christian, LLC, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015). This is because insiders "usually have greater opportunities for . . . inequitable conduct." Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.), 926 F.2d 1458, 1465 (5th Cir. 1991).
>
> A sale to insiders is fundamentally different from a sale at arms-length.  In an arms-length transaction, the asset's exposure to the marketplace insures that the price is reasonable.  Insider sales, by their very nature, lack this characteristic. Insiders do not have an incentive to aggressively market the assets to obtain the highest price.  Their incentive is just the opposite– the less marketing, and the lower the price, the better.
>
> "The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances." Simantob v. Claims Prosecutor, LLC (In re Lahijani), 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005).

In re Roussos, 541 B.R. 721, 730 (Bankr. C.D. Cal. 2015) (citations omitted).

17. Traxys asserts that the Sale is procedurally improper and is the result of self-dealing on the part of Carrero.  Yet Traxys fails to establish how creditors have been harmed by the Stalking Horse Agreement and the marketing process.  Without any support, Traxys asserts that "Debtors' belated marketing effort took place on a constrained time frame that simply could not provide bidders with the time needed to properly consider making a bid."  But the fact is that no additional time for marketing would result in a purchase price greater than the Purchase Price and certainly not more than the amount of Chase's debt.

18. In our case, the insider contract was used as a stalking horse and was fully exposed to the marketplace.  The purchase price is the best and highest price to be realized for the Purchased Assets.  No further marketing would yield a higher offer.  No evidence exists to the contrary.

19. SSG Advisors, LLC ("SSG") was retained by the Debtors as their investment banker to solicit competing bids to the Stalking Horse. SSG provided the following services:

- SSG prepared a Confidential Information Memorandum providing a summary description and overview of the Debtors' business, historical performance, and prospects;

- SSG compiled a data room of information and documents regarding the Debtors' assets and business to enable potential bidders to conduct due diligence;

- SSG developed a list of potential buyers to be contacted;

- SSG coordinated the preparation and execution of confidentiality agreements for potential buyers wishing to review the information in the data room or receive any other confidential information; and

- SSG coordinated site visits for interested buyers.

(See Victor Decl., ¶ 9)

20. SSG contacted 166 parties to solicit interest in the Sale. These parties consisted of 68 potential domestic strategic buyers, 20 potential international strategic buyers, and 78 potential financial buyers. To identify the potential buyer universe, SSG researched multiple industry databases in order to locate companies in the same industry or a tangential industry to MPR which could have the financial wherewithal to consummate a deal. Additionally, SSG leveraged databases and its prior experience to locate financial buyers that either focus on companies in the metals' industry and / or generally invest in companies in distressed situations. As the bankruptcy and sale process were publicly posted and well-known throughout the industry, SSG also fielded many inbound calls from interested parties. SSG offered to provide all potential bidders with access to the information and documents contained in the data room, subject to the execution of an appropriate confidentiality agreement. (See Victor Decl., ¶ 10)

21. Of the 166 parties contacted, 17 parties executed a confidentiality agreement and received data room access. Although several parties expressed an interest in the Debtors' assets, ultimately the Stalking Horse Buyer was the only party to submit a Qualified Bid by the Bid Deadline. Accordingly, no Auction was held and the Stalking Horse Buyer was declared the Successful Bidder (as defined in the Bidding and Sale Procedures). (See Victor Decl., ¶ 11)

22. As a result of SSG's marketing efforts, all parties who would potentially be interested in bidding on the Debtors' assets as a going concern have been provided substantial

37535925.1

opportunity to do so. Additional marketing time would not result in receiving an offer that exceeds the offer of the Stalking Horse Buyer. (See Victor Decl., ¶ 12)

23. Moreover, the Stalking Horse Agreement was entered into in good faith. As explained by one court in analyzing an insider's status and allegations of collusion in a 363 sale process:

> It is well established that a party's status as an insider does not automatically prevent it from being a purchaser in good faith. See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015) ("[N]othing within the Bankruptcy Code prohibits insiders from purchasing estate assets.") (citations omitted). Although the sale of property to an insider is subject to careful scrutiny, see In re Tidal Constr. Co., 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[Section] 363 sales to insiders are subject to higher scrutiny because of the opportunity for abuse"), it is not *per se* bad faith for an insider to purchase the assets of the debtor. See Coleman v. ANMP (In re Dexter Distrib. Corp.), 434 Fed. Appx. 618, 619 (9th Cir. 2011) (citation omitted); Hower v. Molding Sys. Eng'g Corp., 445 F.3d 935, 939 (7th Cir. 2006); U.S. Small Business Admin. v. Xact Telesolutions, Inc. (In re Xact Telesolutions, Inc.), No. DKC 2005-1230, 2006 WL 66665, at *6 (D. Md. Jan. 10, 2006) ("[T]he majority of courts have held that a sale of assets to a fiduciary or insider is not bad faith per se.") (citations omitted). Thus, a sale to an insider, without more, does not establish a lack of good faith.

