

_____
Honorable August B. Landis
United States Bankruptcy Judge

Entered on Docket
October 14, 2020

LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ., NV# 7787
E-mail: zlarson@lzlawnv.com
MATTHEW C. ZIRZOW, ESQ., NV# 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: 702-382-1170
Fax: 702-382-1169

Attorneys for Debtors and
Debtors in Possession

SAUL EWING ARNSTEIN & LEHR LLP
MICHAEL L. GESAS, ESQ., IB# 6186924
E-mail: michael.gesas@saul.com
Tel: 312-876-7125
DAVID A. GOLIN, ESQ., IB# 6180517
E-mail: david.golin@saul.com
Tel: 312-876-7805
*Admitted Pro Hac Vice*
161 North Clark St., Suite 4200
Chicago, Illinois 60601

Attorneys for Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re  METAL PARTNERS REBAR, LLC,<br>☒ Affects this Debtor. | BK-20-12878-abl<br>Chapter 11 (Lead Case)<br>(Jointly Administered) |
| In re BGD LV HOLDING, LLC,<br>☒ Affects this Debtor. | BK-20-12876-abl<br>Chapter 11 |
| In re BRG HOLDING, LLC,<br>☒ Affects this Debtor. | BK-20-12879-abl<br>Chapter 11 |
| In re BCG OWNCO, LLC,<br>☒ Affects this Debtor. | BK-20-12880-abl<br>Chapter 11<br>Date: October 5, 2020<br>Time: 9:30 a.m. |

**ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, LIENS, AND
ENCUMBRANCES, AND (B) THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1

Upon the motion [ECF No. 146] and the supplement thereto [ECF No. 296] (collectively, the "Sale Motion")[1] filed by the above-captioned debtors and debtors in possession (the "Debtors"), for the entry of an order, pursuant to sections 105, 363, 365, 503 and 507 of title 11, United States Code (the "Bankruptcy Code"), authorizing: (i) the sale (the "Sale") of substantially all of the Debtors' assets (the "Purchased Assets")[2] free and clear of claims, liens, and encumbrances, and (ii) the assumption and assignment of executory contracts and unexpired leases; the Court having previously entered an order, upon the initial presentation of the Sale Motion, authorizing the Debtors to enter into an Amended Asset Purchase Agreement (as amended, the "Asset Purchase Agreement") (Exhibit 1 to ECF No. 296 and **Exhibit A** hereto) with JRC OpCo, LLC (the "Purchaser") and to solicit higher or better offers (the "Bidding and Sale Procedures Order") [ECF No. 311]; and the Court having thereafter enter an order amending the Bidding and Sale Procedures Order [ECF No. 446]; and Court having held a further hearing on the Sale Motion on October 5, 2020 (the "Sale Hearing"); and the Court having reviewed and considered (a) the Sale Motion and all declarations in support, (b) the objections to the Sale Motion, and (c) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing;

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:**

A.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

B.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[1] Capitalized terms not otherwise used herein have the meanings set forth in the Sale Motion.

[2] The term "Purchased Assets" carries the same meaning ascribed to that term in the Asset Purchase Agreement (as defined below), and it specifically includes the two parcels of real estate located at 1800 White Lane, Bakersfield, California 93304 (the "California Real Estate").

C.     Proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale Hearing, and the Debtors' proposed sale of the Purchased Assets and the potential assumption and assignment of the contracts and leases listed on **Exhibit B** hereto (the "Assigned Contracts and Leases") to the Purchaser has been provided in accordance with sections 102(1), 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, and 9014 and the Bidding and Sale Procedures Order, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Order is required.

D.     A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities.

E.     The bidding procedures established pursuant to the Bidding and Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or better offer to purchase the Purchased Assets and no higher or better offer was made.

F.     The consideration to be paid by the Purchaser for the Purchased Assets constitutes the highest and best offer for the Purchased Assets and is fair and reasonable consideration.

G.     The Debtors have demonstrated that it is an exercise of their sound business judgment to sell the Purchased Assets and to assume and assign the Assigned Contracts and Leases to the Purchaser, and that approval of the Sale and the assumption and assignment of the Assigned Contracts and Leases is in the best interests of the Debtors and their estates and creditors.

H.     The Sale must be completed immediately in order to preserve the value of the Purchased Assets and, as a result, good and sufficient business justification exists for the immediate sale of the Purchased Assets and assumption and assignment of the Assigned Contracts and Leases to the Purchaser prior to consummation of a plan in these cases.

I.     The Debtors may sell the Purchased Assets free and clear of all claims, liens, interests, and encumbrances other than the Assumed Liabilities and Permitted Encumbrances (as defined in the Asset Purchase Agreement), because each entity with such an interest in any of the Purchased Assets has consented to the Sale, is deemed to have consented to the Sale, has a claim

3

which is subject to a *bona fide* dispute, or could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

J.     The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby with respect to the transactions authorized by this Order.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

K.     The Purchaser has provided adequate assurance of future performance under the Assigned Contracts and Leases, to the extent required by section 365(b)(1)(C) of the Bankruptcy Code.

**NOW, THEREFORE, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:**

1.     The Sale and all of the terms and conditions of the Asset Purchase Agreement, unless otherwise provided in this Order, are approved.

2.     All objections to the Sale Motion that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

3.     Pursuant to sections 105(a), 363(b), and 365 of the Bankruptcy Code, the Debtors are authorized and directed to take all actions and execute all instruments and documents necessary or desirable to consummate the Sale and to assume and assign the Assigned Contracts and Leases, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and this Order.  The Debtors are also authorized to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Purchased Assets and the Assigned Contracts and Leases, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

4.     As of the date of closing (the "Closing") of the Sale, provided that the Purchaser has paid any Cure Amount set forth on Exhibit B hereto, the Assigned Contracts and Leases that are executory contracts or unexpired leases shall be deemed to have been assumed by the Debtors

and assigned to the Purchaser pursuant to section 365(f) of the Bankruptcy Code.  Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and the Debtors' estates shall be relieved from any liability for any breach of any of the Assigned Contracts and Leases occurring after the date of the Closing.  As of the date of the Closing, any of the Assigned Contracts and Leases that are not executory contracts or unexpired leases shall be deemed to have been assigned to the Purchaser pursuant to section 363(b) of the Bankruptcy Code.

5.     Except for any Assumed Liabilities and Permitted Encumbrances, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Purchased Assets  shall be free and clear of all claims, liens, interests, and encumbrances (collectively, and except for any Assumed Liabilities and Permitted Encumbrances, the "Interests"), with all such Interests to attach to the proceeds of the Sale (the "Proceeds") in the order of their respective priorities, with the same extent, validity, force, and effect which they now have against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

6.     The transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement and this Order shall constitute a legal, valid and effective transfer of the Purchased Assets, and it shall vest the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of all Interests of any kind or nature whatsoever.

7.     Without limiting the foregoing two paragraphs, any lease of the California Real Estate granted by debtor BCG Ownco, LLC ("BCG") in favor of debtor Metal Partners Rebar, LLC ("MPR") is hereby deemed to be terminated and of no further force and effect as of the Closing of the Sale.  BCG and MPR are authorized and directed to execute such documents, including a termination of lease, as may be reasonably requested by the Purchaser to evidence such lease termination.

8.     Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors holding Interests of any kind or nature whatsoever against or in

the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' Interests.

9.    On the Closing Date of the Sale, each of the Debtor's creditors is authorized to execute such documents and take all other actions as may be necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests in the Purchased Assets shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Purchased Assets, then on the Closing Date of the Sale (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets, and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Purchased Assets of any kind or nature whatsoever

11.    Upon the Closing of the Sale, the Debtors are authorized to pay all Proceeds to JPMorgan Chase Bank, N.A. ("JPMorgan") for application to its postpetition and prepetition claims against the Debtors subject to and in accordance with the final cash collateral and postpetition financing order entered in this Case [ECF No. 310, the "Final DIP Order"].  For avoidance of doubt in this regard, otherwise unpaid United States Trustee fees that accrue through the Closing Date (including, without limitation, such fees that arise as a result of the closing of

the Sale) shall be included and paid from the "Closing Date Accrual Advance" under and as defined the Final DIP Order.

12.     Notwithstanding anything to the contrary herein or in any documents relating to the Sale, the Purchased Assets shall not include: (a) any cause of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents or proceeds of such causes of action; and (b) any commercial tort claims arising on or before the Closing, or any proceeds of such claims.

13.     The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

14.     This Sale Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.     Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

16.     Except as expressly permitted or otherwise specifically provided for in the Asset Purchase Agreement or this Sale Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets.

Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Interests against or in the Debtors or the Purchased Assets of any kind or nature whatsoever other than as provided for in the Asset Purchase Agreement or this Order.

17.     The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing.  The Purchaser is a purchaser in good faith of the Purchased Assets, and the Purchaser is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

18.     The terms and provisions of the Asset Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Purchased Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

19.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

20.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

21.     Notwithstanding anything in this Order to the contrary, the assumption and

8

assignment to the Purchaser of the Master Lease Agreement Schedules between Wells Fargo Financial Leasing, Inc., as agent for HYG Financial Services, Inc. ("WF"), and either BGD LV Holding, LLC ("BGD") or MPR, as the case may be, is subject to, and conditioned upon, the execution of mutually acceptable assignment and assumption agreements between WF, the Purchaser, and respectively, BGD and MPR, as the case may be.  Notwithstanding the order of parties' filing UCC-1 financing statements against the Purchaser with respect to the Purchaser's assets, including the existing UCC-1 financing statement filed by JPMorgan, WF shall continue to have a first priority security interest in the equipment covered by the Master Lease Agreement Schedules to secure amounts due under the Master Lease Agreement Schedules.  WF may, in addition, amend its existing UCC-1 financing statements or file its own new UCC-1 financing statements against the Purchaser, with respect to the equipment covered by the Master Lease Agreement Schedules, and such WF UCC-1 financing statement shall be prior and senior to any financing statements of JPMorgan related to the subject equipment.

22.    Crestmark Vendor Finance, a division of MetaBank ("Crestmark") has a first priority security interest with respect to certain equipment (the "Crestmark Equipment") described in that certain Equipment Finance Agreement 153253 (the "Crestmark Agreement") between the Debtors and Crestmark's predecessor in interest.  Notwithstanding anything in this Order to the contrary, in resolution of the Limited Objection and Reservation of Rights [ECF 424] filed by Crestmark, the Purchaser has agreed to assume, and have assigned to it, the rights and obligations of the Debtors under the Crestmark Agreement in their entirety upon the Closing of the Sale.  Subsequent to the Closing of the Sale, Purchaser will pay all amounts thereafter payable under the Crestmark Agreement as they come due thereunder.  Additionally, Purchaser shall pay fees and costs incurred by Crestmark, not to exceed $7,500, at the Closing of the Sale.   For the avoidance of doubt, the Crestmark Equipment will not be sold to the Purchaser free and clear of Crestmark's liens but, rather, such Equipment will be sold to the Purchaser subject to such liens.  Notwithstanding the order of parties' filing UCC-1 financing statements against the Purchaser with respect to the Purchaser's assets, including the existing UCC-1 financing statement filed by

JPMorgan, Crestmark shall continue to have a first priority security interest in the Crestmark Equipment to secure amounts due under the Crestmark Agreement upon the sale of the Crestmark Equipment to Purchaser.  Crestmark, Purchaser and JPMorgan have consented to the sale of the Crestmark Equipment and the assumption and assignment of the Crestmark Agreement on these terms.

23.    Nothing herein shall be deemed to modify, waive, release, impair or determine any of the respective claims, defenses, counterclaims, obligations or other rights of the parties to the Traxys Agreement (as defined in the Final DIP Order) that are contained in or preserved by the Traxys Agreement, except as expressly set forth in paragraph 25 herein, and all such claims, defenses, counterclaims obligations or other rights shall be unaffected by the entry of this Order.

24.    Nothing herein shall be deemed to modify, waive, release, impair or determine any claim, defense, counterclaim, obligation or right asserted in connection with the Traxys Delaware Complaint, the Traxys Nevada Complaint, or the Traxys New York Complaint (as such terms are defined in the Final DIP Order), except as expressly set forth in paragraph 25 herein, and all such claims, defenses, counterclaims obligations or other rights shall be unaffected by the entry of this Order.