Mission Product Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC, f/k/a Tempnology, LLC) 558 B.R. 500, 516 (BAP 1st Cir. 2016), aff'd 879 F. 3d 376 (1st Cir. 2018).

24. As explained very recently by Chief Judge Mirandu Du of the U.S. District Court for the District of Nevada in reviewing an appeal from a 363 sale to an insider, neither the Bankruptcy Code nor the Bankruptcy Rules attempts to define "good faith," however, courts generally have followed traditional equitable principles in holding that a good faith purchaser is one who buys "in good faith" and "for value," and typically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the debtor in possession, or an attempt to take grossly unfair advantage of other bidders. See In re X-treme Bullets, Inc., Case No. 3:19-cv-00637-MMD, 2020 WL 4455582, at *10 (D. Nev. Aug. 3, 2020); see also Coleman

v. ANMP (In re Dexter Distributing Corp.), 434 Fed. Appx. 618 (9th Cir. 2011 (affirming sale to insider as a good faith purchaser; bankruptcy court had determined that the insider was the only possible buyer and that his purchase price was above the fair market value of the business); Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.), 163 F.3d 570, 577 (9th Cir. 1998).

25.     In our case, there has been no showing of any fraud, collusion between Stalking Horse Buyer and other bidders or the Debtors, or any attempt to take grossly unfair advantage of other bidders.  The Sale Manager oversaw the Debtors' sale process, and had weekly conversations via email and telephone with the Debtors' various professionals, including principally its counsel, its financial advisors at High Ridge Partners, and its investment bankers at SSG Advisors, to confirm that the Debtors' sale process was conducted appropriately, and without any interference or undue influence by Stalking Horse Buyer or Carrero.  (See Shapiro Decl., ¶ 8)

26.     To the best of the Sale Manager's knowledge, (a) JRC OpCo has complied with the Bidding and Sale Procedures Order and the Bidding and Sale Procedures, (b) JRC OpCo participated in the sale process in good faith, (c) JRC OpCo has not acted in a collusive manner with any person or entity with respect to the Sale, and JRC OpCo did not enter into any agreement with another bidder or potential bidder that controlled the purchase price of the Sale, and (d) JRC OpCo has not engaged in any conduct that would cause or permit the Amended Asset Purchase Agreement to be avoided under 11 U.S.C. § 363(n).  (See Shapiro Decl., ¶ 11)

**C.    The Sale is Not a *Sub Rosa* Plan**

27.     "Parties that oppose § 363(b) transactions on the basis that they constitute a sub rosa chapter 11 plan must articulate the specific rights that they contend are denied by the transaction."  In re Gulf Coast Oil Corp., 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009).  Traxys asserts that "the Proposed Sale is clearly intended to function as a plan without affording creditors any of the procedural protections involved in the plan confirmation process."  Traxys, however, fails to identify what "procedural protections" have not been afforded.

37535925.1

28. All creditors and parties in interest, including Traxys, were provided adequate information to allow them to determine whether to object to the Sale. Traxys obtained additional information from the data room established by SSG (subject to a Confidentiality Agreement). Further, Traxys took a 7 1/2 hour Rule 2004 examination of Chase (two witnesses).

29. A sale is beyond the scope of section 363(b) and should not be approved "where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a chapter 11 plan." Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.), 333 B.R. 30, 52 (S.D.N.Y. 2005), rev'd on other grounds, 600 F.3d 231 (2d Cir. 2010). That is not the case here.

30. The Sale does not impair or affect any substantive rights that creditors are entitled to under a plan. The Sale also does not alter any rights of creditors, other than to have all liens, claims, and encumbrances attach to the sale proceeds in the same priority as existing as of the closing.

31. Traxys asserts that the Sale will result in unfair discrimination between creditor groups. Once again, Traxys provides no factual support. Traxys appears to be asserting that Chase is receiving unfair treatment, but Traxys provides no basis for this position.

32. The Debtors are informed and believe that the Committee intends to file a plan of liquidation. The Debtors previously waived their exclusive right to file a plan in order to facilitate this. [ECF Nos. 299 and 302].

**D.   The Sale Does Not Violate the Absolute Priority Rule**

33. The "absolute priority rule" of section 1129(b)(2)(B)(ii) of the Bankruptcy Code does not apply for the obvious reason that Carrero is not retaining his equity interest or receiving any distribution on account of it, but rather is purchasing the Debtor's assets (as an owner of the Stalking Horse Buyer), and thus the absolute priority rule is not implicated. See In re Tempnology, LLC, 542 B.R. 50, 66 (Bankr. D.N.H. 2015).