25.    For the avoidance of doubt and notwithstanding anything in this Order to the contrary, except as expressly set forth in this paragraph 25, no interest in the Traxys ADR Receivables, the Traxys Equipment, the Traxys Remaining Inventory (as such terms are defined in the Final DIP Order), or any other personal property, whether tangible or intangible, in which Traxys holds a perfected security interest or an ownership interest shall be sold to Purchaser pursuant to this Order or otherwise modified, extinguished or impaired in any manner by this Order, and the same shall be excluded from the Purchased Assets, which Purchased Assets shall otherwise be conveyed to Purchaser free and clear of any Interests that Traxys may assert against any of the Debtors and on account of which Interests Purchaser shall have no liability or responsibility and shall not be deemed a successor of or to any of the Debtors.  Further, for the avoidance of doubt and notwithstanding anything in this Order, no interest in (i) any funds held

10

in the Traxys Blocked Account (as defined in the Final DIP Order), (ii) any receivable governed by the Identified Invoices (as defined in the Traxys Agreement), or (iii) any accounts receivable or collections subject to the March 1, 2018 Joint Venture Agreement between Traxys and Debtors Metal Partners Rebar, LLC and BGD LV Holding, LLC shall be deemed Purchased Assets and sold to Purchaser pursuant to this Order, other than the interests of the Debtors, if any, in such assets (as such interests of the Debtors may be determined by agreement of the parties or entry of a final order of a court of competent jurisdiction or a final arbitration award, as the case may be, in accordance with the Traxys Agreement and applicable law). Until such time as Debtors' interests, if any, in such assets has been finally determined as set forth above, all collections on all Identified Invoices shall continue to be deposited in the Traxys Blocked Account in accordance with the Traxys Agreement.

26. For the avoidance of doubt and notwithstanding anything in this Order to the contrary, MPR's unexpired lease agreement with STORE Capital Acquisitions, LLC for that certain real property located at 20 Davidson Lane, New Castle, Delaware, is not being assumed pursuant to this Order or the Asset Purchase Agreement, and no interest in the Excluded Property (as defined in the Final DIP Order) shall be sold to Purchaser pursuant to this Order or the Asset Purchase Agreement, unless otherwise agreed in writing by STORE Capital Acquisitions, LLC and Purchaser. The parties reserve all of their respective rights and remedies under MPR's unexpired lease agreement with STORE Capital Acquisitions, LLC and all related agreements thereto.

27. As related relief, the Final DIP Order is hereby amended to replace the date of "October 9, 2020" in its definition of "Termination Date" with the date "December 31, 2020"; provided, however, that from and after October 9, 2020, any and all advances of "Postpetition Debt" (as defined in the Final DIP Order) shall be in the sole discretion of JPMorgan, other than the "Sale Closing Date Advance" and the "Carveout" which shall be satisfied in accordance with the terms of and as defined in the Final DIP Order.

28. This Court shall retain jurisdiction (a) to enforce and implement the terms and

11

provisions of the Asset Purchase Agreement, all amendments thereto, and each of the agreements executed in connection therewith, (b) to compel delivery of the Purchased Assets to the Purchaser, (c) to resolve any disputes arising under or related to the Asset Purchase Agreement, and (d) to interpret, implement, and enforce the provisions of this Order.

29.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon its entry shall <u>not</u> be stayed for 14 days after its entry.

**IT IS SO ORDERED.**

Prepared and Submitted By:

By:   /s/ Matthew C. Zirzow
LARSON & ZIRZOW, LLC
ZACHARIAH LARSON, ESQ., NV# 7787
MATTHEW C. ZIRZOW, ESQ., NV# 7222
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
-and-
SAUL EWING ARNSTEIN & LEHR LLP
MICHAEL L. GESAS, ESQ., IB# 6186924
DAVID A. GOLIN, ESQ., IB# 6180517
*Admitted Pro Hac Vice*
161 North Clark St., Suite 4200
Chicago, IL 60601

Attorneys for Debtors and
Debtors in Possession

. . .

. . .

. . .

LEGAL\48777040\2

## **LR 9021 CERTIFICATION**

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

☐     The court has waived the requirement of approval under LR 9021(b)(1).

☐     No party appeared at the hearing or filed an objection to the motion.

☒     I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

| | |
|---|---|
| Max Schlan (Official Committee of Unsecured Creditors): | APPROVED |
| Brian Shapiro (Debtors' Sale Manager): | APPROVED |
| Jeremy Downs/Rob Kinas (JPMorgan Chase Bank, N.A.): | APPROVED |
| Peter J. Roberts/Brett Axelrod (JRC Opco, LLC): | APPROVED |
| Bart Larsen (Traxys North America LLC): | APPROVED |
| Michel B. Wixom (Wells Fargo, *et al.*): | APPROVED |
| Stacy H. Rubin (STORE Capital Acquisitions, LLC): | APPROVED |
| Paul R. Hage/Connor Shea (Crestmark Vendor Finance): | APPROVED |

☐     I certify that this is a case under chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

### # # #

LEGAL\48777040\2

# EXHIBIT A

**AMENDED ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**JRC OPCO LLC**

**AND**

**METAL PARTNERS REBAR, LLC, BRG HOLDING, LLC, BGD LV HOLDING, LLC
AND BCG OWNCO, LLC**

**August __, 2020**

## AMENDED ASSET PURCHASE AGREEMENT

**THIS AMENDED ASSET PURCHASE AGREEMENT** dated as of August ___, 2020 (this "Agreement") is entered into by and between Metal Partners Rebar, LLC, BRG Holding, LLC BGD LV Holding, LLC and BCG Ownco, LLC (each individually a "Debtor" and collectively, the "Debtors" or the "Sellers") and JRC OpCo LLC, a Delaware limited liability company (or its Assignee, the "Purchaser"). Purchaser and Sellers are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, the Sellers are in the business of trading, distributing and fabricating imported and domestic reinforcing bars and other steel products (the "Business");

**WHEREAS**, on June 16, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court");

**WHEREAS**, the Debtors' bankruptcy cases (collectively, the "Bankruptcy Cases") are expected to be jointly administered cases;

**WHEREAS**, BCG Ownco owns two parcels of real estate located at 1800 White Lane, Bakersfield, California 93304 (the "California Real Estate");

**WHEREAS**, each Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of and acquire such Purchased Assets and to assume such Assumed Liabilities, in each case on an "AS IS, WHERE IS" basis, except for the representations and warranties expressly set forth in Section 3 below, and upon the terms and subject to the conditions set forth herein;

**WHEREAS**, the Parties previously executed an Asset Purchase Agreement dated as of June 16, 2020 and now desire to amend and restate that Asset Purchase Agreement in its entirety through this Agreement;

**WHEREAS**, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Cases pursuant to §§ 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions**.

1.1    <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

(a)    "<u>Acquired Owned Real Property</u>" means the California Real Estate and all of the other real property, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto, owned in fee by each Seller, and any part or parcel thereof set forth on <u>Schedule 2.1(a)</u>.

(b)    "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such other Person; provided, however, that ADR, LLC shall not be considered an Affiliate under this Agreement.

(c)    "<u>Break-Up Fee</u>" means an amount equal to $200,000.

(d)    "<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in Illinois are authorized or required by Law to close.

(e)    "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 <u>et</u> <u>seq.</u>), and any Laws promulgated thereunder.

(f)    "<u>Claim</u>" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(g)    "<u>Closing Date</u>" means the date of the Closing, which shall occur on or before September 30, 2020.

(h)    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(i)    "<u>Cure Costs</u>" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(j)    "<u>Employee</u>" means an individual who is employed by the Sellers, whether on a full-time or a part-time basis, whether active or inactive as of the Closing Date, and includes an employee on short-term or long-term disability leave.

(k)    "<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by Sellers or

any ERISA Affiliate or with respect to which each Seller or any ERISA Affiliate has any liability as set forth on Schedule 3.12(a).

(l)     "Environmental Laws" means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(m)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(n)     "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with each Seller for purposes of Code § 414.

(o)     "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other government or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(p)     "Hazardous Substances" means any substance, material or waste regulated by any Governmental Authority, including any material, substance or waste which is defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "contaminant," "toxic waste," "pollutant" or "toxic substance" under any provision of Environmental Law, and including petroleum, petroleum products, asbestos, presumed asbestos-containing material or asbestos-containing material, urea formaldehyde and polychlorinated biphenyls.

(q)     "Improvements" means all buildings, improvements, structures, streets, roads and fixtures located, placed, constructed or installed on or under the Acquired Owned Real Property or the Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(r)     "Intellectual Property Rights" means all of each Seller's intellectual property rights including, but not limited to: (i) patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice); (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks

(registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists (including all wholesale, retail and commercial customer account lists, whether active or inactive including complete contact information), proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software (including front and back office software, customer management and fuel management systems, accounting and billing systems, POS inventory systems and fleet management systems), algorithms, architecture, structure, display screens, layouts, inventions and development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(s)     "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means the actual knowledge of Mr. Joseph Tedesco.

(t)     "Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(u)     "Leased Real Property" means all land, Improvements or other interests in real property leased or subleased by each Seller, as lessee, which is used or intended to be used in, or otherwise related to, the Business, including those set forth on Schedule 1.1(v), unless previously rejected pursuant to Section 365 of the Bankruptcy Code.

(v)     "Liability" means any claim, debt, liability, obligation, Tax, demand, obligation or commitment of any nature whatsoever (whether known or unknown, asserted or unasserted, fixed or unfixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, perfected or unperfected, liquidated or unliquidated or due or to become due), whenever or however arising (including those arising out of any contract or tort, whether based on negligence, strict liability or otherwise whether or not the same would be required by United States generally accepted accounting principles in effect from time to time ("GAAP") to be stated in financial statements or disclosed in the notes thereto), and including all costs and expenses related thereto.

(w)     "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), deed of trust, pledge, hypothecation, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract or finance lease involving substantially the same effect, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown, including any "Lien" as defined in the Bankruptcy Code.  For the avoidance of

doubt, the definition of Lien shall not include any license or sublicense of Intellectual Property Rights granted by Sellers or any lease or sublease by Sellers (as lessor or sublessor) of real property.

(x)    "Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that (a) is materially adverse to the financial condition or results of operations of the Purchased Assets (taken as a whole) or the Business; provided, however, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America, except to the extent that such change has a materially disproportionate adverse effect on the Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index), except to the extent that such change has a materially disproportionate adverse effect on Business relative to the adverse effect that such changes have on other companies in the industry in which the Business operates; (iii) compliance with this Agreement by the party making the claim that a Material Adverse Effect has taken place with respect to the other party, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (iv) any changes directly attributable to the announcement of this Agreement; (v) resulting from any act of God or other force majeure event (including natural disasters or global pandemics); or (vi) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the business or operations of Sellers or any of their respective Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement or the filing of the Bankruptcy Cases or Sellers' and their respective Affiliates' financial condition or Sellers' or certain of their respective Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code or (b) would reasonably be expected to prevent, materially delay or materially impair to the ability of any Seller to consummate the transactions contemplated by this Agreement on the terms set forth herein and therein.

(y)    "Order" means any award, decision, decree, order, directive, injunction, ruling, judgment or consent of or entered, issued, made or rendered by any Governmental Authority.

(z)     "Outstanding Loan Balance" means, as of immediately prior to the Closing, (i) all outstanding Secured Obligations (as such term is defined in the Credit Agreement) due and owing to JP Morgan Chase Bank, N.A. under that certain Credit Agreement ("Credit Agreement"), dated August 3, 2018 (as amended, restated, supplemented or modified from time to time), by and between Debtors and JP Morgan Chase Bank, N.A. plus (ii) all outstanding Secured Obligations (as such term is defined in the DIP Agreement) due and owing to JP Morgan Chase Bank, N.A. under that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or modified from time to time, the "DIP Agreement"), by and among debtor-in-possession Metal Partners Rebar, LLC and JP Morgan Chase Bank, N.A. minus (iii) (A) fifty percent (50%) of the Closing Date Accrual Advance (as such term is defined in the Bankruptcy Court's final order approving the DIP Agreement ("Final DIP Order")) and (B) one hundred percent (100%) of the Post-Closing Fund advance (as such term is defined in the Final DIP Order), provided that the Outstanding Loan Balance (1) shall not exceed an amount equal to (y) the "Commitment" as defined in the DIP Agreement as in effect on the closing of the DIP Agreement plus (z) fifty percent (50%) of the Closing Date Accrual Advance, unless otherwise agreed to in writing between Purchaser and Sellers, and (2) shall not include the Post-Closing Fund advance.

(aa)     "Permits" means licenses, permits, approvals, certificates, authorizations, operating permits, order, registrations, variances, plans, exemptions and other similar documents and authorizations issued by or obtained from any Governmental Authority, under the authority thereof or pursuant to any applicable Law.

(bb)     "Permitted Encumbrances" means (i) encumbrances waived in writing by Purchaser; (ii) all restrictions on the use of any real property included in the Purchased Assets arising as a result of the application of zoning and similar laws; (iii) all exceptions, restrictions, easements, charges, rights-of-way, and other encumbrances that are set forth in any Permit; and (iv) with respect to any real property included in the Purchased Assets, other imperfections in title, if any, or conditions, reservations, restrictions, easements, encroachments, or rights of way, if any, none of which, individually or in the aggregate, materially detracts from the value, or impairs in any significant way the use of the property subject thereto; (v) Liens for Taxes not yet delinquent; and (vi) mechanics liens and similar liens for labor, materials or supplies provided with respect to real property incurred in the ordinary course of business for amounts which are not delinquent.