**E.    The Sale Will Not Render the Estate Administratively Insolvent**

34.    Under the terms (Section 3(b)) of the Final Cash Collateral/DIP Financing Order [ECF. No. 310], upon the Closing, Chase shall make an advance to the Debtors of an amount to cover all accrued administrative expenses (other than for Carveout Professionals) in the Budget and an additional advance of $600,000 to pay any other administrative expenses and to make distributions to creditors in their order of priority.

**F.    The Alleged Breaches of the Joint Venture Agreement Settlement Agreement Are Irrelevant to this Hearing on Approval of the Sale**

35.    Traxys asserts that Carrero wrongfully caused MPR to breach the JVA Settlement.  These allegations are not relevant to the Court's determination as to whether the sale should be approved.  These actions relate to the claims which Traxys asserts against the Debtors, Carrero, and other entities controlled by Carrero.  The Sale however has no impact on such claims. Moreover, although Traxys attempts to portray itself as a victim of Carrero's alleged wrongful conduct, as discussed above, the Debtors have several claims against Traxys and Traxys, itself, has engaged in wrongful conduct.

**G.    The BGD Equipment Will Not Be Sold**

36.    The BGD Equipment will not be sold by the Debtors to the Stalking Horse Buyer.  As a result, this portion of the Traxys Objection is moot.

### III.  WELLS FARGO EQUIPMENT FINANCE, INC. OBJECTION

37.    In its objection, Wells Fargo Finance asserts: (a) on or about October 4, 2018, MPR executed and delivered to Intech Funding Corp. ("Intech") an Equipment Finance Agreement No. xxxx3903 (the "Intech Finance Agreement") wherein MPR promised to pay Intech amounts described in the Intech Finance Agreement in order to finance its purchase of certain equipment described in the Intech Finance Agreement (the "Intech Finance Agreement Property"); (b) Intech perfected its security interest in the Intech Finance Agreement Property by filing a UCC Financing Statement on October 1, 2018, as subsequently amended on October 10, 2018; (c) the rights and interests of Intech in the Intech Finance Agreement and the Intech

13

Finance Agreement Property have been assigned to Wells Fargo Finance; and (d) and as of the Petition Date, the amount due to Wells Fargo Finance under the Intech Finance Agreement is $47,952.91.

38. In its objection, Wells Fargo Finance objects to the sale of the Intech Finance Agreement Property free and clear of its lien interest. The Stalking Horse Buyer has advised the Debtors that it is engaged in discussions with Wells Fargo Finance and anticipates resolving this objection prior to the Sale Hearing.

### IV. WELLS FARGO FINANCIAL LEASING, INC. OBJECTION

39. In its objection, Wells Leasing as agent for HYG Financial Services, Inc. ("HYG") asserts: (a) on or about June 30, 2016, MPR, as lessee, executed and delivered to HYG, as lessor, a Master Lease Agreement No. xxx3134 (the "HYG/MPR Master Lease"); (b) in connection with the HYG/MPR Master Lease, MPR, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx4001, dated June 30, 2016 ("Schedule 4001"), wherein MPR promised to pay to HYG amounts described in Schedule 4001 and leased from HYG certain equipment described in Schedule 4001 (the "Schedule 4001 Property"); (c) HYG perfected its security interest in the Schedule 4001 Property by filing a UCC Financing Statement on July 14, 2016, as subsequently amended on August 2, 2018, April 26, 2019, and May 1, 2019; (d) in connection with the HYG/MPR Master Lease, MPR, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx4002, dated April 7, 2017 ("Schedule 4002"), wherein MPR promised to pay to HYG amounts described in Schedule 4002 and leased from HYG certain equipment described in Schedule 4002 (the "Schedule 4002 Property"); (e) HYG perfected its security interest in the Schedule 4002 Property by filing a UCC Financing Statement on August 2, 2018, as subsequently amended on April 26, 2019 and May 1, 2019; (f) in connection with the HYG/MPR Master Lease, MPR, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx4005, dated March 27, 2018 ("Schedule 4005"), wherein MPR promised to pay to HYG amounts described in Schedule 4005

37535925.1

and leased from HYG certain equipment described in Schedule 4005 (the "Schedule 4005 Property"); and (g) HYG perfected its security interest in the Schedule 4005 Property by filing a UCC Financing Statement on August 2, 2018, as subsequently amended on April 26, 2019 and May 1, 2019.