(cc)     "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(dd)     "Post-Retirement Liabilities" means with respect to all Employees and retirees, all Liabilities for the post-retirement benefits, including those provided under the Employee Benefit Plans, as applicable.

(ee) "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date; and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ff) "Property Taxes" means all real and personal property Taxes levied with respect to the Purchased Assets for any taxable period or portion thereof.

(gg) "Purchase Price" means the Outstanding Loan Balance minus Two Million Dollars ($2,000,000) and, only if the California Real Estate is an Excluded Asset on the basis described in Section 2.2(k)(ii), minus One Million Six Hundred and Fifty Thousand Dollars ($1,650,000).

(hh) "Real Estate" means the Acquired Owned Real Property and the Leased Real Property.

(ii) "Release" has the meaning set forth in CERCLA.

(jj) "Tax" means (i) any federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental (including taxes under Code Section 59A), customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, escheat, employment, social security, unemployment, license, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, windfall profits, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts, capital stock, alternative, or add-on minimum, estimated or other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority (a "Taxing Authority") responsible for the imposition thereof (whether domestic or foreign), whether or not disputed, and whether computed on a separate or consolidated, unitary or combined basis or in any other manner and (ii) Liability for the payment of any amounts of the type described in clause (i) as a result of being a transferee, party to any agreement or any express or implied obligation to indemnify any other Person.

(kk) "Tax Returns" means any report, return, declaration, claim for refund, information report or return or statement required to be supplied to a Taxing Authority in connection with Taxes, including any schedule or attachment thereto or amendment thereof.

(ll) "Trade Payables" means all trade payables incurred by the Sellers in the ordinary course of business.

1.2    Cross References. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Allocation Schedule | 2.7(b) |
| Approval Hearing | 6.3(c)(vi) |
| Approval Order | 6.3(f) |
| Assignment and Assumption Agreement | 2.9(b) |
| Assumed Contracts | 2.1(b) |
| Assumed Contracts A/R | 2.1(d) |
| Assumed Liabilities | 2.4 |
| Auction | 6.3(c) |
| Back-up Bid | 6.3(c)(vi) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid | 6.3(b)(i) |
| Bid Assessment Criteria | 6.3(c)(i) |
| Bid Deadline | 6.3(b)(i) |
| Bidder | 6.3(b)(i) |
| Bidding Procedures | 6.3(a) |
| Bidding Procedures Order | 6.3(a) |
| Business | Recitals |
| Closing | 2.8 |
| Contemplated Transaction Documents | 6.3(c)(i) |
| Debtors | Preamble |
| Deposit | 2.7(a) |
| End Date | 9.1(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.5 |
| Lot Bid | 6.3(b)(ii)(A) |
| Minimum Initial Overbid | 6.3(b)(ii)(G) |
| Missing Assets | 2.7(c) |
| Modified APA | 6.3(b)(ii)(A) |
| Notice Parties | 6.3(b)(i) |
| Opening Bid | 6.3(c)(i) |
| Overbid | 6.3(c)(v) |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Purchase Price | 2.7(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bid | 6.3(b)(ii) |
| Qualified Bidder | 6.3(b)(ii) |
| Reimbursement Demand | 2.7(c) |
| Round Leading Bid | 6.3(c)(v) |
| Sale and Bidding Procedures Motion | 6.3(a) |
| Seller | Preamble |

| Term | Section |
|---|---|
| Subsequent Overbid Increment | 6.3(c)(v)(A) |
| Successful Bid | 6.3(c)(v) |
| Successful Bidder | 6.3(c)(vi) |
| Tax Claim | 7.1 |
| Taxing Authority | 1.1(jj) |
| Termination Date | 6.3(b)(ii)(B) |
| Term Sheet | 2.2(h) |
| Transactions | Recitals |
| Transfer Taxes | 7.2 |

## 2.    **Purchase and Sale**.

2.1    Purchase and Sale.  Subject to the terms and conditions set forth in this Agreement and the Approval Order, at the Closing, each Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from each Seller, all right, title and interest of such Seller as of the Closing Date in and to all of such Seller's properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller, including those that are listed in subsections (a) - (p) below, other than the Excluded Assets (the "Purchased Assets"), free and clear of all Liens (other than the Assumed Liabilities and Permitted Encumbrances).  The cost of collecting and removing the Purchased Assets from their various locations shall be borne by Purchaser; *provided*, *however*, each Seller shall, at its cost, use commercially reasonable efforts to assist Purchaser's efforts by enforcing the terms of this Agreement and the Approval Order against third parties.  Subject to Section 2.2, the Purchased Assets purchased hereunder shall include, without limitation, the following (except to the extent expressly included as an Excluded Asset):

(a)    the Acquired Owned Real Property set forth on Schedule 2.1(a); provided Purchaser may advise each Seller of any additions or deletions to Schedule 2.1(a) within two (2) Business Days before the Approval Hearing;

(b)    all rights of each Seller under the executory contracts and unexpired leases of Seller that are set forth on Schedule 2.1(b) not previously rejected pursuant to Section 365 of the Bankruptcy Code (collectively, the "Assumed Contracts"); provided Purchaser may advise each Seller of any additions or deletions to Schedule 2.1(b) within two (2) Business Days before the Approval Hearing;

(c)    all inventory of each Seller, wherever located, including, without limitation, that inventory set forth on Schedule 2.1(c), except to the extent contained in an Excluded Asset (collectively, the "Inventory");

(d)    any accounts receivable and all proceeds generated therefrom and existing as of Closing and all proceeds thereafter arising (the "Accounts Receivable");

(e)      all tangible personal property and intangible property whether located on Acquired Owned Real Property, Leased Real Property, other real property, in transit, or in the possession of any Person, including, but not limited to, all machinery, equipment, storage tanks and vessels, pumps, dispensers, displays, spare parts, signage, industry memorabilia, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies and other tangible personal property of any kind, including, without limitation, that set forth on Schedule 2.1(e);

(f)      all Permits set forth on Schedule 2.1(f) to the extent the same may be assigned consistent with their terms;

(g)      all Intellectual Property Rights, including, without limitation, the items set forth on Schedule 2.1(g); provided that Purchaser may advise Seller of any additions or deletions to Schedule 2.1(g) within two (2) Business Days before the Approval Hearing;

(h)      all open purchase orders with suppliers;

(i)      all cars, trucks, trailers, forklifts, other industrial vehicles, other motor vehicles, and boats and watercrafts whether powered or unpowered, including, without limitation, those set forth on Schedule 2.1(i), and any personal property located on or within such vehicles, boats and watercrafts;

(j)      all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Purchased Asset;

(k)      all books, records, files and papers of Seller relating to the Business or the Purchased Assets, including equipment logs, service books and records, operating guides and manuals, creative materials, customer lists advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to access such books, records, files, computer systems, and papers with reasonable notice;

(l)      all goodwill associated with the Business or the Purchased Assets, including, without limitation, all goodwill associated with the Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any of Sellers to the extent relating to the Purchased Assets, the Business, and/or the Assumed Liabilities (or any portion thereof);

(m)      all rights of Sellers under non-disclosure or confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, consultants, independent contractors and agents of any of Sellers;

(n)    all insurance policies and rights to proceeds thereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities, including, without limitation, all rights to defense and indemnity coverage, issued to Sellers that relate to the Purchased Assets, including, without limitation, the policies listed on Schedule 2.1(n);

(o)    all claims and causes of action arising on or prior to the Closing Date and relating to the other Purchased Assets, other than avoidance actions, commercial tort claims and any other Excluded Assets; and

(p)    all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person.

Notwithstanding anything herein to the contrary, Purchaser may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until the Closing (except that Purchaser may not add as a Purchased Asset anything specifically listed as an Excluded Asset below); and provided that no such addition shall result in any adjustment to the Purchase Price.  Furthermore, Purchaser may, from time to time, remove any Purchased Asset from this Section 2.1 (other than Inventory or Accounts Receivable) in its sole and absolute discretion until the Closing and elect to treat such removed asset as an Excluded Asset, provided that no such removal shall result in any adjustment to the Purchase Price other than as set forth in the definition of Purchase Price.

2.2    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "Excluded Assets") shall not be transferred, conveyed, sold or assigned to Purchaser, and the Purchased Assets shall not include any of the following assets of Sellers:

(a)    all cash, cash equivalents and bank deposits (including, without limitation, deposits posted as collateral for letters of credit) or similar cash items, provided, however, that all cash proceeds generated from the Sellers' accounts receivable are considered to be Purchased Assets and not Excluded Assets;

(b)    all deposit or prepaid charges and expenses paid exclusively in connection with or relating exclusively to any Excluded Assets;

(c)    all of the Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the Transactions contemplated herein;

(d)    all intercompany obligations, liabilities and indebtedness between the Sellers including, but not limited to, any and all promissory notes between the Sellers, any Affiliates and/or insiders and any note indebtedness owed to Sellers by any Affiliates or insiders;

(e)    any (i) books and records that Sellers are required by Law to retain; provided, however, that Purchaser shall have the right to make copies of any

portions of such retained books and records that relate to the Sellers or any of the Purchased Assets; (ii) minute books, stock or membership interest records and corporate seals; and (iii) documents relating to proposals to acquire the Purchased Assets by Persons other than Purchaser;

(f)    all Tax losses and Tax loss carry forwards of the Sellers and the rights to receive Tax refunds, credits and credit carry forwards with respect to any Taxes of the Sellers;

(g)    any claim, right or interest of the Sellers in or to any refund, rebate, abatement or other recovery for Taxes of the Sellers, together with any interest due thereon or penalty rebate arising therefrom, and all Tax credits and other Tax attributes of the Sellers, for the Pre-Closing Tax Period, but only to the extent the Tax in respect of which such refund or reimbursement is made was not borne by Purchaser or any of its Affiliates;

(h)    any stock or other equity interests in Sellers or any subsidiaries or Affiliates of the Sellers;

(i)    any and all commercial tort claims;

(j)    all avoidance actions and other causes of action under the Bankruptcy Code or similar state insolvency law; and

(k)    the California Real Estate, if (i) the Buyer is not the Successful Bidder with respect to such property after the Approval Hearing, in which event the proceeds of such sale received by JPMorgan (defined below) shall be applied to the Outstanding Loan Balance for purposes of determining the Purchase Price hereunder, or (ii) the Seller elects to exclude the California Real Estate from this sale with the prior written consent of JPMorgan.

2.3    "**AS IS, WHERE IS" SALE**.

(a)    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3 BELOW, THE PURCHASED ASSETS ARE BEING SOLD IN AN "AS IS" CONDITION, ON A "WHERE IS" BASIS AND "WITH ALL FAULTS" AS OF THE CLOSING DATE (AS DEFINED BELOW), AND SUCH SALE IS WITHOUT RECOURSE, REPRESENTATION, OR WARRANTY OF ANY KIND TO OR BY THE SELLERS, WHETHER EXPRESS, IMPLIED OR IMPOSED BY LAW, WHICH RECOURSE, REPRESENTATIONS, AND WARRANTIES (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW) ARE HEREBY EXPRESSLY DISCLAIMED BY PURCHASER.