40. In its objection, Wells Fargo asserts: (a) on or about March 21, 2018, BGD, as lessee, executed and delivered to HYG, as lessor, a Master Lease Agreement No. xxx9978 (the "HYG/BGD Master Lease"); (b) in connection with the HYG/BGD Master Lease, BGD, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx8001 dated March 28, 2018 ("Schedule 8001"), wherein BGD promised to pay to HYG amounts described in Schedule 8001 and leased from HYG certain equipment described in Schedule 8001 (the "Schedule 8001 Property"); (c) in connection with the HYG/BGD Master Lease, BGD, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx8002 dated March 28, 2018 ("Schedule 8002"), wherein BGD promised to pay to HYG amounts described in Schedule 8002 and leased from HYG certain equipment described in Schedule 8002 (the "Schedule 8002 Property"); (d) in connection with the HYG/BGD Master Lease, BGD, as lessee, executed and delivered to HYG, as lessor, an Equipment Schedule – Dollar Purchase Option No. xxxxxx8003 dated June 27, 2018 ("Schedule 8003"), wherein BGD promised to pay to HYG amounts described in Schedule 8003 and leased from HYG certain equipment described in Schedule 8003 (the "Schedule 8003 Property"); and (e) HYG perfected its security interest in the Schedule 8001 Property, the Schedule 8002 Property, and the Schedule 8003 Property by filing a UCC Financing Statement on May 10, 2018.

41. In its objection, Wells Fargo Leasing asserts that the Debtors have failed to provide adequate assurance of the Stalking Horse Bidder's future performance and accordingly objects to the assumption and assignment of the HYG/MPR Master Lease (and all schedules thereto) and the HYG/BGD Master Lease (and all schedules thereto) to the Stalking Horse Bidder. The Stalking Horse Buyer has advised the Debtors that it is engaged in discussions

15

37535925.1

with Wells Fargo Leasing. and anticipates resolving this objection prior to the Sale Hearing.

## V. STORE CAPITAL'S LIMITED OBJECTION

42. STORE Capital is the lessor of the premises known as 20 Davidson Lane, New Castle, Delaware (the "Delaware Premises") under a lease (the "Delaware Premises Lease") with MPR, as lessee. In its limited objection, STORE Capital requests that "in the event assumption and assignment of the [Delaware Premises Lease] is approved by the Court, language be included in an order to provide that the proposed assignee shall be responsible for all obligations, whether accruing prior to or after the effective date of the assumption of the [Delaware Premises Lease], when such charges become due in accordance with the terms of the [Delaware Premises Lease]".

43. The Stalking Horse Buyer has advised that it does not desire to have the Delaware Premises Lease assumed by the Debtors and assigned to it. Accordingly, STORE Capital's limited objection is moot.

## VI. CRESTMARK'S LIMITED OBJECTION

44. In its limited objection, Crestmark asserts: (a) on or about September 17, 2019, Regents Capital Corporation ("Regents") entered into Equipment Finance Agreement 153253 (the "Regents/Crestmark Finance Agreement") with MPR and BRG pursuant to which Regents finance the purchase of certain equipment used in the manufacturing of stirrups and bars (the "Regents/Crestmark Equipment"); (b) the obligations for repayment are secured by a perfected first priority purchase money security interest; (c) on October 15, 2019, Regents assigned its rights under the Regents/Crestmark Finance Agreement and related documents to Crestmark; and (d) the indebtedness owed to Crestmark as of the Petition Date was $271,972.46.

45. In its limited objection, Crestmark objects to the sale of the Regents/Crestmark Equipment free and clear of its interests, but added that it would consent to the Sale if it could reach an agreement with the Stalking Horse Buyer. The Stalking Horse Buyer has advised the Debtors that it is engaged in discussions with Crestmark and anticipates resolving this objection prior to the Sale Hearing.

37535925.1

# VII.  CONCLUSION

WHEREFORE, the Debtors request that the Court approve the Sale to the Stalking Horse Buyer, and the assumption and assignment of the executory contracts and unexpired leases, all pursuant to the terms and conditions of the proposed Sale Order.  The Debtors also request such other and further relief as is just and proper.

Dated: October 2, 2020               By:   /s/ Matthew C. Zirzow
                                     LARSON & ZIRZOW, LLC
                                     ZACHARIAH LARSON, ESQ., NV# 7787
                                     MATTHEW C. ZIRZOW, ESQ., NV# 7222
                                     850 E. Bonneville Ave.
                                     Las Vegas, Nevada 89101

                                     -and-

                                     SAUL EWING ARNSTEIN & LEHR LLP
                                     MICHAEL L. GESAS, ESQ., IB# 6186924
                                     DAVID A. GOLIN, ESQ., IB# 6180517
                                     *Admitted Pro Hac Vice*
                                     161 North Clark St., Suite 4200
                                     Chicago, IL 60601

                                     Attorneys for Debtors and
                                     Debtors in Possession

37535925.1