(b)    PURCHASER ACKNOWLEDGES THAT IT IS FULLY RELYING ON ITS OWN (OR ITS REPRESENTATIVES') INSPECTIONS, EXAMINATIONS AND EVALUATIONS OF THE REAL ESTATE AND NOT

UPON ANY STATEMENTS (ORAL OR WRITTEN) THAT MAY HAVE BEEN MADE OR MAY BE MADE (OR PURPORTEDLY MADE) BY THE SELLERS OR ANY OF THEIR RESPECTIVE REPRESENTATIVES, AGENTS OR ATTORNEYS EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS (OR PURCHASER'S REPRESENTATIVES HAVE), OR PRIOR TO THE CLOSING DATE WILL HAVE, INSPECTED AND EXAMINED THE REAL ESTATE TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE CONDITION OF THE REAL ESTATE AND ALL OTHER ASPECTS OF THE REAL ESTATE (INCLUDING, BUT NOT LIMITED TO, THE ENVIRONMENTAL CONDITION OF THE REAL ESTATE), AND PURCHASER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW, PURCHASER IS RELYING SOLELY UPON ITS OWN (OR ITS REPRESENTATIVES') INSPECTION, EXAMINATION AND EVALUATION OF THE REAL ESTATE AND IS QUALIFIED TO MAKE SUCH INSPECTION, EXAMINATION AND EVALUATION. AS A MATERIAL PART OF THE CONSIDERATION OF THIS AGREEMENT AND THE PURCHASE OF THE ACQUIRED OWNED REAL PROPERTY, PURCHASER HEREBY AGREES TO ACCEPT THE ACQUIRED OWNED REAL PROPERTY ON THE CLOSING DATE IN ITS "AS IS, WHERE IS" CONDITION, WITH ALL FAULTS AND, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT THE SALE OF THE ACQUIRED OWNED REAL PROPERTY IS WITHOUT ANY WARRANTY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW, AND THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW, THE SELLERS HAVE NOT MADE ANY, AND EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL, REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW OR RELATING TO THE ACQUIRED OWNED REAL PROPERTY, INCLUDING, WITHOUT LIMITATION, OF OR RELATING TO (EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN **SECTION 3** BELOW): (A) THE OWNERSHIP, USE, INCOME, POTENTIAL, EXPENSES, OPERATION, CHARACTERISTICS OR CONDITION OF THE ACQUIRED OWNED REAL PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF SUITABILITY, HABITABILITY, MERCHANTABILITY, DESIGN OR FITNESS FOR ANY SPECIFIC PURPOSE OR A PARTICULAR PURPOSE; (B) THE NATURE, MANNER, OR CONDITION (PHYSICAL, STRUCTURAL OR OTHERWISE) OF THE ACQUIRED OWNED REAL

PROPERTY, OR THE SURFACE OR SUBSURFACE THEREOF, WHETHER OR NOT OBVIOUS, VISIBLE OR APPARENT; (C) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED OWNED REAL PROPERTY AND THE PRESENCE OR ABSENCE OF OR CONTAMINATION BY HAZARDOUS MATERIALS, OR THE COMPLIANCE OF THE ACQUIRED OWNED REAL PROPERTY WITH ALL REGULATIONS OR LAWS PERTAINING TO HEALTH OR THE ENVIRONMENT, INCLUDING, BUT NOT LIMITED TO, ENVIRONMENTAL LAWS; AND (D) THE SOIL CONDITIONS, DRAINAGE, FLOODING CHARACTERISTICS, UTILITIES OR OTHER CONDITIONS EXISTING IN, ON OR UNDER THE ACQUIRED OWNED REAL PROPERTY. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

2.4     Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, (i) the accrued and accruing liabilities and obligations of Sellers or the Business arising under the Assumed Contracts and Permits (including, without limitation, all Cure Costs), (ii) all other Liabilities consisting of amounts Purchaser has expressly agreed to pay hereunder and (iii) all accrued and unused paid-time off with respect to any employee of the Business that accepts employment with the Purchaser within ten (10) days after the Closing (collectively, the "Assumed Liabilities") in each case, but in no event to include any Liabilities or obligations of any Seller or its Affiliates (i) that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date or (ii) for which all necessary consents and Bankruptcy Court approval to transfer have not been obtained.

2.5     Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter.  All such other Claims and obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain obligations and Liabilities of Sellers (all such Liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)     all Liabilities related to any Excluded Assets;

(b)     Trade Payables, except to the extent arising under Assumed Contracts;

(c)     all Liabilities for (i) Taxes of Sellers and (ii) any Taxes relating to or arising from the Business or one or more Purchased Assets for any Pre-Closing Tax Periods, provided that this shall exclude Transfer Taxes, which are addressed in Section 7.2;

(d)     all Post-Retirement Liabilities;

(e)      all Employee Benefit Plans and all Liabilities thereunder;

(f)      any WARN Act liability incurred in connection with the Transactions contemplated herein; and

(g)      any Liability based on successor liability theories, including, without limitation, product liability claims.

2.6      <u>Assumption/Assignment of Contracts and Rights</u>.

(a)      To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Sellers and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.  If such assignment is not effectuated pursuant to the Approval Order, Sellers shall, at the request of Purchaser, seek an Order from the Bankruptcy Court after the Closing Date to assign such Assumed Contracts to Purchaser.  All Cure Costs relating to the Assumed Contracts shall be paid by the Seller that is party to the Assumed Contract at issue.

(b)      Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract that, after giving effect to the provisions of Section 365 of the Bankruptcy Code, is not assignable or transferable without the consent of any Person, other than the Sellers and Purchaser, to the extent that such consent shall not have been given prior to the Closing, provided, however, that the Sellers shall use, whether before or after the Closing, reasonable efforts to obtain all necessary consents to the assignment and transfer thereof.

2.7      <u>Consideration; Allocation of Consideration; Adjustment of Purchase Price</u>.

(a)      <u>Purchase Price</u>.  In addition to the assumption of the Assumed Liabilities, the aggregate consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing, shall be an amount equal to the Purchase Price payable as follows: (i) One Million Five Hundred Thousand Dollars ($1,500,000) (the "<u>Deposit</u>") previously paid prior to the execution of this Agreement, and (ii) the remaining portion of the Purchase Price payable at the Closing. Except as set forth in section 6.3(e), the Deposit shall be non-refundable.

(b)      <u>Allocation</u>. Purchaser and Sellers agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with the allocation schedule (the "<u>Allocation Schedule</u>") to be mutually determined by Purchaser and Sellers on or before the Closing.  Purchaser and Sellers shall (and shall cause their respective Affiliates to) file all Tax Returns (including IRS Form 8954) and other Tax-related information reports in a manner consistent with the Allocation Schedule and not take any position inconsistent with such Allocation Schedule in any Tax-related audit, examination or other proceeding (whether administrative or judicial) unless required by applicable Law. If any Party receives any notice from a Taxing Authority in respect of an audit,

examination or other proceeding (whether administrative or judicial) regarding any allocation of the Purchase Price or otherwise proposing an allocation different from the Allocation Schedule, such Party shall notify the other Parties of such notice and provide such other Parties with a copy of such notice, and the Parties hereto shall cooperate with each other in good faith regarding the resolution of any such matter.

2.8    Closing.  The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Saul Ewing Arnstein & Lehr LLP, 161 North Clark Street, Suite 4200, Chicago, IL 60601 on the date of the Approval Order, or at such other time or place as Purchaser and Seller may agree.  The Parties may mutually agree to consummate the Closing electronically.

2.9    Deliveries by Seller.  At the Closing, each Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a)    the Approval Order;

(b)    a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A (the "Assignment and Assumption Agreement"), duly executed by Seller;

(c)    except to the extent that the California Real Estate is an Excluded Asset, a duly executed quitclaim deeds transferring fee simple title to the Acquired Owned Real Property to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(d)    originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto);

(e)    physical possession of all of the Purchased Assets capable of passing by delivery, with the intent that title in such Purchased Assets shall pass by and upon delivery;

(f)    a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(g)    an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance satisfactory to Purchaser, issued pursuant to Section 1445 of the Code and the Treasury regulations thereunder stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(h)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

(i)    any other documents, instruments and writings (x) reasonably requested by Purchaser to be delivered by the applicable Seller at or prior to Closing pursuant to this Agreement and (y) in each case, that are necessary to implement the transactions contemplated hereby or the agreements of the Parties set forth herein.

2.10    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Sellers (unless previously delivered) the following:

(a)    any unpaid portion of the Purchase Price; and

(b)    the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)    any other documents, instruments and writings (x) reasonably requested by each Seller to be delivered by Purchaser at or prior to Closing pursuant to this Agreement and (y) in each case, that are necessary to implement the transactions contemplated hereby or the agreements of the Parties set forth herein.

**3.    Representations and Warranties of Seller**.  Subject to the terms, conditions and limitations set forth in this Agreement, each Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1    <u>Power</u>.  Subject to the entry of an Approval Order (as defined below) by the Bankruptcy Court, each Seller has full legal capacity, right, power and authority to enter into this Agreement.

3.2    <u>Authorization</u>.  The execution, delivery and performance by each Seller of this Agreement and the consummation of the Transactions are within each Seller's powers and have been duly authorized by all necessary actions on the part of each Seller.  Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

3.3    <u>Governmental Authorization</u>.  The execution, delivery and performance by each Seller of this Agreement and the consummation of the Transactions by each Seller require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.4    <u>Non-contravention</u>.  Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by each Seller of this Agreement and the consummation of the Transactions do not and will not, to the Knowledge of Seller (a) assuming compliance with the matters referred to in <u>Section 3.3</u>, violate any applicable Law or (b) result in the creation or imposition of any Lien on any Purchased Asset, except for Assumed Liabilities, Permitted Encumbrance, or Liens that will be released at or prior to Closing.

3.5    <u>Required Consents</u>.  Except as disclosed on <u>Schedule 3.5</u> (which may be modified prior to the Closing Date), and except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, to the Knowledge of Seller, there is no agreement or other instrument binding upon any Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement.

3.6    <u>Litigation</u>.    Except as disclosed on <u>Schedule 3.6</u> and except for the Bankruptcy Cases, as of the date hereof, there is no action, suit, investigation or legal or administrative proceeding pending or, to the Knowledge of Seller, threatened against or affecting, the Purchased Assets (by any Governmental Authority or Person), including real estate tax assessment appeals, which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7    <u>Permits</u>.  <u>Schedule 2.1(f)</u> sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the pre-Petition Date practices of the Sellers.  Except as set forth on <u>Schedule 3.7</u>, to the Knowledge of the Seller, no written notice of violation of any Permit has been received from any Governmental Authority, and no proceeding is pending seeking to revoke or limit any such Permit.

3.8    <u>Compliance with Laws and Court Orders</u>.  No Seller is in material violation of any Law applicable to the Purchased Assets or the conduct of the Business.

3.9    <u>Intellectual Property Rights</u>.    To the Knowledge of Seller, (a) <u>Schedule 2.1(g)</u> sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets, and (b) there are no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.    To the Knowledge of Seller, none of the Intellectual Property Rights included in the Purchased Assets has been licensed by any Seller to any other Person.

3.10    <u>Environmental Matters</u>.  To the Knowledge of Seller, and other than as described on <u>Schedule 3.10</u>: (a)  no Seller has received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which remains unperformed, and (b) the Acquired Owned Real Property is in compliance, in all respects, with applicable Environmental Laws.

3.11    <u>Real Property</u>.  <u>Schedule 2.1(a)</u> sets forth the address and description of all Acquired Owned Real Property.  With respect to each parcel of Acquired Owned Real Property, to the Knowledge of Seller and except as set forth on <u>Schedule 2.1(a)</u>, (a) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (b) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and

(c) there are no condemnation or eminent domain proceedings pending or threatened with respect to all or any part of the Acquired Owned Real Property.

3.12    <u>Employment Matters and Employee Benefits</u>. To the Knowledge of Seller, (a) <u>Schedule 3.12</u> sets forth a complete and accurate list of each Seller's Employee Benefit Plans; (b) with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law; (c) there are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and there are no pending or threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor is there any reasonable basis for any such claim, suit or proceeding; and (d) each Seller has performed all material obligations required to be performed by them and are not in any material respect in default under or in violation of any Employee Benefit Plan, nor has there been any such material default or violation by any other party to any Employee Benefit Plan.

3.13    <u>Taxes</u>.    To the Knowledge of Seller, and other than as described on <u>Schedule 3.13</u>, all Tax Returns (including any IRS Forms W-2 or Forms 1099) required to be filed by or on behalf of the Sellers (or any predecessor of the Sellers) and all Tax Returns required to be filed in respect of any Purchased Asset have been timely filed; *provided*, *however*, no Seller makes any representations regarding the accuracy of such Tax Returns.

3.14    <u>Sufficiency of and Title to the Purchased Assets</u>.  Each Seller with respect to the assets such Seller purports to own, will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all the Purchased Assets.

3.15    <u>Insurance</u>.  As of the date hereof, to the Knowledge of Seller, all material property and liability insurance policies set forth on <u>Schedule 3.15</u> are in full force and effect, and no written notice of cancellation, termination or revocation or other written notice that any such insurance policy is no longer in full force or effect or that the issuer of any such insurance policy is not willing or able to perform its obligations thereunder has been received by any Seller.  All premiums due and payable on such insurance policies have been paid in full.

3.16    <u>Service of Bankruptcy Documents</u>.  Each Seller that is a Debtor shall appropriately and timely serve all parties in interest and lienholders with copies of the Sale and Bidding Procedures Motion and applicable notices as may be required by the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court.

3.17    <u>Certain Fees</u>.  Except for SSG Capital Advisors, no agent, broker, investment banker or other person or firm acting on behalf of any Seller or the Debtors, or under their authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from any Seller in connection with this Agreement or the Transactions.

Except as specifically set forth in this <u>Section 3</u>, the Sellers do not make any representations or warranties of any kind to Purchaser.

**4.**      **Representations and Warranties of Purchaser**.    Purchaser represents and warrants to Sellers as follows:

4.1      <u>Organization</u>.    Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2      <u>Corporate Authorization</u>.    The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions are within the requisite power and authority of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser.  This Agreement constitutes a valid and binding agreement of Purchaser that is enforceable in accordance with its terms.

4.3      <u>Governmental Authorization</u>.    The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material effect on Purchaser or its ability to close the Transactions.

4.4      <u>Non-contravention</u>.    Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any Permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, any Seller.

4.5      <u>Litigation</u>.    There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.6      <u>Adequacy of Funds</u>.    At the time of Closing, Purchaser will have available to it on an unconditional basis cash proceeds in an amount sufficient to satisfy its monetary and other obligations under this Agreement, including, without limitation, the obligation to pay the Purchase Price in accordance herewith.

5.      **Covenants of Seller**.  Each Seller agrees that:

5.1      Access to Information.  From the date hereof until the earlier of the termination of this Agreement pursuant to Section 9.1 or the Closing Date, each Seller shall reasonably afford to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to and all properties, books, accounts, records and documents of, or relating to, the Business.

5.2      Sales of *De Minimis* Assets.  From the execution of this Agreement through the Closing Date, each Seller shall cease all asset sales outside the ordinary course of its business, including *de minimis* asset sales, through the Bankruptcy Court or otherwise.

5.3      Notices of Certain Events.  Each Seller shall promptly notify Purchaser of:

(a)      any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

(b)      any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

(c)      the commencement of any actions, suits, investigations or proceedings relating to Seller, any Purchased Asset or the Business that, if pending on the date of this Agreement, would have resulted in a breach of any representation contained in Section 3.

6.      **Covenants of Purchaser and Seller**.  Purchaser and each Seller agree that:

6.1      Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and each Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Laws to consummate the Transactions contemplated by this Agreement. Each Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

6.2      Certain Filings.  Each Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking to timely obtain any such actions, consents, approvals or waivers.

6.3    <u>Bankruptcy Issues</u>.

(a)    <u>Filing of Sale and Bidding Procedures Motion</u>.  Within three (3) Business Days of the date of this Agreement, Debtors shall file with the Bankruptcy Court a motion (the "<u>Sale and Bidding Procedures Motion</u>") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "<u>Bidding Procedures Order</u>") approving the bidding and auction procedures set forth in Sections 6.3(b) and <u>(c)</u> (the "<u>Bidding Procedures</u>").

(b)    <u>Bidding Procedures</u>.  In the Sale and Bidding Procedures Motion, Debtors shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)    <u>Bidding Deadline</u>.  Any third party (other than Purchaser) (a "<u>Bidder</u>") must submit a bid (the "<u>Bid</u>") in accordance with the terms of the Bidding Procedures so that the Bid is actually received by each of the Notice Parties no later than 10:00 a.m. (prevailing Pacific time) on or before September 23, 2020 (the "<u>Bid Deadline</u>").  Written copies of all Bids shall be delivered by the Bid Deadline to:  (A) counsel to Sellers, Saul Ewing Arnstein & Lehr LLP, 161 North Clark Street, Suite 4200, Chicago, IL 60601, Attn: Michael L. Gesas, michael.gesas@saul.com; (B) counsel to JPMorgan Chase Bank, N.A., Goldberg Kohn Ltd., 55 East Monroe Street, Suite 3300, Chicago, IL 60603, Attn: Jeremy M. Downs, Jeremy.downs@goldbergkohn.com; and (C) counsel to the Official Committee of Unsecured Creditors, Brown Rudnick LLP, 2211 Michelson Drive, Seventh Floor, Irvine, CA 92612, Attn: Cathrine M. Castaldi, ccastaldi@brownrudnick.com (collectively, the "<u>Notice Parties</u>").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.  A Bid shall be delivered to all Notice Parties at the same time.  Each Seller shall deliver to the Notice Parties, at least forty-eight (48) hours prior to the Auction, written confirmation from each Seller that it has a good faith basis to believe the Bidder has a sufficient commitment for financing pursuant to Section 6.3(b)(ii)(D) hereof.  Interested Bidders requesting information about the qualification process, including a copy of this Agreement, and information in connection with their due diligence, should contact Seller's counsel at the above address.

(ii)    <u>Designation as Qualified Bidder</u>.  To participate in the Auction, a Bidder must submit a Bid that is determined by Seller to satisfy each of the following conditions (a "<u>Qualified Bid</u>" and the entity submitting such Qualified Bid, a "<u>Qualified Bidder</u>"):

(A)    <u>Written Submission of Modified APA and Commitment to Close</u>.  Bidders must submit a Bid by the Bid Deadline in the form of an executed mark-up of this Agreement (each a "<u>Modified APA</u>") reflecting such Bidder's proposed changes to this Agreement (together with a blackline of the Modified APA against this Agreement),

and a written and binding commitment to close on the terms and conditions set forth therein. Sellers may discuss the Modified APA of any Bidder after submission with such Bidder including, for clarification, the terms and conditions of the Modified APA. Each Modified APA shall (I) have substantially similar terms and conditions (provided that no Bid other than this Agreement may provide for payment of any break-up fee, expense reimbursement, or similar type of payment) as this Agreement except with higher and better consideration; and (II) contain terms and conditions in the aggregate no less favorable to the Debtors' estates than the terms and conditions in this Agreement; provided, however, the Sellers shall have the sole discretion to solicit bids for the sale of the Purchased Assets without the California Real Estate (any such bid, a "Non-Real Estate Bid") in accordance with the Bidding Procedures Order and the Bidding Procedures, and to solicit bids for the California Real Estate separately in accordance with the Bidding Procedures Order and the Bidding Procedures (any such bid, a "Real Estate Only Bid"). In order for a Modified APA to be deemed a Qualified Bid, it must provide for the acquisition of all of the Purchased Assets, or contain a Non-Real Estate Bid or a Real Estate Only Bid;

(B)     Irrevocable. A Bid must be irrevocable until four (4) Business Days after entry of the Approval Order (the "Termination Date");

(C)     Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other contingencies associated with a Bid may not, in the aggregate, be materially more burdensome than those set forth in this Agreement;

(D)     Financing Sources and Evidence of Financial Ability to Close. A Bid must identify the actual Bidder and owners and ultimate parent company of the Bidder and contain written evidence of a commitment for financing or other evidence of the ability to fund and consummate the Sale on or before a closing date satisfactory to Seller with appropriate contact information for such financing or funding sources;

(E)     No Fees Payable to Bidder. A Bid may not request, be conditioned on or otherwise entitle the Bidder (other than Purchaser) to any break-up fee, expense reimbursement or similar type of payment. A Bidder shall be deemed to waive the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Procedures;

(F)     Good-Faith Deposit. Each Bid must be accompanied by a cash deposit in an amount equal to five percent (5%) percent in cash of the cash and the value of the non-cash purchase price allocated to the Purchased Assets under the Modified APA, which shall be paid to Seller to

be held in an escrow account established at JPMorgan Chase Bank, N.A. in accordance with the Bidding Procedures;

(G) <u>Minimum Initial Overbid</u>. The aggregate consideration in a Bid must have a cash purchase price for the Purchased Assets of at least $34,500,000 <u>plus</u> $250,000, <u>less</u> $1,650,000 if such Bid is a Non-Real Estate Bid; <u>provided</u>, that with respect to a Real Estate Only Bid, the aggregate consideration in a Bid must be not less than $1,650,000 (as applicable, the "<u>Minimum Initial Overbid</u>");

(H) <u>List of Executory Contracts and Unexpired Leases</u>. Each Bid must be accompanied by a list of Debtors' executory and unexpired leases that the Bidder desires to assume and a packet of information, including financial information, that will be provided to the non-Debtor parties to such executory contracts and unexpired leases sufficient to demonstrate adequate assurance of future performance; and

(I) <u>JPMorgan Chase Bank</u>. Notwithstanding anything set forth hereunder, JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") shall automatically be deemed to be a Qualified Bidder hereunder without taking any actions otherwise required to be taken under this <u>Section 6.3</u>, shall have consultation rights throughout the Bid process, shall have the right to attend and participate at the Auction without having submitted a Qualified Bid, and shall be a third-party beneficiary to the Bid procedure in the same way as Purchaser. Notwithstanding anything set forth hereunder, nothing herein shall alter or modify the rights of JPMorgan under Section 363(k) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, (i) JPMorgan shall not exercise its credit bid rights to make the Minimum Initial Overbid; and (ii) any credit bid by JPMorgan shall contain a stipulation and agreement with Seller providing for the consensual use of cash collateral by Seller to pay the Break-Up Fee to Purchaser and JPMorgan shall enter into a stipulation and agreement with Seller that JPMorgan to permit such payment by Seller.

(iii) <u>Due Diligence from Bidders</u>. Each Qualified Bidder shall comply with all reasonable requests for additional information by Seller regarding such Bidder and its contemplated transaction. Failure by a Bidder to comply with requests for additional information will be a basis for Seller to determine that the Bidder is not a Qualified Bidder. Seller acknowledges that Purchaser is a Qualified Bidder and that this Agreement constitutes a Qualified Bid.

(c) <u>Auction</u>. The Sellers shall conduct an auction sale of the Purchased Assets to determine the highest and/or best Bid with respect to the Purchased Assets (the "<u>Auction</u>") only if it receives, prior to the Bid Deadline, a Qualified Bid (other than this Agreement) for the entirety of the Purchased Assets. The Auction shall commence at 10:00 am Central Time on September 24, 2020 at the offices of Saul Ewing Arnstein & Lehr LLP, 161 North Clark Street, Suite 4200, Chicago, IL

60601.  If no such Qualified Bid(s) is/are received by the Bid Deadline, then the Auction shall not take place, Purchaser shall be declared the Successful Bidder, and Seller shall seek approval of, and authority to consummate, this Agreement and the Transactions at the Approval Hearing.  If a Qualified Bid(s) is/are received in accordance with these Bidding Procedures, the Auction shall be conducted according to the following procedures:

> (i)    Participation at the Auction.  Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  For greater certainty, Purchaser is a Qualified Bidder and eligible to participate at the Auction.  Only the authorized representatives (including counsel and other advisors) of each of the Purchaser, Qualified Bidders, Sellers, JPMorgan, the Committee and any other party in interest or its representative who provide Sellers with written notice forty-eight (48) hours prior to the Auction shall be permitted to attend the Auction.  During the Auction, the bidding shall begin with the highest Qualified Bid (the "Opening Bid") and each subsequent round of bidding shall continue in minimum increments of at least the Subsequent Overbid Increment.  At least one (1) Business Day prior to the start of the Auction, Sellers shall provide a copy of the Opening Bid to all participating Qualified Bidders attending the Auction and a blackline of the Opening Bid to this Agreement.  Sellers shall select the Opening Bid, in their discretion but after consultation with JPMorgan and any Committee.  The determination of which Qualified Bid constitutes the Opening Bid shall take into account any factors Seller reasonably deems relevant to the value of the Qualified Bid to Sellers including, among other things, the following:  (A) the amount and nature of the consideration; (B) the proposed assumption of liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from this Agreement, if any, contemplated by the contemplated transaction documents (the "Contemplated Transaction Documents"); (H) the net after-Tax consideration to be received by Seller; (I) the net amounts to be paid to the Debtors' estates, taking into account, among other things, payment of the Break-Up Fee and Cure Costs; and (J) such other considerations as Seller deems relevant in its reasonable business judgment (collectively, the "Bid Assessment Criteria").

> (ii)    Authority to Bid.  All representatives of Qualified Bidders who submit any bids at the Auction shall represent on the record that they have authority to bid and that the Bid they submit is binding on the Qualified Bidder.

> (iii)    Conduct of the Auction.  Sellers and their advisors shall direct and preside over the Auction.  All Bids made after the Opening Bid shall be Overbids (as defined below), and shall be made and received on an

open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders that are participating in the Auction. Each Qualified Bidder will be permitted a fair, but limited amount of time to respond to each Overbid. Sellers shall maintain a transcript of the Opening Bid and all Overbids made and announced at the Auction, including the Successful Bid and the Back-up Bid;

(iv)    Terms of Overbids. An "Overbid" is any Bid made at the Auction subsequent to Sellers' announcement of (A) the Opening Bid, and (B) the then highest and/or best Overbid at the beginning of each subsequent round of bidding (the "Round Leading Bid"). To submit an Overbid, in any round of the Auction, a Qualified Bidder must comply with the following conditions:

(A)    Subsequent Overbid Increment. Any Overbid with respect to Bids for all the Purchased Assets and for any Non-Real Estate Bids shall be made in increments of at least two hundred thousand dollars ($200,000) (the "Subsequent Overbid Increment"). Bidding increments regarding any Real Estate Only Bids must be in accordance with the terms of the Bidding Procedures Order. The amount of the Purchase Price of any Overbid shall not be less than the Purchase Price of the Opening Bid or the Round Leading Bid, as applicable.

(B)    Remaining Terms the Same as for Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid and the Minimum Initial Overbid requirements shall be replaced with the Subsequent Overbid Increment requirements set forth above; provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until the Termination Date. Sellers shall credit the amount of the Break-Up Fee to each and every Overbid submitted by Purchaser at the Auction, meaning that if Purchaser's subsequent Overbid is the Round Leading Bid, any subsequent Overbid must exceed Purchaser's Overbid by the amount of the Break-Up Fee and Subsequent Overbid Increment. To the extent not previously provided (which shall be determined by Sellers), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to Seller in its reasonable business judgment) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(C)    Announcing Overbids. At the start of each round of bidding, Sellers shall announce the Round Leading Bid, the basis for calculating the total consideration offered in the Round Leading Bid, and the resulting benefit to Sellers based on, among other things, the Bid Assessment Criteria.

(v)     Closing the Auction.  Upon conclusion of the bidding, the Auction shall be closed, and Sellers shall identify the highest and/or best Overbid or Opening Bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder"), and the next highest and/or best Overbid or Opening Bid, after the Successful Bid (the "Back-up Bid"), and advise the remaining Qualified Bidders of such determination.  All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "Approval Hearing").  If the Successful Bidder fails to close on the Successful Bid, the Back-up Bid shall automatically be deemed to be the winning Bidder.

(d)     Consent to Jurisdiction as Condition to Bid.  All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.  Qualified Bidders (other than Purchaser) shall not be deemed third party beneficiaries of these Bidding Procedures and shall not have standing to object to the administration of the Bidding Procedures by Sellers.

(e)     Reimbursement of Deposit; Break-Up Fee.  Upon consummation of a sale of all or substantially all of the Purchased Assets (without regard to whether the California Real Estate is included in such sale) to any third party (other than Purchaser) who submits the Successful Bid for the Purchased Assets, upon the occurrence of the actions set forth in Sections 9.1(d) or 9.1(g), or if Sellers commits a material breach of this Agreement or unilaterally abandon consummation of the Transactions contemplated by this Agreement, Sellers shall (i) pay to Purchaser in immediately available funds an amount equal to the Break-Up Fee, and (ii) refund the Deposit.  Upon the occurrence of the actions set forth in Sections 9.1(a) or 9.1(b), Sellers shall refund the Deposit  The provisions of this Section 6.3(e) shall survive any termination of this Agreement.  The Break-Up Fee shall be treated as a senior priority postpetition debt under Section 364(d) of the Bankruptcy Code in the Bankruptcy Cases.  The Break-Up Fee shall be paid to Purchaser upon the earlier to occur from (x) the closing of the sale of all or substantially all of the Purchased Assets to any third party (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee, which shall be entitled to senior priority over such sale proceeds), or (y) the Closing of the Bankruptcy Cases.  The obligation to pay the Break-Up Fee and Deposit under this Agreement shall be absolute and unconditional and shall not be subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever, provided, however, that, for the avoidance of doubt and notwithstanding anything herein to the contrary, the Break-Up Fee shall only be payable if approved by the Bankruptcy Court. Purchaser's right to the Break-Up Fee shall be the sole and exclusive remedy of Purchaser in the event Sellers materially breaches this Agreement or if this Agreement is terminated by Sellers.

(f)    <u>Bankruptcy Court Approval of Sale</u>.  Sellers and Purchaser shall each use their reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order or Orders (collectively, the "<u>Approval Order</u>") of the Bankruptcy Court in the Bankruptcy Cases in form and substance acceptable to Sellers and Purchaser containing provisions, including without limitation, (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Transactions, (v) approving the Break-Up Fee, (vi) providing that the net sale proceeds be used to pay the claims of JPMorgan against the Debtors, and (vii) providing that this Agreement and the Transactions are undertaken by Purchaser and Sellers at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Sellers are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable.  Sellers and Purchaser shall cooperate with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intends to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

6.4    <u>Notices</u>.  If at any time (a) Purchaser becomes aware of any material breach by any Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by such Seller, or (b) any Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 10.1</u>, in writing of such breach.  Upon notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

6.5    <u>Employee Matters</u>.

(a)    Not later than ten days prior to the Auction, Purchaser shall offer (or cause a designee of Purchaser to offer) to employ such current employees (including employees on temporary leave of absence) as it elects (i) to operate the Business, with employment commencing as of the Closing Date or (ii) to be employed in the Purchaser's corporate offices with employment commencing on the Closing Date.  For purposes of this Agreement, each current employee who receives such an offer of employment shall be referred to as an "<u>Offeree</u>."  Prior to the Closing Date, Purchaser will provide Sellers with a schedule setting forth a list of the names of all Offerees.  Purchaser will have reasonable access to the personnel records (including performance appraisals, disciplinary actions, grievances and medical records) of each Seller before Closing.  Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "<u>Transferred Employee</u>."  Effective immediately before the Closing, Purchaser will offer employment to each of the Transferred Employees.  Sellers shall promptly pay when due any deferred payroll Taxes associated with wages incurred or paid prior to the Closing Date.  Each offer to an Offeree shall be on such terms as is acceptable to the Purchaser.

(b)     Each current employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)     Notwithstanding anything in this Agreement to the contrary and unless otherwise agreed to by Sellers and Purchaser,

(d)     Payment Responsibility.

(i)     Sellers shall be responsible for or to (A) process the payroll for and pay, or cause to be paid, the base wages, base salary and benefits and other remuneration that are due and payable on or prior to the Closing Date with respect to all employees of Sellers, (B) the payment of any termination or severance payments, if any, and (C) the provisions of health plan continuation coverage in accordance with the requirements of COBRA and ERISA for the Excluded Employees.  Sellers shall withhold and remit all applicable payroll taxes as required by Law on or prior to the Closing Date with respect to all employees of Sellers as of such date.  Each Seller shall deposit with, or pay, the applicable taxing authority any deferred payroll Taxes associated with wages incurred or paid prior to the Closing Date and any other Taxes on or with respect to the Acquired Assets with respect to the Pre-Closing Tax Period that were permitted to be deferred under applicable law; and

(ii)    Purchaser shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Closing Date with respect to all Transferred Employees. Purchaser shall withhold and remit all applicable payroll taxes as required by Law after the Closing Date with respect to Transferred Employees. Nothing contained herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring, Purchaser to continue any specific employee benefit plan (other than Purchaser's assumption of the paid-time off liability and any liability for bonuses payable to Transferred Employees of the Sellers) or to continue the employment of any specific person.  Nothing in this Agreement is intended to establish, create or amend, nor shall anything in this Agreement be construed as establishing, creating or amending, any employee benefit plan, practice or program of Purchaser, any of its Affiliates or any of Sellers' Employee Benefit Plans, nor shall anything in this Agreement create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(e)     Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote, or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

(f)        Purchaser shall not have any responsibility, liability, or obligation, whether to Transferred Employees, Excluded Employees, former employees, their beneficiaries or to any other Person, with respect to any employee benefit plans, practices, programs or arrangements (including the establishment, operation or termination thereof and the notification and provision of COBRA coverage extension) maintained by Sellers, except that Purchaser shall be required to assume Sellers' obligations with respect to any unpaid bonus payments and paid-time off earned by Transferred Employees prior to the Closing Date.

**7.        Tax Matters**.

7.1        <u>Tax Cooperation</u>.  Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Returns, the making of any election relating to Taxes, the preparation for any audit or examination by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Sellers and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business (each, a "<u>Tax Claim</u>"), provided that Sellers shall (a) promptly notify Purchaser of any notice received in respect to any Tax Claim, (b) promptly notify Purchaser of any significant developments regarding such Tax Claim, (c) permit Purchaser (if Purchaser so chooses) to control the defense and/or resolution of any Tax Claim if any resolution or settlement of such Tax Claim reasonably could be expected to have an effect on Purchaser, any of Purchaser's Affiliates or any Purchased Asset for any taxable period, (d) take all actions and cooperation reasonably necessary in furtherance of the immediately preceding clause (c), and (e) not settle or otherwise resolve any Tax Claim without the prior written consent of Purchaser.

7.2        <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement (collectively, "<u>Transfer Taxes</u>") shall be split equally between each Seller on the one hand and Purchaser on the other hand, and Purchaser shall file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other taxes and fees, and if required by applicable law, the Sellers shall join in the execution of any such Tax Returns and other documentation.  The cost of filing any such tax returns shall be split equally between each Seller on the one hand and Purchaser on the other hand.

7.3        <u>Real Property Taxes</u>.  Real estate Taxes and water and sewer rents, if any, shall be apportioned and pro-rated between each Seller and Purchaser as of the Closing Date. All state, county and local realty, conveyance, recordation and/or documentary Transfer Taxes shall be split equally between the Purchaser on the one hand and each Seller on the other hand. Any real estate Taxes not known or estimated at the Closing and/or real estate Taxes readjusted by municipal authorities after the Closing shall be re-prorated when the amount thereof becomes known.

7.4    <u>Personal Property, Ad Valorem and Excise Taxes</u>.  Purchaser shall not be liable for any unpaid personal property, ad valorem or excise taxes assessed or due to be paid prior to the Closing Date.

**8.    Closing Conditions**.

8.1    <u>Conditions to Obligations of Purchaser and each Seller</u>.  The obligations of Purchaser and each Seller to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date, the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

8.2    <u>Conditions to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Each Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)    As of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in <u>Section 3.1</u>, <u>Section 3.2</u> or <u>Section 3.3</u> shall be true and correct in all material respects, and (ii) each other representation or warranty set forth in <u>Section 3</u> shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; <u>provided</u>, <u>however</u>, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(c)    Purchaser shall have received all of the documents required to be delivered by each Seller under <u>Section 2.9</u>.

8.3     Conditions to Obligations of Seller.    The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)     as of the Closing (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1, Section 4.2 or Section 4.4 shall be true and correct in all material respects, and (ii) each other representation or warranty set forth in Section 4 shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(c)     Seller shall have received all of the documents required to be delivered by Purchaser under Section 2.10.

## 9.     Termination.

9.1     Grounds for Termination.    This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Sellers and Purchaser;

(b)     by Sellers or Purchaser, if the Closing shall not have been consummated on or before the one hundred twentieth day after the Petition Date (the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c)     by Sellers or Purchaser, if any condition set forth in Section 8.1 is not satisfied, and such condition is incapable of being satisfied by the End Date; provided, however, that (i) Sellers shall not have the right to terminate this Agreement under this Section 9.1(c) if, at the time of such termination, any Seller is in material breach of any provision of this Agreement; and (ii) Purchaser shall not have the right to terminate this Agreement under this Section 9.1(c) if, at the time of such termination, Purchaser is in material breach of any provision of this Agreement;

(d)     by Purchaser, if any condition set forth in Section 8.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date; provided, however, that Purchaser shall not have the right to terminate this

Agreement under this <u>Section 9.1(d)</u> if, at the time of such termination, Purchaser is in material breach of any provision of this Agreement;

(e)    by Purchaser, if (i) the DIP Agreement does not close within twenty-eight (28) days of the Petition Date, or (ii) the "Commitment" as defined in the DIP Agreement as in effect on the closing of the DIP Agreement exceeds $35 million (exclusive of the Closing Date Accrual Advance and the Post-Closing Fund advance as such terms are defined in the Final DIP Order), unless otherwise agreed to in writing between Purchaser and Sellers;

(f)    by Sellers, if any condition set forth in <u>Section 8.3</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date; <u>provided</u>, <u>however</u>, that Sellers shall not have the right to terminate this Agreement under this <u>Section 9.1(f)</u> if, at the time of such termination, any Sellers are in material breach of any provision of this Agreement;

(g)    by Sellers, if (i) Sellers execute a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> (other than pursuant to <u>Section 9.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 10.1</u>.

9.2    <u>Effect of Termination</u>.  If this Agreement is terminated as permitted by <u>Section 9.1</u>, such termination shall be without Liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Section 6.3(e)</u>.  The provisions of <u>Section 6.3(e)</u> shall survive any termination hereof pursuant to <u>Section 9.1</u>.

9.3    <u>Fees and Expenses</u>.  Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

**10.    Miscellaneous**.

10.1    <u>Notices</u>.  All notices, requests and other communications to any Party hereunder shall be in writing (including via electronic mail) and shall be given,

if to Purchaser, to:

JRC Opco LLC
10800 Biscayne Blvd., Ste. 870
Miami, FL 33161
Attention:  Jose Carrero
Email Address: jcarrerohd@gmail.com

with a copy to (which shall not constitute notice):

> Peter J. Roberts
> Fox Rothschild LLP
> 321 North Clark St., Ste. 1600
> Chicago, IL 60654
> Email Address: proberts@foxrothschild.com

if to Sellers, to:

> Metal Partners Rebar LLC
> 10800 Biscayne Blvd., Ste. 870
> Miami, FL 33161
> Attention: Joseph Tedesco
> Email Address: tededsco@metalpi.com

with a copy to (which shall not constitute notice):

> Michael L. Gesas
> Saul Ewing Arnstein & Lehr LLP
> 161 North Clark St., Ste. 4200
> Chicago, IL 60601
> Email Address: michael.gesas@saul.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

10.2    Limitation on Damages. No Party shall be authorized to recover from the other Party any special, consequential, exemplary or punitive damages on account of any breach of this Agreement.

10.3    Waivers. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

10.4    Successors and Assigns. No Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party; provided that (a) Purchaser shall have the right to designate one or more wholly owned subsidiaries or Affiliates to take title to the Purchased Assets at the Closing and (b) Purchaser and/or its Affiliates may collaterally assign for security purposes, to any lender that from time to time provides financing in connection with the transactions contemplated hereby, this Agreement and/or any and all of its rights and interests hereunder without the consent of any other Party hereto, in each case with respect to the foregoing

clauses (a) and (b), so long as Purchaser remains liable for all of its obligations hereunder. Subject to the foregoing, all of the terms and provisions of this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective, heirs, successors and permitted assigns.

      10.5   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Illinois and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

      10.6   <u>Jurisdiction</u>.

      (a)     Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

      (b)     After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Nevada, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.1</u> shall be deemed effective service of process on such Party.

10.7   Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

10.8   No Third-Party Beneficiaries. Other than as set forth in Section 10.10(a), no provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

10.9   Entire Agreement; Amendments; Counterparts. This Agreement (including the Schedules and Exhibits hereto) sets forth the entire agreement between the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and each Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto. In the event of any conflict or inconsistency between the statements in this Agreement and the Bidding Procedures, the statements in this Agreement shall control.

10.10   Pre-Petition Secured Party.

(a)   Notwithstanding anything to the contrary herein, JPMorgan Chase Bank, N.A. (the "Pre-Petition Secured Party") will be deemed a third-party beneficiary hereunder entitled to exercise and enforce any and all rights, powers, privileges and remedies of Sellers pursuant to this Agreement or any other agreement, instrument or document executed in connection herewith. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or in any other agreement, instrument or document executed in connection herewith, Sellers will not exercise any right to terminate, or execute and deliver or otherwise provide any waivers, consents or amendments under, this Agreement or any of the other agreements, instruments or documents executed in connection herewith, without the prior written consent of the Pre-Petition Secured Party (which shall not be unreasonably withheld, conditioned or delayed).

(b)   Notwithstanding anything to the contrary in this Agreement or any other agreement, instrument or document executed in connection herewith, the Pre-Petition Secured Party (i) is not making any representations or warranties to any or all of Sellers, Purchaser or any of their respective Affiliates in connection with this Agreement or any other agreement, instrument or document executed in connection herewith, or the transactions contemplated herein or therein, (ii) will not be liable to any Person for any breach by any or all of Sellers, Purchaser or any of their respective Affiliates or any of their respective representations, warranties, covenants or other agreements in connection with this Agreement or any other agreement, instrument or document executed in connection herewith or any of the

Transactions contemplated herein or therein, and (iii) will not have any obligations or liabilities under or in respect of any of this Agreement or any other agreement, instrument or document executed in connection herewith or any of the Transactions contemplated herein or therein, other than the release of any mortgages, security interests, Liens and the like. Without limiting the generality of the foregoing, provided the Approval Order is entered, under no circumstances will the Pre-Petition Secured Party be obligated to return or otherwise disgorge to or for the benefit of Purchaser or any Affiliate thereof any proceeds remitted to the Pre-Petition Secured Party, other than the Break-Up Fee (if applicable) if the Pre-Petition Secured Party receives all net proceeds from the closing of a Successful Bid to a third party.

10.11    Headings; Interpretation.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.  Unless the context otherwise clearly requires, references herein to words importing the masculine gender shall include the feminine and neutral genders and vice versa.

[*Signature page follows*.]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PURCHASER:**

**JRC OPCO LLC**

By:_____
Name:
Title:

**SELLERS:**

**METAL PARTNERS REBAR, LLC**

By:_____
Name:
Title:

**BRG HOLDING, LLC**

By:_____
Name:
Title:

**BGD LV HOLDING, LLC**

By:_____
Name:
Title:

**BCG OWNCO, LLC**

By:_____
Name:
Title:

**EXHIBIT A**

Form of Bill of Sale, Assignment and Assumption Agreement

Active\112944894.v2-8/6/20
Active\113022373.v4-8/7/20

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of _____, 2020, by and among **METAL PARTNERS REBAR, LLC, BRG HOLDING, LLC, BGD LV HOLDING, LLC, and BCG OWNCO, LLC** (each a "Seller" and collective "Sellers"), and **JRC OPCO LLC** ("Purchaser").

## Recitals:

This Agreement is being executed in connection with that certain Asset Purchase Agreement dated as of _____, 2020 (the "Asset Purchase Agreement"), entered into by and among Purchaser and Sellers. Pursuant to the Asset Purchase Agreement, each Seller has agreed to sell to Purchaser and Purchaser has agreed to purchase from each Seller certain assets, properties and rights of the Seller, as more fully described in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the covenants and mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1. <u>Definitions; Construction</u>. Unless the context otherwise requires, all capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Asset Purchase Agreement. The covenants and agreements contained in this Agreement shall be governed by and subject to the terms of the Asset Purchase Agreement.

2. <u>Sale and Assignment.</u> Each Seller hereby sells, contributes, transfers, conveys, assigns and delivers to the Purchaser the Purchased Assets, free and clear of all Liens other than the Assumed Liabilities and Permitted Encumbrances as contemplated in accordance with the terms of the Asset Purchase Agreement.

3. <u>Assignment</u>. As of the date hereof, each Seller hereby transfers and assigns to Purchaser all of each Seller's rights, interests and benefits whatsoever in the Assumed Contracts, subject to and in accordance with the terms of the Asset Purchase Agreement.

4. <u>Assumption of Liabilities</u>. As of the date hereof, Purchaser hereby assumes and shall hereafter pay, discharge and perform the Assumed Liabilities set forth in the Asset Purchase Agreement.

5. <u>Further Assurances</u>. The parties agree that, at any time and from time to time after the execution of this Agreement, upon the request of the other party and at the requesting party's expense, they will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further acts, deeds, assignments, transfers, conveyances or assurances as may be required in order to consummate the transactions contemplated by this Agreement.

Active\112944894.v2-8/6/20
Active\113022373.v4-8/7/20

6.      Power of Attorney.  Each Seller hereby irrevocably designates, makes, constitutes and appoints Purchaser, its successors or assigns, the true and lawful attorney (and agent-in-fact) of each Seller with full power of substitution, for the benefit and at the expense of Purchaser, (a) where such proceedings cannot be in the name of Purchaser, its successors and assigns, to institute and prosecute all proceedings which Purchaser may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to any of the Purchased Assets, to defend or compromise any and all actions, suits or proceedings in respect of any of the Purchased Assets, and to do all such acts and things in relation thereto as Purchaser shall deem advisable; and (b) to endorse each Seller's name on any payment, instrument, notice, or other similar document or agreement relating to the Purchased Assets for the period commencing with the date hereof that may come in to the possession of Purchaser or under Purchaser's control with respect to the Purchased Assets.

7.      Purchase Agreement,  Nothing contained in this Bill of Sale and Assignment and Assumption Agreement shall be deemed to enlarge, modify, alter, supersede or otherwise affect any of the obligations, agreements, covenants, representations or warranties of the Purchaser or Sellers contained in the Asset Purchase Agreement.  If any conflict exists between the terms of this Bill of Sale and Assignment and Assumption Agreement and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and control.

8.      Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

9.      Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Illinois and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

10.     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

3

**PURCHASER:**

**JRC OPCO LLC**

By:_____
Name:
Title:

**SELLERS:**

**METAL PARTNERS REBAR, LLC**

By:_____
Name:
Title:

**BRG HOLDING, LLC**

By:_____
Name:
Title:

**BGD LV HOLDING, LLC**

By:_____
Name:
Title:

**BCG OWNCO, LLC**

By:_____
Name:
Title:

4

**DISCLOSURE SCHEDULES**

**to the**

**AMENDED ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**JRC OPCO LLC**

**AND**

**METAL PARTNERS REBAR, LLC, BRG HOLDING, LLC, BGD LV HOLDING, LLC AND BCG OWNCO, LLC**

**August __, 2020**

## Schedule 1.1(v)

## Leased Real Property

**BGD**

- 3101 East Craig Road, North Las Vegas, NV 89030

**BRG**

- 7621 S.E. Cannonball Road, Holt, Missouri 64048

**MPR**

- 302 Knights Run Ave., 1104, Tampa, FL 33602
- 20 Davidson Lane, New Castle, DE 19720
- 4531 Columbia Ave, Unit C, Hammond, IN 46327

**Schedule 2.1(a)**

**Acquired Owned Real Property**


**BGD**

- NONE

**BRG**

- NONE

**MPR**

- Leasehold Improvements located at:
    - 4531 Columbia Ave, Unit C, Hammond, IN 46327
    - 302 Knights Run Ave., #1104, Tampa, FL 33602
    - 20 Davidson Lane, New Castle, DE 19720
    - 3101 E. Craig Rd., N. Las Vegas, NV 89030

**BCG Ownco**

- 1800 White Lane, Bakersfield, California  93304

## Schedule 2.1(b)

## Assumed Contracts

**BGD**

- Industrial lease dated October 2017 for premises located at 3101 E. Craig Rd., North Las Vegas, Nevada.  Lease expiration 12/31/30.
- Separation Agreement dated 12/19/2016 with Jacob Gurke
- Joint Venture Agreement dated 3/1/2018 with Traxys North America LLC
- *See Schedule 2.1(i) for vehicle leases*

**BRG**

- Subcontractor Agreement with Advanced Concrete Technology, Inc. dated 1/17/2020
- Subcontract Agreement with Blattner Energy, Inc. dated 10/24/2019
- Subcontract Agreement with Briegan Concrete, LLC dated 9/18/2019
- Subcontract Agreement with Ceco Concrete Construction, LLC dated 2/19/2020
- Subcontract Agreement with Hausmann & Sons Construction, Inc. dated 2/22/2019
- Separation, Membership Interest Repurchase and Non-Disclosure Agreement with Jacob Gurke dated 12/17/2019
- Subcontract Agreement with M.A. Mortenson Company dated 4/19/2020
- Subcontract Agreement with Mid States Rebar and Supply LLC dated 4/14/2020
- Subcontract Agreement with PKG Contracting, Inc. dated 2/7/2020
- Consulting Agreement with Reinforcing Steel Installers, LLC dated 5/1/2019
- Rental Agreement for Premises known as "The 2nd Barn" located at 7621 S.E. Cannonball Road, Holt, Missouri.
- Consulting Agreement with Rosalio Marcial Castro dated 9/13/2019
- Truck Lease & Service Agreement with Ryder Truck Rental, Inc.
- Subcontractor Agreement with VAW Investors LLC dated 10/22/2019

**Schedule 2.1(b) (continued)**

**MPR**

- Office Lease dated 4/13/2017 for premises located at 302 Knights Run Ave., Tampa, Florida 33602, 11th Floor, Suite 1104
- Sublease Agreement dated 7/7/2016 for premises located at 4531 Columbia Ave., Hammond, Indiana.
- Notice party for Landlord of Office Lease dated 4/13/2017
  - o Crocker Partners Property Mngmt, LLC
- Month to month agreement for use of certain trucks and trailers, and Freight Carrier Agreement.
  - o F&M Transportation LLC
- Commercial Lease Agreement dated 7/24/2018 for premises located at 3933 75th Street, Ste. 101, Aurora, Illinois
  - o GSF Mortgage Corporation
- Notice party only for Commercial Lease Agreement dated 7/24/2018
  - o GSF Mortgage Corporation
- Notice party only for Landlord of Sublease Agreement between Debtor and Anco Steel Company, Inc.
  - o Hammond 4531 Columbia, LLC
- Severance Agreement dated 12/17/2019
  - o Jacob Gurke
- Employment Agreement dated 12/12/2016
  - o Michael P. Poff
- Coating Service Agreement
  - o Midwest Pipe Coating, Inc.
- Coating Services Agreement date 1/1/2016
  - o MPI Coating Services, LLC
- Blanket coverage, policy
  - o No. Y6307K771132, Phoenix Insurance Company
- Employment Agreement dated 8/11/2016
  - o Roger W. Look
- Employment Agreement dated 12/12/2016
  - o Ryan Humphreys
- General Guaranty Agreement dated 3/12/2018 for use of trucks owned by F&M Transportation, Inc. Through 9/30/23
  - o Ryder Truck Rental, Inc.
- Truck Lease & Service Agreement dated 2/16/2012; as amended and supplemented
  - o Ryder Truck Rental, Inc.
- Notice party only to Lease Agreement dated 3/15/2019 for premises located at 20 Davidson Lane, New Castle, Delaware Expires 3/31/24
  - o Store Capital Acquisitions, LLC
- Motor truck cargo legal liability coverage, policy no. C 6080208056
  - o The Continental Insurance Co.
- Employment Agreement dated 12/12/2016
  - o Thomas Grimme
- *See Schedule 2.1(i) for Vehicle Leases*

**Schedule 2.1(c)**

**Inventory**


**To Be Added by Sellers and Purchaser Within 14 Days**

**Schedule 2.1(e)**

**Intangible and Tangible Real Property**

**BGD**

- *See Schedule 2.1(i) for leased vehicles*

**BRG**

- *See Schedule 2.1(i) for leased vehicles*

**MPR**

- General office furniture and fixtures
- Office equipment, including all computer equipment and communication systems equipment and software
- *See Schedule 2.1(i) for vehicles*

111342383

**Schedule 2.1(f)**

**Permits**

**NONE**

**Schedule 2.1(g)**

**Intellectual Property Rights**

**BGD**

- NONE

**BRG**

- NONE

**MPR**

- ASA Manufacturing Control Software acquired by Applied Systems Associates, Inc.
- AVG 25 User License/Internet Security Business Edition acquired by Bryan Consulting Inc.
- Software License to operate Zebra Printer acquired by Applied Systems Associates
- Additional MetalTrax License acquired by Kimzey Software Solutions
- EDI System Programming acquired by Soule Software
- DB Upgrade acquired by Goldstar Software

## Schedule 2.1(i)

## Vehicles

**BGD**

Leased Vehicles

- HYG Financial Services, Inc.:
  - 2017 HYSTER Forklift, S/N: U005V05188R, MODEL #H11OFT
  - 2017 HYSTER FORKLIFT, S/N U005V05189R, MODEL #H110FT
  - 2018 HYSTER FORKLIFT, S/N KD19ED2090S, MODEL #H33DHD2
  - 2014 HYSTER Forklift, S/N: K006V02714M, MODEL #H155FT
  - 2015 HYSTER FORKLIFT, S/N: K007E02340N, MODEL #H250HD2

**BRG**

Leased Vehicles

- F&M Transportation LLC
  - 20 4x4 vehicles leased from

**MPR**

Owned Vehicles

- 2017 Land Rover
- 2017 Pacifica (USED)
- 2017 Pacifica (USED)

Leased Vehicles

- Equipment Leases with Xtra Lease:
  - 2019 Fontaine flat 53' trailer, VIN: 13N153203K1 533893
  - 2019 Fontaine flat 53' trailer, VIN: 13N153200K1533897
  - 2019 Fontaine flat 53' trailer, VIN: 13N153202K1533903
  - 2019 Fontaine flat 53' trailer, VIN: 13N153207K1537350
  - 2019 Fontaine flat 53' trailer, VIN: 13N153203K1537328
  - 2019 Fontaine flat 53' trailer, VIN: 13N148200G1516315
  - 2019 Fontaine flat 53' trailer, VIN: 13N148207G1516411
  - 2019 Fontaine flat 53' trailer, VIN: 13N153201G1515979
  - 2019 Fontaine flat 53' trailer, VIN: 13N153201G1515982
  - 2019 Fontaine flat 53' trailer, VIN: 13N153208H1520646
  - 2019 Fontaine flat 53' trailer, VIN: 13N153207H1520671
  - 2019 Fontaine flat 53' trailer, VIN: 13N15320XJ1525093
  - 2019 Fontaine flat 53' trailer, VIN: 13N153200J1525054
  - 2019 Fontaine flat 53' trailer, VIN: 13N153202H1520660
- Equipment Leases with TA Services Inc.:
  - 2011 Utility 53' Trailer, VIN: 1GRDM0628BH713446
  - 2011 Utility 53' trailer, VIN: lUYFS2538BA222710
  - 2012 Utility 53' trailer; VIN: lUYFS253XCA484004
  - 2011 Utility 53' trailer; VIN: lUYFS2538BA125703

111342383

- o 2011 Utility 53' trailer, VIN: lUYFS2533BA125706
- o 2011 Utility 53' trailer; VIN: lUYFS253XBA222711
- o 2013 Great Dane 53' trailer, VIN: 1GRDM062XDH71606
- o 2012 Utility 53' trailer; VIN: lUYFS2534CA48001
- o 2011 Utility 53' trailer, VIN: lUYFS2539BA22702
- Equipment Leases with Convoy Capital LLC:
  - o 2016 Fontaine 53', VIN: 13N1532C5G1518765
  - o 2016 Fontaine 53', VIN: 13N1532C7G1518766
  - o 2018 Freightliner Cascadia 125, VIN: 3AKJGLDR8JSJK6694
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C8G1518744
  - o 2016 Fontaine 53' trailer, VIN: 13N1532CXG 1518745
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C1G1518746
  - o 2018 Freightliner Cascadia 125 trailer, VIN: 3AKJGLDR4JSJK6692
  - o 2016 Fontaine 48' Extended trailer, VIN: 57J4482C9J3574562
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C2G1518741
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C4G1518742
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C6G1518743
  - o 2012 Utility 48' trailer, VIN: 1UYFS2484CA333933
  - o 11-53 foot Utility Flat Bed Trailers
  - o 1 Stretch Trailer
  - o 2012 Utility 48' trailer, VIN: 1UYFS2484CA395199
  - o 2012 Utility 48' trailer, VIN: 1UYFS2480CA204961
  - o 2012 Utility 48' trailer, VIN: 1UYFS2481CA333825
  - o 8 – 48 foot Flatbed Trailers
  - o 2012 Utility 4V trailer, VIN: lUYFS2484CA395199
  - o 2012 Utility 4V trailer, VIN: lUYFS2480CA204961
  - o 2012 Utility 4V trailer, VIN: lUYFS2481CA333825
  - o 2012 Utility 4V trailer; VIN: lUYFS2484CA395218
  - o 2012 Utility 4V trailer, VIN: lUYFS2489CA333863
  - o 2012 Utility 4V trailer; VIN: lUYFS2486CA395172
  - o 2012 Utility 4V trailer, VIN: lUYFS2480CA395121
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C7G 1518735
  - o 2016 Fontaine 53' trailer, VIN: 13N1532C9G 1518736
  - o 2016 Fontaine 53', VIN: 13N1532COG1518737
- Equipment Leases with Ryder
  - o 2016 Utility 40', 1UYFS2409GA514901
  - o 2016 Utility 40', 1UYFS2400GA515001
  - o 2015 Utility 53', 1UYFS253XFA336701
  - o 2015 Utility 53', 1UYFS2531FA336702
  - o 2015 Utility 53', 1UYFS2533FA336703
  - o 2015 Freightliner Cascadia, 3AKJGEBG7FDGM0211
  - o 2015 Freightliner Cascadia, 3AKJGEBG9FDGM0212
  - o 2015 Freightliner Cascadia, 3AKJGEBG0FDGM0213
  - o 2015 Freightliner Cascadia, 1FUJGEBG6FLGM0210
  - o 2015 Utility 53', 1UYFS2532FA336501
  - o 2015 Utility 53', 1UYFS2536FA336601
  - o 2015 Utility 53', 1UYFS2538FA336602

- o   2015 Freightliner Cascadia, 1FUJGEBG8FLGL8605
- o   2015 Freightliner Cascadia, 1FUJGEBGXFLGL8606
- o   2015 Utility 53', 1UYFS2532FA288501
- o   2015 Freightliner Cascadia, 3AKJGEBG9FSGK2076
- o   2015 Utility 53', 1UYFS2536FA288601
- o   2015 Freightliner Cascadia, 3AKJGEBG1FDGK2075
- o   2015 Freightliner Cascadia, 1FUJGEBG0FLGK2074
- o   2014 Freightliner Cascadia, 3AKJGEBG5ESFX9080
- o   2014 Utility 53', 1UYFS2536EA073301
- o   2014 Utility 53', 1UYFS2538EA073302
- Lease of 1987 6x4 Ottawa Yark Truck; SN: 323333 Yardtruck Specialists, Inc.

111342383

**Schedule 2.1(n)**

**Insurance Policies**

**BGD**

- NONE

**BRG**

- NONE

**MPR**

- Phoenix Insurance Company, Blanket Limit, Coverage for Blanket Building & BPP including Theft, Blanket BI & EE, Replacement Cost, Agreed Value & Equipment Breakdown BPP in Transit, Leased or Rented Equipment (Policy No.Y6307K771132)
- Charter Oak Fire Insurance, Automobile Liability and Hired Auto PD (Policy No. Y8407C54806A).
- Travelers Insurance Company, Umbrella Liability (Policy No. CUP1N696373)
- Travelers Property Casualty Company of America, Workers Compensation and Employers' Liability (Policy No.B7K796925; UB-7K796925-20-14-G)
- Travelers Property Casualty Company of America, Global Companion commercial general liability coverage – foreign liability (Policy No. ZPP-71M93331-20-GC)
- The Continental Insurance Company, inland marine (continental cargo and motoro truck cargo), (Policy No. C6080508056)

**Schedule 3.5**

**Required Consents**

**NONE**

111342383

**Schedule 3.6**

**Litigation**

**To Be Added by Sellers and Purchaser Within 14 Days**

**Schedule 3.7**

**Permit Violations**

**NONE**

111342383

**Schedule 3.10**

**Environmental Matters**

**NONE**

**Schedule 3.12**

**Employee Benefit Plans**

**To Be Added by Sellers and Purchaser Within 14 Days**

**Schedule 3.13**

**Taxes**

**To Be Added by Sellers and Purchaser Within 14 Days**

111342383

**Schedule 3.15**

**Material Property and Liability Insurance Policies**

**BGD**

- NONE

**BRG**

- NONE

**MPR**

- *See Schedule 2.1(n)*

# EXHIBIT B

**Exhibit B**

**Assigned Contracts and Leases**

| Debtor | Non-Debtor Counterparty | Contract/Lease | Cure Amount |
|---|---|---|---|
| BGD | Gatehouse Las Vegas R.E.I., Inc. | Industrial lease<br>Dated October 2017<br>3101 E. Craig Rd.<br>North Las Vegas, Nevada | $0 |
| BRG | Reinforcing Steel Installers, LLC | Rental Agreement<br>Dated December 1, 2019<br>7621 S.E. Cannonball Road,<br>Holt, Missouri | $0 |
| BRG | Reinforcing Steel Installers, LLC | Consulting Agreement<br>Dated May 1, 2019 | $0 |
| BRG | Advanced Concrete Technology, Inc. | Subcontract Agreement<br>Dated 1/17/2020 | $0 |
| BRG | Blattner Energy, Inc. | Subcontract Agreement<br>Dated 10/24/2019 | $0 |
| BRG | Briegan Concrete, LLC | Subcontract Agreement<br>Dated 9/18/2019<br>Subcontract Agreement<br>Dated 3/31/2020 | $0<br><br>$0 |
| BRG | Ceco Concrete Construction, LLC | Subcontract Agreement<br>Dated 2/19/2020 | $0 |
| BRG | Hausmann & Sons Construction, Inc. | Subcontract Agreement<br>Dated 2/22/2019 | $0 |
| BRG | M.A. Mortenson Company | Subcontract Agreement<br>Dated 4/19/2020 | $0 |
| BRG | Mid States Rebar and Supply LLC | Subcontract Agreement<br>Dated 4/14/2020 | $0 |
| BRG | PKG Contracting, Inc. | Subcontract Agreement<br>Dated 2/7/2020 | $0 |
| MPR | Phoenix Insurance Company | Blanket Coverage<br>Policy No. Y6307K771132 | $0 |
| MPR | The Continental Insurance Company | Motor Truck Cargo Coverage<br>Policy No. C 6080208056 | $0 |
| MPR | CIT Bank, N.A. | (Regents Capital Corporation)<br>Equipment Finance Agreement #153262<br>Dated 9/17/2019 | $0 |

37538139.1

| | | | |
|---|---|---|---|
| MPR/BRG | CrestMark Vendor Finance | (Regents Capital Corporation) Equipment Finance Agreement #153253 Dated 9/17/2019 | $0 |
| MPR | Wells Fargo Financial Leasing, Inc., agent for HYG Financial Services, Inc. | Master Lease Agreement No. xxx3134/Schedule No. xxxxxx4001 | $0 |
| MPR | Wells Fargo Financial Leasing, Inc., agent for HYG Financial Services, Inc. | Master Lease Agreement No. xxx3134/Schedule No. xxxxxx4002 | $0 |
| MPR | Wells Fargo Financial Leasing, Inc., agent for HYG Financial Services, Inc. | Master Lease Agreement No. xxx3134/Schedule No. xxxxxx4005 | $0 |
| BGD | Wells Fargo Financial Leasing, Inc., agent for HYG Financial Services, Inc. | Master Lease Agreement No. xxx9978/Schedule No. xxxxxx8001 | $0 |
| BGD | Wells Fargo Financial Leasing, Inc., agent for HYG Financial Services, Inc. | Master Lease Agreement No. xxx9978/Schedule No. xxxxxx8002 | $0 |

37538139.1